## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA, a )
Pennsylvania corporation, )
           )
           Plaintiff-Counterdefendant, )    Case No.: 08-CV-2187
           )
DISCOVER FINANCIAL SERVICES, )
a Delaware corporation; DISCOVER )
BANK, a Delaware chartered bank; )    Judge David H. Coar
DFS SERVICES LLC, a Delaware limited )    Magistrate Judge Sidney I. Schenkier
liability company; and DISCOVER )
PRODUCTS, INC., a Utah corporation, )
           )
           Defendants-Counterclaimants. )

## DEFENDANTS-COUNTERCLAIMANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING DUTY TO DEFEND

### Parties

1.     The Defendants-Counterclaimants in this action are Discover Financial Services, Discover Bank, DFS Services LLC, and Discover Products, Inc. (collectively "Discover").

2.     Defendant-Counterclaimant Discover Financial Services is a Delaware corporation with its principal place of business in Riverwoods, Illinois. (Tab A (Doc # 25) at 3 ¶ 5.)

3.     Defendant-Counterclaimant Discover Bank is a Delaware charted bank with its principal place of business in Greenwood, Delaware. (*Id*. at 3 ¶ 6.)

4.     Defendant-Counterclaimant DFS Services LLC is a limited liability corporation, with its sole member being Discover Financial Services, a publicly traded Delaware corporation with its principal place of business in Riverwoods, Illinois. (*Id*. at 3 ¶ 7, at 32 ¶ 4.)

5.     Defendant-Counterclaimant Discover Products, Inc., is a Utah corporation with its principal place of business in Riverwoods, Illinois. (*Id*. at 3 ¶ 8.)

6.      Plaintiff-Counterdefendant National Union Insurance Company of Pittsburgh, PA ("National Union") is a Pennsylvania corporation with its principal place of business in New York, New York.  (*Id*. at 2 ¶ 4.)

## Jurisdiction and Venue

7.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  (*Id.* at 4 ¶ 9.)

8.      This Court has personal jurisdiction over National Union because National Union actively sells insurance policies in the State of Illinois, including the Northern District, and is licensed to do business in the State of Illinois.  (Doc. #27 ¶ 8.)

9.      Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) and (c) in that several of the Discover entities reside in the Northern District, the insured risk is substantially in the Northern District of Illinois, and substantial parts of the events giving rise to this claim occurred within this judicial district, including Discover's advertising systems, which are primarily located in and controlled from Riverwoods, Illinois.  (Tab A (Doc # 25) ¶ 11.)

## National Union's Umbrella Insurance Policy

10.     On or before October 1, 1998, National Union issued a commercial umbrella insurance policy to Morgan Stanley Dean Witter & Co.  (Tab A (Doc # 25), Ex. 1; *see also* Doc. # 15 (National Union's First Amended Complaint) at Ex. C).

11.     National Union issued its policy No. BE 357-88-80 as a renewal of BE 357-12-60, effective October 1, 1998, through October 1, 2001, and extended by endorsement through October 1, 2002 (the "Policy").  (*Id*. at Title Page and Endorsement #11.)

12.    At the time the Policy issued, Discover was an insured because it was and is a wholly-owned subsidiary of Discover Financial Services, which in turn was owned at the time by Morgan Stanley. (*Id*. at § IV(E)(1)(a); Tab B (Weisman declaration) ¶¶ 2-4.)

13.    The Policy provides, *inter alia,* the following coverage for "advertising injury" claims:

## Insuring Agreements

### 1.    Coverage.

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of . . . **Advertising Injury** that takes place during the Policy Period and is caused by an **occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.
. . . .

### II.    Defense.

**A.**    We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when . . . (2) damages are sought for . . . **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

**B.**    When we assume the defense of any claim or suit: (1) we will defend any suit against the **Insured** seeking damages on account of . . . **Advertising Injury** even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle a claim as we deem expedient.
. . . .

### IV.    Definitions.

**A.**    **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses: . . . (3) misappropriation of advertising ideas or style of doing business . . . .
. . . .

3

> **H.    Occurrence** means: . . . (3) as respects **advertising injury**, an offense committed in the course of advertising your goods, products or services that results in **Advertising Injury**.

(Tab A (Doc #25), Ex. 1 at 1, 3 and 5; *see also* Doc #15 at Ex. C same pages)

### Background Regarding the Underlying Phoenix Action

14.    On August 31, 2007, Phoenix filed its original complaint against Discover.  (*Id.* at Ex. 2; *see also* Doc #1.)

15.    On November 9, 2007, Phoenix filed its First Amended Complaint in the Phoenix Action (the "Amended Complaint").  (*Id.* at Ex. 3; *see also* Doc #15.)

16.    Both complaint versions allege, in pertinent part, that Plaintiff Phoenix is the sole holder of the right, title, and interest in the following United States patents:

      a.    No. 5,987,434 (titled "Apparatus and Method for Transacting Marketing and Sales of Financial Products") (the "'434 Patent");

      b.    No. 6,076,072 (titled "Method and Apparatus for Preparing Client Communications Involving Financial Products and Services") (the "'072 Patent"); and

      c.    No. 6,999,938 (titled "Automated Reply Generation Direct Marketing System") (the "'938 Patent").  (*Id.* at Ex. 2 ¶ 1; Ex. 3 ¶ 1; hereinafter the "Patents In Suit".)

17.    Both complaint versions allege that LPL Licensing, LLC is the exclusive licensee of the Patents In Suit.  (*Id.*)

18.    Both complaint versions allege that Discover's use of Phoenix's patented technology for advertising the sale of financial products infringes the Patents In Suit.  (*Id.* at Ex. 2 ¶¶ 31, 37; Ex. 3 ¶¶ 35, 41.)

19.    Specifically, both complaint versions allege in pertinent part that Discover is infringing the '072 Patent which states that its claimed invention "relates to methods and apparatus for automatically preparing financial product and/or financial service-related

communications such as *advertisements, marketing solicitations, financial products sales solicitations*, notices and the like for dissemination to clients, potential clients, etc." (*Id*. at Ex. 3, Sub-Tab A, Col. 1:1-6) (emphasis added).

20.     The '072 Patent explains that "[t]he importance of widely-distributed written or printed client communications such as advertising, solicitations, etc. is well known in the marketing and advertising field.  Their applicability to the financial products and services industry also is well known." (*Id*. at Col. 1:24-29) (emphasis added).  The patent claims to cover "a marked departure from known *marketing* and financial product communication systems … in that they allow for the virtually complete automation of the tasks traditionally performed by people, agents, *salesmen*, and the like, and at substantially greater effort and expense." (*Id*. at Col. 3:16-21) (emphasis added).   All of the claims of the '072 Patent are directed toward variations on the use of "host vehicles" to send marketing communications to clients and prospective clients.  (*Id*. at Claims 1-134.)

21.     Both complaint versions also allege that Discover is infringing the '434 Patent, whose field of invention purports to encompass advertising activities by stating that "[t]he present invention relates to apparatus and methods for *marketing* financial products such as individual insurance policies."  (*Id*. at Sub-Tab B, Col. 1:1-3) (emphasis added).  Moreover, the detailed description of the '434 Patent's preferred embodiment and method provides that "the presently preferred embodiment of the invention comprises an apparatus and method for transacting the *marketing* and sales of financial products."   (*Id*. at Col. 5:44-51) (emphasis added).

22.     In relevant part**,** the specification descriptions of the '434 Patent also claim the invention of an "advertising activity" or "style of doing business," as those terms are used in the

5

insurance policy National Union issued to Discover, by specifically listing marketing/advertising activities as part of the claimed invention.  For example:

- Claim 1 of the '434 Patent:  "An apparatus for using client information about clients in the form of a plurality of client records to automatically select and *present financial products appropriate for each of the clients*, the apparatus comprising . . . means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client" (emphasis added) (*id.*, Tab B at Claim No. 1);

- Claim 2 of the '434 Patent:  "A method for using client information about clients comprising a plurality of client records to automatically select and *present financial products appropriate for the clients*" (emphasis added) (*id.* at Claim No. 2); and

- Claim 8 of the '434 Patent:  "An apparatus for using client information about clients to automatically select and *present financial products appropriate for each of the clients*, the apparatus comprising: . . . means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client" (emphasis added) (*id.* at Claim No. 8.)

23.     Various other claims within the '434 Patent also contain similar marketing/advertising activity language.  (*Id.* at Claim Nos. 14, 15, 16, 19, 28, 42 and 49.)

24.     Prior to being named as a defendant in the Phoenix Action, Discover had no knowledge that its website could purportedly infringe any of Phoenix's patents nor did it know of a known loss that required reporting to National Union.  (Tab B ¶ 5.)

## Discover's Tender Of The Phoenix Action To National Union And National Union's Refusal To Defend

25.     The Policy requires National Union to defend Discover where a claim or suit against Discover alleges facts potentially constituting an advertising injury that arises solely out of Discover's advertising activities, provided that such advertising activities allegedly involve the misappropriation of another's advertising ideas or style of doing business, and provided further that the advertising injury is not covered by any underlying insurance.  (Tab A (Doc #25), Ex. 1 at 1, 3 and 5.)

26.     After being served with the Phoenix Action, Discover tendered the matter to its underlying insurance carrier:  Liberty Mutual Insurance Company ("Liberty Mutual").  (Tab C.)

27.     Liberty Mutual provided primary insurance during the relevant times National Union provided commercial umbrella insurance to Discover.  (*Id*.)

28.     Liberty Mutual declined to defend Discover pursuant to its policies' blanket coverage exclusions for patent infringement claims arising from "bodily injury," "property damage," "advertising injury" or "personal injury."  (*Id*.)

29.     Discover subsequently provided National Union notice of the Phoenix Action and requested that National Union defend the Phoenix Action.  National Union refused to defend Discover in the Phoenix Action.  (Tab A (Doc # 25) at 7 ¶¶ 18-19.)

30.     Abandoned by National Union, Discover defended itself in the Phoenix Action. (*Id*.)


DATED:        September 8, 2008

                                                   DISCOVER FINANCIAL SERVICES,
                                                   DISCOVER BANK, DFS SERVICES LLC,
                                                   and DISCOVER PRODUCTS, INC.

                                                   By: /s/  Kimball R. Anderson
                                                        One of Their Attorneys


Kimball R. Anderson
Samuel Mendenhall
Giel Stein
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 (Telephone)
(312) 558-5700 (Facsimile)
kanderson@winston.com
smendenhall@winston.com
gstein@winston.com

CHI:1731254.1

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2008, I electronically filed DEFENDANTS-COUNTERCLAIMANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING DUTY TO DEFEND with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Richard H. Nicolaides, Jr.
Matthew J. Fink
Daniel I. Graham, Jr.
BATES & CAREY LLP
191 N. Wacker, Suite 2400
Chicago, Illinois 60606
(312) 762-3100 (Telephone)
(312) 762-3200 (Facsimile)

/s/  Samuel Mendenhall

## **Exhibit Index**

Tab A .............................................. Discover's Answer, Affirmative Defenses, and Counterclaim

    Ex. 1 ................................................................ National Union Insurance Policy

    Ex. 2 .............................................................. Phoenix Original Complaint

    Ex. 3 ............................................................Phoenix First Amended Complaint

        Sub tab A.................................................................................'072 Patent

        Sub tab B.................................................................................'434 Patent

        Sub tab C.................................................................................'938 Patent

Tab B.................................................................................Andrew Weisman Declaration

Tab C.........................................................................Liberty Mutual Letter to Discover

Tab D ........................................................................ *Hyundi Motors v. National Union*

# TAB A

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation, | ) ) ) ) | |
| Plaintiff-Counterdefendant, | ) ) | Case No.: 08-CV-2187 |
| DISCOVER FINANCIAL SERVICES, a Delaware corporation; DISCOVER BANK, a Delaware chartered bank; DFS SERVICES LLC, a Delaware limited liability company; and DISCOVER PRODUCTS, INC., a Utah corporation, | ) ) ) ) ) ) ) | Judge David H. Coar Magistrate Judge Sidney I. Schenkier |
| Defendants-Counterclaimants. | ) ) | |

### DEFENDANTS-COUNTERCLAIMANTS DISCOVER FINANCIAL SERVICES', DISCOVER BANK'S, DFS SERVICES LLC'S AND DISCOVER PROUCTS, INC.'S ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIM TO PLAINTIFF-COUNTERDEFENDANT NATIONAL UNION'S FIRST AMENDED COMPLAINT

Defendants-Counterclaimants Discover Financial Services, Discover Bank, DFS Services LLC and Discover Products, Inc. (collectively "Discover"), by and through their counsel, for their answer, affirmative defense and counterclaim to Plaintiff-Counterdefendant National Union Fire Insurance Company of Pittsburgh, PA's Complaint for Declaratory Judgment, state as follows:

### Nature of Action

1.      This is an action for declaratory judgment, brought pursuant to 28 U.S.C. §§ 2201 and 2202, wherein National Union seeks a declaration regarding its duties and obligations under certain umbrella liability insurance policies (collectively, the "Umbrella Policies") issued out of, and produced in, New York to Morgan Stanley and/or Discover Financial, Inc. as respects the patent infringement lawsuit entitled *Phoenix, LLC, et al. v. Chase Manhattan Mortgage Corporation, et al.,* filed in the United States District Court for the Eastern District of

Texas, Marshall Division (Civil Action No. 2:07-cv-00387-TJW-CE) (hereinafter the "Phoenix Action").

**ANSWER:**   Discover admits that this is a claim by National Union for declaratory judgment regarding its duties and obligations under certain commercial umbrella insurance policies issued to Morgan Stanley Dean Witter by National Union as its respects the Phoenix Action. Discover denies the remaining allegations of paragraph 1.


2.      Defendants Discover Financial Services, Discover Bank, Discover Services LLC and Discover Products, Inc. (collectively, "Discover") seek coverage with respect to the claims asserted in the Phoenix Action. National Union, in contrast, contends that the claims asserted in the Phoenix Action do not implicate coverage under National Union's insurance policies.

**ANSWER:**   Admitted.


3.      Accordingly, a real, substantial and justifiable controversy has arisen and now exists between National Union, on the one hand, and Discover, on the other, which controversy is subject to resolution by this Court under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:**   Admitted.


### Parties

4.      Plaintiff National Union is a corporation organized under the laws of the state of Pennsylvania with its principal place of business in New York, New York.

**ANSWER:**   Admitted.

5.      Upon information and belief, Defendant Discover Financial Services ("Discover Financial") is a Delaware corporation with its principal place of business in Riverwoods, Illinois.

**ANSWER:**    Admitted.

6.      Upon information and belief, Defendant Discover Bank ("Discover Bank") is a Delaware chartered bank with its principal place of business in New Castle, Delaware.

**ANSWER:**    Discover Bank admits that it is a Delaware chartered bank with its principal place of business in Greenwood, Delaware.  Discover denies the remaining allegations of paragraph 6.

7.      Upon information and belief, Defendant DFS Services LLC ("DFS") is a Delaware limited liability company with its principal place of business in Riverwoods, Illinois.

**ANSWER:**    Admitted.

8.      Upon information and belief, Discover Products, Inc. ("Discover Products") is a Utah corporation with its principal place of business in Riverwoods, Illinois.

**ANSWER:**    Admitted.

## Jurisdiction and Venue

9.    Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332(a)(1), because the Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:**   Admitted.

10.    Discover is subject to this Court's personal jurisdiction because it does and has done substantial business in this judicial district and derives substantial revenue from services provided to individuals in this State and in this District.

**ANSWER:**   Admitted.

11.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a)(1) and (c).

**ANSWER:**   Discover admits that venue is proper in this District under 28 U.S.C. § 1391. Discover denies the remaining allegations of paragraph 11.

## Factual Background

12.    Phoenix, LLC and LPL Licensing, LLC (collectively, "Phoenix") initiated the Phoenix Action on or about August 31, 2007, at which time Phoenix filed suit against Discover Financial and Discover Bank and others for their purported infringement of certain patents in which Phoenix purportedly has interest.  National Union attaches a true and correct copy of the original Complaint for Patent Infringement (the "Phoenix Complaint") as Exhibit "A" of its First Amended Complaint.

4

**ANSWER:**     Admitted.


13.    The Phoenix Complaint alleges that Discover Financial  and Discover Bank and

others infringed the following three U.S. Patents Nos.:  No. 5,987434 ("Appartus and Method

for Transacting, Marketing and Sales of Financial Products") (the "'434 Patent"); No. 6,076,072

("Method and Apparatus Preparing Client Communications Involving Financial Products and

Services") (the "'072 Patent"); and No. 6,999,938 ("Automated Reply Generation Direct

Marketing System") (the "'938 Patent") (collectively, the "Phoenix Patents-in-Suit").

**ANSWER:**     Admitted.


14.    Discover Financial and Discover Bank and their co-defendants are alleged in the

Phoneix Action to have willfully infringed one or more claims of the Phoenix Patents-in-Suit

by manufacturing, importing, using, selling, or offering for sale products and services that

infringe the claims of the Phoenix Patents-in-Suit and by contributing to or inducing others to

infringe the claims of the Phoenix Patents-in-Suit without a license or Phoenix's permission.

**ANSWER:**     Discover admits that the allegations in paragraph 14 are part of the

allegations set forth in the Phoenix Complaint.   Discover denies any characterization of the

Phoenix Complaint that is inconsistent with the actual allegations of the Phoenix Complaint.


15.    The Phoenix Complaint asserts the following causes of action: First Claim for

Patent Infringement – Infringement of the '434 Patent; Second Claim for Patent Infringement –

Infringement of the '072 Patent; and Third Claim for Patent Infringement – Infringement of the '938 Patent.

**ANSWER:**    Admitted.


16.    The Phoenix Complaint seeks injunctive relief, an award of costs of suit and attorneys' fees, an award of treble damages, and such other further relief as justice requires.

**ANSWER:**    Discover admits that the allegations contained in paragraph 16 are some of the relief sought by Phoenix in the Phoenix Complaint.  Discover denies any characterization of the Phoenix Action contained in paragraph 16 that is inconsistent with the actual allegations of the Phoenix Complaint.


17.    On or about November 9, 2007, Phoenix filed a First Amended Complaint for Patent Infringement in the Phoenix Action.  The factual and legal allegations in the Phoenix's First Amended Complaint for Patent Infringement are substantially similar to those contained in the Phoenix Complaint.   However, the First Amended Complaints names additional defendants, among them, DFS and Discover Products.   National Union attaches a true and correct copy of the Phoenix First Amended Complaint for Patent Infringement (without exhibits) (the "Phoenix Amended Complaint") as Exhibit "B" of its First Amended Complaint.

**ANSWER:**    Admitted.

18.    Discover has tendered the Phoenix Action to National Union and seeks defense and indemnity in the action under the Umbrella Policies' "Advertising Injury" and/or "Personal Injury and Advertising Injury" coverage.

**ANSWER:**    Admitted.


19.    National Union has denied coverage to Discover for the Phoenix Action as it does not involve or potentially involve damages for "Advertising Injury" or "Personal Injury and Advertising Injury" caused by an "Occurrence," and/or is otherwise excluded from coverage.

**ANSWER:**    Discover admits that National Union has denied coverage to Discover for the Phoenix Action.  Discover denies the remaining allegations of paragraph 19.


20.    Accordingly, a real, substantial and justifiable controversy has arisen and now exists between National Union, on the one hand, and Discover, on the other, which controversy is subject to resolution by this Court under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:**    Admitted.


### The Insurance Contracts
#### The 1998-05 Umbrella Policies

21.    National Union issued the following commercial umbrella policies: Policy No. BE 3578880 for the policy period effective October 1, 1998 to October 1, 2001, and extended to October 1, 2002 by endorsement (the "1998-02 Umbrella Policy"); Policy No. BE 2195452 for the policy period effective October 1, 2002 to October 1, 2003 (the "2002-03 Umbrella

Policy"); Policy No. BE 2977817 for the policy period effective October 1, 2003 to October 1, 2004 (the "2003-04 Umbrella Policy"); and Policy No. 2978252 for the policy period effective October 1, 2004 to October 1, 2005 (the "2004-05 Umbrella Policy") (collectively, the "1998-05 Umbrella Policies").  National Union attaches copies of the 1998-05 Umbrella Policies as Group Exhibit "C" to this First Amended First Amended Complaint.

    **ANSWER:**   Admitted.

22.    The 1998-05 Umbrella Policies include the following provisions:

**Insuring Agreements**

I.    **Coverage**

> We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world.  The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

*  *  *

II    **Defense**

> A.    We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:
>
> > 1.    The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by

8

payment of claims to which this policy applies; or

**2.** Damages are sought for **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

**ANSWER:** Discover admits the 1998-05 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 22 that are inconsistent with the provisions of the policies.


23. Section III, provision E of the Insuring Agreement in the 1998-05 Umbrella Policies contains the following provisions regarding the "Retained Limit";

**E.** **Retained Limit**

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit which is defined as the greater of either:

**1.** The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured**; or

**2.** The amount stated in the Declarations of Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the **Insured**;

and then up to an amount not exceeding the Each
Occurrence Limit as stated in the Declarations.

**ANSWER:**   Discover admits the 1998-05 National Union policies contain the above-
stated language. However, this language must be considered in the context of the entire policies.
Discover denies any characterizations of the policies contained in paragraph 23 that are
inconsistent with the provisions of the policies.

24.   The 1998-05 Umbrella Policies contain the following definitions:

A.   **Advertising Injury** means injury arising solely out of your
advertising activities as a result of one or more of the
following offenses:

1.   Oral or written publication of material that slanders
or libels a person or organization or disparages a
person's or organization's goods, products or
services;

2.   Oral or written publication of material that violates
a person's right of privacy;

3.   Misappropriation of advertising ideas or style of
doing business; or

4.   Infringement of copyright, title or slogan.

\*   \*   \*

H.   **Occurrence** means:

\*   \*   \*

3.   As respects **Advertising Injury**, an offense
committed in the course of advertising your goods,
products and services that results in **Advertising
injury**. All damages that arise from the same or
related injurious material or act shall be considered
as arising out of one **Occurrence,** regardless of the
frequency or repetition there of, the number and
kind of media used and the number of claimants.

10

**ANSWER:**   Discover admits the 1998-05 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 24 that are inconsistent with the provisions of the policies.

25.     The 1998-05 Umbrella Policies contain the following exclusions:

The insurance does not apply to ...

**K.**     **Personal Injury** or **Advertising Injury:**

1.     Arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity;

2.     Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

\*   \*   \*

**R.**     **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

1.     The purchase, sale, offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument ...

**ANSWER:**   Discover admits the 1998-05 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 25 that are inconsistent with the provisions of the policies.

### The 2005-06 Umbrella Policy

26.    National Union issued Commercial Umbrella Policy No. BE 4484949, effective

from October 1, 2005 to October 1, 2006 ("the 2005-06 Umbrella Policy").  National Union

attaches a copy of the 2005-06 Umbrella Policy as Exhibit "D" to this Complaint.

**ANSWER:**    Admitted.

27.    The 2005-06 Umbrella Policy includes the following provisions:

#### Insuring Agreements

**I.    Coverage**

> We will pay on behalf of the **Insured** those sums in excess
> of the Retained Limit that the **Insured** becomes legally
> obligated to pay by reason of liability imposed by law or
> assumed by the **Insured** under an **Insured Contract**
> because of the **Bodily Injury, Property Damage,
> Personal Injury** or **Advertising Injury** that takes place
> during the Policy Period and is caused by an **Occurrence**
> happening anywhere in the world.  The amount we will pay
> for damages is limited as described in Insuring Agreement
> III, Limits of Insurance.
>
> If we are prevented by law or statute from paying on behalf
> of the **Insured,** then we will, where permitted by law or
> statute, indemnify the **Insured** for those sums in excess of
> the Retained Limit.

*    *    *

**II.    Defense**

> **A.**    We shall have the right and duty to defend any
> claim or **suit** seeking damages covered by the terms
> and conditions of this policy when:
>
> > **1.**    The applicable Limits of Insurance of the
> > underlying policies listed in the Schedule of
> > Underlying Insurance and the Limits of

12

Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or

2. Damages are sought for **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

\* \* \*

## III. Limits of Insurance

\* \* \*

### E. Retained Limit

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit which is defined as the greater of either:

1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured**; or

2. The amount stated in the Declarations as Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor any other underlying insurance providing coverage to the **Insured**;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

\* \* \*

**ANSWER:**   Discover admits the 2005-06 National Union policy contains the above-stated language.  However, this language must be considered in the context of the entire policy.

Discover denies any characterization of the policy contained in paragraph 27 that is inconsistent with the provisions of the policy.

28.    The 2005-06 Umbrella Policy contains the following definitions:

**Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For purposes of this definition:

1.    Notices that are published include material placed on the Internet or on similar electronic means of communication; and

2.    Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.[1]

A.    **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses;

1.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2.    Oral or written publication of material that violates a person's right of privacy;

3.    The use of another's advertising idea in your **Advertisement**; or

4.    Infringement upon another's copyright, trade dress or slogan in your **Advertisement**.[2]

\* \* \*

H.    **Occurrence** means:

---

[1]  Definition added by the Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

[2]  As amended by Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

14

\*   \*   \*

    3.    As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising Injury**. All damages that arise from the same or related injurious material or act shall be considered as arising out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

**ANSWER:**   Discover admits the 2005-06 National Union policy contains the above-stated language. However, this language must be considered in the context of the entire policy. Discover denies any characterization of the policy contained in paragraph 28 that is inconsistent with the provisions of the policy.

29.    The 2005-06 Umbrella Policy contains the following exclusions:

This insurance does not apply to …

    K.    **Personal injury** or **Advertising Injury**:

        1.    Arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity;

        2.    Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

\*   \*   \*

    R.    **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

        1.    The purchase, sale, offer of sale or solicitation of any security, debt, bank deposit or financial interest or instrument …

\*   \*   \*

15

> **Personal Injury** or **Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.
>
> However, this exclusion does not apply to infringement, in your **Advertisement,** of copyright, trade dress or slogan.[3]

\*    \*    \*

**ANSWER:**    Discover admits the 2005-06 National Union policy contains the above-stated language.  However, this language must be considered in the context of the entire policy. Discover denies any characterization of the policy contained in paragraph 29 that is inconsistent with the provisions of the policy.

**The 2006-08 Umbrella Policies**

30.    National Union also issued Commercial Umbrella Policy No. BE 4485685, effective from October 1, 2006 to October 1, 2007, and Commercial Umbrella Policy No. 9835053, effective June 30, 2007 to June 30, 2008 (collectively "the 2006-08 Umbrella Policies").  National Union attaches copies of the 2006-08 Umbrella Policies as Group Exhibit "E" to this First Amended Complaint.

**ANSWER:**    Admitted.

31.    The 2006-08 Umbrella Policies include the following provisions:

I.    **INSURING AGREEMENT – COMMERCIAL UMBRELLA LIABILITY**

A.    We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by

---

[3] Exclusion added by Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

reason of liability imposed by law because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract.**

The amount we will pay for damages is limited as described in Section IV Limits of Insurance.

B.   This policy applies, only if:

   1.   the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**; and

   2.   the **Personal Injury and Advertising Injury** is caused by the **Occurrence** that takes place anywhere arising out of your business, but only if the **Occurrence** was committed during the **Policy Period.**

\*   \*   \*

## III.   DEFENSE PROVISIONS

A.   We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury, Property Damage** or **Personal Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when:

   1.   the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of **Loss** to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted; or[4]

   2.   the damages sought because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** would not be covered by **Scheduled Underlying Insurance** or any applicable **Other**

---

[4]   As amended by Endorsement No. 5, entitled "Miscellaneous Changes Endorsement."

17

**Insurance,** even if the total applicable limits of either the **Scheduled Underlying Insurance** or any applicable **Other Insurance** had not been exhausted by the payment of **Loss** …

B.    We will have no duty to defend the **Insured** against any **Suit** seeking damages for **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance does not apply.

\*    \*    \*

IV.    **LIMITS OF INSURANCE**

\*    \*    \*

M.    We will not make any payment under this policy unless and until:

1.    the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** have been exhausted by the payment of **Loss** to which this policy applies; and

2.    the total applicable **Self-Insured Retention** has been satisfied by the payment of **Loss** to which this policy applies.

**ANSWER:**    Discover admits the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 31 that are inconsistent with the provisions of the policies.

32.    The 2006-08 Umbrella Policies contain the following definitions:

A.    **Advertisement** mean a notice that is broadcast of published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

18

1.    notices that are published include material placed on the Internet or on similar electronic means of communication; and

2.    regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

\*　\*　\*

S.    **Occurrence** means:

\*　\*　\*

2.    as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

\*　\*　\*

U.    **Personal Injury and Advertising Injury** means injury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:

1.    false arrest, detention or imprisonment;

2.    malicious prosecution;

3.    the wrongful eviction from, wrongful entry into, or invasion of the right of privacy occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4.    oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5.    oral or written publication, in any manner, of material that violates a person's right of privacy;

6.    the use of another's advertising idea in your **Advertisement**; or

19

    7.      infringement upon another's copyright, trade dress or slogan in your **Advertisement**.

                            \*    \*    \*

Z.    **Retained Limit** means:

    1.      the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured**; or

    2.      the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** nor any applicable **Other Insurance** providing coverage to the **Insured**.

**ANSWER:**    Discover admits the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 32 that are inconsistent with the provisions of the policies.

33.    The 2006-08 Umbrella Policies contain the following exclusions:

This insurance does not apply to …

                            \*    \*    \*

L.    **Infringement of Copyright, Patent, Trademark or Trade Secret**

    This insurance does not apply to **Personal Injury and Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

    However, this exclusion does not apply to infringement, in your **Advertisement**, of copyright, trade dress or slogan.

                            \*    \*    \*

S.    **Securities**

    This insurance does not apply to any liability arising out of …

2.   the purchase, sale, offer of sale or solicitation of any
     security, debt, insurance policy, bank deposit or
     financial interest or instrument …

*   *   *

U.   **Various Personal Injury and Advertising Injury**

This insurance does not apply to **Personal Injury and
Advertising Injury**:

1.   caused by or at the direction of the **Insured** with the
     knowledge that the act would violate the rights of
     another and would inflict **Personal Injury and
     Advertising Injury**;

2.   arising out of oral, written or electronic publication,
     in any manner, of material if done by or at the
     direction of any **Insured** with knowledge of its
     falsity;

3.   arising out of oral, written or electronic publication,
     in any manner, of material whose first publication
     took place before the beginning of the **Policy
     Period**;

4.   arising out of a criminal act committed by or at the
     direction of the **Insured** …

**ANSWER:**   Discover admits the 2006-08 National Union policies contain the above-

stated language.  However, this language must be considered in the context of the entire policies.

Discover denies any characterizations of the policies contained in paragraph 33 that are

inconsistent with the provisions of the policies.

*   *   *

**COUNT I
DECLARATORY RELIEF
(No Exhaustion of Retained Limit)**

34.   National Union re-alleges the allegations of paragraph 1 through 33 above as if

fully set forth herein.

21

**ANSWER:**     Discover reincorporates its answers to paragraphs 1-33 of this Answer.

35.     The Umbrella Policies are only potentially implicated upon exhaustion of the Retained Limits to which they are excess.

**ANSWER:**     Discover admits that the policies' coverage is implicated upon exhaustion of the Retained Limits to which they are excess. Discover denies the remaining allegations of paragraph 35.

36.     Coverage is not provided to Discover for the claims asserted in the Phoenix Action because Discover has not met its burden of establishing that the Umbrella Policies' respective underlying Retained Limits have been exhausted.

**ANSWER:**     Denied.

## COUNT II
## DECLARATORY RELIEF
### (No "Advertising Injury" or "Personal Injury and Advertising Injury")

37.     National Union re-alleges the allegations of paragraphs 1 through 36 above as if fully set forth herein.

**ANSWER:**     Discover reincorporates its answer to paragraphs 1-36 of this Answer.

38.     The Phoenix Action does not seek damages for "Advertising Injury" caused by an "Occurrence," as those terms are defined by the 1998-05 and 2005-06 Umbrella Policies

(collectively, the "1998-06 Umbrella Policies"). Therefore, the Phoenix Action does not implicate the 1998-06 Umbrella Policies' "Advertising Injury" coverage.

**ANSWER:**　Denied.

39.　The Phoenix Action does not seek damages for "Personal Injury and Advertising Injury" caused by an "Occurrence," as those terms are defined by the 2006-08 Umbrella Policies. Therefore, the Phoenix Action does not implicate the 2006-08 Umbrella Policies' "Personal Injury and Advertising Injury" coverage.

**ANSWER:**　Denied.

## COUNT III
## DECLARATORY RELIEF
## (Application of Solicitation of Financial Instrument Exclusion)

40.　National Union re-alleges the allegations of paragraph 1 through 39 above as if fully set forth herein.

**ANSWER:**　Discover reincorporates its answers to paragraphs 1-39 above of this Answer.

41.　The Phoenix Action's claims against Discover allegedly arise out of the purchase, sale, offer of sale or solicitation of a security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**　Denied.

42.    Exclusion R of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of or by reason of the purchase, sale, offer of sale or solicitation of any security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**    Discover admits Exclusion R of the 1998-06 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 42 that are inconsistent with the provisions of the policies.

43.    Exclusion S of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of or by reason of the purchase, sale, offer of sale or solicitation of any security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**    Discover admits Exclusion S of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 43 that are inconsistent with the provisions of the policies.

44.    To the extent the Phoenix Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), or "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the Phoenix Action by Exclusions R and S, respectively.

**ANSWER:**    Denied.

24

## COUNT IV
## DECLARATORY RELIEF
### (Application of Patent Infringement Exclusions)

45.    National Union re-alleges the allegations of paragraphs 1 through 44 above as if fully set forth herein.

**ANSWER:**    Discover reincorporates its answers to paragraphs 1-44 of this Answer.

46.    The claims alleged in the Phoenix Action arise out of the alleged infringement of the Phoenix Patents-in-Suit.

**ANSWER:**    Admitted.

47.    The 2005-06 Umbrella Policy excludes coverage for "Advertising Injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**ANSWER:**    Discover admits the 2005-06 policy contains the above-stated language. However, this language must be considered in the context of the entire policy. Discover denies any characterization of the policy contained in paragraph 47 that is inconsistent with the provisions of the policy.

48.    Exclusion L of the 2006-08 Umbrella Policies ("Infringement of Copyright, Patent, Trademark or Trade Secret" exclusion) excludes coverage for "Personal Injury and

25

Advertising Injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**ANSWER:**    Discover admits Exclusion L of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 48 that are inconsistent with the provisions of the policies.

49.    To the extent that the Phoenix Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 2005-06 Umbrella Policy defines that term (which it does not), or "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the Phoenix Action by the above Patent Infringement exclusions.

**ANSWER:**    Denied.

### COUNT V
### DECLARATORY RELIEF
### (Application of Additional Personal Injury and Advertising Injury Exclusions)

50.    National Union re-alleges the allegations of paragraphs 1 through 49 above as if fully set forth herein.

**ANSWER:**    Discover reincorporates its answers to paragraphs 1-49 of this Answer.

51.    Discover is alleged to have willfully infringed the Phoenix Patents-in-Suit.

**ANSWER:**    Admitted.

52.    Exclusion K(1) of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of oral or written publication of material, if done by or at the direction of the "Insured" with knowledge of its falsity.

**ANSWER:**    Discover admits Exclusion K(1) of the 1998-06 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 52 that are inconsistent with the provisions of the policies.

53.    Exclusion U.1. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict Personal Injury and Advertising Injury.

**ANSWER:**    Discover admits Exclusion U.1 of the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. Discover denies any characterizations of the policies contained in paragraph 53 that are inconsistent with the provisions of the policies.

54.    Exclusion U.2. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any Insured with knowledge of its falsity.

27

**ANSWER:**    Discover admits Exclusion U.2 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 54 that are inconsistent with the provisions of the policies.

55.    Exclusion U.4. of the 2006-08 Umbrella Policies excludes coverage for Personal Injury and Advertising Injury" arising out of a criminal act committed by or at the direction of the Insured.

**ANSWER:**    Discover admits Exclusion U.4 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 55 that are inconsistent with the provisions of the policies.

56.    Upon information and belief Discover first used its allegedly infringing technology prior to the inception of one or more of the Umbrella Policies.

**ANSWER:**    Denied.

57.    Exclusion K(2) of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**ANSWER:**    Discover admits Exclusion K(2) of the 1998-06 National Union policies contain the above-stated language.  However, this language must be considered in the context of

the entire policies.  Discover denies any characterizations of the policies contained in paragraph 57 that are inconsistent with the provisions of the policies.

58.    Exclusion U.3. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of oral, written or electronic publication, in any manner, of material whose first publication took place before the beginning of the Policy Period.

**ANSWER:**    Discover admits Exclusion U.3 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  Discover denies any characterizations of the policies contained in paragraph 58 that are inconsistent with the provisions of the policies.

59.    To the extent the Phoenix Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), or "Personal Injury and Advertising Injury" cause by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the Phoenix Action by Exclusions K(1) and/or (2) of the 1998-06 Umbrella Policies, and by Exclusions U(1), (2), (3) and/or (4) of the 2006-08 Umbrella Policies.

**ANSWER:**    Denied.

29

## COUNT VI
## DECLARATORY RELIEF
### (No Coverage for Damages Outside of Policy Period)

60.    National Union re-alleges the allegations of paragraph 1 through 59 above as if fully set forth herein.

**ANSWER:**    Discover reincorporates its answers to paragraphs 1-59 of this Answer.

61.    In the alternative, to the extent the Phoenix Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), the 1998-06 Umbrella Policies do not cover liability for damages because of "Advertising Injury" that takes place outside of their respective policy periods.

**ANSWER:**    Denied.

62.    In the alternative, to the extent the Phoenix Action is construed as seeking damages for "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), the 2006-08 Umbrella Policies do not cover liability for damages because of "Personal Injury and Advertising Injury" that was caused by an "Occurrence" committed outside of their respective policy periods.

**ANSWER:**    Denied.

**Affirmative Defense**

Pursuant to the seminal case of *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 150-51, 708 N.E.2d 1122, 1134-35 (Ill. 1999) and its progeny, National Union is estopped from raising policy defenses under the various National Union policies because of its improper handling of Discover's request for coverage for the Phoenix Action.

WHEREFORE, Discover hereby requests that this Court enter judgment in its favor and against National Union and award Discover such other and further relief as this Court deems just and proper, including awarding Discover its attorneys' fees and costs.

## COUNTERCLAIM FOR DECLARATORY JUDGMENT AND BREACH OF CONTRACT

Counterclaimants Discover Financial Services, Discover Bank, DFS Services LLC and Discover Products, Inc. (collectively "Discover"), by their attorneys, complain of counterdefendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and state as follows:

## NATURE OF ACTION

1.      This is an action by Discover, as an insured under a National Union insurance policy, against National Union for declaratory judgment and breach of contract. A controversy exists between Discover and National Union over whether National Union has a duty to defend Discover in a lawsuit styled as *Phoenix Licensing, LLC, et al. v. Chase Manhattan Mortgage Corp., et al.*, filed in the United States District Court for the Eastern District of Texas, Case No. 2:07-cv-387 (TJW/CE) and now consolidated as *In re Phoenix Licensing, L.L.C., Patent Litigation* by the Judicial Panel on Multidistrict Litigation in the United States District Court for the District of Arizona, Case No. 2:08-md-1910 (the "Phoenix Action"). The Phoenix Action alleges that Discover's advertising, marketing and promoting the sale of financial products over

the internet, via direct marketing, and by targeted mass-mailing infringes various Phoenix

patents, at least two of which, according to Phoenix, cover patented advertising ideas or a

patented style of doing business. Consequently, the Phoenix Action triggers "advertising injury"

coverage under the National Union Policy and requires National Union to defend Discover.

National Union's refusal to do so constitutes an abandonment of Discover and has left Discover

to fend for itself in the Phoenix Action. Discover, therefore, seeks a declaratory judgment that

National Union is required to defend Discover in the Phoenix Action. Discover also seeks

damages for National Union's breach of its contractual agreement to defend Discover in the

Phoenix Action.

## **JURISDICTION AND VENUE**

2.      Counterclaimant Discover Financial Services is a Delaware corporation with its

principal place of business in Riverwoods, Illinois.

3.      Counterclaimant Discover Bank is a Delaware charted bank with its principal

place of business in Greenwood, Delaware.

4.      DFS Services LLC is a limited liability corporation with its sole member being

Discover Financial Services, a publicly traded Delaware corporation with its principal place of

business in Riverwoods, Illinois.

5.      Counterclaimant Discover Products, Inc. is Utah corporation with its principal

place of business in Riverwoods, Illinois.

6.      Counterdefendant National Union Insurance Company of Pittsburgh, PA is a

Pennsylvania corporation with its principal place of business in New York, New York.

7.      This is an action for breach of contract and declaratory relief pursuant to 28

U.S.C. § 2201. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332

in that complete diversity exists between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest.

8.     This Court has personal jurisdiction over National Union because National Union actively sells insurance policies in the State of Illinois, including the Northern District, and is licensed to do business in the State of Illinois.

9.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) and (c) in that several of the Discover entities reside in the Northern District, the insured risk is substantially in the Northern District of Illinois, and substantial parts of the events giving rise to this claim occurred within this judicial district, including Discover's advertising systems, which are primarily located in and controlled from Riverwoods, Illinois. The "advertising injury" coverage at issue looks to the location from which the advertising conduct of the insured emanates.

## FACTS
### National Union's Umbrella Insurance Policy

10.     National Union issued its policy No. BE 357-88-80 as a renewal of BE 357-12-60, effective October 1, 1998, through October 1, 2001, and extended by endorsement through October 1, 2002 (the "Policy"). A true and correct copy of the Policy is attached hereto as Exhibit 1.

11.     Under the Policy, Morgan Stanley Dean Witter & Co. is the named insured, with coverage extended to Discover, which at that time was a wholly owned subsidiary of Morgan Stanley. (*See* Ex. 1 § IV(E)(1)(a)).

12.     The Policy provides, *inter alia,* the following coverage for "advertising injury" claims:

**Insuring Agreements**

1.      **Coverage.**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of . . . **Advertising Injury** that takes place during the Policy Period and is caused by an **occurrence** happening anywhere in the world.  The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

. . . .

**II.      Defense.**

**A.**      We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when . . . (2) damages are sought for . . . **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

**B.**      When we assume the defense of any claim or suit: (1) we will defend any suit against the **Insured** seeking damages on account of . . . **Advertising Injury** even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle a claim as we deem expedient.

. . . .

**IV.      Definitions.**

**A.**      **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses: . . . (3) **misappropriation of advertising ideas** or **style of doing business** . . . .

. . . .

**H.**      **Occurrence** means: . . . (3) as respects **advertising injury**, an offense committed in the course of advertising your goods, products or services that results in **Advertising Injury**.

(Ex. 1 at 1, 3 and 5.)

### Background Regarding The Underlying Phoenix Action

13. On August 31, 2007, Phoenix filed its original complaint against Discover. A true and correct copy of the original complaint is attached hereto as Exhibit 2.

14. On November 9, 2007, Phoenix filed its First Amended Complaint in the Phoenix Action (the "Amended Complaint"). A true and correct copy of the Amended Complaint is attached hereto as Exhibit 3. Both the original and Amended complaints allege, in pertinent part, that Plaintiff Phoenix is the sole holder of the right, title, and interest in the following United States patents: No. 5,987,434 (titled "Apparatus and Method for Transacting Marketing and Sales of Financial Products") (the "'434 Patent); No. 6,076,072 (titled "Method and Apparatus for Preparing Client Communications Involving Financial Products and Services") (the "'072 Patent"); and No. 6,999,938 (titled "Automated Reply Generation Direct Marketing System") (the "'938 Patent") (hereinafter the "Patents In Suit"; Exs. 2-3 ¶ 1.)

15. The complaints also allege that LPL Licensing, LLC is the exclusive licensee of the Patents In Suit. (*Id.*)

16. The complaints further allege that Discover has and continues to infringe the Patents In Suit, by among other things using Phoenix's patented technology for advertising the sale of financial products. (*Id.*)

17. More specifically, the '072 Patent and the '434 Patent claim the patented idea of advertising, marketing and promoting the sale of financial products over the internet, via direct marketing, and by targeted mass-mailing. Indeed, the '072 Patent states that claimed invention "relates to methods and apparatus for automatically preparing financial product and/or financial service-related communications such as *advertisements, marketing solicitations, financial products sales solicitations, notices and the like for dissemination to clients, potential clients, etc.*" (Ex. 3, Tab A at Col. 1:1-6) (emphasis added).

18.    The '434 Patent also clearly purports to encompass advertising activities as evidenced by its field of invention which states "[t]he present invention relates to apparatus and methods for *marketing* financial products such as individual insurance policies." (Ex. 3, Tab B at Col. 1:1-3) (emphasis added).  Moreover, the detailed description of the preferred embodiment and method provides that "the presently preferred embodiment of the invention comprises an apparatus and method for transacting the *marketing* and sales of financial products." (*Id.* at Col. 5:44-51) (emphasis added).

19.    Numerous of the claims for the '434 Patent also specifically list marketing/advertising activities as part of the claimed invention:

| PATENT | CLAIM | RELEVANT LANGUAGE |
|--------|-------|-------------------|
| '434 | 1 | "An apparatus for using client information about clients in the form of a plurality of client records to automatically select and *present financial products appropriate for each of the clients*, the apparatus comprising . . . means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client" (emphasis added). |
| '434 | 2 | "A method for using client information about clients comprising a plurality of client records *to automatically select and present financial products appropriate for the clients*" (emphasis added). |
| '434 | 8 | "An apparatus for using client information about clients to automatically select and *present financial products appropriate for each of the clients*, the apparatus comprising: . . . means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client" (emphasis added). |

20.    Various others claims within the '434 Patent contain similar marketing/advertising activity language. (*See e.g.*, Ex. 3, Tab B at Claim Nos. 14, 15, 16, 19, 28, 42 and 49.)

21.    The '072 Patent is equally clearly directed to advertising and marketing.  The underlying invention "relates to methods and apparatus for automatically preparing financial product and/or financial service-related communications *such as advertisements, marketing*

*solicitations, financial product sales solicitations,* notices and the like *for dissemination to* clients, *potential clients*, etc." (Ex. 3, Tab A at Col. 1:12-18) (emphasis added).

22.     The '072 Patent goes on to explain that "[t]he importance of widely-distributed written or printed client communications such as advertising, solicitations, etc. is well known in the marketing and advertising field.  Their applicability to the financial products and services industry also is well known." (*Id.* at Col. 1:24-29) (emphasis added).  The patent claims to cover "a marked departure from known *marketing* and financial product communication systems … in that they allow for the virtually complete automation of the tasks traditionally performed by people, agents, *salesmen*, and the like, and at substantially greater effort and expense." (*Id.* at Col. 3:16-21) (emphasis added).

23.     All of the claims of the '072 Patent are directed toward variations on the use of "host vehicles" to send marketing communications to clients and prospective clients.  (*See, e.g.*, *id.* at Claims 1-134.)

24.     And the '938 Patent, in turn, is directed to "methods and apparatus for automatically preparing replies to each purchase or non-purchase response generated from *mass marketed communications delivered to clients for products or services, such as financial products and/or financial service-related communications*." (Ex. 3, Tab C at Col. 1:15-20) (emphasis added).

### National Union's Duty To Defend

25.     The Policy requires that National Union defend Discover where a claim or suit against Discover alleges facts potentially constituting an advertising injury that arises solely out of Discover's advertising activities, provided that such advertising activities allegedly involve the misappropriation of another's advertising ideas or style of doing business, and provided further that the advertising injury is not covered by any underlying insurance.

26.     Here, all three of the Patents In Suit reflect a claimed advertising idea or style of doing business.  Moreover, the original and Amended complaints allege that Discover has and continues to infringe "Phoenix's patented technology in products and services that they make, use import, sell and offer to sell, without Plaintiffs' permission."  (Exs. 2-3 ¶ 1).  Both complaints further allege facts that constitute advertising injury to Phoenix because at least some of the Patents In Suit can be infringed only by advertising activity.

27.     The alleged advertising injury is not covered by any underlying insurance available to Discover.

28.     Under the foregoing circumstances, National Union has a duty to defend Discover in the Phoenix Action.

### National Union's Breach Of Its Duty

29.     Discover tendered the Phoenix Action to its primary insurer, Liberty Mutual Insurance Company, which declined to defend Discover.  After Liberty Mutual's denial, Discover tendered the Phoenix Action to National Union and requested that National Union defend the Phoenix Action.

30.     National Union declined to defend Discover in the Phoenix Action.  Abandoned by National Union, Discover is defending itself in the Phoenix Action.

31.     Discover has complied with all of its obligations under the Policy.

### COUNT I
### DECLARATORY JUDGMENT

32.     Discover incorporates by this reference each and every allegation set forth in the preceding paragraphs of this Counterclaim as though fully realleged here.

33.     An actual controversy exists between the parties.  This Court has jurisdiction to enter a declaratory judgment concerning the respective rights and duties of the parties.

34.     National Union breached its duty to defend Discover in the Phoenix Action. Moreover, despite Discover's request for a defense, National Union has abandoned Discover and has left Discover to defend itself in the Phoenix Action.

35.     It is necessary and proper under the circumstances alleged herein that this Court adjudicate and declare that National Union: (a) had and has a duty to defend Discover under the Policy for all claims asserted in the Phoenix Action; (b) had and has breached its duty to defend Discover in the Phoenix Action; (c) had and has a duty to pay for Discover's retained counsel, which has been defending Discover against the claims made by Phoenix; and (d) is estopped from asserting any defenses to Discover's claim that National Union is obligated to defend Discover in the Phoenix Action.

WHEREFORE, Discover respectfully requests that this Court enter a declaration that:

(1)     National Union had and has a duty to defend Discover under the Policy for all claims asserted in the Phoenix Action;

(2)     National Union has breached its duty to defend Discover in the Phoenix Action;

(3)     National Union is estopped from asserting policy defenses to defending the Phoenix Action;

(4)     National Union had and has a duty to pay for Discover's retained counsel, which has been defending Discover against the claims made by Phoenix; and

(5)     grant such other and further relief as the Court deems proper under the evidence and circumstances.

## COUNT II
## BREACH OF CONTRACT

36.     Discover incorporates by this reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged here.

39

37.    National Union owed Discover a duty of defense in the Phoenix Action under the Policy.

38.    National Union breached its duty to defend Discover in the Phoenix Action.

39.    As a direct and proximate result of the breach of contract by National Union, Discover has suffered and continues to suffer damages in the form of defense costs and other related expenses.

WHEREFORE, Discover respectfully requests that this Court:

(1)    enter judgment for Discover and against National Union in an amount of compensatory damages proximately caused by National Union's breach of contract;

(2)    award Discover prejudgment interest and attorneys fees pursuant to Illinois statute; and

(3)    grant such other and further relief as the Court deems proper under the evidence and circumstances.

> Respectfully submitted,
> DISCOVER FINANCIAL SERVICES,
> DISCOVER BANK, DFS SERVICES LLC, and
> DISCOVER PRODUCTS, INC.
>
> By:  /s/  Kimball R. Anderson _____
>
>         Kimball R. Anderson
>         Samuel Mendenhall
>         Giel Stein
>         WINSTON & STRAWN LLP
>         35 West Wacker Drive
>         Chicago, Illinois 60601
>         (Tel): (312) 558-5600
>         (Fax): (312) 558-5700
>         kanderson@winston.com
>         smendenhall@winston.com
>         gstein@wiston.com

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on June 30, 2008, I electronically filed the foregoing DEFENDANTS-COUNTERCLAIMANTS' ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIM TO NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA'S COMPLAINT FOR DECLARATORY JUDGMENT with the Clerk of the Court for the Northern District of Illinois using the ECF System, which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Richard H. Nicolaides, Jr.
Matthew J. Fink
Daniel I. Graham, Jr.
Bates & Carey LLP
191 North Wacker Drive
Suite 2400
Chicago, Illinois 60606

/s/  Samuel Mendenhall

# Exhibit 1



# COMMERCIAL UMBRELLA DECLARATIONS

## NATIONAL UNION FIRE INSURANCE COMPANY
## OF PITTSBURGH, PA.

A CAPITAL STOCK Company

ADMINISTRATIVE OFFICES
70 PINE STREET, NEW YORK, NEW YORK 10270-0150

**POLICY NUMBER:** BE 357 88 80

**RENEWAL OF:** BE 357 12 60

**PRODUCER NAME:** MARSH & MCLENNAN GLOBAL BROKING
**ADDRESS:** 1166 AVENUE OF THE AMERICAS
NEW YORK       NY 10036-0000

**ITEM 1. NAMED INSURED:** MORGAN STANLEY DEAN WITTER & CO.
**ADDRESS:** 1585 BROADWAY
NEW YORK, NY 10036

**ITEM 2. POLICY PERIOD:** FROM OCTOBER 01, 1998    TO:    OCTOBER 01, 2001    AT
12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3. LIMITS OF INSURANCE**

The Limits of Insurance, subject to all the terms of this policy, are:

A. $25,000,000    Each Occurrence

B. $25,000,000    General Aggregate ( in accordance with Section III, Limits of Insurance)

C. $25,000,000    Products-Completed Operations Aggregate ( in accordance with Section III, Limits of Insurance)

D. $    10,000    Self Insured Retention

> NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES
> ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW
> YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH
> FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
> THE NEW YORK INSURANCE DEPARTMENT.

**ITEM 4. PREMIUM COMPUTATION**

| ESTIMATED EXPOSURE | RATE/ PER | ADVANCE PREMIUM | MINIMUM PREMIUM |
|---|---|---|---|
| N/A | FLAT | $277,368 | $277,368 |

**ITEM 5. ENDORSEMENTS ATTACHED:** SEE ATTACHED SCHEDULE

COUNTERSIGNED _____ BY _____

DATE                                                            AUTHORIZED REPRESENTATIVE



MARSH Global Broking Inc.
Received

AUG -9 1999

Excess Casualty

57696 (6/93)

 

## ENDORSEMENT #0011

This endorsement, effective 12:01 a.m.        10/01/00        forms a part of

Policy NO.:      BE 357 88 80        issued to:      MORGAN STANLEY DEAN WITTER & CO.

by        NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## <u>EXTENSION ENDORSEMENT</u>

In consideration of an additional premium of $119,700, it is agreed that the expiration date of this policy is amended to October 1, 2002.

All other terms and conditions of this policy remain unchanged.

NOV ~ 2 2000

_____
Authorized Representative




## ENDORSEMENT #0010

This endorsement, effective 12:01 a.m.          10/01/98          forms a part of

Policy NO.:     BE 357 88 80          Issued to:     MORGAN STANLEY DEAN WITTER & CO.

by     NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

# GENERAL AGGREGATE AMENDATORY ENDORSEMENT

Our General Aggregate Limit of Insurance shown in Item 3B of the Declarations applies separately in excess of each Aggregate Limit provided by the policy or policies listed in the Schedule Of Underlying Insurance

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

57724 (8/93)

NOV - 2 2000



ISSUED TO:  MORGAN STANLEY DEAN WITTER & CO.

POLICY# BE 357 88 80

# SCHEDULE OF ENDORSEMENTS

ENDORSEMENT #001    Schedule of Underlying Insurance

ENDORSEMENT #002    Named Insured Endorsement

ENDORSEMENT #003    Foreign Liability Follow Form Endorsement

ENDORSEMENT #004    Named Peril and Time Element Pollution Endorsement

ENDORSEMENT #005    Employee Benefits Liability Follow Form Endorsement

ENDORSEMENT #006    Cross Suits Endorsement

ENDORSEMENT #007    Professional Liability Exclusion Endorsement

ENDORSEMENT #008    Financial Institutions Endorsement

ENDORSEMENT #009    Sexual Abuse and Molestation Exclusion Endorsement

ENDORSEMENT #009    New York Amendatory Endorsement

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES
ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW
YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH
FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
THE NEW YORK INSURANCE DEPARTMENT.

d. after ●●●●nce of the policy or after the las●●●●●●al date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

e. material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

f. required pursuant to a determination by the New York Superintendent of Insurance that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interests of our insureds, our creditors or the public;

g. a determination by the New York Superintendent of Insurance that the continuation of the policy would violate, or would place us in violation of, any provision of the New York Insurance Law;

h. revocation or suspension of an insured's license to practice his profession; or

i. where we have reason to believe that there is a probable risk or danger that you will destroy or permit the destruction of the insured property for the purpose of collecting the insurance proceeds. provided, however, that;

   (1) a notice of cancellation on this ground shall inform you in plain language that you must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (3) of this subparagraph i.;

   (2) notice of cancellation on this ground shall be provided simultaneously by us to the department; and

   (3) upon your written request made to the department within ten days from your receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not we have satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.

Our notice of cancellation shall specify the ground for such cancellation.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Page 2 of 4

4.    The policy period will end on the day and hour stated in the cancellation notice.

5.    If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

6.    If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

7.    Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

8.    The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

9.    Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

10.    We shall mail to you and to your authorized insurance agent or broker, written notice indicating our intention:

a.    not to renew this policy;

b.    to condition its renewal upon change of limits, change in type of coverage, reduction of coverage, increased deductible or addition of exclusions or upon increased premiums in excess of ten percent; (exclusive of any premium increase generated as a result of increased exposure units or as a result of experience rating, loss rating, or audit);

c.    that the policy will not be renewed or will not be renewed upon the same terms, conditions or rates; such alternative renewal notice must be mailed or delivered on a timely basis and advise you that a second notice shall be mailed at a later date indicating our intention as specified in subparagraph a. or b. of this paragraph 10. and that coverage shall continue on the same terms, conditions and rates as expiring, until the later of the expiration date or Sixty (60) days after the second notice is mailed or delivered; such alternative renewal notice also shall advise you of the availability of loss information and, upon written request, we shall furnish such loss information within twenty days to you.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

11. A nonrenewal notice as specified in subparagraph a., a conditional renewal notice as specified in subparagraph b. and the second notice described in subparagraph c. of paragraph 10. shall contain the specific reason or reasons for nonrenewal or conditional renewal, and set forth the amount of any premium increase and nature of any other proposed changes.

12. the notice required by paragraph 10. shall be mailed at least Sixty (60) but not more than One Hundred Twenty (120) days in advance of the end of the policy period.

13. If we employ an alternative renewal notice as authorized by subparagraph c. of paragraph 10. we shall provide coverage on the same terms, conditions, and rates as the expiring policy, until the later of the expiration date or Sixty (60) days after the mailing of the second notice described in such subparagraph.

14. Prior to the expiration date of the policy, in the event that an incomplete or late conditional renewal notice or a late nonrenewal notice is provided by us, the policy period shall be extended, at the same terms and conditions as the expiring policy and at the lower of the current rates or the prior period's rates, until Sixty (60) days after such notice is mailed, unless you elect to cancel sooner.

15. In the event that a late conditional renewal notice or a late nonrenewal notice is provided by us on or after the expiration date of the policy, coverage shall remain in effect on the same terms and conditions of the expiring policy for another required policy period, and at the lower of the current rates or the prior period's rates unless you during the additional required policy period have replaced the coverage or elect to cancel, in which event such cancellation shall be on a pro rata premium basis.

16. Nothing herein shall be construed to limit the grounds for which we may lawfully rescind this policy or decline to pay a claim under this policy.

17. Notice required herein to be mailed to you shall be mailed to you at the address shown in Item 1 of the Declarations.

18. Notice required to be mailed to us shall be mailed to us at the address shown. When other first class mail is used the post mark date of such notice when sent by registered, certified or other first class mail shall be equivalent to mailing.

The 19. Proof of mailing of such notice as aforesaid shall be sufficient proof of notice. policy period shall terminate at the effective date and hour of cancellation or nonrenewal specified in such notice.

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

 

## ENDORSEMENT #008

This endorsement, effective 12:01 a.m.    10/01/98    forms a part of

Policy NO.:    BE 357 88 80

issued to:    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## SEXUAL ABUSE OR MOLESTATION EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of:

1. The actual, threatened or alleged sexual abuse, sexual molestation, sexual assault, sexual victimization, physical abuse, physical assault, any resulting mental or emotional injury or any coercion to engage in sexual activities on the part of any employee, assistant, volunteer or member of any facility owned, operated or maintained by the insured; or

2. The negligent employment, investigation, supervision, reporting to the proper authorities or failure to so report or retention of any employee, assistant, volunteer or member of any facility owned, operated or maintained by the insured whose conduct would be excluded by paragraph 1. above.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative



**ENDORSEMENT #007**

This endorsement, effective 12:01 a.m.          10/01/98          forms a part of

Policy NO.:    BE 357 68 80                    issued to:    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## FINANCIAL INSTITUTIONS ENDORSEMENT

This insurance does not apply to:

1.  Bodily Injury or Property Damage arising out of the ownership, maintenance, operations, use, loading or unloading of any aircraft or watercraft in which the Insured has any financial interest;

2.  Bodily Injury or Property Damage to or arising out of any property held by or in the care, custody or control of the Insured while the Insured is acting in any fiduciary capacity;

3.  Property Damage to money, currency, coin, bank notes, Federal Reserve notes, postage and revenue stamps, U.S. Savings Stamps, bullion, precious metals of all kinds and in any form, articles made from such precious metals, jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, bonds, securities, evidences of debts, debentures, script, certificates, receipts, warrants, rights, transfers, coupons, drafts, bills of exchange, acceptances, notes, checks, withdrawal orders, money orders, travelers, checks, letters of credit, bills of leding, abstracts of title, insurance policies, deeds, mortgages upon real estate and/or upon chattels and upon interests therein, and assignments of such policies, mortgages and instruments, other valuable papers and documents, and all other instruments similar to or in the nature of the foregoing; or

4.  Any damages arising out of any act, error, or omission of any Insured or any agent or sub-agent of any Insured while acting in any fiduciary capacity.

The term "fiduciary capacity" as used in this endorsement shall include, but not by way of limitation:

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

... under a will or personal trust agreement, ... agent or sub-agent for any of the ... manager of real or personal property; or

... registrar, agent for voting trustees, warrant agent, depository, or agent for voting trustees, warrant agent, depository, or agent for committee of holders of stock or securities, escrow agent or in any similar trust capacity, including trustee under a corporate bond indenture, a sinking fund agent or receiver or trustee appointed by any court in receivership, bankruptcy or re-organization proceedings.

All other terms and conditions of this policy remain unchanged.

57709 (6/93)

_____
Authorized Representative




ENDORSEMENT #006

This endorsement, effective 12:01 a.m.    10/01/98    forms a part of

Policy NO.:    BE 357 88 80

issued to:    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## PROFESSIONAL LIABILITY EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the Insured or any person for whom the Insured is legally responsible.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.    HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative





ENDORSEMENT #005

This endorsement, effective 12:01 a.m.        10/01/98        forms a part of

Policy NO.:        BE 357 88 80        issued to:        MORGAN STANLEY DEAN WITTER & CO.

by        NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## CROSS SUITS EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of any injuries initiated, alleged, or caused to be brought about by a Named Insured covered by this policy against any other Named Insured covered by this policy.

All other terms and conditions of this policy remain unchanged.

_____
Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.



ENDORSEMENT #004 

This endorsement, effective 12:01 a.m.    10/01/98    forms a part of

Policy NO.:    BE 357 88 80    Issued to:    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## EMPLOYEE BENEFITS LIABILITY FOLLOW-FORM ENDORSEMENT
### (CLAIMS MADE VERSION)

### PROVIDES CLAIMS MADE COVERAGE -- PLEASE READ CAREFULLY

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of any negligent act, error or omission of the Insured or of any other person for whom the Insured is legally liable in the administration of the Insured's Employee Benefit Programs as defined herein.

However, if insurance for such Bodily Injury, Property Damage, Personal Injury or Advertising Injury is provided by a policy listed in the Schedule of Underlying Insurance:

1.    This exclusion shall not apply; and

2.    The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance; and

3.    Solely as respects the Employee Benefits Liability, our policy will provide coverage for a claim made against the Insured during our policy period.

> NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES
> ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW
> YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH
> FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
> THE NEW YORK INSURANCE DEPARTMENT.

If the insurance provided by the policy listed in the Schedule of Underlying Insurance provides coverage for Occurrences occurring on or after a specified Retroactive Date or for claims made during an Extended Reporting Period, the insurance provided by our policy will also provide such coverage.

For the purposes of this endorsement, the following definitions apply:

1.    Employee Benefit Programs shall mean Group Life Insurance, Group Accident or Health Insurance, Pension Plans, Employee Stock Subscription Plans, Worker's Compensation, Unemployment Insurance, Social Security and Disability Benefits.

57828 (06/93)

Page 1 of 2




2.    <u>Administration</u> shall mean:

A.    Giving counsel to employees with respect to Employee Benefits Programs;

B.    Interpreting Employee Benefits Programs;

C.    Handling of records in connection with Employee Benefits Programs; or

D.    Effecting enrollment of employees under Employee Benefit Programs;

Provided all such acts are authorized by you.

All other terms and conditions of this policy shall remain unchanged.

_____
(Authorized Representative)

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

57826 (06/93)



**ENDORSEMENT #003**

This endorsement, effective 12:01 a.m.          10/01/98          forms a part of

Policy NO.:    BE 357 88 80          issued to:          MORGAN STANLEY DEAN WITTER & CO.

by          NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## NAMED PERIL AND TIME ELEMENT POLLUTION ENDORSEMENT

Exclusion M of this policy is hereby deleted in its entirety and replaced by the following:

This insurance does not apply to:

1.     Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2.     Any loss, cost or expense arising out of any governmental direction or request that we, the insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

3.     Any loss, cost, or expense, including but not limited to costs of investigation or attorney's fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

As used in this exclusion, pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. waste material includes materials which are to be or have been recycled, reconditioned or reclaimed.

However, this exclusion does not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

1.     Any discharge, dispersal, seepage, migration, release or escape directly or indirectly caused by fire, explosion, lightning, windstorm, vandalism or malicious mischief, riot and civil commotion, flood, earthquake, collision, or upset of a motor vehicle, mobile equipment or aircraft, automatic sprinkler leakage;

2.     The Products - Completed Operations Hazard; or

 

3.  Any discharge, dispersal, seepage, migration, release or escape of pollutants that meets all of the following conditions:

    a.   It was accidental and neither expected nor intended by the Named Insured. This condition would not serve to deny coverage for a specific incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the Insured to mitigate or avoid a situation where substantial third party Bodily Injury, Property Damage or Personal Injury could occur; and

    b.   It was demonstrable as "having commenced on a specific date during the term of this policy; and

    c.   Its commencement became known to the Named Insured within twenty (20) calendar days and was further reported to the Risk Management Department within a reasonable time frame; and

    d.   Its commencement was reported in writing to us within eighty (80) calendar days of becoming known to the Risk Management Department; and

    e.   Reasonable effort was expended by the Named Insured to terminate the situation as soon as conditions permitted.

However, nothing contained in this Provision 3. shall operate to provide any coverage with respect to:

    a.   Any site or location principally used by the Insured, or by others on the Insured's behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material;

    b.   Any fines or penalties;

    c.   Any clean up costs ordered by the Superfund Program, or any federal, state, ~~NOTICE: RESIDUAL MARKET ASSIGNMENT APPLICABLE RATED~~ However, this specific ~~RECLASSIFICATION BY FILING REQUIREMENTS OF THE NEW~~ coverage for third party clean ~~YORK STATE INSURANCE DEPARTMENT HAVE SUCH~~ arrangement simply because ~~FORMS AND RATES MUST MEET THE MINIMUM STANDARDS~~ of an environmental authority; ~~THE NEW YORK INSURANCE DEPARTMENT~~

    d.   Acid rain.

    e.   Clean up, removal, containment, treatment, detoxification or neutralization of pollutants situated on premises the Insured owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said pollutants; or

 

It is further agreed that solely as respects any coverage granted by this endorsement:

1.    The Self Insured Retention in Item 3. D. of the Declarations is amended to $1,000,000;

2.    In Section II, Defense, provision A. 2 is hereby deleted in its entirety; and

3.    We will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

It is further agreed that in the event of a disagreement as to the interpretation of this endorsement, the disagreement shall be submitted to binding arbitration before a panel of three (3) arbitrators. Within thirty (30) days of a written request for arbitration by either you or us, each party will choose an arbitrator. If the two arbitrator are unable to agree within one month upon the third arbitrator, such arbitrator shall at the request of either party be selected by the American Arbitration Association in accordance with its rules and procedures.

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the third arbitrator. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud and gross misconduct by the arbitrators. The award will be issued within thirty (30) days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly and equally share with the other the expense of the third arbitrator and of the arbitration.

The arbitration proceedings shall take place in or in the vicinity of New York, N.Y. The procedural rules applicable to this arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

All other terms and conditions remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

_____
Authorized Representative

 

## ENDORSEMENT #002

This endorsement, effective 12:01 a.m.          10/01/98          forms a part of

Policy NO.:      BE 357 88 80

issued to:      MORGAN STANLEY DEAN WITTER & CO.

by      NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## FOREIGN LIABILITY FOLLOW-FORM ENDORSEMENT

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury that occurs outside the United States of America, its territories and possessions, Puerto Rico and Canada.

However, if insurance for such Bodily Injury, Property Damage, Personal Injury or Advertising Injury is provided by a policy listed in the Schedule of Underlying Insurance:

1.   This exclusion shall not apply; and

2.   The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule Of Underlying Insurance.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative



ENDORSEMENT #001

This endorsement, effective 12:01 a.m.    10/01/98    forms a part of

Policy NO.:    BE 357 88 80    issued to    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## NAMED INSURED ENDORSEMENT

It is hereby understood and agreed, Item #1, Named Insured of the Declarations Page is amended to read as follows:

Morgan Stanley Dean Witter & Co. and/or all subsidiaries, affiliates, related companies and joint ventures as they may now exit or hereafter be constituted. The terms "subsidiaries, affiliates, related companies and joint ventures" shall mean those companies or other legal entities in which the named insured has 50% or more ownership interest and/or managing control.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

AUTHORIZED REPRESENTATIVE




ISSUED TO: MORGAN STANLEY DEAN WITTER & CO.

POL. NO.: BE 357 88 80

# SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF COVERAGE | INSURER POLICY NO. POLICY DATE | LIMITS OF LIABILITY |
|---|---|---|
| COMMERCIAL GENERAL LIABILITY | FEDERAL INS. CO. #35321673 10/01/98 - 10/01/01 | $1,000,000 EACH OCCURRENCE $1,000,000 PRODUCTS/COMPLETED OPERATIONS AGGREGATE $1,000,000 NON-OWNED & HIRED CAR LIABILITY $1,000,000 PERSONAL & ADV INJURY $3,000,000 GENERAL AGGREGATE-PER LOC. |

*NOTE:    COVERAGE IS PROVIDED ANYWHERE IN THE WORLD.

| | | |
|---|---|---|
| COMMERICAL GENERAL LIABILITY PUERTO RICO | FEDERAL INS. CO. #35291609 10/01/98 - 10/01/99 | $1,000,000 EACH OCCURRENCE $1,000,000 GENERAL AGGREGATE $1,000,000 PRODUCTS/COMPLETED OPERATIONS AGGREGATE $1,000,000 PERSONAL & ADV INJURY $ 100,000 PROPERTY DAMAGE TO RENTED PREMISES LIMIT $ 10,000 MEDICAL EXPENSE |
| COMMERCIAL AUTO LIABILITY | LIBERTY MUTUAL INS. CO. #AS2621-004305-068 10/01/98 - 10/01/99 | $1,000,000 COMBINED SINGLE LIMIT |
| EMPLOYERS LIABILITY UNITED STATES | LIBERTY MUTUAL INS. CO #WA262D004305016 #WC2631004305178 #EW762N004305098 10/01/98 - 10/01/99 | $1,000,000 EACH ACCIDENT $1,000,000 POLICY LIMIT $1,000,000 EACH EMPLOYEE |
| EMPLOYERS LIABILITY UNITED KINGDOM | INDEPENDENT INS. CO. LTD #023223/01/98 | 10,000,000 ANY ONE EVENT BRITISH POUNDS |
| EMPLOYEE BENEFITS LIABILITY | FEDERAL INS. CO. #35291609 10/01/98 - 10/01/01 | $1,000,000 EACH CLAIM $1,000,000 AGGREGATE LIMIT |
| AIRCRAFT LIABILITY | ASSOC. AVIATION UNDERWRITERS #BHV-309009 06/30/98 - 06/30/99 AND RENEWAL POLICY | COMBINED SINGLE LIMIT $300,000,000 PER OCCURRENCE ANNUAL AGGREGATE WHERE APPLICABLE |



## Commercial Umbrella Policy Form

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured as defined in Insuring Agreement IV, Definitions. The words "we", "us" and "our" refer to the Company providing this insurance. The word "Insured" means any person or organization qualifying as such in Insuring Agreement IV, Definitions.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree with you to provide coverage as follows:

### Insuring Agreements

**I.    Coverage**

We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by law or statute, indemnify the Insured for those sums in excess of the Retained Limit.

**II.    Defense**

**A.**    We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:

1.    The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or

2.    Damages are sought for Bodily Injury, Property Damage, Personal Injury or Advertising Injury covered by this policy but not by the underlying policies listed in the Schedule of Underlying Insurance.

*[stamp: NOTE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.]*

**B.**    When we assume the defense:

1.    We will defend any suit against the Insured seeking damages on account of Bodily Injury, Property Damage, Personal Injury or Advertising Injury even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle the claim as we deem expedient.

2.    We will pay the following, to the extent that they are not included in the underlying policies listed in the Schedule of Underlying Insurance or in any other insurance providing coverage to the Insured:

a.    premiums on bonds to release attachments for amounts not exceeding our Limits of Insurance, but we are not obligated to apply for or furnish any such bond;

b.    premiums on appeal bonds required by law to appeal any claim or suit we defend, but we are not obligated to apply for or furnish any such bond;

c.    all costs taxed against the Insured in any claim or suit we defend;

57697 (6-93)                                                (1)

d. ██████ent interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

e. all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within our applicable Limit of Insurance;

f. the Insured's expenses incurred at our request.

We will not defend any suit or claim after our applicable Limits of Insurance have been exhausted by payment of judgments or settlements.

All expenses we incur in the defense of any suit or claim are in addition to our Limits of Insurance.

C. In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

III.    Limits of Insurance

A.   The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay regardless of the number of:

1.    Insureds;

2.    Claims made or suits brought; or

3.    Persons or organizations making claims or bringing suits.

B.   The General Aggregate Limit is the most we will pay for all damages covered under Insuring Agreement I except:

1.   Damages included in the Products-Completed Operations Hazard; and

2.   Coverages included in the policies listed in the Schedule of Underlying Insurance to which no underlying aggregate limit applies.

C.   The Products-Completed Operations Aggregate Limit is the most we will pay for all damages included in the Products-Completed Operations Hazard.

D.   Subject to B. and C. above, the most we will pay for the sum of damages covered ████████████████████████ Bodily Injury, Property Damage, Personal Injury and ████████████████████████████████████

If the applicable limits of ████████████████████████████ Schedule of Underlying Insurance or of other insurance providing coverage to the Insured are reduced or exhausted by payment of one or more claims that would be insured by our policy we will:



1.   In the event of reduction, pay in excess of the reduced underlying limits of insurance; or

2.   In the event of exhaustion of the underlying limits of insurance, continue in force as underlying insurance.

The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

57697 (6 93)                                            (2)

E.    Retained Lim, 

We will be liable only for that portion of damages in excess of the Insured's Retained Limit which defined as the greater of either:

1.    The total of the applicable limits of the underlying policies listed in the Schedule of Underly: Insurance and the applicable limits of any other underlying insurance providing coverage to tl Insured; or

2.    The amount stated in the Declarations as Self Insured Retention as a result of any o Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insuran nor by any other underlying insurance providing coverage to the Insured;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

IV.    Definitions

A.    Advertising Injury means injury arising solely out of your advertising activities as a result of one or mo of the following offenses:

1.    Oral or written publication of material that slanders or libels a person or organization or disparage a person's or organization's goods, products or services;

2.    Oral or written publication of material that violates a person's right of privacy;

3.    Misappropriation of advertising ideas or style of doing business; or

4.    Infringement of copyright, title or slogan.

B.    Auto means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including an attached machinery or equipment. But auto does not include mobile equipment.

C.    Bodily Injury means bodily injury, sickness, disability or disease. Bodily Injury shall also mean menu injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness disability or disease.

D.    Impaired Property means tangible property, other than Your Product or Your Work, that cannot b used or is less useful because:

1.    It incorporates Your Product or Your Work that is known or thought to be defective, deficient inadequate or dangerous; or

2.    You have failed to fulfill the terms of the contract or agreement.

if such property can be restored to use by:

1.    The repair, replacement, adjustment or removal of Your Product or Your Work; or

2.    Your fulfilling the terms of the contract or agreement.

E.    Insured means each of the following, to the extent set forth:

1.    The Named Insured, meaning:

a.    any person or organization listed in Item 1 of the Declarations, and any company that is your subsidiary as of the effective date of this policy and any company you own or contro as of the effective date of this policy; and

b.    any organization newly acquired, controlled or formed by you during the policy period but only:

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

57697 (6 93)                                (3)

respects Occurrences taking place after you acquire, take control or form suc organization;

2) if such organization is included under the coverage provided by the policies listed i the Schedule of Underlying Insurance; and

3) if you give us prompt notice after you acquire, take control or form suc organization.

We may make an additional premium charge for any additional organizations you acquire form or take control of during the period of this policy.

2. If you are an individual, you and your spouse, but only with respect to the conduct of a business of whic you are the sole owner.

3. If you are a partnership or joint venture, the partners or members and their spouses but only as respect the conduct of your business.

No person or organization is an insured with respect to the conduct of any current or past partnershi or joint venture that is not shown as a Named Insured in the Declarations.

4. Any person or organization, other than the Named Insured, included as an additional insured in th policies listed in the Schedule of Underlying Insurance but not for broader coverage than is available t such person or organization under such underlying policies.

5. Any of your partners, executive officers, directors, stockholders or employees but only while acting within their duties.

However, the coverage granted by this provision 5. does not apply to the ownership, maintenance, use loading or unloading of any autos, aircraft or watercraft unless such coverage is included under th policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provide under such underlying policies.

6. Any person, other than one of your employees, or organization while acting as your real estate manager.

7. Any person, organization, trustee or estate to whom you are obligated by a written insured Contract t provide insurance such as is afforded by this policy but only with respect to:

   a. liability arising out of operations conducted by you or on your behalf; or

   b. facilities owned or used by you.

8. Any person (other than your partners or your employees) o organization with respect to any auto owned or operated by or on your behalf an used with your permission.

However, the coverage granted by this provision 8. does not apply to any person using an auto whil working in a business that sells, services, repairs or parks autos unless you are in that business.

F. Insured Contract means any oral or written contract or agreement entered into by you and pertaining to you business under which you assume the tort liability of another party to pay for Bodily Injury, Property Damage Personal Injury or Advertising Injury to a third person or organization. Tort liability means a liability tha would be imposed by law in the absence of any contract or agreement.

G. Mobile Equipment means any of the following types of land vehicles, including any attached machinery o equipment:

   1. Buildozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   2. Vehicles maintained for use solely on or next to premises you own or rent;

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

57697 (6 93)                                  (4)

3.   Vehicles that ～～ or crawler treads;



4.   Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounte

   a.   power cranes, shovels, loaders, diggers or drills; or

   b.   road construction or resurfacing equipment such as graders, scrapers or rollers;

5.   Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primar to provide mobility to permanently attached equipment of the following types:

   a.   air compressors, pumps and generators, including spraying, welding, building cleann geophysical exploration, lighting and well servicing equipment; or

   b.   cherry pickers and similar devices used to raise or lower workers;

6.   Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than th transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are n mobile equipment but will be considered autos:

   a.   equipment designed primarily for:

     1)   snow removal;

     2)   road maintenance, but not construction or resurfacing; or

     3)   street cleaning;

   b.   cherry pickers and similar devices mounted on automobile or truck chassis and used to raise c lower workers; and

   c.   air compressors, pumps and generators, including spraying, welding, building cleaning geophysical exploration, lighting and well servicing equipment.

**H.   Occurrence means:**

1.   As respects Bodily Injury or Property Damage, an accident, including continuous or repeate exposure to conditions, which results in Bodily Injury or Property Damage neither expected no intended from the standpoint of the insured. All such exposure to substantially the same genera conditions shall be considered as arising out of one Occurrence.

2.   As respects Personal Injury, an offense committed in the course of your business which results in Personal Injury All damages that arise from the same, repeated, or continuing injurious material or act, or out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants, shall be considered as arising out of one Occurrence.

NOTICE! THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

3.   As respects Advertising Injury, an offense committed in the course of advertising your goods, products and services that results in Advertising Injury. All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency o repetition thereof, the number and kind of media used and the number of claimants.

**I.   Personal Injury means injury other than Bodily Injury or Advertising Injury arising out of one or more of the following offenses:**

1.   False arrest, detention or imprisonment;

2.   Malicious prosecution;

3.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

57897 (6 83)

4. Oral or written ██████ of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

J. 1. **Products-Completed Operations Hazard** includes all Bodily Injury and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except:

    a.    products that are still in your physical possession; or

    b.    work that has not yet been completed or abandoned.

  2.  Your Work will be deemed completed at the earliest of the following times:

    a.    When all of the work called for in your contract has been completed.

    b.    When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

    c.    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  3.  This hazard does not include Bodily Injury or Property Damage arising out of:

    a.    the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading of it;

    b.    the existence of tools, ████████████

K.    **Property Damage** means:

  1.  Physical injury to tangible property ████████████ of use shall be deemed to occur at the time of the physical injury that caused it; or

  2.  Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the Occurrence that caused it.

*[stamp:]* NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

L.    **Suit** means a civil proceeding in which Bodily Injury, Property Damage, Personal Injury or Advertising Injury to which this insurance applies is alleged. Suit includes:

  1.  An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

  2.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

M.    **Your Product** means:

  1.  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    a.    you;

    b.    others trading under your name; or

    c.    a person or organization whose business or assets you have acquired; and

S7697 (5/93)

2.   Conta█████(other than vehicles) materials, parts or equipment furnished in connection with su goods or products.

Your Product includes:

1.   Warranties or representations made at any time with respect to the fitness, quality, durabil performance or use of Your Product; and

2.   The providing of or failure to provide warnings or instructions.

Your Product does not include vending machines or other property rented to or located for the use others but not sold.

N.   Your Work means:

1.   Work or operations performed by you or on your behalf; and

2.   Materials, parts or equipment furnished in connection with such work or operations.

O.   Your Work includes:

1.   Warranties or representations made at any time with respect to the fitness, quality, durabili performance or use of Your Work; and

2.   The providing of or failure to provide warnings or instructions.

V.   **Exclusions**

This insurance does not apply to:

A.   Any obligation of the insured under a Workers Compensation, Unemployment Compensation Disability Benefits Law, or under any similar law.

B.   Any obligation of the insured under the Employees' Retirement Income Security Act of 1974 or an amendments to that act.

C.   Any obligation of the insured under a "No Fault", "Uninsured Motorist" or "Underinsured Motorist" law.

D.   Property Damage to :

   1.   Property you own, rent, occ█████

   2.   Personal property in the care, custody or control of the insured.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

E.   Property Damage to Impaired Property or property that has not been physically injured, arising out of

   1.   A defect, deficiency, inadequacy or dangerous condition in Your Product or Your Work; or

   2.   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement ir accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidenta physical injury to Your Product or Your Work after it has been put to its intended use.

F.   Property Damage to Your Product arising out of it or any part of it.

G.   Property Damage to Your Work arising out of it or any part of it and included in the Products-Completed Operations Hazard.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

H.   Damages cla.... any loss, cost or expense incurred b....u a..thers for the loss of use, withdrawal recall, Inspection, repair, replacement, adjustment, removal or disposal of:

   1.   **Your Product;**

   2.   **Your Work;** or

   3.   **Impaired Property**

If such product, work or property is withdrawn or recalled from the market or from use by any person o organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

I.   Liability of any employee with respect to Bodily Injury or Personal Injury to another employee of the same employer injured in the course of such employment.

However, if insurance for such liability is provided by a policy listed in the Schedule of Underlying Insurance:

   1.   This exclusion shall not apply; and

   2.   The insurance provided by our policy will not be broader than the insurance coverage provided to the employee by the policy listed in the Schedule of Underlying Insurance.

J.   Bodily Injury or Property Damage arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft or any aircraft owned by the Insured or rented to the Insured without i crew.

However, if insurance for such Bodily Injury or Property Damage is provided by a policy listed in the Schedule of Underlying Insurance:

   1.   This exclusion shall not apply; and

   2.   The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

K.   Personal Injury or Advertising Injury:

   1.   Arising out of oral or ... with knowledge of its ...

   2.   Arising out of oral or ... beginning of the policy period;

   3.   Arising out of the willful violation of a penal statute or ordinance committed by or with the consen of the Insured; or

   4.   For which the Insured has assumed liability in a contract or agreement. This exclusion does nc apply to liability for damages that the Insured would have in the absence of the contract c agreement.

L   Advertising Injury arising out of:

   1.   Breach of contract, other than misappropriation of advertising ideas under an implied contract;

   2.   The failure of goods, products or services to conform with advertised quality or performance;

   3.   The wrong description of the price of goods, products or services; or

   4.   An offense committed by an Insured whose business is advertising, broadcasting, publishing c telecasting.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

M.  1.  Bodily ⬤, ⬤ ⬤roperty Damage or Personal Injury ⬤⬤ ⬤ arising out of the actual or threatene discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2.  Any loss, cost or expense arising out of any governmental direction or request that we, th insured or any other person or organization test for, monitor, clean-up, remove, contain, trea detoxify, neutralize or assess the effects of pollutants; or

3.  Any loss, cost, or expense, including but not limited to costs of investigation or attorneys' feer incurred by a governmental unit or any other person or organization to test for, monitor, clean-up remove, contain, treat, detoxify or neutralize pollutants.

This exclusion M. shall not apply to Bodily Injury, Property Damage or Personal Injury arisin out of:

a.  Heat, smoke or fumes from a hostile fire;

b.  The upset, overturn or collision of a motor vehicle; or

c.  The Products-Completed Operations Hazard;

if insurance for such Bodily Injury, Property Damage or Personal Injury is provided by a polic listed in the Schedule of Underlying Insurance. However, the insurance provided by our policy fo such Bodily Injury, Property Damage or Personal Injury will not be broader than the insuranc coverage provided by the policy listed in the Schedule of Underlying Insurance.

As used in this exclusion:

a.  Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste materia includes materials which are intended to be or have been recycled, reconditioned o reclaimed;

b.  A hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

N.  Bodily Injury or Property Damage due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

O.  Bodily Injury or Property Damage arising out of the use of reasonable force to protect persons or property.

However, this exclusion does not apply to Bodily Injury resulting from the use of reasonable force to protect persons or property.

[stamped box overlapping text:] NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

P.  1.  Bodily Injury, Property Damage or Personal Injury arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2.  Any obligation of the Insured to indemnify any party because of damages arising out of such Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3.  Any obligation to defend any suit or claim against the Insured alleging Bodily Injury, Property Damage or Personal Injury and seeking damages, if such suit or claim arises from Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

Q.    Bodily Injury ⬤ ___onal Injury to:

1.    A person arising out of any:

   a.    Refusal to employ that person;

   b.    Termination of that person's employment; or

   c.    Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2.    The spouse, child, parent, brother or sister of that person as a consequence of Bodily Injury or Personal Injury to that person at whom any of the employment-related practices described in paragraph a., b. or c. above is directed.

This exclusion applies:

1.    Whether the Insured may be liable as an employer or in any other capacity; and

2.    To any obligation to share damages with or repay someone else who must pay damages because of the injury.

R.    Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of or by reason of:

1.    The purchase, sale, offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument;

2.    Any representations made at any time in relation to the price or value of any security, debt, bank deposit or financial interest or instrument; or

3.    Any depreciation or decline in price or value of any security, debt, bank deposit or financial interest or instrument.

S.    Bodily Injury or Property Damage for which any Insured may be held liable by reason of:

1.    Causing or contributing to the intoxication of any person;

2.    The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol;

3.    Any statute, ordinance ___ ___ use of alcoholic beverages.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

However, if insurance for such Bodily Injury or Property Damage is provided by a policy listed in the Schedule of Underlying Insurance:

1.    This exclusion shall not apply; and

2.    The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

T.    Bodily Injury or Property Damage:

1.    a.    with respect to which the Insured is also an Insured under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

57697 (6·93)                              (10)

**i. b.** ⬤ from the hazardous properties of n⬤ ⬤ ⬤ material and with respect to which (1) any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, (2) the Insured is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

**2.** Bodily Injury or Property Damage resulting from the hazardous properties of nuclear material if:

**a.** the nuclear material (1) is at any nuclear facility owned by the Insured or operated by the Insured or on the Insured's behalf, or (2) has been discharged or dispensed therefrom;

**b.** the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the Insured or on the Insured's behalf; or

**c.** the Bodily Injury or Property Damage arises out of the furnishing by the Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to Property Damage to such nuclear facility and any property thereat.

**3.** As used in this exclusion:

**a.** "hazardous properties" includes radioactive, toxic or explosive properties;

**b.** "nuclear material" means source material, special nuclear material or by-product material;

**c.** "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

**d.** "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

**e.** "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under the paragraphs

**f.** "nuclear facility" means

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

**1)**

**2)** any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging wastes;

**3)** any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the Insured's custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

**4)** any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**g)** "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

h) P⬤  ⬤ Damage includes all forms of radio⬤⬤ ⬤ ⬤tamination of property.

## VI.    Conditions

### A.    Appeals

If the Insured or the Insured's underlying insurers do not appeal a judgment in excess of the Retained Limit, we have the right to make such an appeal. If we elect to appeal, our liability on such an award or judgment shall not exceed our Limits of Insurance as stated in Item 3 of the Declarations plus the cost and expense of such appeal.

### B.    Audit

We may audit and examine your books and records as they relate to this policy at any time during the period of this policy and for up to three years after the expiration or termination of this policy.

### C.    Bankruptcy or Insolvency

Your bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of your underlying insurers will not relieve us from the payment of any claim covered by this policy.

But under no circumstances will such bankruptcy, insolvency or inability to pay require us to drop down and replace the Retained Limit or assume any obligation within the Retained Limit area.

### D.    Cancellation

1.    You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.    We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason , we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3.    The policy period will end on the day and hour stated in the cancellation notice.

4.    If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

5.    If you cancel, final premium will be more than pro rata. It will be based on the time this policy was in force and increased by our short rate table. However, final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

6.    Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representatives' check, mailed or delivered, shall be sufficient tender of any refund due you.

7.    The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8.    Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

57697 (6 93)                                    (12)

**E.  Changes**  

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waive or a change in any part of this policy. This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

**F.  Duties In The Event Of An Occurrence, Claim Or Suit**

1.  You must see to it that we are notified as soon as practicable of an Occurrence which may result in a claim under this policy. To the extent possible, notice should include:

   a.  how, when and where the Occurrence took place;

   b.  the names and addresses of any injured persons and witnesses; and

   c.  the nature and location of any injury or damage arising out of the Occurrence.

2.  If a claim is made or suit is brought against any Insured that is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

3.  You and any other Involved Insured must:

   a.  immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

   b.  authorize us to obtain records and other information;

   c.  cooperate with us in the investigation, settlement or defense of the claim or suit; and

   d.  assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

4.  No Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**G.  Inspection**

We have the right, but are not obligated, to inspect your premises and operations at any time. Our inspections are not safety inspections. They relate only to the insurability of your premises and operations and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person or organization to provide for the health or safety of your employees or the public. We do not warrant that your premises or operations are safe, healthful or that they comply with laws, regulations, codes or standards.

EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW
YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH
FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
THE NEW YORK INSURANCE DEPARTMENT.

**H.  Legal Actions Against Us**

There will be no right of action against us under this insurance unless:

1.  You have complied with all the terms of this policy; and

2.  The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability.

**I.  Maintenance of Underlying Insurance**

During the period of this policy, you agree:

1.  To keep the policies listed in the Schedule of Underlying Insurance in full force and effect;

57697 (6 93)                                    (13)

2. That an ⬤⬤als or replacements of the policies ⬤⬤⬤ the Schedule of Underlying Insurance will not be more restrictive in coverage;

3. That the limits of insurance of the policies listed in the Schedule of Underlying Insurance shall not change except for any reduction or exhaustion of aggregate limits by payment of claims for Occurrences covered by this policy; and

4. That the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not materially change during the period of this policy.

If you fail to comply with these requirements, we will only be liable to the same extent that we would had you fully complied with these requirements.

J.    Other Insurance

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

K.    Premium

The first Named Insured designated in Item 1 of the Declarations shall be responsible for payment of all premiums when due.

The premium for this policy shall be computed on the basis set forth in Item 4 of the Declarations. At the beginning of the policy period, you must pay us the Advance Premium shown in Item 4 of the Declarations.

When this policy expires or if it is cancelled, we will compute the earned premium for the time this policy was in force. If this policy is subject to audit adjustment, the actual exposure basis will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, you will promptly pay us the difference. If the earned premium is less than the Advance Premium, we will return the difference to you. But in any event we shall retain the Minimum Premium as shown in Item 4 of the Declarations for each twelve months of our policy period.

L.    Prior Insurance

If a loss covered by this policy is also covered in whole or in part under any other excess policy issued to the Insured prior to the effective date of this policy, our Limits of Insurance as stated in Item 3 of the Declarations will be reduced by the amount due the Insured under such prior insurance.

M.    Separation of Insureds

Except with respect to ... specifically assigned to the first Named Insured designated in Item 1 of the Declarations, this policy applies:

1. As if each Named Insured were the only Named Insured; and

2. Separately to each Insured against whom claim is made or suit brought.

N.    Subrogation

If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them.

Any recoveries shall be applied as follows:

1. Any interests, including the Insured, that have paid an amount in excess of our payment under this policy will be reimbursed first;

2.    We the ●●● ●● reimbursed up to the amount we ha ●● paid, and

3.    Lastly, any interests, including the Insured, over which our insurance is excess, are entitled
claim the residue.

Expenses incurred in the exercise of rights of recovery shall be apportioned between the interest
including the Insured, in the ratio of their respective recoveries as finally settled.

O.    Transfer Of Your Rights And Duties

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your leg
representative but only while acting within the scope of duties as your legal representative. Howeve
notice of cancellation sent to the first Named Insured designated in Item 1 of the Declarations ar
mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

P.    When Loss Is Payable

Coverage under this policy will not apply unless and until the Insured or the Insured's underlying insure
is obligated to pay the Retained Limit.

When the amount of loss has finally been determined, we will promptly pay on behalf of the Insured th
amount of loss falling within the terms of this policy.

You shall promptly reimburse us for any amount within the Self Insured Retention paid by us on beha
of an Insured.

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unles
countersigned by one of our duly authorized representatives, where required by law.

*Elizabeth M. Tuck*

SECRETARY

*J. P. Cavour*

PRESIDENT

NOTICE  THESE POLICY FORMS AND THE APPLICABLE RATES
ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW
YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH
FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF
THE NEW YORK INSURANCE DEPARTMENT.

57697 (6 93)

(15)

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED-CLERK
U.S. DISTRICT COURT

2007 AUG 31  PH 4: 42

TX EASTERN-MARSHALL

BY_____

| | |
|---|---|
| PHOENIX LICENSING, L.L.C., an Arizona Limited Liability Company, and LPL LICENSING, L.L.C., a Delaware Limited Liability Company; | |
| Plaintiffs, | CASE NO   2 - 0 7 C V - 3 8 7 |
| vs. | Jury Trial Demanded |
| CHASE MANHATTAN MORTGAGE CORPORATION, a New Jersey corporation; JP MORGAN CHASE BANK, N.A., a Delaware corporation; CITIBANK., N.A., a national bank association; CITIBANK USA, N.A., a limited purpose credit card bank; CITIBANK (SOUTH DAKOTA), N. A., a limited purpose credit card bank; CITIMORTGAGE, INC., a New York corporation; CITIGROUP, INC a Delaware corporation; CITI ASSURANCE SERVICES, INC., a Maryland corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE INSURANCE SERVICES, INC., a California corporation; DISCOVER FINANCIAL SERVICES, INC., a Delaware corporation; DISCOVER BANK, a Delaware corporation; GMAC Mortgage, L L C. (f/k/a GMAC Mortgage Corporation), a Delaware corporation; GMAC INSURANCE MARKETING, INC., a Missouri corporation; GMAC BANK, a Utah industrial loan corporation; LIBERTY LIFE INSURANCE COMPANY, a South Carolina corporation; RESPONSE WORLDWIDE INSURANCE COMPANY, an Ohio corporation; DIRECT RESPONSE CORPORATION, a Delaware corporation; WARNER INSURANCE COMPANY, a Illinois corporation; STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a Illinois corporation; STATE FARM BANK, F.S.B., a Federal Savings Association; USAA | |

1

Federal Savings Bank, a FEDERAL SAVINGS
BANK; USAA SAVINGS BANK, a Nevada
corporation;

          Defendants.

## COMPLAINT FOR PATENT INFRINGEMENT

Phoenix Licensing, L.L.C. ("Phoenix") and LPL Licensing, L.L.C. ("LPL") sue,
Chase Manhattan Mortgage Corporation, JP Morgan Chase Bank, N.A., Citibank, N.A., Citibank
USA, N.A., Citibank (South Dakota), N.A., Citimortgage, Inc., Citigroup, Inc., Citi Assurance
Services, Inc., Countrywide Home Loans, Inc., Countrywide Insurance Services, Inc., Discover
Financial Services, Inc., Discover Bank, GMAC Mortgage, L.L.C. (f/k/a GMAC Mortgage
Corporation), GMAC Insurance Marketing, Inc., GMAC Bank, Liberty Life Insurance Company,
Response Worldwide Insurance Company, Direct Response Corporation, Warner Insurance
Company, State Farm Mutual Automobile Insurance Company, State Farm Bank, F.S.B., USAA
Federal Savings Bank, and USAA Savings Bank (collectively "Defendants") and, on information
and belief, allege as follows:

### Introduction

1.    Plaintiff Phoenix owns the invention described and claimed in United
States Patent Nos.

    (a) 5,987,434 entitled "Apparatus and Method for Transacting Marketing and
        Sales of Financial Products" (the "'434 patent");

    (b) 6,076,072 entitled "Method and Apparatus For Preparing Client
        Communications Involving Financial Products and Services" (the "'072

2

patent"); and

(c) 6,999,938 entitled "Automated Reply Generation Direct Marketing System"
(the "'938 patent");

(collectively the "Patents"). Pursuant to a license agreement dated December 1, 2006, Plaintiff
LPL is the exclusive licensee of the Patents. Defendants (a) have used, and continue to use,
Plaintiff Phoenix's patented technology in products and services that they make, use, import,
sell, and offer to sell, without Plaintiffs' permission; and (b) have contributed to or induced, and
continue to contribute to or induce, others to infringe the Patents. Plaintiffs seek damages for
patent infringement and an injunction preventing Defendants from making, using, selling, or
offering to sell, and from contributing to and inducing others to make, use, sell, or offer to sell,
the technology claimed by the Patent without Plaintiffs' permission.

## Jurisdiction and Venue

2.    This is an action for patent infringement arising under the patent laws of
the United States, 35 U.S.C. §§ 271 and 281, *et seq.* The Court has original jurisdiction over this
patent infringement action under 28 U.S.C. § 1338(a).

3.    Within this judicial district each of the Defendants has committed acts and
continues to commit acts that give rise to this action, including making sales of infringing
products and offering for sale infringing products. Venue is proper in this district pursuant to 28
U.S.C. § 1391(b) and § 1400.

## Plaintiffs Phoenix and LPL

4.    Phoenix Licensing, L.C.C. is an Arizona limited liability company having
a principal place of business in Scottsdale, Arizona.

5.    LPL Licensing, L.L.C. is a Delaware limited liability company having a
principal place of business in Scottsdale, Arizona.

3

**Defendants**

*Chase*

6.    Upon information and belief, Chase Manhattan Mortgage Corporation is a New Jersey corporation having its principal place of business in Edison, New Jersey ("Chase Manhattan").

7.    Upon information and belief, JP Morgan Chase Bank, N.A., is a Delaware corporation having its principal place of business in New York, New York ("JP Morgan Chase")

*Citibank*

8.    Upon information and belief, Citibank N.A. is a national bank association having its principal place of business in New York, New York ("Citibank NA").

9    Upon information and belief, Citibank USA, National Association (Citibank USA) is a national bank association having its principal place of business in Sioux Falls, South Dakota ("Citibank")

10.    Upon information and belief, Citibank (South Dakota), N.A., is a national bank association having its principal place of business in Sioux Falls, South Dakota ("Citibank SD").

11    Upon information and belief, Citimortgage, Inc. is a New York corporation having its principal place of business in St. Louis, Missouri ("Citimortgage")

12    Upon information and belief, Citigroup, Inc. is a Delaware corporation having its principal place of business in New York, New York ("Citigroup")

13.    Upon information and belief, Citi Assurance Services, Inc, is a Maryland corporation having its principal place of business in Fort Worth, Texas ("Citi Assurance").

4

*Countrywide*

14    Upon information and belief, Countrywide Home Loans, Inc is a New York corporation having its principal place of business in Calabasas, California ("Countrywide")

15    Upon information and belief, Countrywide Insurance Services, Inc is a California corporation having its principal place of business in Calabasas, California ("Countrywide Insurance")

*Discover*

16.    Upon information and belief, Discover Financial Services, Inc is a Delaware corporation having its principal place of business in Riverwoods, Illinois ("Discover").

17.    Upon information and belief, Discover Bank is a Delaware corporation having its principal place of business in New Castle, Delaware ("Discover Bank")

*GMAC*

18    Upon information and belief, GMAC Mortgage, L.L.C. is a Delaware limited liability corporation having its principal place of business in Horsham, Pennsylvania ("GMAC Mortgage")

19.    Upon information and belief, GMAC Insurance Marketing, Inc. is a Missouri corporation having its principal place of business in Maryland Heights, Missouri ("GMAC Insurance")

20.    Upon information and belief, GMAC Bank is a Utah industrial loan corporation having its principal place of business in Horsham, Pennsylvania ("GMAC Bank ").

### *Liberty Life*

21. Upon information and belief, Liberty Life Insurance Company is a South Carolina corporation doing business as RBC Insurance Company having its principal place of business in Greenville, South Carolina ("Liberty Life")

### *Response Worldwide*

22. Upon information and belief, Response Worldwide Insurance Company is an Ohio corporation having its principal place of business in Meriden, Connecticut ("Response Worldwide")

23. Upon information and belief, Direct Response Corporation, doing business as Response Group, is a Delaware corporation having its principal place of business in 500 Meriden, Connecticut ("Direct Response").

24. Upon information and belief, Warner Insurance Company is an Illinois corporation having its principal place of business in Meriden, Connecticut ("Warner")

### *State Farm*

25. Upon information and belief, State Farm Mutual Automobile Insurance Company is an Illinois corporation having its principal place of business in Bloomington, Illinois ("State Farm")

26. Upon information and belief, State Farm Bank, F S B, is a federal savings association chartered under the Home Owner's Loan Act (12 U.S.C. § 1461 et seq.), having its principal place of business in Bloomington, Illinois ("State Farm Bank")

### *USAA Bank*

27. Upon information and belief, USAA Federal Savings Bank is a federal savings bank having its principal place of business in San Antonio, Texas ("USAA Bank").

28.    Upon information and belief, USAA Savings Bank is a Nevada corporation having its principal place of business in Las Vegas, Nevada ("USAA Savings")

## First Claim for Patent Infringement
### (infringement of the '434 patent)

29.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further allege as follows:

30.    The United States Patent and Trademark Office issued the '434 patent on November 16, 1999  Attached as Exhibit A is what is believed to be a copy of the text of the '434 patent. Through assignment, Plaintiff Phoenix is the owner of all right, title, and interest in the '434 patent, including all rights to pursue and collect damages for past infringements of the patent

31.    Defendants Chase Manhattan, Citibank, Citibank SD, Citimortgage, Discover, Discover Bank, GMAC Mortgage, Liberty Life, Response Worldwide, Direct Response, Warner, State Farm, State Farm Bank, USAA Bank, and USAA Savings, have infringed, contributed to the infringement, and induced others to infringe the '434 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '434 patent and by contributing to or inducing others to infringe the claims of the '434 patent without a license or permission from Plaintiffs.

32.    Plaintiffs have been damaged by Defendants' infringement of the '434 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '434 patent.

33      The Defendants are and have been willfully infringing one or more claims of the '434 patent.

34.     Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

## Second Claim for Patent Infringement
### (infringement of the '072 patent)

35.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further allege as follows:

36      The United States Patent and Trademark Office issued the '072 patent on June 13, 2000. Attached as Exhibit B is what is believed to be a copy of the text of the '072 patent. Through assignment, Plaintiff Phoenix the owner of all right, title, and interest in the '072 patent, including all rights to pursue and collect damages for past infringements of the patent.

37.     Defendants Chase Manhattan, Citimortgage, Citigroup, Countrywide, Discover, Discover Bank, GMAC Mortgage, and Liberty Life have infringed, contributed to the infringement, and induced others to infringe the '072 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '072 patent and by contributing to or inducing others to infringe the claims of the '072 patent without a license or permission from Plaintiffs

38.     Plaintiff has been damaged by Defendants' infringement of the '072 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '072 patent.

8

39.     The Defendants are and have been willfully infringing one or more claims of the '072 patent.

40.     Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

## Third Claim for Patent Infringement
## (infringement of the '938 patent)

41.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further alleges as follows:

42.     The United States Patent and Trademark Office issued the '938 patent on February 14, 2006. Attached as Exhibit C is what is believed to be a copy of the text of the '938 patent. Through assignment, Plaintiff Phoenix is the owner of all right, title, and interest in the '938 patent, including all rights to pursue and collect damages for past infringements of the patent.

43.     Defendants JP Morgan Chase, Citibank NA, Citibank SD, Citimortgage, Citi Assurance, Countrywide Insurance, Discover, Discover Bank, GMAC Insurance, GMAC Bank, GMAC Mortgage, Liberty Life, Response Worldwide, Direct Response, Warner State Farm, State Farm Bank, USAA Bank, and USAA Savings have infringed, contributed to the infringement, and induced others to infringe the '938 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '938 patent and by contributing to or inducing others to infringe the claims of the '938 patent without a license or permission from Plaintiffs.

9

44.    Plaintiffs have been damaged by Defendants' infringement of the '938 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '938 patent.

45.    The Defendants are and have been willfully infringing one or more claims of the '072 patent.

46.    Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

47    Plaintiffs demand trial by jury of all issues relating to this claim

WHEREFORE, Plaintiffs prays for judgment as follows:

A.    A decree preliminarily and permanently enjoining Defendants, their officers, directors, employees, agents, and all persons in active concert with them, from infringing, and contributing to or inducing others to infringe, the '434, '072, and '938 Patents;

B    Compensatory damages for Defendants' infringement of the '434, '072, and '938 Patents;

C.    Treble the compensatory damages as consequence of Defendants' willful infringement;

D.    Costs of suit and attorneys' fees on the basis that this patent infringement case is exceptional;

E    Pre-judgment interest; and

F.    For such other relief as justice requires.

Dated:  August 31, 2007                              Respectfully submitted,

By:  _____

                                                      Gregory S. Dovel
                                                      CA State Bar No 135387
                                                      E-mail: greg@dovellaw.com
                                                      Sean A Luner
                                                      CA State Bar No  165443
                                                      E-mail: sean@dovellaw.com
                                                      Dovel & Luner, LLP
                                                      201 Santa Monica Blvd , Suite 600
                                                      Santa Monica, CA 90401
                                                      Telephone: (310) 656-7066
                                                      Facsimile: (310) 657-7069


                                                      ATTORNEYS FOR PLAINTIFFS
                                                      PHOENIX LICENSING, L C C , and
                                                      LPL LICENSING, L L C

11

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| PHOENIX LICENSING, L.L.C., an Arizona Limited Liability Company, and LPL LICENSING, L.L.C., a Delaware Limited Liability Company;<br><br>        Plaintiffs,<br><br>vs.<br><br>CHASE MANHATTAN MORTGAGE CORPORATION, a New Jersey corporation; JP MORGAN CHASE BANK, N.A., a Delaware corporation; CITIBANK., N.A., a national bank association; CITIBANK USA, N. A., a limited purpose credit card bank; CITIBANK (SOUTH DAKOTA), N. A., a limited purpose credit card bank; CITIMORTGAGE, INC., a New York corporation; CITIGROUP, INC. a Delaware corporation; CITI ASSURANCE SERVICES, INC., a Maryland corporation; CITICORP CREDIT SERVICES, INC., a Delaware corporation, COUNTRYWIDE HOME LOANS, INC., a New York corporation; COUNTRYWIDE INSURANCE SERVICES, INC., a California corporation; DISCOVER FINANCIAL SERVICES,, a Delaware corporation; DISCOVER BANK, a Delaware corporation; DFS SERVICES L.L.C., a Delaware corporation; DISCOVER PRODUCTS, INC, a Utah corporation; GMAC Mortgage, L.L.C. (f/k/a GMAC Mortgage Corporation), a Delaware corporation; GMAC INSURANCE MARKETING, INC., a Missouri corporation; GMAC BANK, a Utah industrial loan corporation; LIBERTY LIFE INSURANCE COMPANY, a South Carolina corporation; RESPONSE WORLDWIDE INSURANCE COMPANY, an Ohio corporation; DIRECT RESPONSE CORPORATION, a Delaware corporation; WARNER INSURANCE COMPANY, a Illinois corporation; STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a Illinois corporation; STATE | CASE NO. 2:07-cv-387 (TJW/CE)<br><br>**Jury Trial Demanded** |

1

FARM BANK, F.S.B., a Federal Savings
Association; USAA Federal Savings Bank, a
FEDERAL SAVINGS BANK; USAA SAVINGS
BANK, a Nevada corporation; UNITED
SERVICES AUTOMOBILE ASSOCIATION, a
reciprocal inter insurance exchange.

Defendants.

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Phoenix Licensing, L.L.C. ("Phoenix") and LPL Licensing, L.L.C. ("LPL") sue

Chase Manhattan Mortgage Corporation, JP Morgan Chase Bank, N.A., Citibank, N.A., Citibank

USA, N.A., Citibank (South Dakota), N. A., Citimortgage, Inc., Citigroup, Inc., Citi Assurance

Services, Inc., Citicorp Credit Services, Inc., Countrywide Home Loans, Inc., Countrywide

Insurance Services, Inc., Discover Financial Services, Discover Bank, DFS Services, L.L.C.,

Discover Products, Inc., GMAC Mortgage, L.L.C. (f/k/a GMAC Mortgage Corporation), GMAC

Insurance Marketing, Inc., GMAC Bank, Liberty Life Insurance Company, Response Worldwide

Insurance Company, Direct Response Corporation, Warner Insurance Company, State Farm

Mutual Automobile Insurance Company, State Farm Bank, F.S.B., USAA Federal Savings Bank,

USAA Savings Bank, and United Services Automobile Association  (collectively "Defendants")

and, on information and belief, allege as follows:

### Introduction

1.    Plaintiff Phoenix owns the invention described and claimed in United

States Patent Nos.:

    (a) 5,987,434 entitled "Apparatus and Method for Transacting Marketing and
        Sales of Financial Products" (the "'434 patent");

    (b) 6,076,072 entitled "Method and Apparatus For Preparing Client
        Communications Involving Financial Products and Services" (the "'072

patent"); and

(c) 6,999,938 entitled "Automated Reply Generation Direct Marketing System"
(the "'938 patent");

(collectively the "Patents"). Pursuant to a license agreement dated December 1, 2006, Plaintiff

LPL is the exclusive licensee of the Patents. Defendants (a) have used, and continue to use,

Plaintiff Phoenix's patented technology in products and services that they make, use, import,

sell, and offer to sell, without Plaintiffs' permission; and (b) have contributed to or induced, and

continue to contribute to or induce, others to infringe the Patents. Plaintiffs seek damages for

patent infringement and an injunction preventing Defendants from making, using, selling, or

offering to sell, and from contributing to and inducing others to make, use, sell, or offer to sell,

the technology claimed by the Patent without Plaintiffs' permission.


### Jurisdiction and Venue

2.      This is an action for patent infringement arising under the patent laws of

the United States, 35 U.S.C. §§ 271 and 281, *et seq.* The Court has original jurisdiction over this

patent infringement action under 28 U.S.C. § 1338(a).

3.      Within this judicial district each of the Defendants has committed acts and

continues to commit acts that give rise to this action, including making sales of infringing

products and offering for sale infringing products. Venue is proper in this district pursuant to 28

U.S.C. § 1391(b) and § 1400.


### Plaintiffs Phoenix and LPL

4.      Phoenix Licensing, L.L.C. is an Arizona limited liability company having

a principal place of business in Scottsdale, Arizona.

5.      LPL Licensing, L.L.C. is a Delaware limited liability company having a

principal place of business in Scottsdale, Arizona.

**Defendants**

*Chase*

6.    Upon information and belief, Chase Manhattan Mortgage Corporation is a New Jersey corporation having its principal place of business in Edison, New Jersey ("Chase Manhattan").

7.    Upon information and belief, JP Morgan Chase Bank, N. A., is a Delaware corporation having its principal place of business in New York, New York ("JP Morgan Chase").

*Citibank*

8.    Upon information and belief, Citibank N.A. is a national bank association having its principal place of business in New York, New York ("Citibank NA").

9.    Upon information and belief, Citibank USA, National Association (Citibank USA) is a national bank association having its principal place of business in Sioux Falls, South Dakota ("Citibank").

10.    Upon information and belief, Citibank (South Dakota), N.A., is a national bank association having its principal place of business in Sioux Falls, South Dakota ("Citibank SD").

11.    Upon information and belief, Citimortgage, Inc. is a New York corporation having its principal place of business in St. Louis, Missouri ("Citimortgage").

12.    Upon information and belief, Citigroup, Inc. is a Delaware corporation having its principal place of business in New York, New York ("Citigroup").

13.    Upon information and belief, Citi Assurance Services, Inc., is a Maryland corporation having its principal place of business in Fort Worth, Texas ("Citi Assurance").

14.    Upon information and belief, Citicorp Credit Services, Inc. is a Delaware

4

corporation having its principal place of business in Long Island City, New York ("Citicorp").

On October 17, 2007 Citicorp filed a complaint for Declaratory Judgment, alleging that the three

Patents are invalid and that Citicorp does not infringe any valid claims of the Patents (the

"Citicorp Complaint"). In the Citicorp Complaint, the only basis that Citicorp provides to

support its declaratory relief claims are the allegations in the present case:

> "On August 31, 2007, [Phoenix and LPL] filed Case No. 2-07cv-387 in the
> United States District Court fro the Eastern District of Texas, Marshall Division,
> accusing 22 companies in the financial products and services industry, including
> certain affiliates of [Citicorp] of patent infringement with respect to the patents-
> in-suit. In light of those allegations, [Citicorp] believes that a controversy also
> exists between it and [Phoenix and LPL] over whether [Citicorp's] business
> practices have infringed, and are continuing to infringe, the patents-in-suit and
> whether the patents-in-suit are valid. This controversy is continuing and ongoing,
> and is ripe for resolution by the Court."

Citicorp Complaint at 10-11. Plaintiffs have requested additional information from Citicorp but

Citicorp has refused to provide any additional information regarding the bases for its claims.

Accordingly, Plaintiffs' allegations against Citicorp in this Amended Compliant are solely based

on the Citicorp Complaint.

### *Countrywide*

15.    Upon information and belief, Countrywide Home Loans, Inc. is a New

York corporation having its principal place of business in Calabasas, California

("Countrywide").

16.     Upon information and belief, Countrywide Insurance Services, Inc. is a California corporation having its principal place of business in Calabasas, California ("Countrywide Insurance").

### Discover

17.     Upon information and belief, Discover Financial Services is a Delaware corporation having its principal place of business in Riverwoods, Illinois ("Discover").

18.     Upon information and belief, Discover Bank is a Delaware corporation having its principal place of business in New Castle, Delaware ("Discover Bank").

19.     Upon information and belief, DFS Services L.L.C., (the successor in interest to Discover Financial Services, Inc.) is a Delaware corporation having its principal place of business in Riverwoods, Illinois ("DFS").

20.     Upon information and belief, Discover Products, Inc. ("Discover Products") is a wholly owned subsidiary of Discover Bank, and is a Utah corporation with its principal place of business in Riverwoods, Illinois.  On October 11, 2007 Discover Products filed a complaint for Declaratory Judgment, alleging that the three Patents are invalid and that Discover Products does not infringe any valid claims of the Patent ("Discover Products Complaint").  Plaintiff's allegations against Discover Products in this Amended Compliant are solely based on the Discover Products Complaint.

### GMAC

21.     Upon information and belief, GMAC Mortgage, L.L.C. is a Delaware limited liability corporation having its principal place of business in Horsham, Pennsylvania ("GMAC Mortgage").

22.    Upon information and belief, GMAC Insurance Marketing, Inc. is a Missouri corporation having its principal place of business in Maryland Heights, Missouri ("GMAC Insurance").

23.    Upon information and belief, GMAC Bank is a Utah industrial loan corporation having its principal place of business in Horsham, Pennsylvania ("GMAC Bank.").

### Liberty Life

24.    Upon information and belief, Liberty Life Insurance Company is a South Carolina corporation doing business as RBC Insurance Company having its principal place of business in Greenville, South Carolina ("Liberty Life").

### Response Worldwide

25.    Upon information and belief, Response Worldwide Insurance Company is an Ohio corporation having its principal place of business in Meriden, Connecticut ("Response Worldwide").

26.    Upon information and belief, Direct Response Corporation, doing business as Response Group, is a Delaware corporation having its principal place of business in 500 Meriden, Connecticut ("Direct Response").

27.    Upon information and belief, Warner Insurance Company is an Illinois corporation having its principal place of business in Meriden, Connecticut ("Warner").

### State Farm

28.    Upon information and belief, State Farm Mutual Automobile Insurance Company is an Illinois corporation having its principal place of business in Bloomington, Illinois ("State Farm").

29.    Upon information and belief, State Farm Bank, F.S.B, is a federal savings association chartered under the Home Owner's Loan Act (12 U.S.C. § 1461 et seq.), having its principal place of business in Bloomington, Illinois ("State Farm Bank").

*USAA Bank*

30.    Upon information and belief, USAA Federal Savings Bank is a federal savings bank having its principal place of business in San Antonio, Texas ("USAA Bank").

31.    Upon information and belief, USAA Savings Bank is a Nevada corporation having its principal place of business in Las Vegas, Nevada ("USAA Savings").

32.    Upon information and belief, USAA is a reciprocal inter insurance exchange organized and existing under the laws of Texas with its principal place of business in San Antonio, Texas ("USAA"). On October 17, 2007 USAA filed a complaint for Declaratory Judgment, alleging that the three Patents are invalid and that USAA does not infringe any valid claims of the Patent ("USAA Complaint"). Plaintiff's allegations against USAA in this Amended Compliant are solely based on the USAA Complaint.

## First Claim for Patent Infringement
### (infringement of the '434 patent)

33.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further allege as follows:

34.    The United States Patent and Trademark Office issued the '434 patent on November 16, 1999. Attached as Exhibit A is what is believed to be a copy of the text of the '434 patent. Through assignment, Plaintiff Phoenix is the owner of all right, title, and interest in the '434 patent, including all rights to pursue and collect damages for past infringements of the patent.

8

35.    Defendants Chase Manhattan, Citibank, Citibank SD, Citimortgage, Citicorp, Discover, Discover Bank, Discover Products, DFS, GMAC Mortgage, Liberty Life, Response Worldwide, Direct Response, Warner, State Farm, State Farm Bank, USAA Bank, USAA Savings, and USAA have infringed, contributed to the infringement, and induced others to infringe the '434 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '434 patent and by contributing to or inducing others to infringe the claims of the '434 patent without a license or permission from Plaintiffs.

36.    Plaintiffs have been damaged by Defendants' infringement of the '434 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '434 patent.

37.    The Defendants are and have been willfully infringing one or more claims of the '434 patent.

38.    Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

## Second Claim for Patent Infringement
## (infringement of the '072 patent)

39.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further allege as follows:

40.    The United States Patent and Trademark Office issued the '072 patent on June 13, 2000. Attached as Exhibit B is what is believed to be a copy of the text of the '072 patent. Through assignment, Plaintiff Phoenix the owner of all right, title, and interest in the

'072 patent, including all rights to pursue and collect damages for past infringements of the patent.

41.　　Defendants Chase Manhattan, Citimortgage, Citigroup, Citicorp, Countrywide, Discover, Discover Bank, Discover Products, DFS, GMAC Mortgage, Liberty Life, and USAA have infringed, contributed to the infringement, and induced others to infringe the '072 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '072 patent and by contributing to or inducing others to infringe the claims of the '072 patent without a license or permission from Plaintiffs.

42.　　Plaintiff has been damaged by Defendants' infringement of the '072 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '072 patent.

43.　　The Defendants are and have been willfully infringing one or more claims of the '072 patent.

44.　　Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

### Third Claim for Patent Infringement
### (infringement of the '938 patent)

45.　　Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 28 above and further alleges as follows:

46.　　The United States Patent and Trademark Office issued the '938 patent on February 14, 2006. Attached as Exhibit C is what is believed to be a copy of the text of the '938 patent. Through assignment, Plaintiff Phoenix is the owner of all right, title, and interest in the

'938 patent, including all rights to pursue and collect damages for past infringements of the patent.

47.    Defendants JP Morgan Chase, Citibank NA, Citibank SD, Citimortgage, Citi Assurance, Citicorp, Countrywide Insurance, Discover, Discover Bank, Discover Products, DFS, GMAC Insurance, GMAC Bank, GMAC Mortgage, Liberty Life, Response Worldwide, Direct Response, Warner, State Farm, State Farm Bank, USAA Bank, USAA Savings, and USAA have infringed, contributed to the infringement, and induced others to infringe the '938 patent and, unless enjoined, will continue to do so, by manufacturing, importing, using, selling, or offering for sale products and services that infringe the claims of the '938 patent and by contributing to or inducing others to infringe the claims of the '938 patent without a license or permission from Plaintiffs.

48.    Plaintiffs have been damaged by Defendants' infringement of the '938 patent and will suffer additional irreparable damage and impairment of the value of its patent rights unless Defendants are enjoined from continuing to infringe the '938 patent.

49.    The Defendants are and have been willfully infringing one or more claims of the '938 patent.

50.    Plaintiffs are entitled to recover damages from the Defendants to compensate them for the infringement.

51.    Plaintiffs demand trial by jury of all issues relating to all claims.

WHEREFORE, Plaintiffs prays for judgment as follows:

    A.    A decree preliminarily and permanently enjoining Defendants, their officers, directors, employees, agents, and all persons in active concert with them, from infringing, and contributing to or inducing others to infringe, the '434, '072, and '938 Patents;

    B.    Compensatory damages for Defendants' infringement of the '434, '072, and '938 Patents;

    C.    Treble the compensatory damages as consequence of Defendants' willful infringement;

    D.    Costs of suit and attorneys' fees on the basis that this patent infringement case is exceptional;

    E.    Pre-judgment interest; and

    F.    For such other relief as justice requires.

| Date: November 9, 2007 | Respectfully Submitted, |
|---|---|
| | /s/ Elizabeth L. DeRieux<br>S. Calvin Capshaw<br>State Bar No. 03783900<br>Elizabeth L. DeRieux<br>State Bar No. 05770585<br>Brown McCarroll LLP<br>1127 Judson Road, Suite 220<br>P.O. Box 3999<br>Longview, Texas  75601-5157<br>Telephone:  (903) 236-9800<br>Facsimile: (903) 236-8787<br>E-mail: ccapshaw@mailbmc.com<br>E-mail: ederieux@mailbmc.com<br><br>Charles Ainsworth<br>State Bar No. 00783521<br>Robert Christopher Bunt<br>State Bar No. 00787165<br>Robert M. Parker<br>State Bar No. 15498000<br>Parker, Bunt & Ainsworth<br>100 E. Ferguson, Suite 1114<br>Tyler, Texas 75702<br>Telephone: (903) 531-3535<br>Facsimile: (903) 533-9687<br>E-mail: charley@pbatyler.com<br>E-mail: rcbunt@pbatyler.com<br>E-mail: rmparker@pbatyler.com |

|  | Gregory Scott Dovel<br>CA State Bar No. 135387<br>Sean A. Luner<br>CA State Bar No. 165443<br>Dovel & Luner, LLP<br>201 Santa Monica Blvd., Suite 600<br>Santa Monica, CA 90401<br>Telephone: (310) 656-7066<br>Facsimile: (310) 656-7069<br>E-mail: greg@dovellaw.com<br>E-mail: sean@dovellaw.com<br><br>ATTORNEYS FOR PLAINTIFFS<br>PHOENIX LICENSING, L.L.C. and<br>LPL LICENSING, L.L.C. |
| --- | --- |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 9th day of November, 2007, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.

/s/ Elizabeth L. DeRieux
Elizabeth L. DeRieux

14

# Sub Tab A

US006076072A

# United States Patent [19]

## Libman

[11] **Patent Number:** 6,076,072

[45] **Date of Patent:** Jun. 13, 2000

[54] **METHOD AND APPARATUS FOR PREPARING CLIENT COMMUNICATIONS INVOLVING FINANCIAL PRODUCTS AND SERVICES**

[76] Inventor: **Richard Marc Libman**, 928 20th St., Unit #6, Santa Monica, Calif. 90403

[21] Appl. No.: **08/834,240**

[22] Filed: **Apr. 15, 1997**

**Related U.S. Application Data**

[63] Continuation-in-part of application No. 08/661,004, Jun. 10, 1996, Pat. No. 5,987,434.

[51] Int. Cl.⁷ ......................................... G06F 17/60
[52] U.S. Cl. ........................... 705/34; 705/4; 705/30; 705/35; 705/36; 705/38; 229/70; 206/232
[58] Field of Search .......................... 705/4, 30, 7, 35, 705/39, 36, 42, 41, 34, 38; 380/24, 51, 55; 53/569; 229/70; 206/232

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,831,526 | 5/1989 | Lucas et al. ........................... | 705/4 |
| 5,220,501 | 6/1993 | Lawlor et al. ......................... | 380/24 |
| 5,502,636 | 3/1996 | Clarke .................................. | 705/10 |
| 5,504,675 | 4/1996 | Cragun et al. ........................ | 705/14 |
| 5,523,942 | 6/1996 | Tyler et al. ........................... | 705/4 |
| 5,537,314 | 7/1996 | Kanter .................................. | 705/14 |
| 5,640,835 | 6/1997 | Muscoplat ............................ | 53/569 |
| 5,644,727 | 7/1997 | Atkins ................................. | 705/40 |
| 5,655,085 | 8/1997 | Ryan et al. ........................... | 705/4 |
| 5,671,282 | 9/1997 | Wolff et al. .......................... | 380/25 |
| 5,673,402 | 9/1997 | Ryan et al. ........................... | 705/38 |
| 5,710,889 | 1/1998 | Clark et al. .......................... | 395/244 |
| 5,819,241 | 10/1998 | Reiter ................................. | 705/408 |

**OTHER PUBLICATIONS**

Dottie Enrico, Dollars and Dialers: Phone company's plan to sell names stirs controversy, Newsday v50 n279 s1, p. 3, Nov. 1990.

John Foley, Market of One—Ready, Aim, Sell!—Technology is helping companies treat their customers like individuals again. The payoff—and the challenges—can be enormous, Feb. 1997.

"Agena for Windows" "Marketing and Sales Campaigns" Software Brochure from Agena Corporation, Nov. 1995.

"Agency Manager for Windows" Software Brochure from Applied Systems, Inc., Los Angeles, California, 1994.

SelectQuote Insurance Services Letter and Quote, SelectQuote Insurance Services of San Francisco, California, Jun. 12, 1995.

(List continued on next page.)

*Primary Examiner*—Emanuel Todd Voeltz
*Assistant Examiner*—Raquel Alvarez
*Attorney, Agent, or Firm*—Snell & Wilmer, L.L.P.

[57] **ABSTRACT**

A method and apparatus are provided for automatically preparing a client communication pertaining to a financial product for a client, wherein the client communication is for combined use with a corresponding host vehicle. The method comprises providing a format for the client communication wherein the communication format includes a variable portion; inputting into a computer-accessible storage medium variable information other than a client identification; inputting into the storage medium decision information; and using the decision information to select a subset of the variable information for inclusion in a variable portion of the client communication corresponding to the variable portion of the client communication format. The apparatus comprises an inputting device for inputting into a computer-accessible storage medium variable information comprising other than a client identification and decision information; a processor operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for each of the clients; and an output preparing component in operative communication with the processor for preparing the client communications and for automatically inserting into the client communication the subset of variable information for the corresponding and respective client.

**134 Claims, 25 Drawing Sheets**



Exhibit B

**6,076,072**

Page 2

## OTHER PUBLICATIONS

Sommers/Moreland & Associates, Inc. Letter and Quote, Sommers/Moreland & Associates, Inc., Atlanta, Georgia, Jul. 8, 1995.

Wells Fargo Insurance Services Letter and Sales Literature, Wells Fargo Insurance Services, Brisbane, California, date unknown.

Consumers Choice Financial Services Company Quote, Nov. 28, 1995.

USAA Credit Card Statement Attachment, 1977.

AT&T Account Statement, Jan., 1997.

David T. Phillips and Co. Insurance Solicitation, Nov. 17, 1995.

Equiguard Insurance Services, Inc. Solicitation, Nov., 1995.

CUNA Life Insurance Solicitation, date unknown.

American Savings Bank Solicitation, about Feb., 1995.

IQ InsuranceQuote Services, Inc. Solicitation, Jul. 12, 1995.

TermQuote Life Insurance Solicitation, date unknown.

American Airlines Advantage Program Statement, Dec. 8, 1998.

Globe Life and Accident Insurance Co. Solicitation, date unknown.

Jackson National Life Insurance Co. Solicitation, Jul. 21, 1995.

Teachers Insurance and Annuity Association Solicitation, about Nov., 1994.

"Ready, Aim Sell", Information Week, Feb. 17, 1997.

U.S. Patent          Jun. 13, 2000          Sheet 1 of 25          6,076,072



*Fig. 1*

U.S. Patent          Jun. 13, 2000          Sheet 2 of 25          6,076,072



Fig. 2

*Fig. 3*

**U.S. Patent**          Jun. 13, 2000          Sheet 4 of 25          6,076,072



*Fig. 4*

*DATA INPUT MODULE*



*Fig. 5*

**U.S. Patent**          Jun. 13, 2000          Sheet 6 of 25          **6,076,072**

| | | |
|---|---|---|
| *FIG. 6A(1)* | *FIG. 6A(2)* | *FIG. 6A(3)* |

*Fig. 6A*

U.S. Patent          Jun. 13, 2000          Sheet 7 of 25          6,076,072



Fig. 6A (1)

U.S. Patent          Jun. 13, 2000          Sheet 8 of 25          6,076,072

## Fig. 6A(2)



*Fig. 6A(3)*



**U.S. Patent**          Jun. 13, 2000          Sheet 10 of 25          6,076,072



| FIG. 6B(1) | FIG. 6B(2) | FIG. 6B(3) | FIG. 6B(4) |

*Fig. 6B*

**U.S. Patent**      Jun. 13, 2000      Sheet 11 of 25      6,076,072



| PGM1 | |
|---|---|
| QUOTENUMBER | CHAR(20) |
| APLANNAME | CHAR(10) |
| ADB | NUMERIC(15,2) |
| APREM | NUMERIC(10,2) |
| ATPREM | NUMERIC(10,2) |
| ADURATION | INT |
| AMED | CHAR(1) |
| A2PLANNAME | CHAR(10) |
| A2DB | NUMERIC(15,2) |
| A2PREM | NUMERIC(10,2) |
| A2TPREM | NUMERIC(10,2) |
| A2DURATION | INT |
| A2MED | INT |
| BPLANNAME | CHAR(10) |
| BDB | NUMERIC(15,2) |
| BPREM | NUMERIC(10,2) |
| BTPREM | NUMERIC(10,2) |
| BDURATION | INT |
| BMED | INT |
| B2PLANNAME | CHAR(10) |
| B2DB | NUMERIC(15,2) |
| B2PREM | NUMERIC(10,2) |
| B2TPREM | NUMERIC(10,2) |
| B2DURATION | INT |
| B2MED | INT |
| CPLANNAME | CHAR(10) |
| CDB | NUMERIC(15,2) |
| CPREM | NUMERIC(10,2) |
| CTPREM | NUMERIC(10,2) |
| CNTPREM | NUMERIC(10,2) |
| CTNPREM | NUMERIC(10,2) |
| CDURATION | INT |
| CMED | INT |
| C2PLANNAME | CHAR(10) |
| C2DB | NUMERIC(15,2) |
| C2PREM | NUMERIC(10,2) |
| C2TPREM | NUMERIC(10,2) |
| C2NTPREM | NUMERIC(10,2) |
| C2TNPREM | NUMERIC(10,2) |
| C2DURATION | INT |
| C2MED | INT |
| CMONEYBACK | NUMERIC(15,2) |
| CMONEYWHEN | NUMERIC(15,2) |
| CID | CHAR(20) |
| PROGRAMNUMBER | INT |
| RELATION | INT |
| WAVE | INT |
| CTARGET | NUMERIC(10,2) |

TO FIG.6B(2)

| RESPONSE | |
|---|---|
| QUOTENUMBER | CHAR(20) |
| FNAME | CHAR(15) |
| LNAME | CHAR(15) |
| ADR1 | CHAR(30) |
| CITY | CHAR(20) |
| STATE | CHAR(2) |
| ZIP | CHAR(10) |
| DOB | DATETIME |
| GENDER | CHAR(1) |
| TOBUSE | CHAR(1) |
| LASTTOBUSE | CHAR(20) |
| WORKPHONE | CHAR(15) |
| HOMEPHONE | CHAR(15) |
| BESTTIME | CHAR(25) |
| MARRIED | CHAR(1) |
| SPFNAME | CHAR(15) |
| SPLNAME | CHAR(15) |
| SPDOB | DATETIME |
| SPGENDER | CHAR(1) |
| SPTOBUSE | CHAR(1) |
| SPLASTTOBUSE | CHAR(20) |
| SELAMOUNT | INT |
| SELPRODUCT | CHAR(10) |
| SPQUOTE | INT |
| REL | CHAR(20) |
| ADDFNAME | CHAR(15) |
| ADDLNAME | CHAR(15) |
| ADDDOB | DATETIME |
| ADDTOBUSE | CHAR(1) |
| ADDLASTTOBUSE | CHAR(20) |
| ADDQA1 | INT |
| ADDQA2 | INT |
| ADDQA3 | INT |
| ADDQPROD1 | CHAR(10) |
| ADDGENDER | CHAR(1) |

*Fig. 6B(1)*



*Fig. 6B(2)*

U.S. Patent          Jun. 13, 2000          Sheet 13 of 25          6,076,072

TO FIG.6B(2)                                        TO FIG.6B(4)



| PCM3 | |
|---|---|
| QUOTENUMBER | CHAR(20) |
| APLANNAME | CHAR(10) |
| ADB | NUMERIC(15,2) |
| APREM | NUMERIC(10,2) |
| ATPREM | NUMERIC(10,2) |
| AMED | CHAR(1) |
| A2PLANNAME | CHAR(10) |
| A2DB | NUMERIC(15,2) |
| A2PREM | NUMERIC(10,2) |
| A2TPREM | NUMERIC(10,2) |
| A2MED | INT |
| BPLANNAME | CHAR(10) |
| BDB | NUMERIC(15,2) |
| BPREM | NUMERIC(10,2) |
| BTPREM | NUMERIC(10,2) |
| BMED | INT |
| B2PLANNAME | CHAR(10) |
| B2DB | NUMERIC(15,2) |
| B2PREM | NUMERIC(10,2) |
| B2TPREM | NUMERIC(10,2) |
| B2MED | INT |
| CPLANNAME | CHAR(10) |
| CDB | NUMERIC(15,2) |
| CPREM | NUMERIC(10,2) |
| CTPREM | NUMERIC(10,2) |
| CMED | INT |
| C2PLANNAME | CHAR(10) |
| C2DB | NUMERIC(15,2) |
| C2PREM | NUMERIC(10,2) |
| C2TPREM | NUMERIC(10,2) |
| C2MED | INT |
| CID | CHAR(10) |
| PROGRAMNUMBER | INT |
| RELATION | INT |
| WAVE | INT |
| | CONTINUED |

| PCM3 (CONTINUED) | |
|---|---|
| ACCIDDBAMT | NUMERIC(15,2) |
| ACCIDDBPREM1 | NUMERIC(10,2) |
| ACCIDDBPREM2 | NUMERIC(10,2) |
| WP1APREM | NUMERIC(10,2) |
| WP2APREM | NUMERIC(10,2) |
| WP1BPREM | NUMERIC(10,2) |
| WP2BPREM | NUMERIC(10,2) |
| WP1CPREM | NUMERIC(10,2) |
| WP2CPREM | NUMERIC(10,2) |
| REL | CHAR(10) |
| REL_NAME | CHAR(10) |
| WP1ATPREM | NUMERIC(10,2) |
| WP2ATPREM | NUMERIC(10,2) |
| WP1BTPREM | NUMERIC(10,2) |
| WP2BTPREM | NUMERIC(10,2) |
| WP1CTPREM | NUMERIC(10,2) |
| WP2CTPREM | NUMERIC(10,2) |

Fig. 6B(3)

U.S. Patent          Jun. 13, 2000          Sheet 14 of 25          6,076,072

TO FIG.6B(1)

| PGM4 | |
|---|---|
| QUOTENUMBER | CHAR(20) |
| APLANNAME | CHAR(10) |
| ADB | NUMERIC(15,2) |
| APREM | NUMERIC(10,2) |
| ATPREM | NUMERIC(10,2) |
| AMED | CHAR(1) |
| A2PLANNAME | CHAR(10) |
| A2DB | NUMERIC(15,2) |
| A2PREM | NUMERIC(10,2) |
| A2TPREM | NUMERIC(10,2) |
| A2MED | INT |
| BPLANNAME | CHAR(10) |
| BDB | NUMERIC(15,2) |
| BPREM | NUMERIC(10,2) |
| BTPREM | NUMERIC(10,2) |
| BMED | INT |
| B2PLANNAME | CHAR(10) |
| B2DB | NUMERIC(15,2) |
| B2PREM | NUMERIC(10,2) |
| B2TPREM | NUMERIC(10,2) |
| B2MED | INT |
| CPLANNAME | CHAR(10) |
| CDB | NUMERIC(15,2) |
| CPREM | NUMERIC(10,2) |
| CTPREM | NUMERIC(10,2) |
| CMED | INT |
| C2PLANNAME | CHAR(10) |
| C2DB | NUMERIC(15,2) |
| C2PREM | NUMERIC(10,2) |
| C2TPREM | NUMERIC(10,2) |
| C2MED | INT |
| SPAPLANNAME | CHAR(10) |
| SPADB | NUMERIC(15,2) |
| SPAPREM | NUMERIC(10,2) |
| SPATPREM | NUMERIC(10,2) |
| SPAMED | CHAR(1) |
| SPA2PLANNAME | CHAR(10) |
| SPA2DB | NUMERIC(15,2) |
| SPA2PREM | NUMERIC(10,2) |
| SPA2TPREM | NUMERIC(10,2) |
| SPA2MED | INT |
| CONTINUED | |

| PGM4 (CONTINUED) | |
|---|---|
| SPBPLANNAME | CHAR(10) |
| SPBDB | NUMERIC(15,2) |
| SPBPREM | NUMERIC(10,2) |
| SPBTPREM | NUMERIC(10,2) |
| SPBMED | INT |
| SPB2PLANNAME | CHAR(10) |
| SPB2DB | NUMERIC(15,2) |
| SPB2PREM | NUMERIC(10,2) |
| SPB2TPREM | NUMERIC(10,2) |
| SPB2MED | INT |
| SPCPLANNAME | CHAR(10) |
| SPCDB | NUMERIC(15,2) |
| SPCPREM | NUMERIC(10,2) |
| SPCTPREM | NUMERIC(10,2) |
| SPCMED | INT |
| SPC2PLANNAME | CHAR(10) |
| SPC2DB | NUMERIC(15,2) |
| SPC2PREM | NUMERIC(10,2) |
| SPC2TPREM | NUMERIC(10,2) |
| SPC2MED | INT |
| CID | CHAR(10) |
| PROGRAMNUMBER | INT |
| RELATION | INT |
| WAVE | INT |
| ACCIDDBAMT | NUMERIC(15,2) |
| ACCIDDBPREM1 | NUMERIC(10,2) |
| ACCIDDBPREM1 | NUMERIC(10,2) |
| WP1APREM | NUMERIC(10,2) |
| WP2APREM | NUMERIC(10,2) |
| WP1BPREM | NUMERIC(10,2) |
| WP2BPREM | NUMERIC(10,2) |
| WP1CPREM | NUMERIC(10,2) |
| WP2CPREM | NUMERIC(10,2) |
| REL | CHAR(10) |
| REL_NAME | CHAR(10) |
| WP1ATPREM | NUMERIC(10,2) |
| WP2ATPREM | NUMERIC(10,2) |
| WP1BTPREM | NUMERIC(10,2) |
| WP2BTPREM | NUMERIC(10,2) |
| WP1CTPREM | NUMERIC(10,2) |
| WP2CTPREM | NUMERIC(10,2) |
| OOM | CHAR(20) |

Fig. 6B (4)

**U.S. Patent**          Jun. 13, 2000          Sheet 15 of 25          6,076,072

*PROCESSOR MODULE*



*Fig. 7*

U.S. Patent    Jun. 13, 2000    Sheet 16 of 25    6,076,072



*PROCESSOR MODULE*

*Fig. 8*



Fig. 9

U.S. Patent          Jun. 13, 2000          Sheet 18 of 25          6,076,072



Fig. 10

U.S. Patent          Jun. 13, 2000        Sheet 19 of 25          6,076,072



*Fig. 11*

**U.S. Patent**          Jun. 13, 2000          Sheet 20 of 25          **6,076,072**



*Fig. 12*

U.S. Patent          Jun. 13, 2000          Sheet 21 of 25          6,076,072



*Fig. 13*

*PRODUCTION AND SCHEDULING*



*Fig. 14*



Fig. 15

U.S. Patent          Jun. 13, 2000          Sheet 24 of 25          6,076,072



*Fig. 16*

NEW BUSINESS PROCESSING MODULE



Fig. 17

6,076,072

1

# METHOD AND APPARATUS FOR PREPARING CLIENT COMMUNICATIONS INVOLVING FINANCIAL PRODUCTS AND SERVICES

## RELATED APPLICATIONS

This is a continuation-in-part of Ser. No. 08/661,004, filed on Jun. 10, 1996 now U.S. Pat. No. 5,987,434.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to methods and apparatus for automatically preparing financial product and/or financial service-related communications such as advertisements, marketing solicitations, financial product sales solicitations, notices and the like for dissemination to clients, potential clients, etc. More specifically, it relates to methods and apparatus suitable for preparing such communications in a fully automated or significantly automated manner permitting large volumes of communications to be prepared and delivered quickly, efficiently, and cost effectively.

### 2. Description of the Related Art

The importance of widely-distributed written or printed client communications such as advertising, solicitations, etc. is well known in the marketing and advertising field. Their applicability to the financial products and services industry also is well known. The revenue generated from sales of various products and services advertised in these solicitations measures in the many millions of dollars per year for all industries. Their revenue generation in the financial industry also has been significant, and this industry has been one of the fastest growing in this area.

Traditionally, client communications of this type have been mass-distributed using techniques such as direct mail. A substantial drawback of the direct mail approach has been the relatively significant cost of distributing the communications. The transmitters and distributors of the communications often have been required to bear the expense of the communications themselves, in some cases the envelopes in which they are contained, the labor involved in stuffing the envelopes, the postage, etc.

Over the years, many businesses which dispatch mail to customers or potential customers as a routine part of their business have seized upon the tremendous profit potential of widely distributing communications by including them as inserts or "stuffers" within the routine mailings. Businesses such as commercial banks, credit card companies, brokerage firms, mortgage companies, insurance companies and utilities, to name a few, commonly include stuffers which offer products and services running the gamut from trinkets and souvenirs to durable appliances and vacation packages. Even this method has been limited, however, in that the expenses still are substantial and the response levels to such solicitations often are quite low.

To improve the efficiency and cost effectiveness of such marketing and communication techniques, companies in recent years have begun to screen or target their distribution of communications to reduce the number of communications sent and the corresponding cost, and to enhance the percentage which respond to such target-segmented marketing. Companies which have pre-existing databases of client information for their own clients, such as those mentioned above, are ideally suited for such targeted marketing. As an inherent part of their business, for example, these companies typically have client information for each of their clients.

2

This client information typically includes not only such fundamental "client identification" information as client name and address, but often additional items such as client age, occupation, marital status, income, and the like. In many instances, the client information includes or is sufficient to derive certain information about needs and purchasing habits of the client. Even with such targeted distributions, however, response rates in many cases have remained relatively low.

An important drawback of such known approaches is the limited extent to which they personalize or individualize the communication. The communications usually are in the form of generic ads or solicitations which merely present the product or service identically in every communication to every client. A relative few of the communication or solicitation generating systems create communications which list the client identification information at the top of the communication, e.g., in a header. In the life insurance context, there have been systems which generate a letter or solicitation containing a selected set of insurance products. These systems have been limited mostly or entirely to term life insurance products. They merely list the product or products selected, and provide a brief non-individualized description or explanation of the product and perhaps sample prices or rates at various ages and amounts of coverage. The extent to which the communications take into account the particular circumstances and needs of the individual prospective client, or provide individualized explanations necessary to make an informed purchasing decision about the highlighted products, or enough interest to make further inquiries which may lead to a sale, has been extremely limited or nonexistent.

These systems also are limited in their ability to process large volumes of client communications quickly and efficiently. This is attributable in large part to their requirement for human involvement, the required level of interaction as a necessary part of their operation, the sophisticated nature of the financial products in many cases, and because of the relatively unsophisticated nature of the known systems. All of these methods and systems have been limited in that they require a substantial amount of human involvement. This necessitates substantial cost for wages, salaries, benefits, etc., and it can increase the likelihood of errors.

### 3. Objects of the Invention

Accordingly, an object of the present invention is to provide a method and apparatus for preparing client communications, which method and apparatus are relatively cost effective compared to prior approaches.

Another object of the invention is to provide a method and apparatus for preparing client communications, which method and apparatus are capable of being highly automated.

Another object of the invention is to provide a method and apparatus for preparing client communications, which method and apparatus are capable of preparing large volumes of client communications relatively quickly, efficiently, and cost effectively.

Another object of the invention is to provide a method and apparatus for preparing client communications, wherein the method and apparatus produce communications which are more personalized and individualized to individual clients and/or prospective clients in many prior approaches.

Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be apparent from the description, or may be learned by practice of the invention. The objects and advantages of the invention

6,076,072

3

## SUMMARY OF THE INVENTION

To achieve the foregoing objects, and in accordance with the purposes of the invention as embodied and broadly described in this document, a method and an apparatus are provided for automatically preparing client communications pertaining to one or more financial products for clients. The client communications preferably are adapted for combination with a host vehicle, such as a bank statement, utility bill and the like, so that the host vehicle and the client communication become a single document or document file.

The method and apparatus according to the invention provide a marked departure from known marketing and financial product communication systems, for example, in that they allow for the virtually complete automation of the tasks traditionally performed by people, agents, salesmen and the like, and at substantially greater effort and expense. Automatically, with little or no human intervention and with essentially no time delays, they can analyze and evaluate client information, incorporate additional information, determine and/or compare client needs with various available financial products to solve needs, select and/or recommend products most appropriate for the individual needs of each prospective client, and prepare personalized and individualized communications specifically tailored for each individual prospect to effectively communicate the information to the client or prospective client that he or she needs to make an informed buying decision, or to enable the client to seek more information which hopefully will lead to such a decision.

The method according to one aspect comprises providing a format for the communication wherein the communication format includes a variable portion, inputting into a computer-accessible storage medium variable information other than a client identification, and inputting into the storage medium decision information. The method also includes using the decision information to select a subset of the variable information, and generating the client communication according to the communication format. The generating step includes inserting the subset of variable information into a variable portion of the client communication corresponding to the variable portion of the client communication format.

In accordance with another aspect of the invention, a method is provided for automatically preparing a client communication or communications pertaining to a financial product for a client, wherein the method comprises using decision information to automatically select variable information, the variable information comprising other than a client identification, and automatically inserting the variable information into the client communication or communications. The variable information may comprise client information, financial product information, ancillary information, and/or text information. The method preferably includes a step of automatically combining the client communication for each of the clients with the host vehicle for the corresponding and respective one of the clients to create a combined communication for the corresponding and respective one of the clients, wherein each of the combined communications comprises a single document.

An apparatus according to the invention is provided for automatically preparing a client communication pertaining to a financial product for a client, wherein the client com-

4

munication is for combined use with a corresponding host vehicle. The apparatus comprises means for inputting into a computer-accessible storage medium variable information comprising other than a client identification and decision information, processing means operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for the client, and output preparing means in operative communication with the processing means for preparing the client communication and automatically inserting the subset of the variable information into the client communication. The inputting means may comprise a disk drive, a tape drive, an optical scanner, a bar code reader, a modem, and the like. The output preparing means may comprise a laser printer, a modem, another computer, and the like.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate a presently preferred method and embodiment according to the invention. These drawings, together with the general description given above and the detailed description of the preferred method and embodiment given below, serve to explain the principles of the invention.

FIG. 1 is a hardware block diagram of the preferred embodiment of the invention;

FIG. 2 is a flow chart diagram of system software used in the preferred embodiment of FIG. 1, and which illustrates the preferred embodiment and method of the invention;

FIG. 3 provides an illustrative main menu for the system software generally depicted in FIG. 2;

FIG. 4 is a flow diagram which illustrates a preferred method according to the invention;

FIG. 5 is a flow chart diagram illustrating the data input module of the preferred embodiment and method of the invention;

FIG. 6 (including 6A and 6B) shows the organizational structure of various illustrative database tables managed by the database module according to the preferred embodiment and as used in connection with the preferred method of the invention;

FIG. 7 is a flow chart diagram illustrating the processor module of the preferred embodiment and method of the invention;

FIG. 8 is a flow chart diagram illustrating the processor module of the preferred embodiment and method of the invention similar to that of FIG. 7, but which is specifically adapted for processing of insurance products;

FIG. 9 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to a mortgage life insurance-related communication;

FIG. 10 is a flow chart diagram illustrating another specific example of the organization and flow of the processor module specifically pertaining to another mortgage life insurance-related communication;

FIG. 11 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to another mortgage life insurance-related communication;

FIG. 12 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to a basic individual life insurance-related communication;

FIG. 13 is a flow chart diagram illustrating the organization and flow of the sales presentation and output module of the preferred embodiment and method as depicted in FIG. 2.;

6,076,072

5

FIG. 14 is a flow chart diagram illustrating the organization and flow of the production and scheduling module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 15 is a flow chart diagram illustrating the organization and flow of the sales and financial report and analysis module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 16 is a flow chart diagram illustrating the organization and flow of the telemarketing module of the preferred embodiment and method as depicted in FIG. 2; and

FIG. 17 is a flow chart diagram illustrating the organization and flow of the automated new business processing module of the preferred embodiment and method as depicted in FIG. 2, adapted for use in the marketing and sale of insurance products.

DETAILED DESCRIPTION OF THE
PREFERRED METHOD AND EMBODIMENT

Reference will now be made in detail to the presently preferred method and the preferred embodiment of the invention as illustrated in the accompanying drawings, in which like reference characters designate like or corresponding parts throughout the drawings. For simplicity and ease of illustration, the preferred apparatus and method according to the invention are described in conjunction with one another. This is not, however, to be construed as necessary or limiting.

In accordance with the invention, an apparatus and method are provided for automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients. The apparatus and method may be used to automatically prepare a single client communication or, more preferably, to automatically prepare a plurality of client communications. The client communications preferably are for combined use with corresponding and respective host vehicles for the corresponding and respective clients, which combined communications may be and preferably are delivered to the clients.

"Client" as the term is used here should be interpreted broadly to include an actual client or customer of the user of the system and/or method according to the invention, or the party for whom the system and/or method is employed. The term "client" also includes a potential client or customer, or a similar party for whom a communication is prepared. A client is assumed for illustrative purposes here to be a party for whom a client record has been created in the client database as described more fully below.

"Client information" as used here means information which pertains to a particular client, or to a particular set or group of clients. Examples of client information would include a client name, address, telephone number, age, marital status, occupation, employer, financial income, etc. Client information also may include information pertaining to the family or other relations to the client, such as information on the spouse, children, parents, etc., or perhaps to a business associate, such as a business partner, fellow board member or officer, and the like. This category of information also may include psychographic and demographic data pertaining to the client or clients.

"Client record" as used here means a compilation of information pertaining to a particular client. The client information typically would be collected into an automated or computerized database, which is referred to herein as a "client database." In this context, a client record would be a single record for a given client within the client database.

6

The fields of each client database record would include the various items of client information, examples of which are provided above. The organization of this client information database and the records and fields within it typically would be in conformity with the data organization and structures of known relational databases.

A "client communication" as the term is used herein refers to a communication which is prepared for a given client and which provides information to the client about one or more selected financial products and/or financial services and/or related financial plans. A client communication, for example, might include a solicitation or similar marketing or advertising document in which the one or more financial products, services, etc. are presented to the client in an attempt to sell the product, service, etc. to the client, provide information on the products and services, provide a notice pertaining to such products or services, etc. A client communication may assume the physical form of a paper or papers which would be integrally attached to a host vehicle, a computerized document which is adapted to be incorporated with a computerized host vehicle, an electronic mail document, and the like.

Each client communication according to the invention includes at least one "variable." A "variable" as the term is used herein, which also is referred to as a "variable portion," refers to a portion of a client communication which may vary from client communication to client communication. The variable in a sense serves as a location marker in the client communication, at which location the system and method according to the invention insert or provide certain "variable information" selected by the system and method. The variable information, which may take a number of different forms, is selected using the decision information so that it is appropriate for, and to a certain extent individualized for, a particular client.

"Financial product" as the term is used herein is used in its broad sense to include any financially-related product, service or plan. The term would include, for example, insurance products and services, banking products and services, securities and investment products and services, and the like. Examples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the like. Examples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related products, etc. Securities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc. The term "plan" is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client. For convenience and ease of explanation, the term "financial products" as used hereinbelow may refer to financial products and/or financial services and/or financial plans, and combinations of these.

"Financial product information" as used herein refers to information which identifies, describes, explains or otherwise pertains to the financial product or products (including services and plans) which are to be the subject of some or all of the client communications, as explained more fully below.

"Host vehicle" as used here means a vehicle, such as an account statement, notice, letter, etc., other than a client communication, which is to be sent to a client. The term

6,076,072

7

"vehicle" is used here in the sense of a medium for communication, examples of which would include a paper document, and electronic document, a machine-readable medium, and the like. Specific examples of host vehicles would include a bank account statement, credit card account statement, brokerage account statement, billing statement from a local utility, a notice or advisory bulletin, etc. In the context of the illustrative examples provided herein, typically there would be a host vehicle for each client, which host vehicle would provide the statement, notice, etc. The host vehicle typically would constitute the primary purpose for contacting or communicating with the client. The client communication preferably would be attached as an integral part of the host document.

"Host information" would include information which is included within or otherwise pertains to a host vehicle or a collection of host vehicles. Examples of host information would include such things as the type of checking account to which a statement pertains, the bank or other institution which holds the account or which issues a financial product reflected in the host vehicle (e.g., the product provider), the amount of utility services or products reflected in a particular bill, account information, a statement of account, etc.

A presently preferred embodiment of the apparatus according to the invention is illustrated in FIG. 1. This embodiment comprises a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations. A network server 10 is shown in FIG. 1. Computer workstation nodes may be very similarly configured. In addition to the server and workstation nodes, system nodes also may include output devices, such as laser printers (not shown). Each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24.

The processor of each computer node (server or workstation) includes a central processing unit (CPU) 26, random access memory (RAM) 28, and at least one mass storage device 30, such as a hard drive and/or a diskette drive. The design and configuration of CPU 26 is not limiting, and may include any of the CPU designs sold as standard components with high-end IBM-compatible personal computers or business machines. Such processors include Pentium™ processors from Intel Corp., Santa Clara, Calif., Power PC processors from IBM Corp., and their substantial equivalents, preferably with at least 32 megabytes of RAM and a hard drive with at least about 1 gigabyte of storage capacity. The capability and speed of CPU 26 will depend upon the specific application to which the apparatus is to be put, the volume of data to be handled, etc. In the preferred embodiment of FIG. 1, the CPU of the principal server comprises a 166 MHz Pentium-based processor with 32 megabytes of RAM and a 2 gigabyte hard drive. The CPUs of the network workstations comprise 166 MHz Pentium-based processors with at least about 32 MHz of RAM and at least about 500 megabytes of hard disk storage capacity.

Display 14 should be compatible with the processor, and preferably should have a resolution of at least about 800× 600 pixels. Other than these requirements, many commercially-available Super VGA monitors would suffice.

Keyboard 16 is a standard IBM PC-compatible keyboard which is compatible with the processor. Keyboard 16 comprises a means for the system user to selectively input information, decisional information or criteria, module instructions, and the like into the system where manual input is called for.

8

The mouse, light pen, track ball or similar pointing device 18 is used to navigate the graphical user interface of the system, which is designed to increase the ease of use of the system, as will be described more fully below. It also comprises means for inputting information into the system, particularly where graphical interface environments are used in implementation. These devices may be obtained from commercially-available sources as off-the-shelf components.

Modem 20 is used for communicating with computer systems remotely from processor 12. The design of modem 20 also is not limiting, and its specific design will depend upon the design of processor 12, the design and configuration of the computer or computers to be communicated with, and similar generally known factors in a given application. In the preferred embodiment of FIG. 1, modem 20 comprises a 28.8 baud modem which is compatible with processor 12, such as the Model Sportster 28.8, commercially available from U.S. Robotics Inc.

Tape drive 22 is optional, but may be used for inputting bulk files and lists, as described in greater detail below. The specific design and configuration of tape drive 22 also will depend to a large extent on the design and configuration of other system components, and on the particulars of the application. In the preferred embodiment of FIG. 1, tape drive 22 comprises a high-capacity digital tape device which may be obtained as an off-the-shelf component from commercial suppliers.

Bar code readers may be used to speed manual input of data and also to record responses and other correspondence from prospective clients. They should be industry-standard readers capable of reading the major bar code formats, such as Code-39 bar codes, and inputting the scanned information to processor 12. An optical scanner (not shown) also may be provided as an optional input device.

The system includes a high-speed laser printer 32, such as any of the high-end commercially-available laser printers available for processors of the type employed in this system. Large-volume commercial laser printers also may be used for producing large quantities of client communications at rapid rates. The system also may include as an output a modem such as modem 20 or similar on-line or networked connection.

Processor 12 has resident within its accessible memory system computer software or system software, a flow diagram of which is shown in FIG. 2. The software has a "core" system for processing tasks such as selecting variable information and preparing client communications. The system software also includes an "administrative and support" system for supporting the core system, facilitating the communication or marketing program, providing administrative and management reports and functions, and other tasks. The core system includes a plurality of modules, including a data input module, a database module, a processor module, and a sales presentation and output module. The administrative and support system includes a production and scheduling module, a sales and financial report and analysis module, a telemarketing module, a communications interface module, and an automated new business processing module. Each of these systems and modules will be described in greater detail below.

In accordance with the preferred embodiment and method, an example of a main menu for the system software is shown in FIG. 3. This menu includes a plurality of buttons corresponding to the modules of the system as depicted in FIG. 2.

6,076,072

9

A flow diagram which outlines steps of the preferred method is shown in FIG. 4. Referring to the left portion of the diagram, the method includes a step of inputting information of various types into the system. Although the specific forms of information to be inputted will vary from application to application, they generally will include client information. This client information may be pre-selected or pre-sorted, for example, using known market segmentation or targeting techniques, or what has been referred to recently as "database mining." Financial product information, and in some cases host information, also may serve as inputs.

The preferred method also includes a processing step (center of FIG. 4) in which decision information is used to automatically select variable information for inclusion or provision in the client communication or communications. The output of the processing step (right portion of FIG. 4) is one or more client communications which include the variable information. The variable information is used to make the client communications highly individualized or personalized. The client communications are adapted to be combined with corresponding host vehicles for the respective clients to create a corresponding plurality of combined outputs. This combination can be very advantageous over prior known methods, e.g., based upon the ability to make the client communications highly personalized and at the same time delivering the client communication together with the host vehicle to achieve the corresponding cost savings.

As an initial step in the preferred method, one generally would determine the financial product or products which are to be presented in the client communications. This selection may be made, for example, based upon the nature of the client population itself, the desired financial product or products to be offered, etc. It should be appreciated that this step need not necessary occur first. The selection of financial products, for example, may be one of the functions which the system performs, e.g., during its processing step as described more fully below.

The preferred method includes a step of providing a format for the client communication wherein the client communication format includes a variable portion. Each of the client communications includes at least one variable or variable portion in which variable information is inserted or otherwise provided. The variable information is selected based upon the decision information. These aspects and features of the invention will be described more fully below.

The term "format" is used according to its common meaning and refers to the general layout and appearance of the communication. The format may assume any one of a wide variety of forms, depending upon the financial product or products involved, the intended client base, the communication medium, the desired or available space, the tastes and specific needs of the communication designer, etc. Formatting inputs would include such things as typographical formatting information (e.g., top, bottom and side margins), fonts, graphics, displays and display locations, etc. The format also may include content designations. In more advanced applications, a plurality of formats may be selected, and the desired format and method may be adapted to select from among the formats for a given client and client communication. For illustrative purposes herein we will use single-format examples, rather than a set of communication formats from which the system and method would select on a client-by-client basis. Sample client communication formats are attached hereto as Appendix 1 and Appendix 2. These samples, which are merely illustrative and not limiting, might be attached to a bank statement (a sample host vehicle), and would be used for marketing individual

10

life insurance. Note that each begins as page 3 of 4 pages. Pages 1 and 2 in this illustrative example would be the host vehicle.

The communication format includes at least one variable or variable portion, as noted above. Preferably, the format of each communication will include a plurality of variables or variable portions. Each of these variables constitutes a portion or segment of the client communication which, in the actual communications, will vary from client to client, and from client communication to client communication. The variable may assume any one or combination of a wide variety of informational types and content components. Examples would include client information (generally other than a client identification), financial product information, ancillary data, variable text, etc. A given communication format may include a plurality of variables of a given type, e.g., all client information, or it may comprise different types of variables, e.g., client information, financial product information, etc.

The preferred method includes steps of inputting into a computer-accessible storage medium variable information other than a client identification, and inputting into the storage medium decision information. The preferred apparatus similarly is provided with appropriate input means for inputting these and other various categories of information into a computer-accessible storage medium. The method and apparatus of the invention are adapted to process various types of information in generating and outputting the client communications. The flexibility and variability of the specific types of information which may be used, and the specific manner in which the information may be used, comprise significant advantages of the invention over prior known systems and methods.

Initial system inputs typically and preferably would include client information, financial product information, decision information, text information, and in some applications ancillary information. Any one of these classes of information could comprise variable information, although decision information often is used primarily for internal systems purposes.

The types and amounts of client information provided to the system and used in the method will depend upon the types and amounts available, the desired client communication format, the decisional information or logic to be used, etc. Client information may comprise a variety of types of information pertaining to a particular client, or to a particular class of clients. In most instances, this client information will include a client identification. "Client identification" as used herein includes the information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client. In most instances this client identification constitutes the client's name, or the client's name and post office address. A client account number also may be included. This term is intended to be construed narrowly, for example, to include only the minimum information, usually name and postal address, necessary to uniquely identify the client and forward the communication to the client. It would not include, for example, information which may happen to be unique to the client and may uniquely identify the client under analysis, but which information is not typically used to identify the client. Individual components of client identification other than client name also typically would not be included within the scope of the term client identification as used herein. A client's postal zip code used separately from the postal address, for example, would not qualify as the client identification.

6,076,072

11

A wide variety of types of client information other than the client identification may exist and often is available. Typical examples might include the client's age, occupation, employer, annual income, marital status, whether he or she smokes, family information, geographic information other than client address information (e.g., zip code, city, county, state, etc.), purchasing information such as purchasing practices and proclivities, client asset information, liability information such as mortgage or loan information, client activity information (e.g., hobbies, sporting activities, etc.), and other psychographic, demographic and general client data or information. A commercial bank or savings and loan which loans on home mortgages, for example, typically would have client information in the form of the address of the mortgaged property, the mortgage loan amount, and the loan origination date. This information would be useful for an individual mortgage life insurance program in which insurance solicitation communications are sent to mortgagee clients.

"Financial product information" as used herein refers to information which identifies, describes, explains or otherwise pertains to the financial product or products (including financial services and financial plans) which are to be the subject of some or all of the client communications. Financial product information includes product pricing information and product non-pricing information. Pricing information includes the pricing for the relevant products, and perhaps other information relevant to pricing, for example, such as the time period during which particular prices will be available, payment terms, available financing terms, etc. Product non-pricing information includes any financial product information other than product pricing information. Examples of product non-pricing information would include product-related descriptions, conditions of offer, classes of clients for whom the product is available (e.g., "issue constraints" as used in the insurance industry), annuity tables, actuarial tables, etc.

The financial product information may pertain to a single product, or to a plurality of different financial products. In the field of insurance, for example, the financial product information may pertain to a non-property and non-casualty insurance product, an individual life insurance product such as term, whole life, universal life and the like, a health insurance product, a disability insurance product, an annuity, and the like, and combinations of these. In the banking area, the financial product information may pertain to a savings product, a checking or demand account product, a loan product, a credit-related product, a retirement product, etc., and combinations of these. In the banking and brokerage firm areas, the financial product information may pertain to such products as an investment product and/or financial security (e.g., stocks and other equities, bonds and other debt instruments, money markets, mutual funds, etc.), derivatives, etc., and combinations. Combinations of financial products across fields, such as banking and insurance, also are possible.

"Ancillary information" as used herein refers to virtually any type of data or information useful for the system (hardware and software of FIGS. 1 and 2) and/or method in performing the intended functions, but excludes client information, financial product information and decision information. Examples of such ancillary data or information would include statistical information, geo-code data, and the like. Non-client specific information also may be included in this category, such as demographic, psychographic or buying habit data. Incidentally, the term "information" is used broadly herein to include quantitative data as well as other forms of information.

12

Text information comprises text, e.g., in the form of an alphanumeric character or character string, a word, a phrase, a sentence, a paragraph, or even a graphical symbol. The preferred form of text information in many applications involving the marketing of financial products would comprise a phrase, i.e., a collection of words, which would be part of a sentence or paragraph of fixed text within the client communication. For example, if the client communication presents a financial product such as a security, the description of the product may assume one form for clients under a predetermined age, such as 40 years old, and the description of the same product may assume another, perhaps more conservative or risk-adverse form for clients over the predetermined age.

Text information as used herein can and often will overlap with the other categories of information as defined herein. Text information may, for example, comprise or pertain to client information. In the example provided immediately above, the text information pertains to financial product information. Text information also may comprise or pertain to ancillary information, decision information, etc.

The decision information to be provided to the system may and usually will vary from application to application. This decision information typically would be inputted as part of the system initialization for a given run. The decision information generally will comprise criteria or conditions used for the selection of variable information. The decision criteria preferably comprise programmed database queries which are used in conjunction with the client database, and perhaps a financial product database and/or an ancillary information database to select records, to select fields within records, and the like. The decision information also may comprise conditions and instructions for selection of information from lookup tables and similar data structures.

According to the method of the invention, decision information is used to automatically select variable information for insertion or inclusion in the variable or variable portions of the client communication or communications. This variable information preferably includes information other than, or in addition to, a client identification as that term has been defined herein. The variable information may be selected for insertion into the variables or variable portions of the client communication for one or more of the clients.

The variable information may comprise part or all of the information provided to the system as the client information, the financial product information, the ancillary information, text information, and even the decision information. This variable information may comprise virtually any form of client information, but preferably, as noted, it would be other than, e.g., in addition to, a client identification, most notably the client's name, address, account number, etc. The variable client information may, for example, comprise information pertaining to the client such as client age information, health information, client family information, client geographic information other than client address information, client purchasing information, client asset information, client liability information such as information about a mortgage, client financial income information, client occupation information, client activity information (e.g., sports activities, recreational activities, etc.), and the like. The variable client information may comprise psychographic client data and/or demographic client data. In the term life insurance context specifically, this variable client information preferably would be other than a client name, address, age, marital status, tobacco habits, and other than the type and amount of life insurance coverage, which comprise related product information.

6,076,072

13

Where the variable information comprises financial product information, this variable financial product information also may assume a wide variety of forms. As noted, the variable financial product information may pertain to a single financial product or to a plurality of different financial products. The variable financial product information may comprise or pertain to, for example, one or more insurance-related products. Examples would include property and casualty insurance products, as well as non-property and non-casualty insurance products. The latter grouping would include individual life insurance products such as individual term life insurance products and individual life insurance products other than term, such as permanent life insurance products. Permanent life insurance products would include such things as whole life, universal life, and the like. Where combinations of insurance products are included, they may include, for example, a combination of an individual term life insurance product and an individual permanent life insurance product. Other types of insurance products to which the variable information may pertain include health insurance products, disability insurance products, annuities, etc.

The variable financial product information also may comprise or pertain to bank-related products such as information on various types of demand deposit accounts, savings accounts and product, loan products, credit products, etc. Where the variable financial product information pertains to financial investments or brokerage-type products, the information may comprise or pertain to various investment products, financial securities, equity instruments such as common and/or preferred stocks, stock options, warrants and the like, debt instruments, money market funds, mutual funds, derivatives, etc. The variable financial product information may comprise or pertain to financial product pricing information or financial product non-pricing information, or both.

The variable information also may comprise or pertain to ancillary information, such as statistical demographic information, geo-code data, psychographic data, economic data pertaining to more than one person, e.g., pertaining to persons other than merely to a single client, and combinations of these.

The variable information also may comprise text or text information. Where it would be desirable to present differing text in the respective communications, for example, depending upon the age, marital status, etc., of the respective clients, several different versions of text may be used as variable information. Any given one of the text inputs would be used for a particular client only if that text were appropriate for that client. As noted, information other than a client identification, i.e., information in addition to the client identification information if client identification is present, may constitute the variable information.

The apparatus according to the invention comprises means for inputting into a computer-accessible storage medium variable information comprising other than (in addition to) a client identification and decision information. The input means used for a particular application will vary depending upon the format in which the information is available. Examples would include a keyboard, a disk drive, a tape drive, a hard drive, a modem, an optical scanner, a bar code reader, a pointing device such as a mouse or track ball, a network link, etc. Client information, financial product information, decision information, ancillary information, etc. may be provided on a data tape, compact disk, diskette, or similar storage medium, in which case the input means correspondingly would comprise a tape drive, a compact disk reader, a disk drive, and so on. Some records may be

14

available on non-resident databases, as noted. This is increasingly the case as online networks such as the Internet gain widespread use and acceptance. In such instances, the information may be received via modem 20.

The input means of the preferred embodiment may include any one or any combination of keyboard 16, pointing device 18, modem 20, tape drive 22, bar code reader 24, an optical scanner, mass storage device 30 (e.g., hard drive or diskette drive), and equivalent input devices. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. In some instances, bulk information may be available, for example, comprising lists of client records, in which case the input devices more suitable for transfer of bulk files would be used. Diskette drive 30, for example, as would come as standard equipment with the types of processors noted above, may be used.

The input means preferably is adapted for inputting such data and information both individually and automatically in bulk. Automatic or bulk input would be done essentially or entirely without human intervention. This is particularly desirable when inputting client information, which ideally would be capable of being inputted as client records without human intervention between input of the respective client records.

The decision information may take a number of forms, as noted above. The means for inputting the decision information therefore may assume different forms, such as those identified above and their equivalents. Preferably, the decision information will comprise one or more computer programs which include database query commands to query or filter the client information, financial product information, etc. according to desired conditions or criteria. The preferred input means for this task accordingly would comprise keyboard 16 and/or tracking and pointing device 18, operated in conjunction with the associated device-related software and software drivers.

The input means is operatively coupled to a computer-accessible storage medium so that the storage medium receives and stores the information as it is inputted. The storage medium according to the preferred embodiment may comprise RAM 28, mass storage device 30, other memory within CPU 26, tape drive 22, and any combination of these. The storage medium according to this aspect of the invention may comprise any storage device or medium capable of storing the inputted information and storing it for subsequent retrieval and transmission ultimately to CPU 26. The storage medium need not be directly connected to or directly in communication with CPU 26, provided it is capable of transferring the information to CPU 26 upon the appropriate command.

The inputting of data and information in the preferred embodiment is carried out as part of the data input module as depicted in FIG. 2. This module forms part of and interacts with the inputting means to receive the inputted client information, financial product information, and possibly ancillary information and text, and to store the information in an appropriate storage medium, such as mass storage device 30 or RAM 28.

The data input module performs tasks related to inputting information into the system. An example of the organization and task flow of the data input module is shown in FIG. 5. As noted above, data may be entered manually or automatically. For example, information may be entered using scanning technologies. Bar codes may be used on advertisements, information cards and other documentation. Scanners such as those commercially available for use with

6,076,072

**15**

processor 12 may be used to read the bar coded information. Similarly, an optical scanner may be used to scan an entire page or document, and standard image processing software may be used to read information from the scanned client information from the scanned input. The invention is not, however, limited to these input modes, and others may be used. For example, as voice recognition technology develops, there very well may be the ability to input client information merely by voicing that information into a voice recognition device, which would translate the voice information into digital client data.

The task of automatically or semi-automatically sending large numbers of communications efficiently and cost effectively generally will require that the system receive or gather on its own large volumes of client information. For a given client, the system is adapted to retrieve client information and, depending upon the circumstances, other information as well. Inherent advantages of using an automated environment to undertake such tasks is the tremendous speed with which computers can retrieve, process and store large volumes of information.

The data input module of this embodiment and method inputs data into the system from one or more of the input devices for the system, such as modem 20, tape drive 22, or bar code reader 24. The details of the data input module will depend to a certain extent upon the type of data to be input.

With further reference to FIG. 5, as data is inputted, the data input module stores it in a temporary storage area within processor 12. If necessary or appropriate, the data is converted to a format compatible with the system. For example, as is known in the database arts, it is sometimes necessary to import or export files to convert one database format to a pre-defined database structure. In this embodiment, the data input module also may tag and identify client records as they are inputted, and perform general and routine "house keeping" tasks on the data.

Once these tasks have been performed by the data input module, the properly-formatted client information is transferred to the database module. In the preferred embodiment, the database module comprises a relational database essentially equivalent to commercially-available database packages.

The database module of the preferred embodiment stores client information for general use by the system, as explained more fully below. The database stores client information so that each client is represented by a record in the database, and the various items of information for a given client are contained within fields under the record for that client. Examples of the structure and contents of a client database for life insurance, for example, may include the following fields:

Name

Address (including zip code)

Age

Tobacco user v. non-tobacco user

Marital Status

General Health

The contents of a representative client database record for marketing of individual mortgage life insurance may include the following:

**16**

| Borrower | Co-Borrower |
|---|---|
| Name | Name |
| Address | Address |
| (including zip code) | (including zip code) |
| Age | Age |
| Tobacco user v. non-tobacco user | Tobacco user v. non-tobacco user |
| Marital Status | Marital Status |
| General Health | General Health |

The contents of a representative client database record for a commercial bank may include the following:

Name
Address (including zip code)
Account Type
Account Number
Account Balance
Spouse
Occupation
Employer
Income

The database module also may include information other than client information. For example, this module typically may include a listing or database of financial products and/or financial product information. The financial product information typically would include not only the identification of the products, but information about pricing, conditions on availability (e.g., "issue constraints"), etc. Product availability conditions or constraints as used here refers generally to limitations on the availability of the product, e.g., geographic availability constraints, age range constraints, face value or amount constraints, and so forth. The product-related database also may include descriptions and explanations of the products, e.g., in the form of text information. This will be explained in greater detail in connection with the sales presentation and output module.

A sample set of tables for use in preparing and delivering client communications pertaining to life insurance products is presented in FIG. 6 (including FIG. parts 6A and 6B). These tables may be inter-related depending upon the specific design of the database or databases for a given application.

According to the method, the decision information is used or processed to automatically select variable information. In the preferred method, the decision information is used to select a subset of the variable information for inclusion in the variable portion or portions of the client communication corresponding to the variable portion or portions of the client communication format. The apparatus according to the invention similarly includes processing means operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for the client, or for each client where processing involves a plurality of client records. The subset of variable information for a given client then may be used in the subsequently-prepared communication for that client to individualize or personalize the communication. As implemented in the preferred embodiment, the processing means comprises processor 12, including CPU 26 and related components, operating under the control of processor module computer software, as shown generally in FIG. 2.

The specific identity and nature of the variable information selected by the processing module may be varied from application to application depending upon a number of factors, the most important of which is the decision information as selected by the system user. The processor module

6,076,072

17

provides tremendous flexibility. It may be adapted, for example, to handle a wide variety of classes of financial products, such as term life insurance, permanent life insurance, combinations of term and permanent life insurance, health insurances, disability insurances, long term care insurances, and the like. The processor module can accommodate any type of client information that can be incorporated into the client database. In addition, the processor module has great flexibility in the specific analytical and decision making methods and procedures used. Specific yet merely illustrative examples are provided below.

A flow chart depicting the general organization and logic flow of the processor module for the preferred embodiment and method is presented in FIG. 7. As indicated at block A, the processor module is scheduled by and operates under the general instruction of the production and scheduling module (described more fully below). The production and scheduling module would determine, for example, which of several competing jobs or client databases would be processed and in which order. The processor module flow then moves to step B, in which it retrieves decision information and other instructions delineating the tasks the system is to perform and upon which information.

The processor module flow at block C retrieves the information, in this case a client record (client information), which is to be used with the decision information in selecting the variable information. By operating upon the decision information, such as database query commands based upon the client database fields, the system processes the client information and uses it to select the variable information. The type of information retrieved by the processor module will depend upon the type of analysis under consideration, and for which the system has been adapted. Illustrative examples of such input data are described above with reference to the data input module and the database module. The processor module is described herein as processing data files sequentially, one record at a time. This is not necessarily limiting. For example, the processor module may be configured so that it processes more than one record at a time through such generally known approaches as multi-tasking or parallel processing, and/or by means of networked machines operating in parallel or otherwise concurrently.

In step C, depending on the particular application, the processor module may undertake some pre-sorting or other manipulation of the client information prior to the principal analysis of it. For example, there may be categories or items of information within a given a client record that are not utilized in the analysis and decision making procedures to be undertaken by the processor module in that application. Therefore, it may be appropriate to modify the retrieved client records to eliminate such categories or items before further processing is undertaken in the processor module.

In step D of the processor module, the processor module uses the decision information to analyze and evaluate the client information for that record to select the subset of variable information for that client. The selected variable information is outputted as step E. This may occur as each client record is processed or, preferably, for a plurality of records. The process returns to block C to retrieve the next client record, and processing is repeated at block D. This looping process is continued until all client records to be processed in fact have been processed in this manner.

A slightly more complicated application or process flow for the processor module of the preferred embodiment and method is illustrated in FIG. 8. FIG. 8 is similar to FIG. 7, but is specifically adapted for preparing client communications in connection with the marketing of life insurance.

18

Blocks A through C of FIG. 8 are essentially identical to those of FIG. 7. Block D of FIG. 8 shows considerably more detail as to the process which occurs in this example. In substep D1, the insurance need of the client is identified. This may be done, for example, based upon information in the client record such as age, marital status, financial information pertaining to the client, etc. Substep D2 involves analyzing and evaluating the client information, such as demographic data, to make the selections described in the subsequent steps. In substep D3, the processing flow decides on the number and types of insurance plans to offer to this particular client. In substep D4, the processing flow selects the financial product or products to fit each plan offered. This would be accomplished as part of the decision information and its programming. Two sample options are illustrated in the drawing figure. Option A involves presenting only certain products and/or the products of certain product carriers. Option B provides greater leeway in selecting products and plans. In substep D5, the processing flow uses client information, such as for example the client's age, financial income, and the client's zip code, to determine an amount of coverage to be offered in each plan presented to that client. The process returns to block C to retrieve the next client record, and processing is repeated at block D. This looping process is continued until all client records to be processed have been processed in this manner.

Variable information may be selected using client information, i.e., the decision information may include using client information to select the variable information for inclusion in the client communication. This is generally true regardless of the nature or content of the information actually selected as the variable information.

In step D3 of the processor module flow depicted in FIG. 8, the module decides on the number and types of plans to be proposed to the client, which represents financial product variable information. This decision is based upon the insurance needs of the clients as identified in the decision information, on the client information in the client record, and possibly on other information such as demographic information, geo-coding information, etc. This step involves making an informed intelligent decision regarding the possible solution or solutions to the product or protection needs of the customer. Factors which may be considered by the module in this selection process may include the client demographic information (e.g. age, gender, tobacco usage, and occupation) mortgage information, financial information such as income, marital information, existing policy information, family-related information, and other factors selected by the system user and incorporated into the processor module decision making criteria.

The processor module in conjunction with the decision information selects the variable information, in this example the financial products, which satisfy the decision making criteria being employed in the module. Under this substep, the processor module draws from the available product pool the most appropriate product to fit each plan selected as a candidate in this substep. Preferably the processor module has the ability to select from a large number of products and product providers. In performing this step D3, the processor module may take into consideration factors such as: the premium for the product, the compensation paid to the system user or other provider including primary and secondary compensation, legal issues, underwriting requirements, demographic information pertaining to the client, and the net cost of premiums over a specified period of time. As to legal issues, all local, state, and federal laws regarding insurance sales, for example, and additional constraints imposed by product providers may be considered.

6,076,072

19

There are numerous examples in which client information may be used to select client information. To illustrate this approach, the decision information may include the criteria of selecting a first text string describing a financial product ("text string A") if the client has an annual financial income of greater than a certain amount, e.g., $ 50,000, and selecting a second text string ("text string B"), if the client's income is less than $ 50,000. This example uses client information (annual income) to select variable information (alternative financial product descriptions) based upon decision information (income greater than or less than $ 50,000). The client's age easily could be used instead of annual income, as could virtually any other item of client information.

To further illustrate the types of decision making procedures and criteria which may be embodied in the processor module, we will use the example of individual mortgage life insurance. Pursuant to the example, assume that each client record includes the address of the property subject to the mortgage, the amount of the mortgage, the monthly mortgage payments and the following information for each borrower and co-borrower: Name, age, and gender. As part of the analytical and decision making criteria information retrieved by the processor module, a set of scenarios are provided for characterizing the client and the surrounding circumstances. Illustrative examples of the scenarios would include the following:

Scenario 1: Single individual borrower.

Scenario 2: Two borrowers of different gender, which may include a husband and wife, business partners, etc.

Scenario 3: Two borrowers of the same gender, which may include a parent and child, siblings, business partners, gay partners, etc.

As part of the retrieved decision making criteria, the processor module would retrieve the information depicted graphically in FIGS. 9 through 11. If the client record under consideration reflected a single borrower, the processor module would employ the decision making criteria (decision information) reflected in FIG. 9. According to those criteria, the processor module would determine into which of three mutually exclusive categories the mortgage falls based on the loan amount. In this example, loan amounts of at least $ 10,000 but less than $ 50,000 would fall into category A. Loan amounts of at least fifty thousand dollars but less than one hundred thousand dollars would fall into category B, whereas loan amounts of at least one hundred thousand dollars would fall into category C. At a second level of decision making, the age of the borrower would be considered. For borrowers in category A between the ages of twenty (20) and sixty-five (65), the processor module would select product package number 1 (P1), which includes three alternative plans, i.e., plan A, plan B, or plan C, as described in the box for package P1 in FIG. 9. Note that for any age or mortgage loan amounts outside the ranges indicated in FIG. 9, no proposal would be made because of issue constraints.

To the extent the client record falls into category B based on loan amount, the agent borrower similarly would be used to further categorize the record. In this illustrative example, category is segregated into two age categories, i.e., B1 and B2. Category B1 includes borrower of at least twenty (20) but less than fifty (50). Category B2 includes ages greater than fifty (50) but less than sixty-nine (69). Those records qualifying under category B1 would result in the proposal of a package P2. This package P2 would include three optional proposals, as described in the box for package P2 in FIG. 9.

For category B2, a package P3 would be proposed. Package P3 similarly includes three optional plans, as described in the box for package P3 in FIG. 9.

20

For those records falling within category C, i.e., involving loan amounts of at least $ 100,000, package P3 would be proposed.

The processor module would analyze each client record to recognize scenario # 2, i.e., two borrowers of different gender. The decision making criteria and processing undertaken for records qualifying under scenario # 2 is depicted in FIG. 10. Processing under this scenario would be very similar to that described above with regard to FIG. 9. At the initial level, each record would be categorized based on loan amount. Segregation at a second level would occur based on age of the first or principal borrowers.

Similarly to FIG. 9, those clients qualifying under scenario # 2 and falling within category A1 would be proposed a package P1 which includes three optional plans, i.e., A, B and C. A package P2 would be proposed to those clients qualifying under category B1 in FIG. 10. For those clients qualifying under category B2, a package P3 would be proposed. For those clients qualifying under category B3 of FIG. 10, a package P4 would be proposed. For clients qualifying under category C1, package P5 would be proposed. For those clients qualifying under category C2, a package P6 would be proposed.

Where the client record indicates there are two borrowers of the same gender, scenario # 3 would be implicated. The decision making criteria and processing for this illustrative example is shown in FIG. 11, which follows the same logic and processing of FIGS. 9 and 10.

In these illustrative insurance examples, two methodologies may be employed for selecting the variable product information, i.e., a product and/or product provider-specific methodology and a "best policy" analysis methodology. Both of these methodologies taken to account the information from substep D3. The first methodology considers each of the various factors which may be used to evaluate the attractiveness of that product for the particular client. Such factors considered by the processor module may include the premiums, issue constraints, compensation paid to the system user, product provider, etc., and underwriting requirement.

The "best policy" methodology evaluates and analyzes a potentially large number of product providers and products which best meet a specified set of criteria, for example, by picking the product having the lowest premium for the client.

In step I of processor module processing according to this embodiment and method (FIG. 8), the module analyzes the past or current performance on a real-time basis of various sale programs. It identifies on a real-time basis who is buying on any geographic or any demographic basis. This step involves determining what the individual client is most likely to buy, making the end users aware of that fact, recommending changes, and if given permission, or appropriately coded, automatically implementing the changes, which may occur even during the running of the module.

To better illustrate the organization, operation and flow of the processor module, another example, i.e., one involving the logic associated with the marketing of life insurance, will now be explained with reference to FIG. 12. Steps C, D, E, . . . of FIG. 12 correspond to the similar steps of FIG. 8. In step C, the processor module retrieves a client record for analysis. In step D, the module identifies the insurance need for the client, e.g., to replace lost income.

In step E, the module analyzes and evaluates client information for this client, including all pertinent client demographics available to the system. The system also may retrieve and use additional demographic data, for example from a geo-coding module.

6,076,072

| 21 | 22 |

The database module of this preferred embodiment includes a geo-coding module which includes geo-coding data. This geo-coding data can be organized by zip code and includes statistical information regarding location, average income, average education, average property values and the like within that zip code area. It can obtain in real-time any field of demographic information for use contained within the United States census.

In this illustrative example shown in FIG. 12, step F involves segregating client records by annual income. For client records reflecting an annual income of less than one hundred thousand dollars, processing continues along a path F1. For client records reflecting an annual income of at least one hundred thousand dollars, processing proceeds along a path F2.

In step G of FIG. 12, clients falling under category F1 are offered two optional term insurance plans, depending on the age of the client. For those clients having an income of less than one hundred thousand (path F1), two term insurance plans would be proposed, but specifically which two would depend upon the age of the client. For clients at least twenty (20) years old but younger than fifty (50) years, their choices would include a 15 year term policy and a 20 year term policy. For clients aged at least fifty (50) but less than sixty, the choices would include a 10 year term policy and a 15 year term policy. For clients older than sixty (60) but not over sixty-nine (69), the two choices would include a 5 year term policy and a 10 year term policy. In each of these instances, three separate coverage amounts for each of the two policies proposed would be presented. In this illustrative example, the system user may select between an Option A and an Option B. Under Option A, only specified products and/or specific product providers may be considered. Under Option B, a variety of products and product providers may be considered in selecting the appropriate plans and products for selection.

In step H of the processor module flow of FIG. 8, the module selects a specific amount or amounts of coverage to propose under each plan. This decision is based on the information as compiled in step D as described above.

These three coverage amounts are determined by multiplying the annual income by a multiplier and rounding (e.g., to the nearest $5,000 or $10,000). The multiplier for path F1 would be 1.0, 2.5 and 5.0 for plan A, B and C, respectively.

For those clients who have annual incomes in excess of at least one hundred thousand dollars (path F2), the processor module optionally proposes two term insurance plans and one cash value insurance plan. The specific plan again depend on the age of the client among other things. For clients at least twenty (20) but less than fifty (50) years old, the choices include a twenty year term policy, a 15 year term policy, and a universal life policy. For clients at least fifty (50) but not more than sixty (60), the choices include a 10 year term policy, a fifteen year term policy, and a universal life policy. For clients older than sixty (60) but less than sixty-nine (69), the choices proposed are a 5 year term policy, a 10 year term policy, and a universal life policy. In this example the processor module also selects an amount of coverage based on income. Specifically, five alternative levels of coverage are proposed corresponding to annual income multipliers of 1.0, 2.5 and 5.0, respectively.

Financial product information also may be used to select the variable information. To illustrate, a particular financial product may be offered at one price in some states and at another price in others. As part of the decision information, the system and method may use this pricing information to select text and/or pricing information as variable information for inclusion in the respective client communications.

In some instances it may be useful or otherwise desirable to use separate software packages or "link programs" to provide financial information. A link program, for example, may be used to calculate insurance premiums based on a selected set of client information. The premiums then would be imported back into the system software of FIG. 2 and used as financial product information, such as product pricing data.

The subset or subsets of the variable information selected for a given client is adapted to be inserted into or provided as an integral part of the corresponding variable portion or portions of the client communication for that client. Depending upon the manner in which the tasks are segregated, the output of the system software therefore may comprise the completed client communications ready as they are delivered to the clients. Short of this, however, the system output may comprise an intermediate product such as the subset or subsets of the variable information themselves, ready for inclusion or integration into the client communication or communications, but not yet so integrated or merged.

In the latter instance, i.e., where the system output comprises unintegrated subsets of the variable information themselves, ready for inclusion or integration into the client communications, these variable information subsets preferably would be stored and provided as part of the client information database, e.g., as was provided as part of the initial system and method input, or as a separate database. Each record of the database would include the subset of variable information for that client, as well as an identifier to identify the client, such as client name, account number, etc. This client output database could be stored, for example, to RAM 28, mass storage 30, or other suitable storage medium.

As an optional but preferred step in the method, the variable information is automatically inserted into the client communications. This step preferably involves generating the client communication according to the communication format, wherein the generating step includes inserting the subset of variable information into the variable portion of the client communication corresponding to the variable portion of the client communication format. The variable information preferably is inserted or merged into the format or other text of the client communication without unwanted gaps or spaces, so that the entire document appears to be created from a single source, or the entire document appears to be an integrated whole. The merged subset or subsets of the variable information may be formatted with the same font or a compatible font to achieve this end.

A primary objective is to deliver the finalized client communications to the clients. Accordingly, the preferred method includes a step of generating the client communications according to the communication format. The generating step includes inserting the variable information or a subset of the variable information for a given client into the variable portion of the client communication for that client. The preferred embodiment of the invention similarly includes output preparing means in operative communication with the processing means for preparing the client communication and automatically inserting the variable information or variable information subset into the client communication. In the preferred embodiment, the output preparing means comprises a computer, such as processor 12 and its CPU 26, in conjunction with and operating under the sales presentation and output module ("output module"). The output preparing means of this embodiment also includes

6,076,072

23

laser printer 32, modem 20, and similar means for creating the final form of the client communications, whether they be in the form of printed paper, electronic mail, or other form. Where the client communication is to be transmitted on a network or other electronic medium, for example, the output preparing means may comprise another computer.

The output module uses the information obtained from the processor module and optionally from other sources to generate, design, individualize and particularize all of the client communications. Marketing solicitations, ads, product- or service-related notices, presentation letters, followup letters, and reminders would be examples of such client communications. The output module automatically prepares and outputs a client communication, for example, in a form of a marketing solicitation, which provides information sufficient to enable the client to make informed, intelligent decision regarding the purchase of the plans or products selected by the processor module, or sufficient to gain the interest of a prospective buyer and motivate him or her to seek additional information. The processor module creates these client communications in a manner using a format which personalizes and individualizes the information presented to the client.

The output module of the preferred embodiment and method does not merely insert client information in the header of the client communication, nor does it merely import product information from the generic product information directly from the product-related database into the communication. The output module instead selectively can use substantial portions of client information, product information, and in many instances other information as well to generate a particularized communication tailored to the particular client for whom the communication is to be sent. The communications therefore typically will vary from individual client to individual client.

Client communications generation according to the preferred embodiment and method involves organizing, formatting and outputting client communications using information received generally from the processor module. As explained, the processor module uses client information, information about available financial products, and perhaps other available information to recommend products, plans, and the like specifically tailored to each client. The output module allows the system user to define a particularized communication format for classes of customers, such as for potential individual mortgage insurance clients. It then generates highly individualized communications specifically tailored to present that client with individualized plan and product presentations, reminders, followup, etc.

The output module is adapted to present its output in a variety of forms. For example, the output can be displayed on display 14 for visual inspection by the system user, or client, etc. The output also may be in the form of a printed communication or document using a printer such as a laser printer. It may be in the form of an automated document or data file or both, and it also may be in a form suitable for transmission, for example, over modem 20 or to a network, with or without simultaneous video conferencing.

The particular format of client communication outputs will depend upon the specific circumstances, such as client demographics, plans and products offered, and marketing objectives of the particular application. Examples of client communications prepared using the preferred system and method and employing individual mortgage life insurance programs and using a procedure similar to that described above with respect to FIGS. 9–12 are attached as Appendix 1 and Appendix 2.

24

FIG. 13 presents an illustrative flow chart diagram of the logic flow of the output module for the preferred embodiment and the preferred method. In step A of FIG. 13, the output module retrieves work to be performed from other parts of the system. For example, after a set of client records has been processed with the processor module as described above, the output module would retrieve those files and store them in temporary memory locations so that a client communication, for example, can be prepared for each client record. As part of step A, the output module retrieves instructions which would be used in preparing the client communication or other communications output. The specific nature and content of these instructions will depend upon the specific type of client communication to be prepared and the specific format for the client communication. The specific examples to be presented below also provide a description and explanation of the types of the instructions used by the output module in preparing communications.

In step B of FIG. 13, client files are grouped by user, or by the sales program to be used, or by other criteria specified by the system user. Grouping criteria preferably would be selected by the system user during a setup phase, and would remain unchanged indefinitely until a different set of grouping criteria is desired.

The processing of a set of client records to generate and output a corresponding set of client communications primarily takes place between step C and F of FIG. 13. More specifically in step C the output module receives a client record for processing. In step D, the output module analyzes and evaluates the client information from the client record, the corresponding output from the processor module for that client record, and other data or information needed to construct the communication. Other forms of data or information which might be retrieved at this point could include geo-coding data, demographic data, and the like.

In step E, the output module uses the instructions for preparation of the communication, together with the data and information from step D, to prepare the client communication. The specific manner in which the instructions and the information are used to construct the communication will vary depending upon the application, the specification of the system user and other factors. To better understand and appreciate this aspect of the invention, however, we will refer to the client communication attached hereto as Appendix 1, which is a sample communication presenting individual mortgage life insurance. Appendix 2 provides another very similar example, to which the description of Appendix 1 generally applies as well.

The sample format used for this client communication includes eight sections. Each section may or may not use information variables and insertion logic to construct the text or presentation of the section, and decisional logic (decision information) is employed to determine what if any states the variable is to assume. In other words, the instructions and/or decision logic may be employed in various places throughout a section and throughout the entire communication to adapt the communication to the particular circumstances of the client. The following discussion will provide more concrete examples of these features.

The output module may include any one or any combination of at least four types of logic or variables, including (1) customer information logic, (2) words/paragraphs/ sentence ("text") logic, (3) product/plan/amount of coverage/payment mode/underwriting logic, and (4) pricing logic. "Logic" or "variable" as referred to herein may involve the placement of a particular word, number, phase, or item of information in a particular place within the

6,076,072

<table>
<tr><td>25</td><td>26</td></tr>
</table>

communication. Insertion of such items within a blank space in a sentence would be an example. Client information logic refers to the place of the selective placement of client information in a particular location, blank space, or gap in a communication. "Text logic" refers to the insertion of Words, Paragraphs, Sentence etc. other than client information, product type and related information and pricing information, which is selectively placed in a specific location, blank space or gap in the communication. Products/Plans/Amount of Coverage/Payment Mode/ Underwriting Logic ("product logic") refers to information pertaining to any of these topics, which is to be placed in particular location, blank space or gap in the communication. Pricing logic refers to pricing information which pertains to the product which is to be positioned in a particular location, blank space or gap (variable) in the document.

The purpose and function of each of the illustrative sections as created by the output module will now be outlined and discussed. It should be borne in mind that this sample client communication is merely an example, and that virtually an infinite number of alternative formats and designs is possible.

Section 1 describes the "need" for the proposed product and why the proposal or offer is being made to the client. In the individual mortgage life insurance application, the need is straightforward, i.e., to provide funds to pay the mortgage or liquidate it upon the death of the mortgagee so the family may retain ownership of the home without the burden of a mortgage. In the individual life insurance application, the need may be less apparent because there are so many individual uses of the coverage, a prime example of which is replacement of lost income.

In terms of variables, in this section, for example, the client name, address, the loan number and the loan amount constitute client information logic gleaned from the client record. The entry at the top of the letter at "Co-Mortgager" as well as the name of the company of the third paragraph of the letter constitute text logic. The mortgage loan amount in the fourth paragraph of the communication again constitutes client information logic.

Section 2 of the sample form client communication presents proposed solutions to the need. This usually involves identifying and presenting alternative plan(s) or financial product(s) to meet the need, and factors such as the provider, coverage and price particular to each plan and product. Referring again to Appendix 1, most of section 2 comprises product logic and pricing logic. The boxed portion in which the client may select the desired plan also includes product logic, for example, in that not all product proposals will include the same plans as has been demonstrated in the examples shown above. Much of the information presented in the footnote supplementing the product presentation involves text logic, but client information logic (e.g., personal information about the client), product logic, and pricing logic also appear in this footnote material. The footnotes both front and back are highly individualized throughout.

In the case of individual life insurance, the proposed plans may include various plans which include term insurance products, and permanent insurance plans such as whole life, universal life, variable life, and the like.

Section 3 of the sample communication format of Appendix 1 explains the various products selected by the processor module for presentation to the client in this presentation. This section may include text logic and product logic, for example, in that it may provide alternative descriptions, explanations, even different tone of writing depending on such things as the age of the client.

Section 4 of the sample communication format of Appendix 1 explains each plan utilized and selected by the processor module. This section typically would include text logic and product logic in that the description would change for the various products and classes of the various plans and products. The description of plans will vary with the plan selected. In addition, for a given plan the explanation may change to more particularly addressed a given client or class of clients. For example, the explanation provided to a client in the twenty (20) to forty (40) year old category may differ from the explanation from for the same product provided to a client in the sixty-five (65) to sixty-nine (69) year old range. Similarly, the explanation for a single male may differ for a given product from the explanation provided for the same products to a married couple.

Incidentally, the location of the various sections as described herein would not typically appear sequentially, e.g., section 1, 2, 3, . . . . The order may be changed or mixed, and information from one section may be intermingled or interposed with information from another section or sections. Sections and what is contained therein also may be subject to change frequently. The number of sections also may vary.

Section 5 of the sample communication format explains to the client if there are requirements to qualify for a particular plan presented, if any. These requirements will be listed in this section 5 (if the plan requires such based on among other things, amount of insurance, age, etc.) if it is necessary to qualify with more than just the standard application presented to the client. Much of the logic here centers around Plan/Product/Amount of Coverage/Underwriting Logic, etc., text logic, and client information logic.

Section 6 of the sample communication format explains in clear, concise and individualized terms how to obtain the coverage. This section typically will include customer logic in personalizing the presentation, e.g., by inserting the clients name in various places in the text, and product logic in explaining the requirements specific to a particular product(s).

Section 7 of the sample communication format presents, in question and answer format, for example, important information and commonly asked questions regarding the plans and products shown in the presentation. This section typically would include text logic, e.g., to refer to the system user or product marketer. It also may include client information logic, e.g., to refer to specific circumstances which the customer may encounter.

Section 8 of the sample communication format is variable in nature, and may be customized for a given application, product set, system user, etc. It may, for example, provide information on how to obtain additional information, help with application forms, additional price quotes, etc. Given its customized format it may include any of the logic forms as variables, as may essentially any other section.

Through designation by the system user in interaction with the system, the output module creates the format to be used, the specific information to be included within the format, and the specific locations in the output format where the specific items of information will be used. In all formats all sections to be easy to read and highly organized, no matter what amount of information is contained in the output.

The method according to the invention also may and preferably does include a step of automatically combining the client communication with the host vehicle to create a combined communication, wherein the combined communication comprises a single document, again using the term

6,076,072

27

document in its broad sense. Where a plurality of client communications are to be prepared, this step includes automatically combining the client communication for each of the clients with the host vehicle for the corresponding and respective one of the clients to create a combined communication for the corresponding and respective one of the clients, wherein each of the combined communications comprises a single document.

In accordance with the preferred method, all client communications sent to the client could be accompanied by an application for the financial product, together with an envelope or other means to facilitate return. For example, the client communication would be accompanied by a application for the products presented therein with a return envelope. This also could include electronic communication forms, such as by return e-mail, etc. This effectively results in a one-step sales process for any or all sales programs and products marketed by the system. In many instances, little or no human interaction or involvement is required in the marketing and purchasing process beyond the initiation of the system to provide the appropriate input information.

Turning now to the administrative and support system as illustrated in FIG. 2, the various modules of this system are intended to provide support functions for the Core System modules. In addition, they include management and administrative support modules to aid management in the system, including operation of the core system, scheduling of follow-ups, future communications, etc., with little or no need for human involvement.

The production and scheduling module automates scheduling of marketing sales, preparing budgets, and the like. A flow diagram outlining the logical organization and flow of the production and scheduling module according to the preferred embodiment and method is shown in FIG. 14.

In step A of FIG. 14, the production and scheduling module accepts, stores and allows for future modification instructions for system user(s), and for all sales programs for which the system user will utilize the system. Future add-on sales programs can be easily accepted.

As shown in step B of FIG. 14, the production and scheduling module analyzes and evaluates the jobs which are to be performed by the system. This is done on a daily basis. With this information as an input, the production and scheduling module schedules operation of the core system and instructs the system to operate accordingly, as indicated in step C. In the course of this scheduling and the instruction, the production and scheduling module operates according to a set of predetermined criteria to determine the ordering and scheduling of the system operation and job performance.

As jobs are completed, the production and scheduling module causes that fact and others to be recorded in each of the client records for which processing has been successfully completed. This is indicated in step E of FIG. 14.

As an administrative support role, the production and scheduling module is capable of generating hard copy, readable, production reports, e.g., on at daily basis, as indicated in step F. of FIG. 14. Production reports may be useful for system users and operators, for example, for allocating and providing sufficient supplies, paper, toner, etc. The system also is capable of generating management reports which can aid management in activity planning, resource allocation, budgeting, etc.

The production and scheduling module also is useful for automatically following up on pre-defined activities. A key attribute of the production and scheduling module is it's ability to remember a virtually unlimited number of users and user sales program(s) and implement a virtually unlim-

28

ited number of instructions for the system to begin work at any point in the future.

The sales & financial report and analysis module ("sales and report module") assembles, calculates and outputs sales, test, financial and projected earnings reports. This can be done on a real-time basis with the preferred embodiment and method.

A flow chart which illustrates the organization and flow of the sales and financial report and analysis module for the preferred embodiment and method is shown in FIG. 15. This particular example pertains to the marketing and sale of life insurance products. As shown in that illustrative diagram, step A involves receiving sales information based on sales of financial products actually made. In step B, these sales results are inputted into the system, manually, by scanning, or by other methods described above which regard to the data input module. In step C of FIG. 15, these results are stored and organized in a sales database resident in the database module.

The sales report module analyzes and evaluates this sales data, e.g., by segregating and compiling it in formats and statistical summaries useful in management. Once calculated, compiled, etc., the data may be incorporated into and reported as sales reports, as reflected in step E of FIG. 15. These reports may be cumulative in nature or they may be non-cumulative, essentially reflecting snapshots in time. The reports also may be interactive or non-interactive, depending on the format selected, the output mode, etc. The reports may be provided to system users, management, etc. These reports also may be used in digital or automated form to interact automatically with other modules of the system, for example, the processor module.

The sales reports may compile such information as sales demographics, penetration, etc. They may reflect such statistics on several basics, such as sales submitted, the number of sales actually placed, as policies and the number of sales which resulted in falloff (for which no policy was issued or taken).

The sales module also is adapted to generate financial reports. These financial reports also may reflect sales on a submitted, placed, and/or falloff basis. They may be incorporated with other data to reflect actual and/or projected earnings reports, commission reports, and the like.

The system also supports a telemarketing function using the telemarketing module. An illustrative flow chart which outlines the organization and flow of the telemarketing module according to the preferred embodiment and method for the marketing of life insurance products is shown in FIG. 16. In accordance with that flow chart, the operator would log on to the system and thereby gain access to it. Communications between the operator and clients would take place, for example, through inbound or outbound calls. For existing clients for whom a client record exists in the client database, that record would be retrieved and edited appropriately. Where no client record exists, a new one would be created as reflected in FIG. 16. In both instances, information would be entered into the system so that the client record reflects the appropriate client information. When this task is complete, the call is disconnected. At this stage, the operator may instruct the system, e.g., to schedule an input the client record for processing in the core system to generate a client communication. To create a record of the communication the operator would complete the compliance note pad to reflect the conversation and the events which occurred during it.

The automated new business ("new business") module supports the processing for new business. The automated

6,076,072

29

portion of this module supports the future policy holder service and insurance need of the client automatically. Flow chart reflecting the organization and logic of this module is shown in FIG. 17.

Referring to FIG. 17, as sales are made the sales information is received by the system user. The sale results are inputted, for example, by scanning, or by other input means, e.g., as disclosed in the discussion of the data input module. As new sales are made a corresponding client record is created in this module. The module automatically creates a "thank you" notification, which is particularized for that particular client. It confirms the products that have been purchased and the corresponding coverage. The automatically-generated communications also lists any outstanding requirements the client needs to execute to obtain product.

In addition to generating a confirming notice to the client, the system also manages the tasks, if any which correspond with sales and new business. As reflected in FIG. 17, such followup tasks may include sending submission materials to the product provider, processing the new business, e.g., from an accounting perspective, attending to function relating to issuance of an insurance policy, placement functions, etc. Client records and other system files are updated as appropriate to reflect the sales, the correspondence of the client, etc.

In performing these tasks, it may be necessary in some instances to undertake additional communications, which may implicate the communications and interface module. These communication may be required, for example to order medical examinations, to order attending physicians statements, and to obtain all other information pertaining to the client as required under the circumstances. This module will follow-up on these requirements automatically with no human intervention.

Additional advantages and modifications will readily occur to those skilled in the art. Therefore, the invention in its broader aspects is not limited to the specific details, representative devices, and illustrative examples shown and described. Accordingly, departures may be made from such details without departing from the spirit or scope of the general inventive concept as defined by the appended claims and their equivalents.

What is claimed is:

1. A method for automatically preparing a client communication pertaining to a financial product or insurance product for a client, wherein the client communication is for combined use with a corresponding and respective host vehicle, the method comprising:

selecting information from a database comprising information about a plurality of clients;

using decision information to automatically select from the database variable information, the variable information comprising other than client identification, automatically inserting the variable information into the client communication, and combining the client communication with the host vehicle into a single communication.

2. A method as recited in claim 1, wherein the variable information comprises client information.

3. A method as recited in claim 2, wherein the variable information comprises client information other than a client name.

4. A method as recited in claim 2, wherein the variable information comprises client information other than a client address.

5. A method as recited in claim 2, wherein the variable client information comprises client family information.

30

6. A method as recited in claim 2, wherein the variable client information comprises client age information.

7. A method as recited in claim 2, wherein the variable client information comprises client geographic information other than client address information.

8. A method as recited in claim 2, wherein the variable client information comprises client purchasing information.

9. A method as recited in claim 2, wherein the variable client information comprises client asset information.

10. A method as recited in claim 2, wherein the variable client information comprises client liability information.

11. A method as recited in claim 2, wherein the variable client information pertains to a mortgage.

12. A method as recited in claim 2, wherein the variable client information comprises client financial income information.

13. A method as recited in claim 2, wherein the variable client information comprises client occupation information.

14. A method as recited in claim 2, wherein the variable client information comprises client activity information.

15. A method as recited in claim 2, wherein the variable client information comprises at least one of psychographic and demographic client data.

16. A method as recited in claim 1, wherein the variable information comprises other than a client name, address, age, marital status, tobacco habits, type of life insurance and amount of life insurance coverage.

17. A method as recited in claim 1, wherein the variable information comprises financial product information.

18. A method as recited in claim 17, wherein the variable financial product information pertains to a plurality of different financial products.

19. A method as recited in claim 17, wherein the variable financial product information pertains to a non-property and non-casualty insurance product.

20. A method as recited in claim 17, wherein the variable financial product information pertains to an individual life insurance product.

21. A method as recited in claim 17, wherein the variable financial product information pertains to an individual term life insurance product.

22. A method as recited in claim 17, wherein the variable financial product information pertains to an individual life insurance product other than a term life insurance product.

23. A method as recited in claim 17, wherein the variable financial product information pertains to an individual term life insurance product and an individual permanent life insurance product.

24. A method as recited in claim 17, wherein the variable financial product information pertains to a disability insurance product.

25. A method as recited in claim 17, wherein the variable financial product information pertains to an annuity.

26. A method as recited in claim 17, wherein the variable financial product information pertains to a savings product.

27. A method as recited in claim 17, wherein the variable financial product information pertains to an investment product.

28. A method as recited in claim 17, wherein the variable financial product information pertains to a financial security.

29. A method as recited in claim 17, wherein the variable financial product information pertains to a loan product.

30. A method as recited in claim 17, wherein the variable financial product information pertains to at least one of an equity instrument, a debt instrument, a money market fund, and a mutual fund.

31. A method as recited in claim 1, wherein the variable information comprises financial product pricing information.

6,076,072

31

32. A method as recited in claim 31, wherein the variable information further includes financial product non-price information.

33. A method recited in claim 1, wherein the variable information comprises ancillary information.

34. A method as recited in claim 33, wherein the ancillary information comprises statistical demographic information.

35. A method as recited in claim 33, wherein the ancillary information comprises geo-code data.

36. A method as recited in claim 33, wherein the ancillary information comprises psychographic data.

37. A method as recited in claim 33, wherein the ancillary information comprises economic data pertaining to more than one person.

38. A method as recited in claim 1, wherein the variable information comprises text.

39. A method as recited in claim 1, further including a step of automatically combining the client communication with the host vehicle to create a combined communications, wherein the combined communication comprises a single document.

40. A method as recited in claim 39, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

41. A method as recited in claim 39, wherein the variable product information comprises financial product information.

42. A method as recited in claim 39, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

43. A method as recited in claim 39, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

44. The method as recited in claim 39, further comprising sending the combined communication to the client via the internet.

45. The method as recited in claim 44, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

46. The method as recited in claim 45, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

47. The method as recited in claim 44, wherein the variable product information comprises financial product information.

48. The method as recited in claim 44, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

49. The method as recited in claim 1, further comprising sending the client communication to the client via the internet.

50. The method as recited in claim 49, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

51. The method as recited in claim 50, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

52. The method as recited in claim 49, wherein the variable product information comprises financial product information.

53. The method as recited in claim 49, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

32

54. The method as recited in claim 39, further comprising sending the combined communication to the client by means other than the internet.

55. The method as recited in claim 54, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

56. The method as recited in claim 55, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

57. The method as recited in claim 54, wherein the variable product information comprises financial product information.

58. The method as recited in claim 54, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

59. The method as recited in claim 1, further comprising sending the client communication to the client by means other than the internet.

60. The method as recited in claim 59, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

61. The method as recited in claim 60, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

62. The method as recited in claim 59, wherein the variable product information comprises financial product information.

63. The method as recited in claim 59, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

64. The method of claim 1, wherein the single communication is in a single document.

65. A method for automatically preparing a plurality of client communications pertaining to a financial or insurance product for a corresponding and respective plurality of clients, wherein the client communications are for combined use with a corresponding and respective plurality of host vehicles, the method comprising:

selecting information from a database comprising information about a plurality of clients;

using for each client decision information to automatically select from the database variable information, the variable information for each of the plurality of clients comprising other than a client identification, automatically inserting the variable information into each of the client communications; and

combining each client communication with its respective host vehicle.

66. An apparatus for automatically preparing a client communication pertaining to a financial product for a client, wherein the client communication is for combined use with a corresponding host vehicle, the apparatus comprising:

means for inputting into a computer-accessible storage medium variable information comprising other than a client identification and decision information;

processing means operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for the client; and

output preparing means in operative communication with the processing means for preparing the client communication, automatically inserting the subset of

6,076,072

33

the variable information into the client communication, and for combining the client communication with a host vehicle.

67. An apparatus as recited in claim 66, wherein the inputting means comprises a disk drive.

68. An apparatus as recited in claim 66, wherein the inputting means comprises a tape drive.

69. An apparatus as recited in claim 66, wherein the inputting means comprises an optical scanner.

70. An apparatus as recited in claim 66, wherein the inputting means comprises a bar code reader.

71. An apparatus as recited in claim 66, wherein the inputting means comprises a modem.

72. An apparatus as recited in claim 66, wherein the output preparing means comprises a laser printer.

73. An apparatus as recited in claim 66, wherein the output preparing means comprises a modem.

74. An apparatus as recited in claim 66, wherein the output preparing means comprises a computer.

75. An apparatus for automatically preparing a plurality of client communications pertaining to a financial product for a corresponding and respective plurality of clients, wherein the client communications are for combined use with a corresponding and respective plurality of host vehicles, the apparatus comprising:

means for inputting into a computer-accessible storage medium variable information comprising other than a client identification and decision information;

processing means operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for each of the clients; and

output preparing means in operative communication with the processing means for preparing the client communications, for automatically inserting into the client communication the subset of variable information for the corresponding and respective client, and for combining the client communication with a host vehicle.

76. A method for automatically preparing a client communication pertaining to a financial product for a client, wherein the client communication is for combined use with a corresponding host vehicle, the method comprising:

providing a format for the client communication wherein the communication format includes a variable portion;

inputting into a computer-accessible storage medium variable information about a plurality of clients other than client identification;

inputting into the storage medium decision information;

using the decision information to select a subset of the variable information for inclusion in a variable portion of the client communication corresponding to the variable portion of the client communication format, and combining the client communication with the host vehicle.

77. A method as recited in claim 76, further including a step of automatically combining the client communication with the host vehicle to create a combined communication, wherein the combined communication comprises a single document.

78. A method of automatically preparing a plurality of client communications pertaining to a financial product for a corresponding and respective plurality of clients, wherein each of the client communications is for combined use with a corresponding and respective host vehicle, the method comprising:

34

providing a format for the client communications wherein the communication format includes a variable portion;

inputting into a computer-accessible storage medium variable information about a plurality of clients other than a client identification;

inputting into the storage medium decision information; and

using the decision information to select a subset of the variable information for each of the clients for inclusion in a variable portion of the client communication for that client, the variable portion of the client communications corresponding to the variable portion of the client communication format, and combining the client communication with the host vehicle.

79. A method as recited in claim 78, further including a step of automatically combining the client communication with the host vehicle to create a combined communication, wherein the combined communication comprises a single document.

80. A computer-based method for automatically preparing a plurality of client communications pertaining to a financial or insurance product for a corresponding and respective plurality of clients, the method comprising:

using decision information comprising software to automatically select variable information about clients from a software database comprising variable information about a plurality of clients, the variable information comprising other than a client identification;

automatically inserting the variable information into each of a plurality of client communications, each client communication customized for one of the clients based on the decision information; and

combining each of the customized client communications with a host vehicle directed to a particular one of the plurality of clients.

81. The method as recited in claim 80, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

82. A method as recited in claim 80, wherein the variable product information comprises financial product information.

83. A method as recited in claim 80, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

84. A method as recited in claim 80, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

85. A method as recited in claim 80, wherein the variable information comprises financial product information.

86. A method as recited in claim 85, wherein the financial product information pertains to an annuity.

87. A method as recited in claim 85, wherein the financial product information pertains to a savings product.

88. A method as recited in claim 85, wherein the financial product information pertains to an investment product.

89. A method as recited in claim 85, wherein the financial product information pertains to a financial security.

90. A method as recited in claim 85, wherein the financial product information pertains to a loan product.

91. A method as recited in claim 85, wherein the financial product information pertains at least one of an equity instrument, a debt instrument, a money market fund, and a mutual fund.

92. A method as recited in claim 80, wherein the variable product information pertains to a plurality of different financial products.

6,076,072

35

93. A method as recited in claim 80, wherein the variable product information pertains to a non-property and non-casualty insurance.

94. A method as recited in claim 80, wherein the variable product information pertains to an individual life insurance product.

95. A method as recited in claim 80, wherein the variable product information pertains to an individual term life insurance product.

96. A method as recited in claim 80, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

97. A method as recited in claim 80, wherein the variable product information pertains to an individual permanent life insurance product.

98. A method as recited in claim 80, wherein the variable product information pertains to a disability insurance product.

99. The method of claim 80, further comprising sending the communication, created for each of the corresponding and respective one of the plurality of clients, to the respective client via the internet.

100. The method as recited in claim 99, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

101. A method as recited in claim 99, wherein the variable product information comprises financial security product information.

102. A method as recited in claim 99, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

103. A method as recited in claim 99, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

104. A method as recited in claim 99, wherein the variable information comprises financial product information.

105. A method as recited in claim 104, wherein the financial product information pertains to an annuity.

106. A method as recited in claim 104, wherein the financial product information pertains to a savings product.

107. A method as recited in claim 104, wherein the financial product information pertains to an investment product.

108. A method as recited in claim 104, wherein the financial product information pertains to a loan product.

109. A method as recited in claim 104, wherein the financial product information pertains at least one of an equity instrument, a debt instrument, a money market fund, and a mutual fund.

110. A method as recited in claim 99, wherein the variable product information pertains to a plurality of different financial products.

111. A method as recited in claim 99, wherein the variable product information pertains to a non-property and non-casualty insurance.

112. A method as recited in claim 99, wherein the variable product information pertains to an individual life insurance product.

113. A method as recited in claim 99, wherein the variable product information pertains to an individual term life insurance product.

114. A method as recited in claim 99, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

36

115. A method as recited in claim 99, wherein the variable product information pertains to an individual permanent life insurance product.

116. A method as recited in claim 99, wherein the variable product information pertains to a disability insurance product.

117. The method of claim 80, further comprising sending the communication, created for each of the corresponding and the respective one of the plurality of the clients, to the respective client by means other than the internet.

118. The method as recited in claim 117, wherein the variable information comprises other than a client name, address, age, medical status, tobacco habits, type of life insurance and amount of life insurance coverage.

119. A method as recited in claim 117, wherein the variable product information comprises financial security product information.

120. A method as recited in claim 117, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

121. A method as recited in claim 117, wherein the variable product information pertains to an individual life insurance product other than a permanent life insurance product.

122. A method as recited in claim 117, wherein the variable information comprises financial product information.

123. A method as recited in claim 122, wherein the financial product information pertains to an annuity.

124. A method as recited in claim 122, wherein the financial product information pertains to a savings product.

125. A method as recited in claim 122, wherein the financial product information pertains to an investment product.

126. A method as recited in claim 122, wherein the financial product information pertains to a loan product.

127. A method as recited in claim 122, wherein the financial product information pertains at least one of an equity instrument, a debt instrument, a money market fund, and a mutual fund.

128. A method as recited in claim 117, wherein the variable product information pertains to a plurality of different financial products.

129. A method as recited in claim 117, wherein the variable product information pertains to a non-property and non-casualty insurance.

130. A method as recited in claim 117, wherein the variable product information pertains to an individual life insurance product.

131. A method as recited in claim 117, wherein the variable product information pertains to an individual term life insurance product.

132. A method as recited in claim 117, wherein the variable product information pertains to an individual life insurance product other than a term life insurance product.

133. A method as recited in claim 117, wherein the variable product information pertains to an individual permanent life insurance product.

134. A method as recited in claim 117, wherein the variable product information pertains to a disability insurance product.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO : 6,076,072

DATED        : June 13, 2000

INVENTOR(S): Richard Marc Libman

It is certified that error appears in the above-identified patent and that said Letters Patent
are hereby corrected as shown below:

In Claim 102, Column 35, line 31 of the Patent, change
"instance" to --insurance--.

In Claim 114, Column 35, line 65 of the Patent, change
"tern" to --term--.

Signed and Sealed this

Third Day of April, 2001

Attest:

*Nicholas P. Godici*

NICHOLAS P. GODICI

Attesting Officer          Acting Director of the United States Patent and Trademark Office

# Sub Tab B

US005987434A

# United States Patent [19]

Libman

[11]   Patent Number:   **5,987,434**

[45]   Date of Patent:   **Nov. 16, 1999**

[54]   **APPARATUS AND METHOD FOR TRANSACTING MARKETING AND SALES OF FINANCIAL PRODUCTS**

[76]   Inventor:   **Richard Marc Libman**, 928 20th St. Unit #6, Santa Monica, Calif. 90403

[21]   Appl. No.: **08/661,004**

[22]   Filed:   **Jun. 10, 1996**

[51]   Int. Cl.⁶ ............................................... G06F 157/00
[52]   U.S. Cl. ............................... 705/36; 705/34; 705/35; 705/39; 705/42
[58]   Field of Search ........................... 705/4, 36, 42, 705/35, 38, 39, 41, 30, 34, 7; 364/401; 395/201, 244

[56]   **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,831,526 | 5/1989 | Luchs et al. | 705/4 |
| 5,124,911 | 6/1992 | Sack | 705/10 |
| 5,220,501 | 6/1993 | Lawlor et al. | 364/408 |
| 5,502,636 | 3/1996 | Clarke | 364/401 |
| 5,504,675 | 4/1996 | Cragun et al. | 364/401 |
| 5,523,942 | 6/1996 | Tyler et al. | 705/4 |
| 5,537,314 | 7/1996 | Kanter | 364/406 |
| 5,592,375 | 1/1997 | Salmon et al. | 705/7 |
| 5,640,835 | 6/1997 | Muscoplat | 53/569 |
| 5,643,402 | 7/1997 | Ryan et al. | 705/38 |
| 5,644,727 | 7/1997 | Atkins | 705/40 |
| 5,655,085 | 8/1997 | Ryan et al. | 705/4 |
| 5,710,889 | 1/1998 | Clark et al. | 395/244 |
| 5,819,241 | 10/1998 | Reiter | 705/408 |

### OTHER PUBLICATIONS

"Agenda for Windows" Software Brochure from Agena Corporation, Nov. 1995.
"Agency Manager for Windows" Software Brochure from Applied Systems, Los Angeles, California, 1994.
SelectQuote Insurance Services Letters and Quote, Select-Quote Insurance Services of San Francisco, California, Jun. 12, 1995.

Saommers/Moreland & Associates, Inc. Letter and Quote, Sommers/Moreland & Associates, Inc., Atlanta, Georgia, Jul. 8, 1995.
Wells Fargo Insurance Services Letter and Sales Literature, Wells Fargo Insurance Services, Brisbane, California, date unknown.
Consumers Choice Financial Services Company Quote.
USAA Credit Card Statement Attachment.
AT&T Account Statement.
David T. Phillips and Co. Insurance Solicitation.
Equigard Insurance Services, Inc. Solicitation.
CONA Life Insurance Solicitation.
American Savings Bank Solicitation.
IQ Insurance Quote Services, Inc. Solicitation.
TermQuote Life Insurance Solicitation.

*Primary Examiner*—Allen R. MacDonald
*Assistant Examiner*—Romain Jeanty
*Attorney, Agent, or Firm*—Snell & Wilmer L.L.P.

[57]   **ABSTRACT**

An apparatus and method which use client information to automatically select and present financial products appropriate for the client. The apparatus according to one aspect includes an input device for inputting client information, financial product information, ancillary data, and decision criteria; a storage device for storing the inputted items; decision making logic circuitry for using the inputted items to select a subset of the financial products; and an output device for preparing a client communication which identifies the subset of the financial products. The output device incorporates a portion of the client information and a portion of the financial products information into the client communication. The method according to one aspect includes inputting the same items; storing these inputted items; using the stored items to select a subset of the financial products; and preparing a client communication which identifies the subsets of the inputted information and incorporates it into the client communication.

**56 Claims, 14 Drawing Sheets**



Exhibit A

**U.S. Patent**        Nov. 16, 1999        Sheet 1 of 14        5,987,434



*Fig. 1*

**U.S. Patent**     Nov. 16, 1999     Sheet 2 of 14     **5,987,434**



Fig. 2

**U.S. Patent**          Nov. 16, 1999          Sheet 3 of 14          **5,987,434**



*Fig. 3*

**U.S. Patent**       Nov. 16, 1999       Sheet 4 of 14       **5,987,434**



*Fig. 4*

U.S. Patent          Nov. 16, 1999          Sheet 5 of 14          5,987,434



*Fig. 5*

U.S. Patent        Nov. 16, 1999        Sheet 6 of 14        5,987,434



Fig. 6

**U.S. Patent**    Nov. 16, 1999    Sheet 7 of 14    5,987,434



*Fig. 7*

U.S. Patent          Nov. 16, 1999          Sheet 8 of 14          5,987,434



Fig. 8

**U.S. Patent**        Nov. 16, 1999        Sheet 9 of 14        **5,987,434**



U.S. Patent          Nov. 16, 1999          Sheet 10 of 14          5,987,434



*Fig. 10*



A — ACCEPTS, STORES, AND ALLOWS FOR FUTURE MODIFICATION INSTRUCTIONS FOR USER AND ALL SALES PROGRAM(S) FOR WHICH USER WILL UTILIZE SYSTEM.

B — ON A DAILY BASIS, ANALYZES AND EVALUATES WHAT JOB(S) ARE TO BE PERFORMED BY THE SYSTEM.

C — INSTRUCTS THE SYSTEM ON WHAT IS TO BE PERFORMED.

D — ANALYZE AND EVALUATE THE ORDER AND PRIORITY TO PERFORM JOB(S).

E — RECORDS THAT THE JOB(S) HAS BEEN COMPLETED IN EACH CLIENT RECORDS.

GENERATE PRODUCTION REPORTS

F — PRODUCTION REPORTS FOR:
  –SUPPLIES
  –APPLICATIONS
  –PAPER
  –TONER
  –ETC.

MANAGEMENT REPORTS FOR:
  –ACTIVITY PLANNING
  –RESOURCE ALLOCATION
  –BUDGETING
  –ETC.

*Fig. 11*

U.S. Patent     Nov. 16, 1999     Sheet 12 of 14     5,987,434



*Fig. 12*

U.S. Patent          Nov. 16, 1999          Sheet 13 of 14          5,987,434



Fig. 13

**U.S. Patent**    Nov. 16, 1999    Sheet 14 of 14    **5,987,434**



*Fig. 14*

5,987,434

1

## APPARATUS AND METHOD FOR TRANSACTING MARKETING AND SALES OF FINANCIAL PRODUCTS

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to apparatus and methods for marketing financial products such as individual insurance policies. More specifically, it relates to apparatus and methods for marketing such products in a fully automated or significantly automated manner to achieve high volumes of transactions and sales in a short period of time.

#### 2. Description of the Related Art

Financial products such as life insurance products, health insurance products, and the like traditionally have been marketed largely through the use of agents. The product providers, such as the insurance companies actually providing the insurance, rely upon the agents to perform a host of essential tasks to sell their products. The agents, for example, typically identify prospective clients ("prospects") and communicate with these prospects to determine which of the various financial products are appropriate for that individual. A "prospective client" or "client" as used in this document refers to a person, company, or other entity to whom a financial product has never before been sold by the system user of marketer, and an existing client of that user or marketer which has purchased financial products in the past and for which a client record has been created in the client database as described more fully below. In a representative case, for example, the agent obtains a limited amount of basic or "lead" information about the prospective client from which to initiate the marketing contact. In the case of a mortgage insurance policy, for example, the agent may obtain the type of information included in a recorded deed instrument, including the potential client's name, address, age, and mortgage amount. From this lead information, the agent typically would prepare introductory materials, and contact the prospective client by telephone to solicit a meeting in the client's home or business. The agent then would meet with the client and attempt to propose financial products most suitable for the particular circumstances.

There have been several attempts in recent years to mass market term life insurance products. A typical format would be as follows. The marketer generally places ads directed to the general public which provide either an (800) telephone number or a return postcard. Through either a return call from the prospective client or the return postcard from the prospective client, lead information is obtained, including the name, age, and smoker versus nonsmoker status of the client, and the amount of term insurance desired. From this lead information, the marketer selects from the term life insurance products available to it. In some instances, the marketer may select several products offering low premiums and provide them to the client, for example, in table format, for selections by the client. The marketer then includes these product selections in a presentation letter which is sent to the prospective client. The presentation letter typically will list as the addressee the client, and it will provide the lead information at the introduction of the letter.

Regardless of the marketing techniques, gaining the consideration of the prospective client may require global follow-up in the form of multiple letters or other contacts, perhaps staged over a period of time selected by the agent as appropriate for the circumstances. Over this time period, the circumstances and needs of the prospective client may have

2

changed, perhaps in ways that are somewhat predictable based on the initial lead information. For example, shortly after purchase of a new home and recording of the mortgage, the new homeowner may have a cash flow shortage which limits the attractiveness of mortgage insurance. Perhaps one year later, however, after the family is settled in and the various expenses of new home ownership have been accommodated, the homeowner may have a better cash flow situation and be far more inclined to purchase this type of insurance. Therefore, a followup presentation letter a year or so after the initial home purchase would be very timely and beneficial.

For those prospective clients who have responded to the presentation materials, the agent might seek additional client information, for example, such as their marital status, whether they smoke, their general health, etc. This would enable the agent to further refine or revisit the financial products selected for consideration by that prospective client. It hopefully results in the final selection of the particular product best suited for that client.

Upon approval by the prospective client, the agent or marketer then prepares an application to the provider for the selected financial product. Depending upon the financial product involved, the agent may be required to follow up, for example, by ordering medical reports, medical exams, etc., for the provider or underwriter.

Marketing processes such as the ones described above have been substantially limited in that they require significant amounts of the agent's or an agent telemarketer's time and attention. Moreover, the market for these products in terms of potential clients numbers in the millions per year. Each client has particularized circumstances and needs, and these circumstances and needs typically vary over time. The variety of financial products, even for a given need, is substantial. Considering all of these factors, the volume of transactions that can be undertaken by a given agent or agent telemarketer is relatively limited.

Attempts have been made in the past to automate limited portions of the various marketing tasks. It is not uncommon, for example, for insurance marketing organizations to maintain a database of potential clients and related client and prospective client information. Most insurance marketing companies also maintain databases of insurance products and related pricing information.

There are some insurance marketing companies, for example, which use computer software to select a set of candidate financial products from a larger set of possible products based upon premium prices. Some of the mass marketing organizations referred to above are examples.

In systems used by several mass marketers selling term life insurance, usually in conjunction with a telemarketer on the telephone, for example, the agent or an assistant enters lead client information into a computer, whereupon the software selects and displays the four or five term insurance policies offering the desired level of coverage for the lowest premium cost. The client information, together with the selected financial product information, then can be used to prepare introductory materials such as a presentation letter to the potential client, as previously described. The product selection and presentation letter preparation are done automatically.

Such known automated systems, however, have been subject to a number of important limitations and drawbacks. For example, they have been limited largely if not entirely to one of two major types (term of permanent) or product, i.e., term life insurance. The ability of these software sys-

5,987,434

**3**

tems to select from among alternative financial products has been extremely primitive. In most instances, the ability of the system is limited to selections based solely or predominantly on the insurance premium. They also typically require the attention of and interaction with the agent or telemarketer to gather and input the lead client information, and to aid in the selection of the most advantageous products for presentation to the client.

Another important drawback of such known systems is the limited extent to which they personalize the presentation letter or other communication. The presentation letter resulting from such systems usually is a form letter which merely lists the client information at the top of the letter, lists the product or products selected, and provides a brief non-individualized description or explanation of the product. The extent to which the communications take into account the particular circumstances and needs of the individual prospective client including individualized explanations necessary to make an informed decision about the highlighted products, has been extremely limited.

These known systems also are limited in their ability to process large volumes of prospective client communications. This is attributable in large part to their requirement for human input and decision making as a necessary part of their operation, and because of the relatively unsophisticated nature of the known systems.

All of these methods and systems have been limited in that they require a substantial amount of human involvement. This necessitates substantial cost for wages, salaries, benefits, etc., and it can increase the likelihood of errors.

3. Objects of the Invention

Accordingly, an object of the present invention is to provide an apparatus and method for transacting financial product marketing and sales which is capable of being highly automated.

Another object of the invention is to provide an apparatus and method for transacting financial product marketing and sales which is capable of processing relatively large volumes of client communications efficiently.

Another object of the invention is to provide an apparatus and method for transacting financial product marketing and sales which are relatively cost effective compared to prior approaches.

Another object of the invention is to provide an apparatus and method for transacting financial product marketing and sales which are more personalized and individualized to individual prospective client relative to prior approaches.

Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be apparent from the description, or may be learned by practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instrumentalities and combinations pointed out in the appended claims.

SUMMARY OF THE INVENTION

To achieve the foregoing objects, and in accordance with the purposes of the invention as embodied and broadly described in this document, an apparatus and method for transacting financial product marketing and sales is provided. The apparatus and methods according to the invention provide a marked departure from known financial product marketing and sales systems, for example, in that they allow for the virtually complete automation of the tasks traditionally performed by agents and telemarketers in transacting

**4**

such marketing and sales. Automatically, with little or no human intervention and with essentially no time delays, they can analyze and evaluate client information, incorporate additional information, determine and/or compare client needs with various available financial products to solve needs, select and/or recommend products most appropriate for the individual needs of each prospective client, and prepare personalized and individualized correspondence specifically tailored for each individual prospect to effectively communicate the information to the prospective client that he or she needs to make an informed buying decision.

The apparatus according to one aspect of the invention uses client information from a client to automatically select and present financial products appropriate for the client. The apparatus comprises means for inputting client information relevant to a need by the client for the financial products, for inputting information about the financial products, for inputting ancillary data which excludes the client information and the financial products information, and for inputting decision criteria pertaining to selection from among the financial products. The apparatus further includes means for storing the client information, the financial products information, the ancillary information, and the decision criteria. The apparatus still further includes means for using the client information, the financial products information, the ancillary information, and the decision criteria to select a subset of the financial products. It further includes means for preparing a client communication which identifies the subset of the financial products. The client communication preparing means incorporates a portion of the client information and a portion of the financial products information into the client communication.

The method according to one aspect of the invention also uses client information from a client to automatically select and present financial products appropriate for the client. The method comprises inputting client information relevant to a need by the client for the financial products, inputting information about the financial products, inputting ancillary data which excludes the client information and the financial products information, and inputting decision criteria pertaining to selection from among the financial products. The method also includes storing the client information, the financial products information, the ancillary information, and the decision criteria. This method further includes using the client information, the financial products information, the ancillary information, and the decision criteria to select a subset of the financial products. It further includes preparing a client communication which identifies the subset of the financial products. This client communication preparing step includes incorporating a portion of the client information and a portion of the financial products information into the client communication.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate a presently preferred embodiment and a presently preferred method of the invention. These drawings, together with the general description given above and the detailed description of the preferred embodiment and method given below, serve to explain the principles of the invention.

FIG. 1 is a hardware block diagram of the preferred embodiment of the invention;

FIG. 2 is a flow chart diagram illustrating the preferred embodiment and method of the invention;

FIG. 3 provides an illustrative main menu for the system depicted in FIG. 2;

Case 1:08-cv-02187     Document 34-3     Filed 09/08/2008     Page 81 of 88

Case 1:07-cv-99999     Document 2619-4     Filed 04/16/2008     Page 30 of 42

5,987,434

**5**

FIG. 4 is a flow chart diagram illustrating the data input module of the preferred embodiment and method of the invention;

FIG. 5 is a flow chart diagram illustrating the Virtual Agent™ module of the preferred embodiment and method of the invention;

FIG. 6 is a flow chart diagram illustrating a specific example of the organization and flow of the Virtual Agent™ module specifically pertaining to a individual mortgage life insurance program;

FIG. 7 is a flow chart diagram illustrating a specific example of the organization and flow of the Virtual Agent™ module specifically pertaining to a individual mortgage life insurance program;

FIG. 8 is a flow chart diagram illustrating a specific example of the organization and flow of the Virtual Agent™ module specifically pertaining to an individual mortgage life insurance program;

FIG. 9 is a flow chart diagram illustrating a specific example of the organization and flow of the Virtual Agent™ module specifically pertaining to a basic individual life insurance program;

FIG. 10 a flow chart diagram illustrating the organization and flow of the sales presentation and output module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 11 is a flow chart diagram illustrating the organization and flow of the production and scheduling module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 12 is a flow chart diagram illustrating the organization and flow of the sales and financial report and analysis module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 13 is a flow chart diagram illustrating the organization and flow of the telemarketing module of the preferred embodiment and method as depicted in FIG. 2; and

FIG. 14 is a flow chart diagram illustrating the organization and flow of the automated agency and new business processing module of the preferred embodiment and method as depicted in FIG. 2.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT AND METHOD

Reference will now be made in detail to the presently preferred embodiment and method of the invention as illustrated in the accompanying drawings, in which like reference characters designate like or corresponding parts throughout the drawings.

The presently preferred embodiment of the invention comprises an apparatus and method for transacting the marketing and sales of financial products. Financial products as the term is used in this document refers to insurance products such as individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, and the like. Financial products, however, also may include other forms of financial instruments.

For purposes of illustration and not by way of limitation, the financial products discussed in this document in connection with the preferred embodiment and preferred method comprise individual insurance products, such as individual life insurance and health insurance. Examples of life insurance would include individual term and permanent life insurance instruments such as whole life, universal life, level and decreasing term life insurance, and the like. It is to be understood, however, that the invention is not necessarily limited to these products.

**6**

A presently preferred embodiment of the apparatus according to the invention is illustrated in FIG. 1. This embodiment comprises a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations. A network server 10 is shown in FIG. 1. Computer workstation nodes would be very similarly configured. In addition to the server and workstation nodes, system nodes also may include output devices, such as laser printers (not shown). Each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse 22, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24.

The processor of each computer node (server or workstation) includes a central processing unit (CPU) 26, random access memory (RAM) 28, and at least one mass storage device 30. The design and configuration of CPU 26 is not limiting, and may include any of the CPU designs sold as standard components with high-end IBM-compatible personal computers or business machines. Such processors include Pentium™ processors from Intel Corp., Santa Clara, Calif., Power PC processors from IBM Corp., and their substantial equivalents, preferably with at least 16 megabytes of RAM and a hard drive with at least about 500 megabytes of storage capacity. The capability and speed of CPU 26 will depend upon the specific application to which the apparatus is to be put, the volume of data to be handled, etc. In the preferred embodiment of FIG. 1, the CPU of the principal server comprises a 100 MHz Pentium-based processor with 32 megabytes of RAM and a 2 gigabyte hard drive. The CPUs of the network workstations comprise 90 to 100 MHz Pentium-based processors with at least about 16 MHz of RAM and at least about 500 megabytes of hard disk storage capacity.

Display 14 should be compatible with the processor, and preferably should have a resolution of at least about 800x 600 pixels. Other than these requirements, many commercially-available Super VGA monitors would suffice.

Keyboard 16 is a standard IBM PC-compatible keyboard which is compatible with the processors. Keyboard 16 comprises a means for the system user to selectively input information, decisional criteria, module instructions, and the like into the system where manual input is called for.

The mouse, light pen, track ball or similar pointing device 18 is used to navigate the graphical user interface of the system, which is designed to increase the ease of use of the system, as will be described more fully below. It also comprises means for inputting information into the system, particularly where graphical interface environments are used in implementation. These devices may be obtained from commercially-available sources as off-the-shelf components.

Modem 20 is used for communicating with computer systems remotely from processor. The design of modem 20 also is not limiting, and its specific design will depend upon the design of processor, the design and configuration of the computer or computers to be communicated with, and similar generally known factors in a given application. In the preferred embodiment of FIG. 1, modem 20 comprises a 28.8 baud modem which is compatible with processor 12, such as the Model Sportster 28.8, commercially available from U.S. Robotics Inc.

Tape drive 22 is optional, but may be used for inputting bulk files and lists, as described in greater detail below. The specific design and configuration of tape drive 22 also will

5,987,434

**7**

depend to a large extent on the design and configuration of other system components, and on the particulars of the application. In the preferred embodiment of FIG. 1, tape drive 22 comprises a high-capacity digital tape device which may be obtained as an off-the-shelf component from commercial suppliers.

Bar code readers may be used to speed manual input of data and also to record responses and other correspondence from prospective clients. They should be industry-standard readers capable of reading the major bar code formats, such as Code-39 bar codes, and inputting the scanned information to processor 12. An optical scanner also may be provided as an optional input device, as described in greater detail below.

In accordance with the preferred embodiment and the preferred method of the invention, processor 12 has resident within its memory system computer software, a flow diagram of which is shown in FIG. 2. The software has a "core" system for transacting financial product marketing, and an "administrative and support" system for supporting the core system, facilitating the marketing program, providing administrative and management reports and functions, and preferring other tasks. The core system includes a plurality of modules, including a data input module, a database module, a Virtual Agent™ module, and a sales presentation and output module. The administrative and support system includes a production and scheduling module, a sales and financial report and analysis module, a telemarketing module, a communications interface module, and an automated agency and new business processing module. Each of these systems and modules will be described in greater detail below.

### The Data Input Module

The data input module performs tasks related to inputting prospective client information into the system. The types of prospective client information to be inputted will vary, depending, for example, on the types of plans and products involved, the types of prospective client information available, etc. Typical examples for individual life insurance might include the prospective client's name, address including zip code, age, and whether he or she smokes. Where individual mortgage life insurance is involved, the available, prospective client information may include only name or names on the mortgage loan, address, mortgage date, and mortgage amount.

Product-related information also would be entered into the system. Examples of this type of data or information would include product-related descriptions, issue constraints, product prices, etc. Ancillary data also may be entered into the system using the input module. Such ancillary data would include virtually any type of data or information useful for the system in performing its intended function, but by definition excluding client information about specific clients and product-related information about products potentially presentable by the system. Examples of such ancillary data or information would include statistical information, geo-code data, and the like.

The means of inputting may vary depending on the format in which the information is available. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. Diskette drives (not shown), for example, as would come as standard equipment with the types of processors noted above also may be used. In some instances, bulk lists of client records may be available by tape, in which case in which case tape drive 22 may be used. Some records are available on non-resident databases. This is increasingly

**8**

the case as online networks such as the Internet gain widespread use and acceptance. In such instances, prospective client information may be received via modem 20.

In accordance with the preferred embodiment and method, an example of a main menu for the system is shown in FIG. 3. This menu includes a plurality of buttons corresponding to the modules of the system as depicted in FIG. 2.

An example of the organization and task flow of the data input module shown in FIG. 4. As noted above, data may be entered manually or automatically. For example, information may be entered using scanning technologies. For example, bar codes may be used on advertisements, information cards and other documentation. Scanners such as those commercially available for use with processor 12 may be used to read the bar-coded information. Similarly, an optical scanner may be used to scan an entire page or document, and standard image processing software may be used to read information from the scanned client information from the scanned input.

The invention is not, however, limited to these input modes, and others may be used. For example, as voice recognition technology develops, there very well may be the ability to input client information merely by voicing that information into a voice recognition device, which would translate the voice information into digital client data.

The task of automatically or semi-automatically performing the functions of an agent in marketing and selling financial products generally will require that the system receive or gather on its own essentially the same client information that would be made available to an agent. For a given potential client, the system is adapted to retrieve client information and, depending upon the circumstances, other information as well. Inherent advantages of using an automated environment to undertake these tasks is the tremendous speed with which computers can retrieve, process and store large volumes of information.

The data input module of this embodiment and method inputs data into the system from one or more of the input devices for the system, such as modem 20, tape drive 22, or bar code reader 24. The details of the data input module will depend to a certain extent upon the type of data to be inputted. For example, input data for a set of potential mortgage insurance clients might include the mortgagee's name, the address of the mortgaged property, and the amount of the mortgage. Input data for potential life insurance clients might include the name, address, age, and marital status of each potential client.

With further reference to FIG. 4, as data is inputted, the data input module stores it in a temporary storage area within processor 12. If necessary or appropriate, the data is converted to a format compatible with the system. For example, as is known in the database arts, it is sometimes necessary to import or export files to convert one database format to a pre-defined database structure. In this embodiment, the data input module also may tag and identify client records as they are inputted, and perform general and routine "house keeping" tasks on the data. Once these tasks have been performed by the data input module, the properly-formatted client information is transferred to the database module. In the preferred embodiment, the database module comprises a relational database essentially equivalent to commercially-available database packages.

### The Database Module

The database module stores client information for general use by the system, as explained more fully below. The

5,987,434

9

database stores client information so that each client is represented by a record in the database, and the various items of information pertaining to a given client are contained within fields under the record for that client. Examples of the structure and contents of a client database for life insurance, for example, may include the following fields:

Name

Address (including zip code)

Age

Tobacco user v. non-tobacco user

Marital Status

General Health

The contents of a representative client database record for marketing of individual mortgage life insurance may include the following:

| Borrower | Co-Borrower |
|---|---|
| Name | Name |
| Address | Address |
| (including zip code) | (including zip code) |
| Age | Age |
| Tobacco user v. non-tobacco user | Tobacco user v. non-tobacco user |
| Marital Status | Marital Status |
| General Health | General Health |

The database module also includes information other than client information. For example, this module typically would include a listing of the financial products. This information typically would include not only the identification of the product, but information about pricing and "issue constraints" for the product. Issue constraints as used here refers to limitations on the availability of the product, e.g., age range constraints, amount constraints, and so forth. The product-related database also may include descriptions and explanations of the products. This will be explained in greater detail in connection with the sales presentation and output module.

The Virtual Agent™ Module

The Virtual Agent™ module uses client information and its own decision logic as described more fully below to select the plan or plans and the financial product or products which best meet a specified set of decision criteria. The Virtual Agent™ module embodiment and method also are designed to perform many of the analytical and decision making tasks that would normally be performed by an agent. This would include, for example, but is not limited to analyzing the particular financial product needs, circumstances, and demographics of each client, analyzing a variety of plans and financial products which are calculated to meet the needs of the client, and applying decision making criteria to select from among these plans and products the ones most suitable for the client based on the decision making criteria. Within these general guidelines, however, the Virtual Agent™ module provides tremendous flexibility. It may be adapted, for example, to handle a wide variety of classes of financial products, such as term life insurance, permanent life insurance, combinations of term and permanent life insurance, health insurances, disability insurances, long term care insurances, and the like. The Virtual Agent™ module can accommodate any type of client information that can be incorporated into the client database. In addition, the Virtual Agent™ module has great flexibility in the specific analytical and decision making methods and

10

procedures used. Specific yet merely illustrative examples are provided below.

A flow chart depicting the general organization and logic flow of the Virtual Agent™ module for the preferred embodiment and method is presented in FIG. 5. Note, however, that steps D through I of FIG. 5 need not necessarily be carried out in the order shown. The Virtual Agent™ module flow process retrieves or otherwise receives client information from the database module and from other areas of the system. The Virtual Agent™ module is described herein as processing data files sequentially, one record at a time. This is not necessarily limiting. For example, the Virtual Agent™ module may be configured so that it processes more than one record at a time through such generally known approaches as multi-tasking or parallel processing.

The type of information retrieved by the Virtual Agent™ module will depend upon the type of analysis under consideration, and for which the system has been adapted. Illustrative examples of such input data is described above with reference to the data input module.

In Step B of Virtual Agent™ module processing according to this embodiment and method, the Virtual Agent™ module retrieves the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records. Examples of these analytical instructions and decision making criteria will be presented below.

In Step C of Virtual Agent™ module processing according to this embodiment and method, the Virtual Agent™ module retrieves or otherwise receives a set of client records from the client database. Depending on the particular application, the Virtual Agent™ module may undertake some pre-sorting or other manipulation of the client information prior to the principal analysis of it. For example, there may be categories or items of information within a given client record that are not utilized in the analysis and decision making procedures to be undertaken by the Virtual Agent™ module in that application. Therefore, it may be appropriate to modify the retrieved client records to eliminate such categories or items before further processing is undertaken in the Virtual Agent™ module.

In Step D of Virtual Agent™ module processing according to this embodiment and method, the module identifies, evaluates and analyzes the needs of the client among other reasons for plan(s) and product(s) selection of a given type. For example, in the context of individual mortgage life insurance, the client would want to pay off the loan in the event of the mortgagee's death.

In Step E of Virtual Agent™ module, the module analyzes the client information for that record, including demographic information.

In Step F of Virtual Agent™ module processing, the module uses the analyzed client information and applies it against the decision making criteria.

To illustrate the types of decision making procedures and criteria which may be embodied in the Virtual Agent™ module, we will continue to use the example of individual mortgage life insurance. Pursuant to the example, assume that each client record includes the address of the property subject to the mortgage, the amount of the mortgage, the monthly mortgage payments and the following information for each borrower and co-borrower: Name, age, and gender. As part of the analytical and decision making criteria information retrieved by the Virtual Agent™ module, a set of scenarios are provided for characterizing the client and the surrounding circumstances. Illustrative examples of the scenarios would include the following:

5,987,434

11

Scenario 1: Single individual borrower.

Scenario 2: Two borrowers of different gender, which may include a husband and wife, business partners, etc.

Scenario 3: Two borrowers of the same gender, which may include a parent and child, siblings, business partners, gay partners, etc.

As part of the retrieved decision making criteria, the Virtual Agent™ module would retrieve the information depicted graphically in FIGS. 6–8. If the client record under consideration reflected a single borrower, the Virtual Agent™ module would employ the decision making criteria reflected in FIG. 6. According to those criteria, the Virtual Agent™ module would determine which of three mutually exclusive categories the mortgage falls based on the loan amount. In this example, loan amounts of at least $10,000 but less than $50,000 would fall into category A. Loan amounts of at least fifty thousand dollars but less than one hundred thousand dollars would fall into category B, whereas loan amounts of at least one hundred thousand dollars would fall into category C. At a second level of decision making, the age of the borrower would be considered. For borrowers in category A between the ages of twenty (20) and sixty-five (65), the Virtual Agent™ module would select product package number 1 (P1), which includes three alternative plans, i.e., plan A, plan B, or plan C, as described in the box for package P1 in FIG. 6. Note that for any age or mortgage loan amounts outside the ranges indicated in FIG. 6, no proposal would be made because of issue constraints.

To the extent the client record falls into category B based on loan amount, the agent borrower similarly would be used to further categorize the record. In this illustrative example, category is segregated into two age categories, i.e., B1 and B2. Category B1 includes borrower of at least twenty (20) but less than fifty (50). Category B2 includes ages greater than fifty (50) but less than sixty-five (69). Those records qualifying under category B1 would result in the proposal of a package P2 This package P2 would include three optional proposals, as described in the box for package P2 in FIG. 6.

For category B2, a package P3 would be proposed. Package P3 similarly includes three optional plans, as described in the box for package P3 in FIG. 6.

For those records falling within category C, i.e., involving loan amounts of at least $100,000, package P3 would be proposed.

Also under Step F of FIG. 5, the Virtual Agent™ module would analyze each client record to recognize scenario #2, i.e., two borrowers of different gender. The decision making criteria and processing undertaken for records qualifying under scenario #2 is depicted in FIG. 7. Processing under this scenario would be very similar to that described above with regard to FIG. 6. At the initial level, each record would be categorized based on loan amount. Segregation at a second level would occur based on age of the first or principal borrowers.

Similarly to FIG. 6, those clients qualifying under scenario #2 and falling within category A1 would be proposed a package P1 which includes three optional plans, i.e., A, B and C. A package P2 would be proposed to those clients qualifying under category B1 in FIG. 7. For those clients qualifying under category B2, a package P3 would be proposed. For those clients qualifying under category B3 of FIG. 7, a package P4 would be proposed. For clients qualifying under category C1, package P5 would be proposed. For those clients qualifying under category C2, a package P6 would be proposed.

Where the client record indicates there are two borrowers of the same gender, scenario #3 would be implicated. The

12

decision making criteria and processing for this illustrative example is shown in FIG. 8, which follows the same logic and processing of FIGS. 6 and 7. In Step F of the Virtual Agent™ module flow depicted in FIG. 5, the module decides on the number and types of plans to be proposed to the client. This decision is based upon the insurance needs of the clients as identified in Step D above, on the client information in the client record, and possibly on other information such as demographic information, geo-coding information, etc. This step involves making an informed intelligent decision regarding the possible solution or solutions to the product needs of the client. Factors which may be considered by the module in this selection process may include the client demographic information (e.g. age, gender, tobacco usage, and occupation), mortgage information, financial information such as income, marital information, existing policy information, family-related information, and other factors selected by the system user and incorporated into the Virtual Agent™ module decision making criteria.

In Step G of the Virtual Agent™ module flow of FIG. 5, the module selects the product or products which satisfy the decision making criteria being employed in the module. Under this Step G, the Virtual Agent™ module draws from the available product pool the most appropriate product to fit each plan selected as a candidate in Step F. Preferably the Virtual Agent™ module has the ability to select from a large number of products and product providers. In performing this Step G the Virtual Agent™ module may take into consideration factors such as the premium for the product, the compensation paid to the system user or other provider including primary and secondary compensation, legal issues, underwriting requirements, demographic information pertaining to the client, and the net cost of premiums over a specified period of time. As to legal issues, all local, state, and federal laws regarding insurance sales, for example, and additional constraints imposed by product providers may be considered.

In this illustrative example, two methodologies may be employed for selecting the product, i.e., a product and/or product provider-specific methodology and a "best policy" analysis methodology. Both of these methodologies taken to account the information from Steps D, E, and F. The first methodology considers each of the various factors which may be used to evaluate the attractiveness of that product for the particular client. Such factors considered by the Virtual Agent™ module may include the premiums, issue constraints, compensation paid to the system user, product provider, etc., and underwriting requirement.

The "best policy" methodology evaluates and analyzes a potentially large number of product providers and products which meet a specified set of criteria, for example, by picking the product having the lowest premium for the client.

In Step I of Virtual Agent™ module processing according to this embodiment and method, the module analyzes the past or current performance on a real-time basis of various sale programs. It identifies on a real-time basis who is buying on any geographic or any demographic basis. This step involves determining what the individual client is most likely to buy, making the end users aware of that fact, recommending changes, and if given permission, or if appropriately coded, automatically implementing the changes, which may occur even during the running of the module.

To better illustrate the organization, operation and flow of the Virtual Agent™ module, another example, i.e., one involving the logic associated with the marketing of life

Case 1:07-cv-99999    Document 2619-4    Filed 04/16/2008    Page 34 of 42

5,987,434

13

insurance, will now be explained with reference to FIG. 9. Step C, D, E, . . . of FIG. 9 correspond to Steps C, D, E, . . . respectively, of FIG. 5. In Step C, the Virtual Agent™ module retrieves a client record for analysis.

In Step D, the module identifies the insurance need for the client, e.g., to replace lost income.

In Step E, the module analyzes and evaluates client information for this client, including all pertinent client demographics available in the system. The system also may retrieve and use additional demographic data, for example from a geo-coding module.

The database module of this preferred embodiment includes a geo-coding module which includes geo-coding data. This geo-coding data can be organized by zip code and includes statistical information regarding location, average income, average education, average property values and the like within that zip code area. It can obtain in real-time any field of demographic information for use contained within the United States census.

In this illustrative example shown in FIG. 9, Step F involves segregating client records by annual income. For client records reflecting an annual income of less than one hundred thousand dollars, processing continues along a path F1. For client records reflecting an annual income of at least one hundred thousand dollars, processing proceeds along a path F2.

In Step G of FIG. 9, clients falling under category F1 are offered two optional term insurance plans, depending on the age of the client. For those clients having an income of less than $100,000 (path F1), two term insurance plans would be proposed, but specifically which two would depend upon the age of the client. For clients at least twenty (20) years old but younger than fifty (50) years, their choices would include a 15 year term policy and a 20 year term policy. For clients aged at least fifty (50) but less than sixty, the choices would include a 10 year term policy and a 15 year term policy. For clients older than sixty (60) but not over sixty-nine (69), the two choices would include a 5 year term policy and a 10 year term policy. In each of these instances, three separate coverage amounts for each of the two policies proposed would be presented.

In this illustrative example, the system user may select between an Option A and an Option B. Under Option A, only specified products and specific product providers may be considered. Under Option B, a variety of products and product providers may be considered in selecting the appropriate plans and products for selection.

In Step H of the Virtual Agent™ module flow of FIG. 5, the module selects a specific amount or amounts of coverage to propose under each plan. This decision is based on the information as compile in Step D, E, F and G as described above.

These three coverage amounts are determined by multiplying the annual income by a multiplier and rounding (e.g., to the nearest $5,000 or $10,000). The multiplier for path F1 would be 1.0, 2.5 and 5.0 for plan A, B and C, respectively.

For those clients have annual incomes in excess of at least one hundred thousand dollars (path F2), the Virtual Agent™ module optionally proposes two term insurance plans and one cash value insurance plan. The specific plan again depend on the age of the client among other things. For clients at least twenty (20) but less than fifty (50) years old, the choices include a twenty year term policy, a 15 year term policy, and a universal life policy. For clients at least fifty (50) but no more than sixty (60), the choices include a 10 year term policy, a fifteen year term policy, and a universal life policy. For clients older than sixty (60) but less than

14

sixty-nine (69), the choices proposed are a 5 year term policy, a 10 year term policy, and a universal life policy. In this example the Virtual Agent™ module also selects an amount of coverage based on income. Specifically, five alternative levels of coverage are proposed corresponding to annual income multipliers of 1.0, 2.5 and 5.0 respectively.

### Sales Presentation and Output Module

The sales presentation and output module ("output module") uses the information obtained from the Virtual Agent™ module and optionally from other sources to generate, design, individualize and particularize all of the client communications. Presentation letters, followup letters, and reminders would be examples of such client communications. The output module automatically prepares and outputs a client communication, for example, in a form of a presentation letter, which provides information sufficient to enable the client to make informed, intelligent decision regarding the purchase of the plans or products selected by the Virtual Agent™ module. The Virtual Agent™ module creates these client communications in a manner using a format which personalizes and individualizes the information presented to the client.

This output module does not merely insert client information in the header of the client communication, nor does it merely import product information from the generic product information directly from the product-related database into the communication. The output module instead selectively uses substantial portions of client information, product information, and in many instances other information as well to generate a particularized communication tailored to the particular client for whom the communication is to be sent.

Client communications generation involves organizing, formatting and outputting client communications using information received generally from the Virtual Agent™ module. As explained, the Virtual Agent™ module uses client information, information about available financial products, plans, and the like specifically tailored to each client. The output module allows the system user to define a particularized communication format for classes of customers, such as for potential individual mortgage insurance clients. It then generates highly individualized communications specifically tailored to present that client with individualized plan and product presentations, reminders, followup, etc.

The output module is adapted to present its output in a variety of forms. For example, the output can be displayed on display 14 for visual inspection by the system user, client, etc. The output also may be in the form of a printed letter or document using a printer such as a laser printer. It may be in the form of an automated document or data file or both, and it also may be in a form suitable for transmission, for example, over modem 20 or to a network with or without simultaneous video conferencing.

The particular format of client communication outputs will depend upon the specific circumstances, such as client demographics, plans and products offered, and marketing objectives of the particular application. An Example of a presentation letter prepared using the preferred system and method and employing the individual mortgage life insurance program outlined using a procedure essentially as described above with respect to FIGS. 6-8 is attached as Appendix 1. An example of a presentation letter prepared using the preferred system and method and employing the

5,987,434

15

individual life insurance program outlined using the procedure essentially as discussed above with respect to FIG. 9 is attached as Appendix 2.

FIG. 10 presents an illustrative flow chart diagram of the logic flow of the output module for the preferred embodiment and the preferred method. In Step A of FIG. 10, the output module retrieves work to be performed from other parts of the system. For example, after a set of records has been processed with the Virtual Agent™ module as described above, the output module would retrieve those files and store them in temporary memory locations so that a presentation letter, for example, can be prepared for each client record.

As part of Step A, the output module retrieves instructions which would be used in preparing the presentation letter or other communications output. The specific nature and content of these instructions will depend upon the specific type of presentation to be made and the specific format for the presentation. The specific examples to be presented below also provide a description and explanation of the types of the instructions used by the output module in preparing communications.

In Step B of FIG. 10, client files are grouped by user, or by the sales program to be used, or by other criteria specified by the system user. Grouping criteria preferably would be selected by the system user during a setup phase, and would remain unchanged indefinitely until a different set of grouping criteria is desired.

The processing of a set of client records to generate and output a corresponding set of presentation letters or other communications primarily takes place between Step C and F of FIG. 10. More specifically in Step C the output module receives a client record for processing. In Step D, the output module analyzes and evaluates the client information from the client record, the corresponding output from the Virtual Agent™ module for that client record, and other data or information needed to construct the communication. Other forms of data or information which might be retrieved at this point could include geo-coding data, demographic data, and the like.

In Step E, the output module uses the instructions for preparation of the communication, together with the data and information from Step D, to prepare the presentation or other communication. The specific manner in which the instructions and the information are used to construct the presentation will vary depending upon the application, the specification of the system user and other factors. To better understand and appreciate this aspect of the invention, however, we will refer to the presentation letter attached hereto as Appendix 1, which is a sample presentation letter presenting individual mortgage life insurance.

The sample presentation format used for this letter includes eight sections. Each section may or may not use information variables and insertion logic to construct the text or presentation of the section, and decisional logic may or may not be employed to determine what if any states the variable is to assume. In other words, the instructions and/or decision logic may be employed in various places throughout a section and throughout the entire communication to adapt the communication to the particular circumstances of the client. The following discussion will provide more concrete examples of these features.

The output module may include any one or any combination of at least four types of logic or variables, including (1) customer information logic, (2) words/paragraphs/ sentence logic, (3) product/plan/amount of coverage/

16

payment mode/underwriting logic, and (4) pricing logic. Logic or variable, as referred to herein, may involve the placement of a particular word, number, phrase, or item of information in a particular place within the communication. Insertion of such items within a blank space in a sentence would be an example. Customer information logic refers to the place of the selective placement of client information in a particular location, blank space, or gap in a communication. Words/Paragraphs/Sentence Logic ("Word Logic") refers to the insertion of Words, Paragraphs, Sentence etc. other than client information, product type and related information and pricing information, which is selectively placed in a specific location, blank space or gap in the communication. Products/Plans/Amount of Coverage/ Payment Mode/Underwriting Logic ("Product Logic") refers to information pertaining to any of these topics, which is to be placed in particular location, blank space or gap in the communication. Pricing Logic refers to pricing information that refers to the product, which is to be positioned in a particular location, blank space or gap in the document.

The purpose and function of each of the illustrative sections as created by the output module will now be outlined and discussed.

Section 1 describes the "need" for the proposed product and why the proposal or offer is being made to the client. In the individual mortgage life insurance application, the need is straightforward, i.e., to provide funds to pay the mortgage or liquidate it upon the death of the mortgagee so the family may retain ownership of the home without the burden of a mortgage. In the individual life insurance application, the need may be less apparent because there are so many individual uses of the product, a prime example of which is replacement of lost income.

In terms of variables, in this section, for example, the client name, address, the loan number and the loan amount constitute customer information logic gleaned from the client record. The entry at the top of the letter at "Co-Mortgager" as well as the name of the company of the third paragraph of the letter constitute word logic. The mortgage loan amount in the fourth paragraph of the letter again constitutes customer information logic.

Section 2 of the sample form presentation output presents proposed solutions to the need. This usually involves identifying and presenting alternative plan(s) or financial product (s) to meet the need, and factors such as the provider, coverage and price particular to each plan and product. Referring again to Appendix 1, most of section 2 comprises product logic and pricing logic. The boxed portion in which the client may select the desired plan also includes product logic, for example, in that not all product proposals will include the same plans as has been demonstrated in the examples shown above. Much of the information presented in the footnote supplementing the product presentation involves word logic, but customer logic (e.g., personal information about the client), product logic, and pricing logic also appear in this footnote material. The footnotes both front and back are highly individualized throughout.

In the case of individual life insurance, the proposed plans may include various plans which include term insurance products, and permanent insurance plans such as whole life, universal life, and the like.

Section 3 of the sample presentation format of Appendix 1 explains the various products selected by the Virtual Agent™ module for presentation to the client in this presentation. This section may include word logic and product logic, for example, in that is may provide alternative

5,987,434

**17**

descriptions, explanations, even different tone of writing depending on such things as the age of the client.

Section 4 of the sample presentation format of Appendix 1 explains each plan utilized and selected by the Virtual Agent™ module. This section typically would include word logic and product logic in that the description would change for the various products and classes of the various plans and products. The description of plans will vary with the plans selected. In addition, for a given plan the explanation may change to more particularly addressed a given client or class of clients. For example, the explanation provided to a client in the twenty (20) to forty (40) year old category may differ from the explanation from for the same product provided to a client in the sixty-five (65) to sixty-nine (69) year old range. Similarly, the explanation for a single male may differ for a given product from the explanation provided for the same products to a married couple.

Incidentally, the location of the various sections as described herein would not necessarily appear sequentially, e.g., section 1, 2, 3, . . . . The order may be changed or mixed, and information from one section may be intermingled or interposed with information from another section or sections. Sections and what is contained therein also may be subject to change frequently.

Section 5 of the sample presentation format explains to the client if there are requirements to qualify for a particular plan presented, if any. These requirements will be listed in this section 5 (if the plan requires such based on among other things, amount of insurance, age, etc.) if it is necessary to qualify with more than just the standard application presented to the client. Much of the logic here centers around Plan/Product/Amount of Coverage/Underwriting Logic, etc., and word and client information logic.

Section 6 of the sample presentation format explains in clear, concise and individualized terms how to obtain the coverage. This section typically will include customer logic in personalizing the presentation, e.g., by inserting the client's name in various places in the text, and product logic in explaining the requirements specific to a particular product(s).

Section 7 of the sample presentation format presents, in question and answer format, for example, important information and commonly asked questions regarding the plans and products shown in the presentation. This section typically would include word logic, e.g., to refer to the system user or product marketer. It also may include customer information logic, e.g., to refer to specific circumstances which the customer may encounter.

Section 8 of the sample presentation format is variable in nature, and may be customized for a given application, product set, system user, etc. It may, for example, provide information on how to obtain additional information, help with application forms, additional price quotes, etc. Given its customized format it may include any of the logic forms as variables.

Through designation by the system user in interaction with the system, the output module creates the format to be used, the specific information to be included within the format, and the specific locations in the output format where the specific items of information will be used. It also formats all sections to be easy to read and highly organized, so matter what amount of information is contained in the output.

In accordance with the preferred method, all sales presentation output sent to the client is accompanied by an application for the financial product, together with an enve-

**18**

lope or other means to facilitate return. For example, presentation letters would be accompanied by a application for the products presented therein with a return envelope. This also could include electronic communication forms, such as by return e-mail, etc. This effectively results in a one-step sales process for any or all sales programs and products marketed by the system.

The Administrative and Support System

Turning now to the administrative and support system as illustrated in FIG. 2, the various modules of this system are intended to provide support functions for the Core System modules. In addition, they include management and administrative support modules to aid management in the system, including operation of the core system, scheduling of follow-ups, future communications, etc., with little or no need for human interaction.

The Production and Scheduling Module

The production and scheduling module automates scheduling of marketing sales, preparing budgets, and the like. A flow diagram outlining the logical organization and flow of the production and scheduling module as shown in FIG. 11.

In Step A of FIG. 11, the production and scheduling module accepts, stores and allows for future modification instructions for system user(s), and for all sales programs for which the system user will utilize the system. Future add-on sales programs can be easily accepted.

As shown in Step B of FIG. 11, the production and scheduling module analyzes and evaluates the jobs which are to be performed by the system. This is done on a daily basis. With this information as an input, the production and scheduling module schedules operation of the core system and instructs the system to operate accordingly, as indicated in Step C. In the course of this scheduling and the instruction, the production and scheduling module operates according to a set of predetermined criteria to determine the ordering and scheduling of the system operation and job performance.

As jobs are completed, the scheduling module causes that fact to be recorded in each of the client records for which processing has been successfully completed. This is indicated in Step E of FIG. 11.

As an administrative support role, the production and scheduling module is capable of generating hard copy, readable, production reports, e.g., on a daily basis, as indicated in Step F. of FIG. 11. Production reports may be useful for system users and operators, for example, for allocating and providing sufficient supplies, paper, toner, etc. The system also is capable of generating management reports which can aid management in activity planning, resource allocation, budgeting, etc.

The production and scheduling module also is useful for automatically following up on pre-defined activities. A key attribute of the production and scheduling module is it's ability to remember a virtually unlimited number of users and user sales program(s) and implement a virtually unlimited number of instructions for the system to begin work at any point in the future.

The Sales and Financial Report And Analysis Module

The sales & financial report and analysis module ("sales module") assembles, calculates and outputs sales, test, financial and projected earnings reports. This can be done on a real-time basis with the preferred embodiment and method.

5,987,434

19

A flow chart which illustrates the organization and flow of the sales and financial report and analysis module is shown in FIG. 12. As shown in that illustrative diagram, Step A involves receiving sales information based on sales of financial products actually made. In Step B, these sales results are inputted into the system, manually, by scanning, or by other methods described above which regard to the data input module. In Step C of FIG. 12, these results are stored and organized in a sales database resident in the database module.

The sales report module analyzes and evaluates this sales data, e.g., by segregating and compiling it in formats and statistical summaries useful in management. Once calculated, compiled, etc., the data may be incorporated into and reported as sales reports, as reflected in Step E of FIG. 12. These reports may be cumulative in nature or they may be non-cumulative, essentially reflecting snapshots in time. The reports also may be interactive or non-interactive, depending on the format selected, the output mode, etc. The reports may be provided to system users, management, etc. These reports also may be used in digital or automated form to interact automatically with other modules of the system, for example, the Virtual Agent™ module.

The sales reports may compile such information as sales demographics, penetration, etc. They may reflect such statistics on several basics, such as sales submitted, the number of sales actually placed, as policies and the number of sales which resulted in falloff (for which no policy was issued or taken).

The sales module also is adapted to generate financial reports. These financial reports also may reflect sales on a submitted, placed, and/or falloff basis. They may be incorporated with other data to reflect actual and/or projected earnings reports, commission reports, and the like.

The Telemarketing Module

The system also supports a telemarketing function using the telemarketing module. An illustrative flow chart which outlines the organization and flow of the telemarketing module is shown in FIG. 13. In accordance with that flow chart, the operator would log on to the system and thereby gain access to it. Communications between the operator and clients would take place, for example, through inbound or outbound calls. For existing clients for whom a client record exists in the client database, that record would be retrieved and edited appropriately. Where no client record exists, a new one would be created as reflected in FIG. 13. In both instances, information would be entered into the system so that the client record reflects the appropriate client information. When this task is complete, the call is disconnected. At this stage, the operator may instruct the system, e.g., to schedule an input the client record for processing in the core system to generate a presentation letter. To create a record of the communication the operator would complete the compliance note pad to reflect the conversation and the events which occurred during it.

The Automated Agency And New Business Module

This "new business" module supports the processing for new business. The automated agency portion of this module supports the future policy holder service and insurance needs of the client automatically. A flow chart reflecting the organization and logic of this module is shown in FIG. 14.

Referring to FIG. 14, as sales are made the sales information is received by the system user. The sale results are inputted, for example, by scanning, or by other input means,

20

e.g., as disclosed in the discussion of the data input module. As new sales are made a corresponding client record is created in this module. The module automatically creates a "thank you" notification, which is particularized for that particular client. It confirms the products that have been purchased and the corresponding coverage. The automatically-generated communications also lists any outstanding requirements the client needs to execute to obtain product.

In addition to generating a confirming notice to the client, the system also manages the tasks, if any which correspond with sales and new business. As reflected in FIG. 14, such followup tasks may include sending submission materials to the product provider, processing the new business, e.g., from an accounting perspective, attending to function relating to issuance of the policy, placement functions, etc. Client records and other system files are updated as appropriate to reflect the sales, the correspondence of the client, etc.

In performing these tasks, it may be necessary in some instances to undertake additional communications, which may implicate the communications and interface module. These communications may be required, for example, to order medical examinations, to order attending physician statements, and to obtain all other information pertaining to the client as required under the circumstances. This module will follow-up on these requirements automatically with no human intervention.

Additional advantages and modifications will readily occur to those skilled in the art. Therefore, the invention in its broader aspects is not limited to the specific details, representative devices, and illustrative examples shown and described. Accordingly, departures may be made from such details without departing from the spirit or scope of the general inventive concept as defined by the appended claims and their equivalents.

What is claimed is:

1. An apparatus for using client information about clients in the form of a plurality of client records to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products, the inputting means automatically inputting the plurality of client records without human intervention between input of the respective client records;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

2. A method for using client information about clients comprising a plurality of client records to automatically select and present financial products appropriate for the clients, the method comprising:

automatically inputting into a computer-accessible storage medium the client information including the plurality of client records without human intervention between input of the respective client records, inputting information about the financial products, and inputting

5,987,434

21

decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the financial products for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products appropriate for that client.

**3.** An apparatus as recited in claim **1,** wherein the inputting means comprises a disk drive.

**4.** An apparatus as recited in claim **1,** wherein the inputting means comprises a tape drive.

**5.** An apparatus as recited in claim **1,** wherein the inputting means comprises an optical scanner.

**6.** An apparatus as recited in claim **1,** wherein the inputting means comprises a bar code reader.

**7.** An apparatus as recited in claim **1,** wherein the inputting means comprises a modem.

**8.** An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products, the client information comprising information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using (a) the client information including the information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client, (b) the financial products information, and (c) the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

**9.** An apparatus as recited in claim **8,** wherein:

the financial products comprise life insurance products and the inputting means comprise means for inputting the financial products information to include information regarding individual life insurance products other than term life insurance products.

**10.** An apparatus as recited in claim **8,** wherein:

the inputting means includes means for inputting the financial product information as term life insurance product information and permanent life insurance product information; and

the selecting means includes means for selecting the term life insurance product information and the permanent life insurance product information as part of the subset of financial products.

**11.** An apparatus as recited in claim **8,** wherein:

the inputting means inputs the financial product information as financial price data and non-price product information; and

the selecting means selects the subset of financial products based upon the non-price product information.

22

**12.** An apparatus as recited in claim **8,** wherein:

the inputting means includes means for inputting the client information to include a financial income; and

the selecting means includes means for selecting the subset of financial products based upon the financial income.

**13.** An apparatus as recited in claim **8,** wherein:

the inputting means includes means for inputting the client information to include a mortgage amount; and

the selecting means includes means for selecting the subset of financial products based upon the mortgage amount.

**14.** An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products including financial products having the differing face value amounts, and decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client, the selecting means including means for selecting the subset of financial products to include the financial products having the differing face value amounts; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

**15.** An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products, the financial product information including a plurality of plans wherein at least one of the plans includes a plurality of the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products in the form of a plurality of the plans for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

**16.** An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, ancillary data, and decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, the ancillary data and the decision criteria;

5,987,434

23

means operatively coupled to the storing means for using the client information, the financial products information, the ancillary data and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

17. An apparatus as recited in claim 16, wherein:

the inputting means comprises means for inputting the ancillary data to include statistical data; and

the selecting means includes means for using the statistical data to select the subset of financial products.

18. An apparatus as recited in claim 16, wherein:

the inputting means comprises means for inputting the ancillary data to include geo-code data; and

the selecting means includes means for using the geo-code data to select the subset of financial products for that client.

19. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting (a) the client information, (b) information about the financial products including at least one term life insurance product and at least one insurance product other than a term life insurance product, and (c) decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client, the subset of the financial products including the at least one term life insurance product and the at least one insurance product other than a term life insurance product; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

20. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting (a) the client information, (b) information about the financial products wherein the financial products have differing face values, and (c) decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client, wherein the subset of financial products includes the financial products having differing face values; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

21. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

24

means for inputting (a) the client information, (b) information about the financial products including product price data and non-price product information, and (c) decision criteria pertaining to selection from among the financial products;

means operatively coupled to the input means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information including the non-price product information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client.

22. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, a plurality of plans each of which includes at least one of the financial products, and decision criteria pertaining to selection from among the plans;

means operatively coupled to the inputting means for storing the client information, the financial products information, the plans, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, the plans and the decision criteria to select a subset of the plans for each of the clients appropriate for that client, the subset of the plans including at least one plan comprising a plurality of the financial products; and

means for preparing a client communication for each of the clients which identifies the subset of the plans for that client.

23. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client, the client communication preparing means incorporating a portion of the client information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client.

24. An apparatus as recited in claim 23, further including means operatively coupled to the client communication preparing means for outputting the client communications to a remote location.

25. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

5,987,434

**25**

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client, the client communication means further using words/paragraphs/sentence logic to incorporate at least one of variable words, variable paragraphs, and variable sentences into each of the client communications.

26. An apparatus as recited in claim 25, wherein the client communication preparing means comprises means for preparing each of the client communications to include:

a first section including header information comprising the client information for that client, and

a second section including product presentation information comprising the financial product information for the subset of the financial products for that client and a portion of the client information for that client.

27. An apparatus as recited in claim 25, further including means operatively coupled to the client communication preparing means for outputting the client communications to a remote location.

28. An apparatus for using client information about clients to automatically select and present financial products appropriate for each of the clients, the apparatus comprising:

means for inputting the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products;

means operatively coupled to the inputting means for storing the client information, the financial products information, and the decision criteria;

means operatively coupled to the storing means for using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients; and

means for preparing a client communication for each of the clients which identifies the subset of the financial products for that client, the client communication preparing means incorporating into each of the client communications a portion of the client information for that client and a portion of the financial products information for the subset of products selected for that client, the client communication preparing means further using at least one of (a) customer information logic, (b) words/paragraphs/sentence logic, (c) product/ plan/amount of coverage/payment mode/underwriting logic, and (d) pricing logic to incorporate at least one of the client information and the financial product information into a footnote within each of the client communications.

29. An apparatus as recited in claim 28, further including means operatively coupled to the client communication preparing means for outputting the client communications to a remote location.

30. A method as recited in claim 2, wherein the inputting step comprises inputting the client records using a disk drive.

**26**

31. A method as recited in claim 2, wherein the inputting step comprises inputting the client records using a tape drive.

32. A method as recited in claim 2, wherein the inputting step comprises inputting the client records using an optical scanner.

33. A method as recited in claim 2, wherein the inputting step comprises inputting the client records using a bar code reader.

34. A method as recited in claim 2, wherein the inputting step comprises inputting the client records using a modem.

35. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising the steps of:

inputting into a computer-accessible storage medium the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products, the client information comprising information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client;

using a central processing unit in communication with the storage medium to select for each of the clients a subset of the financial products appropriate for that client using (a) the client information including the information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client, (b) the financial products information, and (c) the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

36. A method as recited in claim 35, wherein the financial products comprise life insurance products and the inputting step includes inputting information regarding individual life insurance products other than term life insurance products.

37. A method as recited in claim 35, wherein:

the inputting step includes inputting term life insurance product information and permanent life insurance product information as part of the financial product information; and

the selecting step includes selecting as part of the subset of financial products for the clients the term life insurance product information and the permanent life insurance product information.

38. A method as recited in claim 35, wherein:

the inputting step includes inputting product price data and non-price product information as part of the financial product information; and

the selecting step includes selecting the subset of financial products based upon the non-price product information.

39. A method as recited in claim 35, wherein:

the inputting step includes inputting a financial income for each of the clients as part of the client information; and

the selecting step includes selecting the subset of financial products for each of the clients based upon the financial income for that client.

40. A method as recited in claim 35, wherein:

the inputting step includes inputting a mortgage amount as part of the client information; and

the selecting step includes selecting the subset of financial products based upon the mortgage amount.

41. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

Case 1:07-cv-99999     Document 2619-4     Filed 04/10/2008     Page 41 of 42

5,987,434

27

inputting into a computer-accessible storage medium the client information, information about the financial products including financial products having differing face value amounts, and decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the financial products using the client information, the financial products information, and the decision criteria to select a subset of the financial products for each of the clients appropriate for that client, the selecting step including selecting the subset of financial products to include the financial products having the differing face value amounts; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

42. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a computer-accessible storage medium the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products, the financial product information including a plurality of plans wherein at least one of the plans includes a plurality of the financial products;

using a central processing unit in communication with the storage medium to select a subset of the financial products in the form of a plurality of the plans for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

43. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a computer-accessible storage medium the client information, information about the financial products, ancillary data, and decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select for each of the clients a subset of the financial products appropriate for that client using the client information, the financial products information, the ancillary data and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

44. A method as recited in claim 43, wherein:

the inputting step includes inputting statistical data as part of the ancillary data; and

the selecting step includes using the statistical data to select the subsets of financial products for the clients.

45. A method as recited in claim 43, wherein:

the inputting step includes inputting geo-code data as part of the ancillary data; and

the selecting step includes using the geo-code data to select the subsets of financial products for the clients.

46. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

28

inputting into a machine-readable storage medium (a) the client information, (b) information about the financial products including at least one term life insurance product and at least one insurance product other than a term life insurance product, and (c) decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select for each of the clients a subset of the financial products appropriate for that client using the client information, the financial products information, and the decision criteria, the subset of the financial products including the at least one term life insurance product and the at least one insurance product other than a term life insurance product; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

47. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium (a) the client information, (b) information about the financial products wherein the financial products have differing face values, and (c) decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the financial products for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria, wherein the subset of financial products includes the financial products having differing face values; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

48. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium (a) the client information, (b) information about the financial products including product price data and non-price product information, and (c) decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the financial products for each of the clients appropriate for that client using the client information, the financial products information including the non-price product information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client.

49. A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium the client information, information about the financial products, a plurality of plans each of which includes at least one of the financial products, and decision criteria pertaining to selection from among the plans;

using a central processing unit in communication with the storage medium to select a subset of the plans for each of the clients appropriate for that client using the client information, the financial products information, the

5,987,434

29

plans and the decision criteria, the subset of the plans including at least one plan comprising a plurality of the financial products; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the plans for that client.

**50.** A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the plans for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client, the client communication incorporating a portion of the client information other than a client name, address, age, marital status, tobacco habits, and amount of life insurance coverage for a given client.

**51.** A method as recited in claim 50, wherein the output step includes outputting the client communications to a remote location.

**52.** A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium the client information, information about the financial products, and decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the plans for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client, the client communication preparing step further including using words/paragraphs/sentence logic to incorporate at least one of

30

variable words, variable paragraphs, and variable sentences into each of the client communications.

**53.** A method as recited in claim 52, wherein the client communication preparing step comprises preparing each of the client communications to include:

a first section including header information comprising the client information for that client, and

a second section including product presentation information comprising the financial product information for the subset of the financial products for that client and a portion of the client information for that client.

**54.** A method as recited in claim 52, wherein the outputting step further includes outputting the client communications to a remote location.

**55.** A method for using client information about clients to automatically select and present financial products appropriate for each of the clients, the method comprising:

inputting into a machine-readable storage medium the client information, information about the financial products including plans pertaining to the financial products, and decision criteria pertaining to selection from among the financial products;

using a central processing unit in communication with the storage medium to select a subset of the plans for each of the clients appropriate for that client using the client information, the financial products information, and the decision criteria; and

using an output device to prepare a client communication for each of the clients which identifies the subset of the financial products for that client, wherein each of the client communications includes a portion of the client information for that client and a portion of the financial products information for the subset of products selected for that client, the client communication preparing step including using at least one of (a) customer information logic, (b) words/paragraphs/sentence logic, (c) product/plan/amount of coverage/payment mode/underwriting logic, and (d) pricing logic to incorporate at least one of the client information and the financial product information into a footnote within each of the client communications.

**56.** A method as recited in claim 55, wherein the outputting step further includes outputting the client communications to a remote location.

* * * * *

# Sub Tab C



US006999938B1

(12) **United States Patent**
Libman

(10) Patent No.: **US 6,999,938 B1**
(45) Date of Patent: **Feb. 14, 2006**

(54) **AUTOMATED REPLY GENERATION DIRECT MARKETING SYSTEM**

(76) Inventor: **Richard M. Libman**, 10947 E. Lillian La., Scottsdale, AZ (US) 85259

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/354,802

(22) Filed: **Jul. 16, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/834,240, filed on Apr. 15, 1997, now Pat. No. 6,076,072, which is a continuation-in-part of application No. 08/661,004, filed on Jun. 10, 1996, now Pat. No. 5,987,434.

(51) Int. Cl.
*G06F 17/60* (2006.01)

(52) U.S. Cl. ........................ 705/10; 705/26; 705/14; 705/36 R

(58) Field of Classification Search ................ 705/36, 705/1, 2, 4, 14, 26, 27, 30, 35, 10, 500, 11, 705/36 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,088,981 A | 5/1978 | Gott | |
| 4,221,086 A | 9/1980 | Berman | |
| 4,237,799 A | 12/1980 | Berman | |
| 4,751,640 A | 6/1988 | Lucas et al. | |
| 4,752,675 A * | 6/1988 | Zetmeir | 235/375 |
| 4,831,526 A * | 5/1989 | Luchs et al. | 705/4 |
| 5,124,911 A | 6/1992 | Sacl | 705/10 |
| 5,220,501 A | 6/1993 | Lawlor et al. | 364/408 |
| 5,245,535 A | 9/1993 | Weiss et al. | |
| 5,446,653 A * | 8/1995 | Miller et al. | 705/4 |
| 5,453,601 A | 9/1995 | Rosen | |
| 5,455,407 A | 10/1995 | Rosen | |
| 5,502,636 A | 3/1996 | Plarke | 364/401 |

| | | | |
|---|---|---|---|
| 5,504,675 A | 4/1996 | Cragun et al. | 364/401 |
| 5,523,942 A | 6/1996 | Tyler et al. | 705/4 |
| 5,537,314 A | 7/1996 | Kanter | 364/406 |
| 5,557,518 A | 9/1996 | Rosen | |
| 5,592,375 A | 1/1997 | Salmon et al. | 705/7 |
| 5,621,797 A | 4/1997 | Rosen | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2282873 | 3/2001 |

(Continued)

OTHER PUBLICATIONS

"Agenda for Windows" Software Brochure from Agena Corporation, Nov. 1995.

(Continued)

*Primary Examiner*—Jeffrey A. Smith
(74) *Attorney, Agent, or Firm*—Sterne, Kessler Goldstein & Fox PLLC

(57) **ABSTRACT**

A system for automatically preparing customized replies in response to communications from a plurality of clients. To facilitate automation and tracking, each original communication to the client (or each original response from the client) is tagged with a unique label, and replies to client responses are each correspondingly labeled. The system provides individualized replies to each of a variety of response options that a client might exercise in response to a received communication, whether an original communication or a reply to a previous response. The system is applicable to mass marketing communications, and is particularly well suited to the generation of personalized replies to each and every one of a multitude (tens of thousands and up to millions) of communications from clients. The system is also capable of continuing to generate replies to follow-up responses from clients and to thereby maintain an ongoing "conversation" until the client makes a purchase decision, or no longer responds. Communications may be delivered through a variety of means, such as the internet, the mails, by facsimile, on a host communication, etc.

**312 Claims, 29 Drawing Sheets**



Exhibit C

## US 6,999,938 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,640,835 A | 6/1997 | Muscoplat ............. 53/569 | |
| 5,642,419 A | 6/1997 | Rosen | |
| 5,644,727 A | 7/1997 | Atkins ................. 705/40 | |
| 5,655,085 A * | 8/1997 | Ryan et al. .......... 705/4 | |
| 5,659,165 A | 8/1997 | Jennings et al. | |
| 5,671,280 A | 9/1997 | Rosen | |
| 5,671,282 A * | 9/1997 | Wolff et al. .......... 380/25 | |
| 5,673,402 A | 9/1997 | Ryan et al. .......... 705/38 | |
| 5,703,949 A | 12/1997 | Rosen | |
| 5,710,889 A * | 1/1998 | Clark ............. 705/244 | |
| 5,721,831 A | 2/1998 | Waits et al. | |
| 5,732,400 A | 3/1998 | Mandler et al. | |
| 5,745,886 A | 4/1998 | Rosen | |
| 5,761,650 A | 6/1998 | Munsil et al. | |
| 5,774,553 A | 6/1998 | Rosen | |
| 5,787,403 A * | 7/1998 | Randle ................. 705/43 | |
| 5,794,218 A | 8/1998 | Jennings et al. | |
| 5,799,087 A | 8/1998 | Rosen | |
| 5,819,241 A * | 10/1998 | Reiter ................. 705/408 | |
| 5,819,263 A * | 10/1998 | Bromley et al. ....... 707/3 | |
| 5,822,735 A | 10/1998 | De Lapa et al. | |
| 5,825,856 A | 10/1998 | Porter et al. | |
| 5,844,971 A | 12/1998 | Elias et al. | |
| 5,852,811 A * | 12/1998 | Atkins ............. 705/36 | |
| 5,866,889 A | 2/1999 | Weiss et al. | |
| 5,878,139 A | 3/1999 | Rosen | |
| 5,890,140 A | 3/1999 | Clark et al. | |
| 5,893,075 A * | 4/1999 | Plainfield et al. ....... 705/14 | |
| 5,898,154 A | 4/1999 | Rosen | |
| 5,920,629 A | 7/1999 | Rosen | |
| 5,930,764 A | 7/1999 | Melchione et al. | |
| 5,953,423 A | 9/1999 | Rosen | |
| 5,963,648 A | 10/1999 | Rosen | |
| 5,963,968 A | 10/1999 | Warmus et al. ....... 707/517 | |
| 5,966,695 A | 10/1999 | Melchione et al. | |
| 5,978,485 A | 11/1999 | Rosen | |
| 5,987,434 A * | 11/1999 | Libman ................. 705/36 | |
| 6,018,721 A | 1/2000 | Aziz et al. | |
| 6,029,153 A | 2/2000 | Bauchner et al. | |
| 6,047,057 A | 4/2000 | Rosen | |
| 6,047,887 A | 4/2000 | Rosen | |
| 6,049,782 A | 4/2000 | Gottesman et al. | |
| 6,055,513 A * | 4/2000 | Katz et al. .......... 705/26 | |
| 6,058,378 A | 5/2000 | Clark et al. | |
| 6,076,068 A | 6/2000 | DeLapa et al. | |
| 6,076,072 A | 6/2000 | Libman | |
| 6,088,686 A | 7/2000 | Walker et al. | |
| 6,122,190 A | 9/2000 | Oohki | |
| 6,122,625 A | 9/2000 | Rosen | |
| 6,131,810 A | 10/2000 | Weiss et al. | |
| 6,141,666 A * | 10/2000 | Tobin ................. 705/513 | |
| 6,154,527 A | 11/2000 | Porter et al. | |
| 6,175,921 B1 | 1/2001 | Rosen | |
| 6,188,993 B1 | 2/2001 | Eng et al. | |
| 6,205,436 B1 | 3/2001 | Rosen | |
| 6,226,623 B1 | 5/2001 | Schein et al. | |
| 6,233,564 B1 * | 5/2001 | Schulze, Jr. .......... 705/14 | |
| 6,236,975 B1 * | 5/2001 | Boe et al. .......... 705/7 | |
| 6,272,528 B1 * | 8/2001 | Cullen et al. .......... 705/36 R | |
| 6,336,095 B1 | 1/2002 | Rosen | |
| 6,349,290 B1 * | 2/2002 | Horowitz et al. ....... 705/35 | |
| 6,354,490 B1 | 3/2002 | Weiss et al. | |
| 6,411,686 B1 | 6/2002 | Porter et al. | |
| 6,453,302 B1 * | 9/2002 | Johnson et al. ........ 705/27 | |
| 6,513,019 B1 * | 1/2003 | Lewis ................. 705/35 | |
| 6,611,811 B1 | 8/2003 | Deaton et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 572 281 A1 | 12/1993 |
| EP | 1 071 030 A1 | 1/2001 |
| WO | WO 97/15023 A2 | 4/1997 |
| WO | WO 97/34246 A1 | 9/1997 |
| WO | WO 99/22328 A1 | 5/1999 |

### OTHER PUBLICATIONS

"Agency Manager for Windows" Software Brochure from Applied Systems, Los Angeles, California, Jun. 12, 1995.
SelectQuote Insurance Services Letter and Quote, SelectQuote Insurance Services of San Francisco, California, Jun. 12, 1995.
Sommers/Moreland & Associates, Inc. Letter and Quote, Sommers/Moreland & Associates, Inc., Atlanta, Georgia, Jul. 8, 1995.
Wells Fargo Insurance Services Letter and Sales Literature, Wells Fargo Insurance Services, Brisbane, California, date unknown.
Consumers Choice Financial Services Company Quote.
USAA Credit Card Statement Attached.
AT&T Account Statement.
David T. Phillips and Co. Insurance Solicitation.
Equigard Insurance Services, Inc. Solicitation.
CUNA Life Insurance Solicitation.
American Savings Bank Solicitation.
IQ InsuranceQuote Services, Inc. Solicitation.
TermQuote Life Insurance Solicitation.
Dottie Enrico, Dollars and Dialers; Phone company's plan to sell names stirs controversy, Newday v50 n279 s1, p3. Nov. 1990.
John Foley, "Market of One—Ready, Aim, Sell!—Technology is helping companies treat their customers like individuals again. The payoff-and the challenges—can be enormous", Feb. 1997.
"Agency Manager for Windows" Software Brochure from Applied Systems, Los Angeles, California, 1994.
Friedman, A.S., "Turnkey Selling Shifts Away From Quoting," National Underwriter, vol. 101, No. 46, National Underwriter Company, 1 Page (Nov. 17, 1997).
Goldstein, S., "Firstmerit Offers Customized Insurance Quotes With Checking Statements," Bank Investment Product News, vol. III, No. 15, Institutional Investor, Inc., 1 Page (Apr. 27, 1997).
Institutional Telemarketing Services, Insurance Service Incorporated Brochure, 2 Pages (Date believed to be 1986 or 1987).
Larmer, F.L., "'Virtual Agent' Maximizes Small Bank Reach," National Underwriter, National Underwriter Company, p. 17 (Apr. 13, 1998).
Lauer, G., "FirstMerit: Using Technology to Personalize Mass-Marketed Life Insurance," Bank Insurance Marketing, vol. 6, No. 3, 2 Pages (Summer 1997).
Newsx™ News, Richard Libman, I.C.A. Insurance Marketing, Inc., 2 Pages (Jun. 1996).
"Virtual Agent Custom Markets Bank Insurance: High-volume, low-touch selling boosts profits," FutureBanker, 1 Page (Nov. 1997).
Alliance Mortgage Company Equity Accelerator™ Solicitation Letter with attachments, 3 pages (dated Mar. 10, 1994).
American Airlines AAdvantage Program Statement, 2 pages (Dec. 8, 1995).
Globe Life and Accident Insurance Co. Solicitation, 3 pages (date unknown).
Jackson National Life Insurance Co. Solicitation, 6 pages (Jul. 1995).
Teachers Insurance and Annuity Association Solicitation, 4 pages (Nov. 1994).
U.S. Appl. No. 09/592,086, filed Jun. 12, 2000, Libman.

# US 6,999,938 B1
### Page 3

Foley, John, "Market of One: Ready, Aim, Sell!," *Information Week*, pp. 34-36, 40, 42 and 44 (Feb. 17, 1997).
*Electronic Image Management—EIM*, Brochure from Applied Systems, 6 pages (Jan. 1996).
Premiumatic Plan Life Insurance Solicitation, United Services Life Insurance Company, 4 pages (date unknown).
SelectQuote Insurances Services Letter and Attachments, SelectQuote Insurance Services of San Francisco, California, 4 pages (Jul. 5, 1995).
SelectQuote Insurances Services Letter and Insurance Application, SelectQuote Insurance Services of San Francisco, California, 7 pages (Jun. 27, 1995).
SelectQuote Insurances Services Letter and Quote, SelectQuote Insurance Services of San Francisco, California, 6 pages (Jun. 12, 1995).
USLife All American Life Insurance Company Account Statement, 1 page appears to be before Jan. 15, 1997).
KeyMoney Access Account Statement, 2 pages (Jan. 27, 1997).
Wells Fargo Proven Credit Visa Gold Account Statement, 4 pages (Jan. 8, 1997).
Colonial Penn Life "Happy Birthday" letter, internal date of Apr. 15, 1993, 2 pages.
Colonial Penn Life, 1Q91 GBL Birthday Results as of Dec. 27, 1991, 1 page.
Colonial Penn Life, 2Q91 GBL Birthday Results as of Dec. 27, 1991, 1 page.
Colonial Penn Life, 1Q91 Lifechoice Birthday Results as of Dec. 27, 1991, 1 page.
Colonial Penn Life, 2Q91 Lifechoice Birthday Results as of Dec. 27, 1991, 1 page.
Colonial Penn Life, "Life Advertising 1986.", 1 page.
Colonial Penn Life, Memorandum, "4Q90 GLB Birthday Campaign—Input Document," May 8, 1990, 8 pages.
AT&T Universal Gold MasterCard, Apr. 1993, 8 pages.
AT&T Universal MasterCard, Apr. 1993, 8 pages.
Ford Citibank MasterCard billing statements, Feb. 1995, 2 pages.
Stanfed Financial Services, Inc., "BiWeekly Advantage Plan," home mortgage payment acceleration, Jul. 30, 1993, 6 pages.
America's Mortgage Servicing, Inc., unemployment insurance, Mar. 6, 1992, 4 pages.
ABN-AMRO Mortgage Acceleration Offer Letter, 2 pages, dated Jul. 29, 2002, earliest date for letters/processes of this type unknown but possibly early 1990's (unconfirmed).
Berry, J. et al., "Database Marketing: A Potent New Tool for Selling," *Business Week*, pp. 56-62 (Sep. 5, 1994).
"American Express Acquires License For Banc One's Triumph Card Processing Software," *PR Newswire*, PR Newswire Association, Inc., 2 pages (Feb. 6, 1995).

\* cited by examiner

U.S. Patent       Feb. 14, 2006       Sheet 1 of 29       US 6,999,938 B1



Fig. 1



Fig. 2

Case 1:08-cv-02187   Document 34-4   Filed 09/08/2008   Page 12 of 89

Case 1:07-cv-99999   Document 2619-6   Filed 04/16/2008   Page 7 of 65



*Fig. 3*



*Fig. 4*

*DATA INPUT MODULE*



*Fig. 5*

| | | |
|---|---|---|
| *FIG. 6A(1)* | *FIG. 6A(2)* | *FIG. 6A(3)* |

*Fig. 6A*

Case 1:08-cv-02187    Document 34-4    Filed 09/08/2008    Page 16 of 89
Case 1:07-cv-99999    Document 2619-6    Filed 04/16/2008    Page 11 of 65

*Fig. 6A(1)*



Case 1:08-cv-02187    Document 34-4    Filed 09/08/2008    Page 17 of 89

Case 1:07-cv-99999    Document 2619-6    Filed 04/16/2008    Page 12 of 65



*Fig. 6A(2)*



Case 1:08-cv-02187    Document 34-4    Filed 09/08/2008    Page 18 of 89

Case 1:07-cv-99999    Document 2619-6    Filed 04/16/2008    Page 13 of 65

*Fig. 6A(3)*



**U.S. Patent**        Feb. 14, 2006        Sheet 10 of 29        US 6,999,938 B1

| FIC. 6B(1) | FIC. 6B(2) | FIC. 6B(3) | FIC. 6B(4) |
|---|---|---|---|

*Fig. 6B*

TO FIG.6B(2)

**PCM1**

| QUOTENUMBER | CHAR(20) |
| APLANNAME | CHAR(10) |
| ADB | NUMERIC(15,2) |
| APREM | NUMERIC(10,2) |
| ATPREM | NUMERIC(10,2) |
| ADURATION | INT |
| AMED | CHAR(1) |
| A2PLANNAME | CHAR(10) |
| A2DB | NUMERIC(15,2) |
| A2PREM | NUMERIC(10,2) |
| A2TPREM | NUMERIC(10,2) |
| A2DURATION | INT |
| A2MED | INT |
| BPLANNAME | CHAR(10) |
| BDB | NUMERIC(15,2) |
| BPREM | NUMERIC(10,2) |
| BTPREM | NUMERIC(10,2) |
| BDURATION | INT |
| BMED | INT |
| B2PLANNAME | CHAR(10) |
| B2DB | NUMERIC(15,2) |
| B2PREM | NUMERIC(10,2) |
| B2TPREM | NUMERIC(10,2) |
| B2DURATION | INT |
| B2MED | INT |
| CPLANNAME | CHAR(10) |
| CDB | NUMERIC(15,2) |
| CPREM | NUMERIC(10,2) |
| CTPREM | NUMERIC(10,2) |
| CNTPREM | NUMERIC(10,2) |
| CTNPREM | NUMERIC(10,2) |
| CDURATION | INT |
| CMED | INT |
| C2PLANNAME | CHAR(10) |
| C2DB | NUMERIC(15,2) |
| C2PREM | NUMERIC(10,2) |
| C2TPREM | NUMERIC(10,2) |
| C2NTPREM | NUMERIC(10,2) |
| C2TNPREM | NUMERIC(10,2) |
| C2DURATION | INT |
| C2MED | INT |
| CMONEYBACK | NUMERIC(15,2) |
| CMONEYWHEN | NUMERIC(15,2) |
| CID | CHAR(20) |
| PROGRAMNUMBER | INT |
| RELATION | INT |
| WAVE | INT |
| CTARGET | NUMERIC(10,2) |

**RESPONSE**

| QUOTENUMBER | CHAR(20) |
| FNAME | CHAR(15) |
| LNAME | CHAR(15) |
| ADR1 | CHAR(30) |
| CITY | CHAR(20) |
| STATE | CHAR(2) |
| ZIP | CHAR(10) |
| DOB | DATETIME |
| GENDER | CHAR(1) |
| TOBUSE | CHAR(1) |
| LASTTOBUSE | CHAR(20) |
| WORKPHONE | CHAR(15) |
| HOMEPHONE | CHAR(15) |
| BESTTIME | CHAR(25) |
| MARRIED | CHAR(1) |
| SPFNAME | CHAR(15) |
| SPLNAME | CHAR(15) |
| SPDOB | DATETIME |
| SPGENDER | CHAR(1) |
| SPTOBUSE | CHAR(1) |
| SPLASTTOBUSE | CHAR(20) |
| SELAMOUNT | INT |
| SELPRODUCT | CHAR(10) |
| SPQUOTE | INT |
| REL | CHAR(20) |
| ADDFNAME | CHAR(15) |
| ADDLNAME | CHAR(15) |
| ADDDOB | DATETIME |
| ADDTOBUSE | CHAR(1) |
| ADDLASTTOBUSE | CHAR(20) |
| ADDQA1 | INT |
| ADDQA2 | INT |
| ADDQA3 | INT |
| ADDQPROD1 | CHAR(10) |
| ADDGENDER | CHAR(1) |

*Fig. 6B(1)*

**U.S. Patent**    Feb. 14, 2006    Sheet 12 of 29    US 6,999,938 B1



*Fig. 6B(2)*

Case 1:08-cv-02187    Document 34-4    Filed 09/08/2008    Page 22 of 89

Case 1:07-cv-00009    Document 2619-6    Filed 04/16/2008    Page 17 of 65



*Fig. 6B(3)*

**U.S. Patent**     Feb. 14, 2006     Sheet 14 of 29     US 6,999,938 B1

TO FIG.6B(1)

| PCM4 | |
|---|---|
| QUOTENUMBER | CHAR(20) |
| APLANNAME | CHAR(10) |
| ADB | NUMERIC(15,2) |
| APREM | NUMERIC(10,2) |
| ATPREM | NUMERIC(10,2) |
| AMED | CHAR(1) |
| A2PLANNAME | CHAR(10) |
| A2DB | NUMERIC(15,2) |
| A2PREM | NUMERIC(10,2) |
| A2TPREM | NUMERIC(10,2) |
| A2MED | INT |
| BPLANNAME | CHAR(10) |
| BDB | NUMERIC(15,2) |
| BPREM | NUMERIC(10,2) |
| BTPREM | NUMERIC(10,2) |
| BMED | INT |
| B2PLANNAME | CHAR(10) |
| B2DB | NUMERIC(15,2) |
| B2PREM | NUMERIC(10,2) |
| B2TPREM | NUMERIC(10,2) |
| B2MED | INT |
| CPLANNAME | CHAR(10) |
| CDB | NUMERIC(15,2) |
| CPREM | NUMERIC(10,2) |
| CTPREM | NUMERIC(10,2) |
| CMED | INT |
| C2PLANNAME | CHAR(10) |
| C2DB | NUMERIC(15,2) |
| C2PREM | NUMERIC(10,2) |
| C2TPREM | NUMERIC(10,2) |
| C2MED | INT |
| SPAPLANNAME | CHAR(10) |
| SPADB | NUMERIC(15,2) |
| SPAPREM | NUMERIC(10,2) |
| SPATPREM | NUMERIC(10,2) |
| SPAMED | CHAR(1) |
| SPA2PLANNAME | CHAR(10) |
| SPA2DB | NUMERIC(15,2) |
| SPA2PREM | NUMERIC(10,2) |
| SPA2TPREM | NUMERIC(10,2) |
| SPA2MED | INT |
| CONTINUED | |

| PCM4 (CONTINUED) | |
|---|---|
| SPBPLANNAME | CHAR(10) |
| SPBDB | NUMERIC(15,2) |
| SPBPREM | NUMERIC(10,2) |
| SPBTPREM | NUMERIC(10,2) |
| SPBMED | INT |
| SPB2PLANNAME | CHAR(10) |
| SPB2DB | NUMERIC(15,2) |
| SPB2PREM | NUMERIC(10,2) |
| SPB2TPREM | NUMERIC(10,2) |
| SPB2MED | INT |
| SPCPLANNAME | CHAR(10) |
| SPCDB | NUMERIC(15,2) |
| SPCPREM | NUMERIC(10,2) |
| SPCTPREM | NUMERIC(10,2) |
| SPCMED | INT |
| SPC2PLANNAME | CHAR(10) |
| SPC2DB | NUMERIC(15,2) |
| SPC2PREM | NUMERIC(10,2) |
| SPC2TPREM | NUMERIC(10,2) |
| SPC2MED | INT |
| CID | CHAR(10) |
| PROGRAMNUMBER | INT |
| RELATION | INT |
| WAVE | INT |
| ACCIDDBAMT | NUMERIC(15,2) |
| ACCIDDBPREM1 | NUMERIC(10,2) |
| ACCIDDBPREM1 | NUMERIC(10,2) |
| WP1APREM | NUMERIC(10,2) |
| WP2APREM | NUMERIC(10,2) |
| WP1BPREM | NUMERIC(10,2) |
| WP2BPREM | NUMERIC(10,2) |
| WP1CPREM | NUMERIC(10,2) |
| WP2CPREM | NUMERIC(10,2) |
| REL | CHAR(10) |
| REL_NAME | CHAR(10) |
| WP1ATPREM | NUMERIC(10,2) |
| WP2ATPREM | NUMERIC(10,2) |
| WP1BTPREM | NUMERIC(10,2) |
| WP2BTPREM | NUMERIC(10,2) |
| WP1CTPREM | NUMERIC(10,2) |
| WP2CTPREM | NUMERIC(10,2) |
| OOM | CHAR(20) |

*Fig. 6B(4)*

*PROCESSOR MODULE*



*Fig. 7*

U.S. Patent        Feb. 14, 2006        Sheet 16 of 29        US 6,999,938 B1



*PROCESSOR MODULE*        *Fig. 8*

Case 1:08-cv-02187    Document 34-4    Filed 09/08/2008    Page 26 of 89

Case 1:07-cv-99999    Document 2619-6    Filed 04/16/2008    Page 21 of 65



*Fig. 9*



Fig. 10



Fig. 11

U.S. Patent          Feb. 14, 2006          Sheet 20 of 29          US 6,999,938 B1



Fig. 12

U.S. Patent     Feb. 14, 2006     Sheet 21 of 29     US 6,999,938 B1



*OUTPUT MODULE*

A — RETRIEVES WORK TO PERFORMED FROM OTHER PARTS OF THE SYSTEM.

B — GROUP CLIENT FILES BY USER, SALES PROGRAM TO BE USED, ETC.

C — RETRIEVES NEXT CLIENT RECORD.

D — ANALYZES AND EVALUATES ALL DATA FROM OTHER PARTS OF THE SYSTEM THAT IS PARTICULAR TO THE CURRENT CLIENT RECORD TO FORMULATE SALES PRESENTATION.

E — CREATES THE SALES PRESENTATION FOR CLIENT.

F — MORE CLIENT RECORDS ? — YES

NO

G — SORTS ALL OUTPUT BY USER, LIFE COMPANY, APPLICATION(S) NEEDED, ETC.

*PRESENTATION OUTPUT*

| PRINTED MATERIALS | MODEM OR ELECTRONIC TRANSFER | INTERNET | VOICE RESPONSE | ETC. |
|---|---|---|---|---|

H —

*Fig. 13*

**U.S. Patent**      Feb. 14, 2006      Sheet 22 of 29      US 6,999,938 B1

*PRODUCTION AND SCHEDULING*



A — ACCEPTS, STORES, AND ALLOWS FOR FUTURE MODIFICATION INSTRUCTIONS FOR USER AND ALL SALES PROGRAM(S) FOR WHICH USER WILL UTILIZE SYSTEM.

B — ON A DAILY BASIS, ANALYZES AND EVALUATES WHAT JOB(S) ARE TO BE PERFORMED BY THE SYSTEM.

C — INSTRUCTS THE SYSTEM ON WHAT IS TO BE PERFORMED.

D — ANALYZE AND EVALUATE THE ORDER AND PRIORITY TO PERFORM JOB(S).

E — RECORDS THAT THE JOB(S) HAS BEEN COMPLETED IN EACH CLIENT RECORDS.

GENERATE PRODUCTION REPORTS

F — PRODUCTION REPORTS FOR:
−SUPPLIES
−APPLICATIONS
−PAPER
−TONER
−ETC.

MANAGEMENT REPORTS FOR:
−ACTIVITY PLANNING
−RESOURCE ALLOCATION
−BUDGETING
−ETC.

*Fig. 14*

**U.S. Patent**      Feb. 14, 2006      Sheet 23 of 29      US 6,999,938 B1



*SALES AND FINANCIAL REPORT AND ANALYSIS*

*Fig. 15*

U.S. Patent          Feb. 14, 2006          Sheet 24 of 29          US 6,999,938 B1



*Fig. 16*

**U.S. Patent**    Feb. 14, 2006    Sheet 25 of 29    US 6,999,938 B1

### NEW BUSINESS PROCESSING MODULE



Fig. 17

U.S. Patent        Feb. 14, 2006        Sheet 26 of 29        US 6,999,938 B1



*Fig. 18*



Fig. 19

U.S. Patent          Feb. 14, 2006          Sheet 28 of 29          US 6,999,938 B1



Fig. 20



*Fig. 21*

US 6,999,938 B1

1

# AUTOMATED REPLY GENERATION DIRECT MARKETING SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation in part of Ser. No. 08/834,240 now U.S. Pat. No. 6,076,072 filed Apr. 15, 1997, which is in turn a continuation in part of Ser. No. 08/661,004 now U.S. Pat. No. 5,987,434 filed on Jun. 10, 1996.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to methods and apparatus for automatically preparing replies to each purchase or non-purchase response generated from mass marketed communications delivered to clients for products or services, such as financial products and/or financial service-related communications. More specifically, it relates to methods and apparatus suitable for preparing an appropriately customized reply communication to each client in a fully automated or significantly automated manner permitting large numbers (millions) of communications to be prepared and delivered quickly, efficiently, and cost effectively.

### 2. Description of the Related Art

The importance of widely-distributed written or printed client communications such as advertising, solicitations, etc. is well known in the marketing and advertising field. Their applicability to the financial products and services industry also is well known. The revenue generated from sales of various products and services advertised in these solicitations measures in the many millions of dollars per year for all industries. Their revenue generation in the financial industry also has been significant, and this industry has been one of the fastest growing in this area.

Traditionally, client communications of this type have been mass-distributed using techniques such as direct mail. With the increasing use of the Internet, that delivery medium is expected to grow in importance. A substantial drawback of the direct mail (or telemarketing, etc.) approach has always been the relatively significant cost of distributing the communications. The transmitters and distributors of the communications often have been required to bear the expense of the communications themselves, in some cases at the expense of the envelopes in which they are contained, the labor involved in stuffing the envelopes, the postage, etc. Use of the Internet could eliminate many of these cost factors.

Another disadvantage of traditional mass marketing, especially mass direct marketing, is that it uses a generic communication that is not particularly customized to the needs of a particular client, and partially as a result of this it has a relatively low purchase response rate. Low purchase response rate coupled with high delivery costs reduces the attractiveness and effectiveness of this type of marketing. For example, mass communication by mail may cost of the order of $0.50 for each communication, but this kind of communication has a relatively low "visibility," and often has a purchase response rate of only about two percent (2% or lower), such as in the case of financial and insurance products. The response to telemarketing, which is somewhat more personalized to the particular client, is significantly higher, often in the range of $2.20 per client contacted.

The issue of customizing mass communications to significantly improve response rates and purchase response rates from a large group of clients (numbering in the hundreds of thousands or up to millions) and/or reducing the

2

cost of delivery of the communications has been addressed in our prior patent applications, U.S. Pat. Nos. 5,987,434 and 6,076,072. In the first of these, we described methods for accessing information from large client data bases, analyzing the data according to a predetermined screening and selection model, and preparing a plurality of customized communications, each one specifically addressed to and designed to meet the most likely needs (based on accessed information) of each of the clients or potential clients ("clients"). These communications could be delivered to the clients in any one of a number of ways, including for example direct mail (expensive) or electronically (for example, inexpensively to those clients who have an internet address). It was recognized, however, that the main medium for direct mass communications was delivery through direct mail, and since this method of communication is relatively expensive, our second U.S. patent application, U.S. Ser. No. 08/834,240, addressed this issue. That application discloses a method of providing the customized communication directed to each particular client on a "host communication" i.e., a communication that would in any event have been sent to that particular client. Thus, the cost of including the customized direct marketing communication as part of the host communication is very low, and the additional cost of mailing the combined communication is normally insignificant.

Thus, the technologies disclosed and claimed in our above-described prior patent applications represent significant advances in mass marketing or mass direct marketing, permitting delivery of customized communications to each client, at significantly reduced cost. These technologies do not, however, address the range of permutations of a client's response. For example, a client may want to purchase, elect not to purchase, request further information, request a modification of the product, etc. However, current mass direct marketing typically only takes into account a purchase/no purchase response. Other responses are generally too time consuming and costly to process and reply to individually so that a potentially large number of purchases are foregone. If these clients have concerns or questions about the product that could be responded to in order to facilitate make a purchase decision, the response rate from mass marketing campaigns could be increased, but current mass marketing response generation and delivery methods costs makes this prohibitive for most direct marketed sales campaigns.

There exists a need in direct marketing for an automatic reply mechanism that is flexible, and able to respond to a wide range of client inquiries, in an ongoing "conversational" manner, that will ultimately increase the rate of purchase responses. Moreover, the automatic reply should be directed to each client's specific response or request, be cost effective, and virtually immediate, so that the client's interest in the product is not diminished by delay. Such an automatic reply system should preferably be able to respond by communicating with the client either through mail, facsimile, e-mail, on a host communication, or by the now evolving voice response technologies, depending upon the type of communication suited to the product or service being marketed or customer preference.

## SUMMARY OF THE INVENTION

This Summary of the Invention section is intended to introduce only certain aspects of the invention and is not a complete disclosure of the invention. Particular aspects of

US 6,999,938 B1

3

the invention are pointed out in other sections here below, and the invention is set forth in the appended claims, which alone demarcate its scope.

In one aspect, the invention provides a method for automatically preparing customized replies in response to communications from a plurality of clients. To facilitate automation, each original communication to the client is tagged with a unique label, and the responses from the clients are each correspondingly labeled. Each of the responses that includes a nonpurchase response i.e. a request for further information, a request for a modified product, a request for a different type of quotation, and the like, and is inputted into a system for automatically generating the replies. Each reply that is automatically prepared is tagged with a label that corresponds to the label of the response communication to which it is responsive. The replies are then delivered, each to their respective client, through any one of a variety of means, such as through the internet, through direct mail, inclusion in a host communication, via facsimile, etc.

In another aspect of the invention, customized communications are prepared and sent to a plurality of clients, nonpurchase responses from the clients are processed and automatic replies are generated to each of the responses, each reply is specific to the type of response requested by the client. The method allows further follow up and "conversation" with the client, or may respond to a reply communication with a second response, which will in turn generate an automatic second reply. Likewise, a third response received by the system will automatically generate a third reply. This dialogue continues until the client either makes a purchase or terminates the communication by not responding.

In one aspect of the invention the original client communication sent to each of the plurality of clients is appended to a "host communication," i.e. one that would in the ordinary course of business have been sent to the client for another purpose, and the combined communication may then be delivered at reduced cost. This method of delivery is particularly attractive when the communication is sent by mail, resulting in savings in postage charges. Notwithstanding, this method of communication is also useful when the combined communication is delivered by other means, particularly where the host communication carries important information that a client will be inclined to read, and it will provide encouragement to read the appended communication.

In other aspects of the invention, the original communication is delivered to each of the plurality of clients by transmission through the internet. This means of communication is of relatively low cost, and generally reaches middle to upper income individuals who comprise an important market segment for a wide range of products and services.

Notwithstanding the origin or nature of the original communication, so long as the original communication provides the recipient with a unique identifying "label" that corresponds to and identifies that individual, and further includes a purchase or nonpurchase response option, then the invention may be used to automatically generate replies. When the response is a purchase option, generation of further replies may not be necessary or a reply "thank you" communication may be sent. However, when the response contains requests for nonpurchase information, then the system automatically generates a reply in each of the responses, with each reply tagged with a label corresponding to the label on the response (or initial offer). Thus, a tracking system is established to insure appropriate replies to each response.

In another aspect, the invention also provides an apparatus for automatically preparing replies to client responses.

4

The apparatus comprises means for inputting response option information from the plurality of client responses into a computer-accessible storage medium, preferably by machine. The apparatus further includes processing means, operatively coupled to the storage medium, for using decision information to automatically select variable information for insertion into a reply to a particular client. Output preparing means are in operating communication with the processing means to enable preparation of the reply to the client. The apparatus may also include delivery means.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate presently preferred embodiments of the invention. These drawings, together with the general description given above and the detailed description of the preferred method and embodiment given below, are intended to explain the principles of the invention and do not limit its scope, which is solely determined by its claims.

FIG. 1 is a hardware block diagram of the preferred embodiment of the invention;

FIG. 2 is a flow chart diagram of system software used in the preferred embodiment of FIG. 1, and which illustrates the preferred embodiment and method of the invention;

FIG. 3 provides an illustrative main menu for the system software generally depicted in FIG. 2;

FIG. 4 is a flow diagram which illustrates a preferred method according to the invention;

FIG. 5 is a flow chart diagram illustrating the data input module of the preferred embodiment and method of the invention;

FIG. 6 (including 6A and 6B) shows the organizational structure of various illustrative database tables managed by the database module according to the preferred embodiment and as used in connection with the preferred method of the invention;

FIG. 7 is a flow chart diagram illustrating the processor module of the preferred embodiment and method of the invention;

FIG. 8 is a flow chart diagram illustrating the processor module of the preferred embodiment and method of the invention similar to that of FIG. 7, but which is specifically adapted for processing of insurance products;

FIG. 9 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to a mortgage life insurance-related communication;

FIG. 10 is a flow chart diagram illustrating another specific example of the organization and flow of the processor module specifically pertaining to another mortgage life insurance-related communication;

FIG. 11 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to another mortgage life insurance-related communication;

FIG. 12 is a flow chart diagram illustrating a specific example of the organization and flow of the processor module specifically pertaining to a basic individual life insurance-related communication;

FIG. 13 is a flow chart diagram illustrating the organization and flow of the sales presentation and output module of the preferred embodiment and method as depicted in FIG. 2;

US 6,999,938 B1

5

FIG. 14 is a flow chart diagram illustrating the organization and flow of the production and scheduling module of the preferred embodiment and method as depicted in FIG. 2.;

FIG. 15 is a flow chart diagram illustrating the organization and flow of the sales and financial report and analysis module of the preferred embodiment and method as depicted in FIG. 2.;

FIG. 16 is a flow chart diagram illustrating the organization and flow of the telemarketing module of the preferred embodiment and method as depicted in FIG. 2;

FIG. 17 is a flow chart diagram illustrating the organization and flow of the automated new business processing module of the preferred embodiment and method as depicted in FIG. 2, adapted for use in the marketing and sale of insurance products;

FIG. 18 is an illustrative embodiment of a flow chart of a reply system of the invention;

FIG. 19 is an illustrative example of an embodiment of a reply generation system of the invention relating to term life insurance marketing by mail;

FIG. 20 is an illustrative schematic showing some of the types of input into the system software of the invention and the reply generation system; and

FIG. 21 is a simplified overview of an embodiment of the invention showing important features of the system software and reply generation module.

## DETAILED DESCRIPTION OF THE PREFERRED METHOD AND EMBODIMENT

The following descriptions illustrate aspects of the invention, and point out certain preferred embodiments of these aspects. The explanation is not intended to be exhaustive, but rather to inform the person of skill in the art will come to appreciate more fully other aspects, equivalence, and possibilities presented by the invention, and hence the full scope of the invention as set forth in the claims, upon reading this disclosure.

Reference will now be made in detail to the presently preferred method and the preferred embodiment of the invention as illustrated in the accompanying drawings, in which like reference characters designate like or corresponding parts throughout the drawings. For simplicity and ease of illustration, the preferred apparatus and method according to the invention are described in conjunction with one another. This is not, however, to be construed as necessary or limiting.

In accordance with the invention, an apparatus and method are provided for automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients. The apparatus and method may be used to automatically prepare a single client communication or, more preferably, to automatically prepare a plurality of client communications. The client communications preferably are for combined use with corresponding and respective host vehicles for the corresponding and respective clients, which combined communications may be and preferably are delivered to the clients.

"Client" as the term is used here should be interpreted broadly to include an actual client or customer of the user of the system and/or method according to the invention, or the party for whom the system and/or method is employed. The term "client" also includes a potential client or customer, or a similar party for whom a communication is prepared. A client is assumed for illustrative purposes here to be a party

6

for whom a client record has been created in the client database as described more fully below.

"Client information" as used here means information which pertains to a particular client, or to a particular set or group of clients. Examples of client information would include a client name, address, telephone number, age, marital status, occupation, employer, financial income, etc. Client information also may include information pertaining to the family or other relations to the client, such as information on the spouse, children, parents, etc., or perhaps to a business associate, such as a business partner, fellow board member or officer, and the like. This category of information also may include psychographic and demographic data pertaining the client or clients.

"Client record" as used here means a compilation of information pertaining to a particular client. The client information typically would be collected into an automated or computerized database, which is referred to herein as a "client database." In this context, a client record would be a single record for a given client within the client database. The fields of each client database record would include the various items of client information, examples of which are provided above. The organization of this client information database and the records and fields within it typically would be in conformity with the data organization and structures of known relational databases.

A "client communication" as the term is used herein refers to a communication which is prepared for a given client and which provides information to the client about one or more selected financial products and/or financial services and/or related financial plans. A client communication, for example, might include a solicitation or similar marketing or advertising document in which the one or more financial products, services, etc. are presented to the client in an attempt to sell the product, service, etc. to the client, provide information on the products and services, provide a notice pertaining to such products or services, etc. A client communication may assume the physical form of a paper or papers which would be integrally attached to a host vehicle, a computerized document which is adapted to be incorporated with a computerized host vehicle, an electronic mail document, and the like.

Each client communication according to the invention includes at least one "variable." A "variable" as the term is used herein, which also is referred to as a "variable portion," refers to a portion of a client communication which may vary from client communication to client communication. The variable in a sense serves as a location marker in the client communication, at which location the system and method according to the invention insert or provide certain "variable information" selected by the system and method. The variable information, which may take a number of different forms, is selected using the decision information so that it is appropriate for, and to a certain extent individualized for, a particular client.

"Financial product" as the term is used herein is used in its broad sense to include any financially-related product, service or plan. The term would include, for example, insurance products and services, banking products and services, securities and investment products and services, and the like. Examples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the like. Examples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related

US 6,999,938 B1

**7**

products, etc. Securities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc. The term "plan" is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client. For convenience and ease of explanation, the term "financial products" as used hereinbelow may refer to financial products and/or financial services and/or financial plans, and combinations of these.

"Financial product information" as used herein refers to information which identifies, describes, explains or otherwise pertains to the financial product or products (including services and plans) which are to be the subject of some or all of the client communications, as explained more fully below.

"Label" as used herein refers to any means of identifying a communication (including responses and replies) as one relating to a particular client, in other words, it is an identifier that allows tracking of the communications to and from each client to distinguish these from those communications to and from other clients in a plurality of such client communications. Preferably, the label is electronically received or machine readable, such as a bar code, but other identifying labels may also be used, such as a unique identifying number, and the like.

"Letter" as used herein means any communication, whether delivered by mail or by other means, and includes verbal communication.

"Host vehicle" as used here means a vehicle, such as an account statement, notice, letter, etc., other than a client communication, which is to be sent to a client. The term "vehicle" is used here in the sense of a medium for communication, examples of which would include a paper document, and electronic document, a machine-readable medium, and the like. Specific examples of host vehicles would include a bank account statement, credit card account statement, brokerage account statement, billing statement from a local utility, a notice or advisory bulletin, etc. In the context of the illustrative examples provided herein, typically there would be a host vehicle for each client, which host vehicle would provide the statement, notice, etc. The host vehicle typically would constitute the primary purpose for contacting or communicating with the client. The client communication preferably would be attached as an integral part of the host document.

"Host information" would include information which is included within or otherwise pertains to a host vehicle or a collection of host vehicles. Examples of host information would include such things as the type of checking account to which a statement pertains, the bank or other institution which holds the account or which issues a financial product reflected in the host vehicle (e.g., the product provider), the amount of utility services or products reflected in a particular bill, account information, a statement of account, etc.

"Response" refers to a communication from a client in response to an original "client communication" sent to that particular client or a reply communication. The response includes a selection of response options, for example, "buy," "more information," "different amount," etc., depending upon the nature of the financial product or service being marketed. Of particular interest are responses that select nonpurchase type options (i.e. ones that do not include an order to buy) because, as explained above, traditional mass marketing generally does not permit and generally does not cope with these types of responses. To facilitate the automatic reply scheme of the invention, each response is tagged with a

**8**

label. Responses can be received by a variety of transmission methods, e.g. electronically from call centers, users of the system, faxes, internet, etc.

"Reply" as used herein means a responsive communication generated by a user of the system of the invention that responds to a "response" from a client. Each reply preferably includes a label corresponding to the label of the client response to which it is responsive. Each reply is preferably individualized beyond merely a name and address of the client, to include such personalized details as specific product information requested, alternative quotations requested, and the like, as discussed herein.

One of many possible embodiments of the apparatus according to the invention is illustrated in FIG. 1. It should be readily understood by those of skill in the art that the apparatus may vary significantly from the example shown, based on the rapid advances in technology that are ongoing in this field. The example shows an embodiment including a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations. A network server 10 is shown in FIG. 1. Computer workstation nodes would be very similarly configured. In addition to the server and workstation nodes, system nodes also may include output devices, such as laser printers (not shown). Each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24.

The processor of each computer node (server or workstation) includes a central processing unit (CPU) 26, random access memory (RAM) 28, and at least one mass storage device 30, such as a hard drive and/or a diskette drive. The design and configuration of CPU 26 is not limiting, and may include any of the CPU designs sold as standard components with high-end IBM-compatible personal computers or business machines. Such processors include Pentium™-type processors from Intel Corp., Santa Clara, Calif., Power PC processors from IBM Corp., and their substantial equivalents. With the continuous and ongoing improvements in computer and electronic technology, many modifications may be made to the specific nature of hardware components required. Accordingly, one of skill in the art may select any hardware components that would rapidly and efficiently process the number of client communications anticipated, whether numbering in the hundreds of thousands or in the tens of millions. For example, an IBM-compatible personal computer with about 256 megabytes of RAM, a 500 MHz Pentium III processor and a hard-drive of about 16 gigabytes of storage capacity, as is presently widely commercially available, would find ready application in the apparatus of the invention. The desired speed of the CPU 26 and size of hard drive will depend, as indicated above, on the specific application for which the apparatus must be used, and the volume updated to be handled. The CPUs of network workstations may, for instance comprise PentiumIII-based processors with about 256 megabytes of RAM and about 10 gigabytes of hard disk storage capacity.

Display 14 should be compatible with the processor, and preferably should have a resolution of at least about 800x600 pixels. Many other and better commercially-available monitors would suffice.

Keyboard 16 may be any modern keyboard which is compatible with the processor. Keyboard 16 comprises a means for the system user to selectively input information, decisional information or criteria, module instructions, and the like into the system where manual input is called for.

US 6,999,938 B1

9

The mouse, light pen, track ball or similar pointing device 18 is used to navigate the graphical user interface of the system, which is designed to increase the ease of use of the system, as will be described more fully below. It also comprises means for inputting information into the system, particularly where graphical interface environments are used in implementation. These devices may be obtained from commercially-available sources as off-the-shelf components.

Modem 20 is used for communicating with computer systems remotely from processor 12. The design of modem 20 also is not limiting, and its specific design will depend upon the design of processor 12, the design and configuration of the computer or computers to be communicated with, and similar generally known factors in a given application. In the preferred embodiment of FIG. 1, modem 20 comprises a high speed modem, about 56K baud modem which is compatible with processor 12, such as are commercially available.

Tape drive 22 is optional, but may be used for inputting bulk files and lists, as described in greater detail below. The specific design and configuration of tape drive 22 also will depend to a large extent on the design and configuration of other system components, and on the particulars of the application. In the preferred embodiment of FIG. 1, tape drive 22 comprises a high-capacity digital tape device which may be obtained as an off-the-shelf component from commercial suppliers.

Bar code readers may be used to speed manual input of data and also to record responses and other correspondence from clientive clients. They should be industry-standard readers capable of reading the major bar code formats, such as Code-39 bar codes, and inputting the scanned information to processor 12. An optical scanner (not shown) also may be provided as an optional input device.

The system includes a high-quality laser printer 32, such as any of the high-end commercially-available laser printers available for processors of the type employed in this system. Large-volume commercial laser printers also may be used for producing large quantities of client communications at rapid rates. The system also may include as an output a modem such as modem 20 or similar on-line or networked connection.

Technology of Prior Pending Patent Applications

Before describing in more detail the invention of the present application, an explanation of the technologies of prior U.S. application Ser. Nos. 08/661,004 and 08/834,240 are presented for completeness. These explanations cover present FIGS. 1–17, previously filed and described in those applications.

Processor 12 has resident within its accessible memory system computer software or system software, a flow diagram of which is shown in FIG. 2. The software has a "core" system for processing tasks such as selecting variable information and preparing client communications. The system software also includes an "administrative and support" system for supporting the core system, facilitating the communication or marketing program, providing administrative and management reports and functions, and other tasks. The core system includes a plurality of modules, including a data input module, a database module, a processor module, and a sales presentation and output module. The administrative and support system includes a production and scheduling module, a sales and financial report and analysis module, a telemarketing module, a communications interface module,

10

and an automated new business processing module. Each of these systems and modules will be described in greater detail below.

In accordance with the preferred embodiment and method, an example of a main menu for the system software is shown in FIG. 3. This menu includes a plurality of buttons corresponding to the modules of the system as depicted in FIG. 2.

A flow diagram which outlines steps of the preferred method is shown in FIG. 4. Referring to the left portion of the diagram, the method includes a step of inputting information of various types into the system. Although the specific forms of information to be inputted will vary from application to application, they generally will include client information. This client information may be pre-selected or pre-sorted, for example, using known market segmentation or targeting techniques, or what has been referred to recently as "database mining." Financial product information, and in some cases host information, also may serve as inputs.

The preferred method also includes a processing step (center of FIG. 4) in which decision information is used to automatically select variable information for inclusion or provision in the client communication or communications. The output of the processing step (right portion of FIG. 4) is one or more client communications which include the variable information. The variable information is used to make the client communications highly individualized or personalized. The client communications are adapted to be combined with corresponding host vehicles for the respective clients to create a corresponding plurality of combined outputs. This combination can be very advantageous over prior known methods, e.g., based upon the ability to make the client communications highly personalized and at the same time delivering the client communication together with the host vehicle to achieve the corresponding cost savings.

As an initial step in the preferred method, one generally would determine the financial product or products which are to be presented in the client communications. This selection may be made, for example, based upon the nature of the client population itself, the desired financial product or products to be offered, etc. It should be appreciated that this step need not necessary occur first. The selection of financial products, for example, may be one of the functions which the system performs, e.g., during its processing step as described more fully below.

The preferred method includes a step of providing a format for the client communication wherein the client communication format includes a variable portion. Each of the client communications includes at least one variable or variable portion in which variable information is inserted or otherwise provided. The variable information is selected based upon the decision information. These aspects and features of the invention will be described more fully below.

The term "format" is used according to its common meaning and refers to the general layout and appearance of the communication. The format may assume any one of a wide variety of forms, depending upon the financial product or products involved, the intended client base, the communication medium, the desired or available space, the tastes and specific needs of the communication designer, etc. Formatting inputs would include such things as typographical formatting information (e.g., type, bottom and side margins), fonts, graphics, displays and display locations, etc. The format also may include content designations. In more advanced applications, a plurality of formats may be selected, and the system and method may be adapted to select from among the formats for a given client and client

US 6,999,938 B1

11

communication. For illustrative purposes herein we will use single-format examples, rather than a set of communication formats from which the system and method would select on a client-by-client basis. Sample client communication formats are attached hereto as Appendix 1 and Appendix 2. These samples, which are merely illustrative and not limiting, might be attached to a bank statement (a sample host vehicle), and would be used for marketing individual life insurance. Note that each begins as page 3 of 4 pages. Pages 1 and 2 in this illustrative example would be the host vehicle.

The communication format includes at least one variable or variable portion, as noted above. Preferably, the format of each communication will include a plurality of variables or variable portions. Each of these variables constitutes a portion or segment of the client communication which, in the actual communications, will vary from client to client, and from client communication to client communication. The variable may assume any one or combination of a wide variety of informational types and content components. Examples would include client information (generally other than a client identification), financial product information, ancillary data, variable text, etc. A given communication format may include a plurality of variables of a given type, e.g., all client information, or it may comprise different types of variables, e.g., client information, financial product information, etc.

The preferred method includes steps of inputting into a computer-accessible storage medium variable information other than a client identification, and inputting into the storage medium decision information. The preferred apparatus similarly is provided with appropriate input means for inputting these and other various categories of information into a computer-accessible storage medium. The method and apparatus of the invention are adapted to process various types of information in generating and outputting the client communications. The flexibility and variability of the specific types of information which may be used, and the specific manner in which the information may be used, comprise significant advantages of the invention over prior known systems and methods.

Initial system inputs typically and preferably would include client information, financial product information, decision information, text information, and in some applications ancillary information. Any one of these classes of information could comprise variable information, although decision information often is used primarily for internal systems purposes.

The types and amounts of client information provided to the system and used in the method will depend upon the types and amounts available, the desired client communication format, the decisional information or logic to be used, etc. Client information may comprise a variety of types of information pertaining to a particular client, or to a particular class of clients. In most instances, this client information will include a client identification. "Client identification" as used herein includes the information about the client which uniquely identifies a given client and permits correspondence or communications to be forwarded to the client. In most instances this client identification constitutes the client's name, or the client's name and post office address. A client account number also may be included. This term is intended to be construed narrowly, for example, to include only the minimum information, usually name and postal address, necessary to uniquely identify the client and forward the communication to the client. It would not include, for example, information which may happen to be unique to the client and may uniquely identify the client under analy-

12

sis, but which information is not typically used to identify the client. Individual components of client identification other than client name also typically would not be included within the scope of the term client identification as used herein. A client's postal zip code used separately from the postal address, for example, would not qualify as the client identification.

A wide variety of types of client information other than the client identification may and often is available. Typical examples might include the client's age, occupation, employer, annual income, marital status, whether he or she smokes, family information, geographic information other than client address information (e.g., zip code, city, county, state, etc.), purchasing information such as purchasing practices and proclivities, client asset information, liability information such as mortgage or loan information, client activity information (e.g., hobbies, sporting activities, etc.), and other psychographic, demographic and general client data or information. A commercial bank or savings and loan which loans on home mortgages, for example, typically would have client information in the form of the address of the mortgaged property, the mortgage loan amount, and the loan origination date. This information would be useful for an individual mortgage life insurance program in which insurance solicitation communications are sent to mortgage clients.

"Financial product information" as used herein refers to information which identifies, describes, explains or otherwise pertains to the financial product or products (including financial services and financial plans) which are to be the subject of some or all of the client communications. Financial product information includes product pricing information and product non-pricing information. Pricing information includes the pricing for the relevant products, and perhaps other information relevant to pricing, for example, such as the time period during which particular prices will be available, payment terms, available financing terms, etc. Product non-pricing information includes any financial product information other than product pricing information. Examples of product non-pricing information would include product-related descriptions, conditions of offer, classes of clients for whom the product is available (e.g., "issue constraints" as used in the insurance industry), annuity tables, actuarial tables, etc.

The financial product information may pertain to a single product, or to a plurality of different financial products. In the field of insurance, for example, the financial product information may pertain to a non-property and non-casualty insurance product, an individual life insurance product such as term, whole life, universal life and the like, a health insurance product, a disability insurance product, an annuity, and the like, and combinations of these. In the banking area, the financial product information may pertain to a savings product, a checking or demand account product, a loan product, a credit-related product, a retirement product, etc., and combinations of these. In the banking and brokerage firm areas, the financial product information may pertain to such products as an investment product and/or financial security (e.g., stocks and other equities, bonds and other debt instruments, money markets, mutual funds, etc.), derivatives, etc., and combinations. Combinations of financial products across fields, such as banking and insurance, also are possible.

"Ancillary information" as used herein refers to virtually any type of data or information useful for the system (hardware and software of FIGS. 1 and 2) and/or method in performing the intended functions, but excludes client infor-

US 6,999,938 B1

13

mation, financial product information and decision information. Examples of such ancillary data or information would include statistical information, geo-code data, and the like. Non-client specific information also may be included in this category, such as demographic, psychographic or buying habit data. Incidentally, the term "information" is used broadly herein to include quantitative data as well as other forms of information.

Text information comprises text, e.g., in the form of an alphanumeric character or character string, a word, a phrase, a sentence, a paragraph, or even a graphical symbol. The preferred form of text information in many applications involving the marketing of financial products would comprise a phrase, i.e., a collection of words, which would be part of a sentence or paragraph of fixed text within the client communication. For example, if the client communication presents a financial product as a security, the description of the product may assume one form for clients under a predetermined age, such as 40 years old, and the description of the same product may assume another, perhaps more conservative or risk-adverse form for clients over the predetermined age.

Text information as used herein can and often will overlap with the other categories of information as defined herein. Text information may, for example, comprise or pertain to client information. In the example provided immediately above, the text information pertains to financial product information. Text information also may comprise or pertain to ancillary information, decision information, etc.

The decision information to be provided to the system may and usually will vary from application to application. This decision information typically would be inputted as part of the system initialization for a given run. The decision information generally will comprise criteria or conditions used for the selection of variable information. The decision criteria preferably comprise programmed database queries which are used in conjunction with the client database, and perhaps a financial product database and/or an ancillary information database to select records, to select fields within records, and the like. The decision information also may comprise conditions and instructions for selection of information from lookup tables and similar data structures.

According to the method of the invention, decision information is used to automatically select variable information for insertion or inclusion in the variable or variable portions of the client communications or communications. This variable information preferably includes information other than, or in addition to, a client identification as that term has been defined herein. The variable information may be selected for insertion into the variables or variable portions of the client communication for one or more of the clients.

The variable information may comprise part or all of the information provided to the system as the client information, the financial product information, the ancillary information, text information, and even the decision information. This variable information may comprise virtually any form of client information, but preferably, as noted, it would be other than, e.g., in addition to, a client identification, most notably the client's name, address, account number, etc. The variable client information may, for example, comprise information or pertaining to the client such as client age information, health information, client family information, client geographic information other than client address information, client purchasing information, client asset information, client liability information such as information about a mortgage, client financial income information, client occupation information, client activity information (e.g., sports activities,

14

recreational activities, etc.), and the like. The variable client information may comprise psychographic client data and/or demographic client data. In the term life insurance context specifically, this variable client information preferably would be other than a client name, address, age, marital status, tobacco habits, and other than the type and amount of life insurance coverage, which comprise related product information.

Where the variable information comprises financial product information, this variable financial product information also may assume a wide variety of forms. As noted, the variable financial product information may pertain to a single financial product or to a plurality of different financial products. The variable financial product information may comprise or pertain to, for example, one or more insurance-related products. Examples would include property and casualty insurance products, as well as non-property and non-casualty insurance products. The latter grouping would include individual life insurance products such as individual term life insurance products and individual life insurance products other than term, such as permanent life insurance products. Permanent life insurance products would include such things as whole life, universal life, and the like. Where combinations of insurance products are included, they may include, for example, a combination of an individual term life insurance product and an individual permanent life insurance product. Other types of insurance products to which the variable information may pertain include credit life, disability, and unemployment insurance; health insurance products; disability insurance products; annuities; etc.

The variable financial product information also may comprise or pertain to bank-related products such as information on various types of demand deposit accounts, savings accounts and product, loan products, credit products, etc. Where the variable financial product information pertains to financial investments or brokerage-type products, the information may comprise or pertain to various investment products, financial securities, equity instruments such as common and/or preferred stocks, stock options, warrants and the like, debt instruments, money market funds, mutual funds, derivatives, etc. The variable financial information may comprise or pertain to financial product pricing information or financial product non-pricing information, or both.

The variable financial information may also include assurance products and money saving products such as information on warranty plans (home, automobile, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty plans; and the like.

The variable information also may comprise or pertain to ancillary information, such as statistical demographic information, geo-code data, psychographic data, economic data pertaining to more than one person, e.g., pertaining to persons other than merely to a single client, and combinations of these.

The variable information also may comprise text or text information. Where it would be desirable to present differing text in the respective communications, for example, depending upon the age, marital status, etc., of the respective clients, several different versions of text may be used as variable information. Any given one of the text inputs would be used for a particular client only if that text were appropriate for that client. As noted, information other than a client identification, i.e., information in addition to the client identification information if client identification is present, may constitute the variable information.

The apparatus according to the invention comprises means for inputting into a computer-accessible storage

US 6,999,938 B1

15

medium variable information comprising other than (in addition to) a client identification and decision information. The input means used for a particular application will vary depending upon the format in which the information is available. Examples would include a keyboard, a disk drive, a tape drive, a hard drive, a modem, an optical scanner, a bar code reader, a pointing device such as a mouse or track ball, a network link, etc. Client information, financial product information, decision information, ancillary information, etc. may be provided on a data tape, compact disk, diskette, or similar storage medium, in which case the input means correspondingly would comprise a tape drive, a compact disk reader, a disk drive, and so on. Some records may be available on non-resident databases, as noted. This is increasingly the case as online networks such as the Internet gain widespread use and acceptance. In such instances, the information may be received via modem 20.

The input means of the preferred embodiment may include any one or any combination of keyboard 16, pointing device 18, modem 20, tape drive 22, bar code reader 24, an optical scanner, mass storage device 30 (e.g., hard drive or diskette drive), and equivalent input devices. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. In some instances, bulk information may be available, for example, comprising lists of client records, in which case the input devices more suitable for transfer of bulk files would be used. Diskette drive 30, for example, as would come as standard equipment with the types of processors noted above, may be used.

The input means preferably is adapted for inputting such data and information both individually and automatically in bulk. Automatic or bulk input would be done essentially or entirely without human intervention. This is particularly desirable when inputting client information, which ideally would be capable of being inputted as client records without human intervention between input of the respective client records.

The decision information may take a number of forms, as noted above. The means for inputting the decision information therefore may assume different forms, such as those identified above and their equivalents. Preferably, the decision information will comprise one or more computer programs which include database query commands to query or filter the client information, financial product information, etc. according to desired conditions or criteria. The preferred input means for this task accordingly would comprise keyboard 16 and/or tracking and pointing device 18, operated in conjunction with the associated device-related software and software drivers.

The input means is operatively coupled to a computer-accessible storage medium so that the storage medium receives and stores the information as it is inputted. The storage medium according to the preferred embodiment may comprise RAM 28, mass storage device 30, other memory within CPU 26, tape drive 22, and any combination of these. The storage medium according to this aspect of the invention may comprise any storage device or medium capable of storing the inputted information and storing it for subsequent retrieval and transmission ultimately to CPU 26. The storage medium need not be directly connected to or directly in communication with CPU 26, provided it is capable of transferring the information to CPU 26 upon the appropriate command.

The inputting of data and information in the preferred embodiment is carried out as part of the data input module as depicted in FIG. 2. This module forms part of and interacts with the inputting means to receive the inputted

16

client information, financial product information, and possibly ancillary information and text, and to store the information in an appropriate storage medium, such as mass storage device 30 or RAM 28.

The data input module performs tasks related to inputting information into the system. An example of the organization and task flow of the data input module is shown in FIG. 5. As noted above, data may be entered manually or automatically. For example, information may be entered using scanning technologies. Bar codes may be used on advertisements, information cards and other documentation. Scanners such as those commercially available for use with processor 12 may be used to read the bar coded information. Similarly, an optical scanner may be used to scan an entire page or document, and standard image processing software may be used to read information from the scanned client information from the scanned input. The invention is not, however, limited to these input modes, and others may be used. For example, as voice recognition technology develops, there very well may be the ability to input client information merely by voicing that information into a voice recognition device, which would translate the voice information into digital client data.

The task of automatically or semi-automatically sending large numbers of communications efficiently and cost effectively generally will require that the system receive or gather on its own large volumes of client information. For a given client, the system is adapted to retrieve client information and, depending upon the circumstances, other information as well. Inherent advantages of using an automated environment to undertake these tasks is the tremendous speed with which computers can retrieve, process and store large volumes of information.

The data input module of this embodiment and method inputs data into the system from one or more of the input devices for the system, such as modem 20, tape drive 22, or bar code reader 24. The details of the data input module will depend to a certain extent upon the type of data to be input.

With further reference to FIG. 5, as data is inputted, the data input module stores it in a temporary storage area within processor 12. If necessary or appropriate, the data is converted to a format compatible with the system. For example, as is known in the database arts, it is sometimes necessary to import or export files to convert one database format to pre-defined database structure. In this embodiment, the data input module also may tag and identify client records as they are inputted, and perform general and routine "house keeping" tasks on the data.

Once these tasks have been performed by the data input module, the properly-formatted client information is transferred to the database module. In the preferred embodiment, the database module comprises a relational database essentially equivalent to commercially-available database packages.

The database module of the preferred embodiment stores client information for general use by the system, as explained more fully below. The database stores client information so that each client is represented by a record in the database, and the various items of information to a given client are contained within fields under the record for that client. Examples of the structure and contents of a client database for life insurance, for example, may include the following fields:

Name
Address (including zip code)
Age
Tobacco user v. non-tobacco user

US 6,999,938 B1

**17**

Marital Status
General Health

The contents of a representative client database record for marketing of individual mortgage life insurance may include the following:

| Borrower | Co-Borrower |
|---|---|
| Name | Name |
| Address | Address |
| (including zip code) | (including zip code) |
| Age | Age |
| Tobacco user v. non-tobacco user | Tobacco user v. non-tobacco user |
| Marital Status | Marital Status |
| General Health | General Health |

The contents of a representative client database record for a commercial bank may include the following:

Name
Address (including zip code)
Account Type
Account Number
Account Balance
Spouse
Occupation
Employer
Income

The database module also may include information other than client information. For example, this module typically may include a listing or database of financial products and/or financial product information. The financial product information typically would include not only the identification of the products, but information about pricing, conditions on availability (e.g., "issue constraints"), etc. Product availability conditions or constraints as used here refers generally to limitations on the availability of the product, e.g., geographic availability constraints, age range constraints, face value or amount constraints, and so forth. The product-related database also may include descriptions and explanations of the products, e.g., in the form of text information. This will be explained in greater detail in connection with the sales presentation and output module.

A sample set of tables for use in preparing and delivering client communications pertaining to life insurance products is presented in FIG. 6 (including FIGURE parts 6A and 6B). These tables may be inter-related depending upon the specific design of the database or databases for a given application.

According to the method, the decision information is used or processed to automatically select variable information. In the preferred method, the decision information is used to select a subset of the variable information for inclusion in the variable portion or portions of the client communication corresponding to the variable portion or portions of the client communication format. The apparatus according to the invention similarly includes processing means operatively coupled to the storage medium for using the decision information to automatically select a subset of the variable information for the client, or for each client where processing involves a plurality of client records. The subset of variable information for a given client then may be used in the subsequently-prepared communication for that client to individualize or personalize the communication. As implemented in the preferred embodiment, the processing means comprises processor **12**, including CPU **26** and related

**18**

components, operating under the control of processor module computer software, as shown generally in FIG. 2.

The specific identity and nature of the variable information selected by the processing module may be varied from application to application depending upon a number of factors, the most important of which is the decision information as selected by the system user. The processor module provides tremendous flexibility. It may be adapted, for example, to handle a wide variety of classes of financial products, such as term life insurance, permanent life insurance, combinations of term and permanent life insurance, health insurances, disability insurances, long term care insurances, and the like. The processor module can accommodate any type of client information that can be incorporated into the client database. In addition, the processor module has great flexibility in the specific analytical and decision making methods and procedures used. Specific yet merely illustrative examples are provided below.

A flow chart depicting the general organization and logic flow of the processor module for the preferred embodiment and method is presented in FIG. 7. As indicated at block A, the processor module is scheduled by and operates under the general instruction of the production and scheduling module (described more fully below). The production and scheduling module would determine, for example, which of several competing jobs or client databases would be processed and in which order. The processor module flow then moves to step B, in which it retrieves decision information and other instructions delineating the tasks the system is to perform and upon which information.

The processor module flow at block C retrieves the information, in this case a client record (client information), which is to be used with the decision information in selecting the variable information. By operating upon the decision information, such as database query commands based upon the client database fields, the system processes the client information and uses it to select the variable information. The type of information retrieved by the processor module will depend upon the type of analysis under consideration, and for which the system has been adapted. Illustrative examples of such input data are described above with reference to the data input module and the database module. The processor module is described herein as processing data files sequentially, one record at a time. This is not necessarily limiting. For example, the processor module may be configured so that it processes more than one record at a time through such generally known approaches as multi-tasking or parallel processing, and/or by means of networked machines operating in parallel or otherwise concurrently.

In step C, depending on the particular application, the processor module may undertake some pre-sorting or other manipulation of the client information prior to the principal analysis of it. For example, there may be categories or items of information within a given a client record that are not utilized in the analysis and decision making procedures to be undertaken by the processor module in that application. Therefore, it may be appropriate to modify the retrieved client records to eliminate such categories or items before further processing in undertaken in the processor module.

In step D of the processor module, the processor module uses the decision information to analyze and evaluate the client information for that record to select the subset of variable information for that client. The selected variable information is outputted as step E. This may occur as each client record is processed or, preferably, for a plurality of records. The process returns to block C to retrieve the next client record, and processing is repeated at block D. This

US 6,999,938 B1

19

looping process is continued until all client records to be processed in fact have been processed in this manner.

A slightly more complicated application or process flow for the processor module of the preferred embodiment and method is illustrated in FIG. 5. FIG. 8 is similar to FIG. 7, but is specifically adapted for preparing client communications in connection with the marketing of life insurance. Blocks A through C of FIG. 8 are essentially identical to those of FIG. 7. Bock D of FIG. 8 shows considerably more detail as to the process which occurs in this example. In substep D1, the insurance need of the client is identified. This may be done, for example, based upon information in the client record such as age, marital status, financial information pertaining to the client, etc. Substep D2 involves analyzing and evaluating the client information, such as demographic data, to make the selections described in the subsequent steps. In substep D3, the processing flow decides on the number and types of insurance plans to offer to this particular client. In substep D4, the processing flow selects the financial product or products to fit into each plan offered. This would be accomplished as part of the decision information and its programming. Two sample options are illustrated in the drawing figure. Option A involves presenting only certain products and/or the products of certain product carriers. Option B provides greater leeway in selecting products and plans. In substep D5, the processing flow uses client information, such as for example the client's age, financial income, and the client's zip code, to determine an amount of coverage to be offered in each plan presented to that client. The process returns to block C to retrieve the next client record, and processing is repeated at block D. This looping process is continued until all client records to be processed have been processed in this manner.

Variable information may be selected using client information, i.e., the decision information may include using client information to select the variable information for inclusion in the client communication. This is generally true regardless of the nature or content of the information actually selected as the variable information.

In step D3 of the processor module flow depicted in FIG. 8, the module decides on the number and types of plans to be proposed to the client, which represents financial product variable information. This decision is based upon the insurance needs of the clients as identified in the decision information, on the client information in the client record, and possibly on other information such as demographic information, geo-coding information, etc. This step involves making an informed intelligent decision regarding the possible solution or solutions to the product or protection needs of the customer. Factors which may be considered by the module in this selection process may include the client demographic information (e.g. age, gender, tobacco usage, and occupation) mortgage information, financial information such as income, marital information, existing policy information, family-related information, and other factors selected by the system user and incorporated into the processor module decision making criteria.

The processor module in conjunction with the decision information selects the variable information, in this example the financial products, which satisfy the decision making criteria being employed in the module. Under this substep, the processor module draws from the available product pool the most appropriate product to fit each plan selected as a candidate in this substep. Preferably the processor module has the ability to select from a large number of products and/or product providers. In performing this step D3, the processor module may take into consideration factors such as: the

20

premium for the product, the compensation paid to the system user or other provider including primary and secondary compensation, legal issues, underwriting requirements, demographic information pertaining to the client, and the net cost of premiums over a specified period of time. As to legal issues, all local, state, and federal laws regarding insurance sales, for example, and additional constraints imposed by product providers may be considered.

There are numerous examples in which client information may be used to select client information. To illustrate this approach, the decision information may include the criteria of selecting a first text string describing a financial product ("text string A") if the client has an annual financial income of greater than a certain amount, e.g., $ 50,000, and selecting a second text string ("text string B"), if the client's income is less than $50,000. This example uses client information (annual income) to select variable information (alternative financial product descriptions) based upon decision information (income greater than or less than $50,000). The client's age easily could be used instead of annual income, as could virtually any other item of client information.

To further illustrate the types of decision making procedures and criteria which may be embodied in the processor module, we will use the example of individual mortgage life insurance. Pursuant to the example, assume that each client record includes the address of the property subject to the mortgage, the amount of the mortgage, the monthly mortgage payments and the following information for each borrower and co-borrower: Name, age, and gender. As part of the analytical and decision making criteria information retrieved by the processor module, a set of scenarios are provided for characterizing the client and the surrounding circumstances. Illustrative examples of the scenarios would include the following:

| | |
|---|---|
| Scenario 1: | Single individual borrower. |
| Scenario 2: | Two borrowers of different gender, which may include a husband and wife, business partners, etc. |
| Scenario 3: | Two borrowers of the same gender, which may include a parent and child, siblings, business partners, gay partners, etc. |

As part of the retrieved decision making criteria, the processor module would retrieve the information depicted graphically in FIGS. 9 through 11. If the client record under consideration reflected a single borrower, the processor module would employ the decision making criteria (decision information) reflected in FIG. 9. According to those criteria, the processor module would determine into which of three mutually exclusive categories the mortgage falls based on the loan amount. In this example, loan amounts of at least $10,000 but less than $50,000 would fall into category A. Loan amounts of at least fifty thousand dollars but less than one hundred thousand dollars would fall into category B, whereas loan amounts of at least one hundred thousand dollars would fall into category C. At a second level of decision making, the age of the borrower would be considered. For borrowers in category A between the ages of twenty (20) and sixty-five (65), the processor module would select product package number 1 (P1), which includes three alternative plans, i.e., plan A, plan B, or plan C, as described in the box for package P1 in FIG. 9. Note that for any age or mortgage loan amounts outside the ranges indicated in FIG. 9, no proposal would be made because of issue constraints.

US 6,999,938 B1

21

To the extent the client record falls into category B based on loan amount, the agent borrower similarly would be used to further categorize the record. In this illustrative example, category is segregated into two age categories, i.e., B1 and B2. Category B1 includes borrower of at least twenty (20) but less and fifty (50). Category B2 includes ages greater than fifty (50) but less than sixty-nine (69). Those records qualifying under category B1 would result in the proposal of a package P2. This package P2 would include three optional proposals, as described in the box for package P2 in FIG. 9.

For category B2, a package P3 would be proposed. Package P3 similarly includes three optional plans, as described in the box for package P3 in FIG. 9.

For those records falling within category C, i.e., involving loan amounts of at least $100,000, package P3 would be proposed.

The processor module would analyze each client record to recognize scenario # 2, i.e., two borrowers of different gender. The decision making criteria and processing undertaken for records qualifying under scenario # 2 is depicted in FIG. 10. Processing under this scenario would be very similar to that described above with regard to FIG. 9. At the initial level, each record would be categorized based on loan amount. Segregation at a second level would occur based on age of the first or principal borrowers.

Similarly to FIG. 9, those clients qualifying under scenario # 2 and falling within category A1 would be proposed a package P1 which includes three optional plans, i.e., A, B and C. A package P2 would be proposed to those clients qualifying under category B1 in FIG. 10. For those clients qualifying under category B2, a package P3 would be proposed. For those clients qualifying under category B3 of FIG. 10, a package P4 would be proposed. For clients qualifying under category C1, package P5 would be proposed. For those clients qualifying under category C2, a package P6 would be proposed.

Where the client record indicates there are two borrowers of the same gender, scenario # 3 would be implicated. The decision making criteria and processing for this illustrative example is shown in FIG. 11, which follows the same logic and processing of FIGS. 9 and 10.

In these illustrative insurance examples, two methodologies may be employed for selecting the variable product information, i.e., a product and/or product provider-specific methodology and a "best policy" analysis methodology. Both of these methodologies taken to account the information from substep D3. The first methodology considers each of the various factors which may be used to evaluate the attractiveness of that product for the particular client. Such factors considered by the processor module may include the premiums, issue constraints, compensation paid to the system user, product provider, etc., and underwriting requirement.

The "best policy" methodology evaluates and analyzes a potentially large number of product providers and products which best meet a specified set of criteria, for example, by picking the product having the lowest premium for the client.

In step I of processor module processing according to this embodiment and method (FIG. 8), the module analyzes the past or current performance on a real-time basis of various sale programs. It identifies on a real-time basis who is buying on any geographic or any demographic basis. This step involves determining what the individual client is most likely to buy, making the end users aware of that fact, recommending changes, and if given permission, or appro-

22

priately coded, automatically implementing the changes, which may occur even during the running of the module.

To better illustrate the organization, operation and flow of the processor module, another example, i.e., one involving the logic associated with the marketing of life insurance, will now be explained with reference to FIG. 12. Steps C, D, E, . . . of FIG. 12 correspond to the similar steps of FIG. 8. In step C, the processor module retrieves a client record for the client, e.g., to replace lost income.

In step E, the module analyzes and evaluates client information for this client, including all pertinent client demographics available to the system. The system also may retrieve and use additional demographic data, for example from a geo-coding module.

The database module of this preferred embodiment includes a geo-coding module which includes geo-coding data. This geo-coding data can be organized by zip code and includes statistical information regarding location, average income, average education, average property values and the like within that zip code area. It can obtain it one value any field of demographic information for use contained within the United States census.

In this illustrative example shown in FIG. 12, step F involves segregating client records by annual income. For client records reflecting an annual income of less than one hundred thousand dollars, processing continues along a path F1. For client records reflecting an annual income of at least one hundred thousand dollars, processing proceeds along a path F2.

In step G of FIG. 12, clients falling under category F1 are offered two optional term insurance plans, depending on the age of the client. For those clients having an income of less than one hundred thousand (path F1), two term insurance plans would be proposed, but specifically which two would depend upon the age of the client. For clients at least twenty (20) years old but younger than fifty (50) years, their choices would include a 15 year term policy and a 20 year term policy. For clients aged at least fifty (50) but less than sixty, the choices would include a 10 year term policy and a 15 year term policy. For clients older than sixty (60) but not over sixty-nine (69), the two choices would include a 5 year term policy and a 10 year term policy. In each of these instances, three separate coverage amounts for each of the two policies proposed would be presented. In this illustrative example, the system user may select between an Option A and an Option B. Under Option A, only specified products and/or specific product providers would be considered. Under Option B, a variety of products and product providers may be considered in selecting the appropriate plans and products for selection.

In step H of the processor module flow of FIG. 8, the module selects a specific amount or amounts of coverage to propose under each plan. This decision is based on the information as compiled in step D as described above.

These three coverage amounts are determined by multiplying the annual income by a multiplier and rounding (e.g., to the nearest $5,000 or $10,000). The multiplier for path F1 would be 1.0, 2.5 and 5.0 for plan A, B and C, respectively.

For those clients who have annual incomes in excess of at least one hundred thousand dollars (path F2), the processor module optionally proposes two term insurance plans and one cash value insurance plan. The specific plan again depend on the age of the client among other things. For clients at least twenty (20) but less than fifty (50) years old, the choices include a twenty year term policy, a 15 year term policy, and a universal life policy. For clients at least fifty

US 6,999,938 B1

23

(50) but no more than sixty (60), the choices include a 10 year term policy, a fifteen year term policy, and a universal life policy. For clients older than sixty (60) but less than sixty-nine (69), the choices proposed are a 5 year term policy, a 10 year term policy, and a universal life policy. In this example the processor module also selects an amount of coverage based on income. Specifically, five alternative levels of coverage are proposed corresponding to annual income multipliers of 1.0, 2.5 and 5.0, respectively.

Financial product information also may be used to select the variable information. To illustrate, a particular financial product may be offered at one price in some states and at another price in others. As part of the decision information, the system and method may use this pricing information to select text and/or pricing information as variable information for inclusion in the respective client communications.

In some instances it may be useful or otherwise desirable to use separate software packages or "link programs" to provide financial information. A link program, for example, may be used to calculate insurance premiums based on a selected set of client information. The premiums then would be imported back into the system software of FIG. 2 and used as financial product information, such as pricing data.

The subset or subsets of the variable information selected for a given client is adapted to be inserted into or provided as an integral part of the corresponding variable portion or portions of the client communication for that client. Depending upon the manner in which the tasks are segregated, the output of the system software therefore may comprise the completed client communications ready as they are delivered to the clients. Short of this, however, the system output may comprise an intermediate product such as the subset or subsets of the variable information themselves, ready for inclusion or integration into the client communication or communications, but not yet so integrated or merged.

In the latter instance, i.e., where the system output comprises unintegrated subsets of the variable information themselves, ready for inclusion or integration into the client communications, these variable information subsets preferably would be stored and provided as part of the client information database, e.g., as was provided as part of the initial system and method input, or as a separate database. Each record of the database would include the subset of variable information for that client, as well as an identifier to identify the client, such as client name, account number, etc. This client output database could be stored, for example, to RAM 28, mass storage 30, or other suitable storage medium.

As an optional but preferred step in the method, the variable information is automatically inserted into the client communications. This step preferably involves generating the client communication according to the communication format, wherein the generating step includes inserting the subset of variable information into the variable portion of the client communication corresponding to the variable portion of the client communication format. The variable information preferably is inserted or merged into the format or other text of the client communication without unwanted gaps or spaces, so that the entire document appears to be created from a single source, or the entire document appears to be an integrated whole. The merged subset or subsets of the variable information may be formatted with the same font or a compatible font to achieve this end.

A primary objective is to deliver the finalized client communications to the clients. Accordingly, the preferred method includes a step of generating the client communi-

24

cations according to the communication format. The generating step includes inserting the variable information or a subset of the variable information for a given client into the variable portion of the client communication for that client. The preferred embodiment of the invention similarly includes output preparing means in operative communication with the processing means for preparing the client communication and automatically inserting the variable information or variable information subset into the client communication. In the preferred embodiment, the output preparing means comprises a computer, such as processor 12 and its CPU 26, in conjunction with and operating under the sales presentation and output module ("output module"). The output preparing means of this embodiment also includes laser printer 32, modem 20, and similar means for creating the final form of the client communications, whether they be in the form of printed paper, electronic mail, or other form. Where the client communication is to be transmitted on a network or other electronic medium, for example, the output preparing means may comprise another computer.

The output module uses the information obtained from the processor module and optionally from other sources to generate, design, individualize and particularize all of the client communications. Marketing solicitations, ads, product- or service-related notices, presentation letters, follow-up letters, and reminders all would be examples of such client communications. The output module automatically prepares and outputs a client communication, for example, in a form of a marketing solicitation, which provides information sufficient to enable the client to make informed, intelligent decision regarding the purchase of the plans or products selected by the processor module, or sufficient to gain the interest of a clientive buyer and motivate him or her to seek additional information. The processor module creates these client communications in a manner using a format which personalizes and individualizes the information presented to the client.

The output module of the preferred embodiment and method does not merely insert client information in the header of the client communication, nor does it merely import product information from the generic product information directly from the product-related database into the communication. The output module instead selectively can use substantial portions of client information, product information, and in many instances other information as well to generate a particularized communication tailored to the particular client for whom the communication is to be sent. The communications therefore typically will vary from individual client to individual client.

Client communications generation according to the preferred embodiment and method involves organizing, formatting and outputting client communications using information received generally from the processor module. As explained, the processor module uses client information, information about available financial products, and perhaps other available information to recommend products, plans, and the like specifically tailored to each client. The output module allows the system user to define a particularized communication format for classes of customers, such as for potential individual mortgage insurance clients. It then generates highly individualized communications specifically tailored to present that client with individualized plan and product presentations, reminders, follow up, etc.

The output module is adapted to present its output in a variety of forms. For example, the output can be displayed on display 14 for visual inspection by the system user, or client, etc. The output also may be in the form of a printed

Case 1:07-cv-99999   Document 2619-8   Filed 04/16/2008   Page 47 of 65

US 6,999,938 B1

25

communication or document using a printer such as a laser printer. It may be in the form of an automated document or data file or both, and it also may be in a form suitable for transmission, for example, over modem 20 or to a network, with or without simultaneous video conferencing and for transmission via the internet.

The particular format of client communication outputs will depend upon the specific circumstances, such as client demographics, plans and products offered, and marketing objectives of the particular application. Examples of client communications prepared using the preferred system and method and employing individual mortgage life insurance programs and using a procedure similar to that described above with respect to FIGS. 9–12 are attached as Appendix 1 and Appendix 2.

FIG. 13 presents an illustrative flow chart diagram of the logic flow of the output module for the preferred embodiment and the preferred method. In step A of FIG. 13, the output module retrieves work to be performed from other parts of the system. For example, after a set of client records has been processed with the processor module as described above, the output module would retrieve those files and store them in temporary memory locations so that a client communication, for example, can be prepared for each client record. As part of step A, the output module retrieves instructions which would be used in preparing the client communication or other communications output. The specific nature and content of these instructions will depend upon the specific type of client communication to be prepared and the specific format for the client communication. The specific examples to be presented below also provide a description and explanation of the types of the instructions used by the output module in preparing communications.

In step B of FIG. 13, client files are grouped by user, or by the sales program to be used, or by other criteria specified by the system user. Grouping criteria preferably would be selected by the system user during a setup phase, and would remain unchanged indefinitely until a different set of grouping criteria is desired.

The processing of a set of client records to generate and output a corresponding set of client communications primarily takes place between step C and F of FIG. 13. More specifically in step C the output module receives a client record for processing. In step D, the output module analyzes and evaluates the client information from the client record, and the corresponding output from the processor module for that client record, and other data or information needed to construct the communication. Other forms of data or information which might be retrieved at this point could include geo-coding data, demographic data, and the like.

In step E, the output module uses the instructions for preparation of the communication, together with the data and information from step D, to prepare the client communication. The specific manner in which the instructions and the information are used to construct the communication will vary depending upon the application, the specification of the system user and other factors. To better understand and appreciate this aspect of the invention, however, we will refer to the client communication attached hereto as Appendix 1, which is a sample communication presenting individual mortgage life insurance. Appendix 2 provides another very similar example, to which the description of Appendix 1 generally applies as well.

The sample format used for this client communication includes eight sections. Each section may or may not use information variables and insertion logic to construct the text or presentation of the section, and decisional logic

26

(decision information) is employed to determine what if any states the variable is to assume. In other words, the instructions and/or decision logic may be employed in various places throughout a section and throughout the entire communication to adapt the communication to the particular circumstances of the client. The following discussion will provide more concrete examples of these features.

The output module may include any one or any combination of at least four types of logic or variables, including (1) customer information logic, (2) words/paragraphs/sentence ("text") logic, (3) product/plan/amount of coverage/payment mode/underwriting logic, and (4) pricing logic. "Logic" or "variable" as referred to herein may involve the placement of a particular word, number, phase, or item of information in a particular place within the communication. Insertion of such items within a blank space in a sentence would be an example. Client information logic refers to the place of the selective placement of client information in a particular location, blank space, or gap in a communication. "Text logic" refers to the insertion of Words, Paragraphs, Sentence etc. other than client information, product type and related information and pricing information, which is selectively placed in a specific location, blank space or gap in the communication. Products/Plans/Amount of Coverage/Payment Mode/Underwriting Logic ("product logic") refers to information pertaining to any of these topics, which is to be placed in particular location, blank space or gap in the communication. Pricing logic refers to pricing information which pertains to the product which is to be positioned in a particular location, blank space or gap (variable) in the document.

The purpose and function of each of the illustrative sections as created by the output module will now be outlined and discussed. It should be borne in mind that this sample client communication is merely an example, and that virtually an infinite number of alternative formats and designs is possible.

Section 1 describes the "need" for the proposed product and why the proposal or offer is being made to the client. In the individual mortgage life insurance application, the need is straightforward, i.e., to provide funds to pay the mortgage or liquidate it upon the death of the mortgagee so the family may retain ownership of the home without the burden of a mortgage. In the individual life insurance application, the need may be less apparent because there are so many individual uses of the product, a prime example of which is replacement of lost income.

In terms of variables, in this section, for example, the client name, address, the loan number and the loan amount constitute client information logic gleaned from the client record. The entry at the top of the letter at "Co-Mortgager" as well as the name of the company of the third paragraph of the letter constitute text logic. The mortgage loan amount in the fourth paragraph of the communication again constitutes client information logic.

Section 2 of the sample form client communication presents proposed solutions to the need. This usually involves identifying and presenting alternative plan(s) or financial product(s) to meet the need, and factors such as the provider, coverage and price particular to each plan and product. Referring again to Appendix 1, most of section 2 comprises product logic and pricing logic. The boxed portion in which the client may select the desired plan also includes product logic, for example, in that not all product proposals will include the same plans as has been demonstrated in the examples shown above. Much of the information presented in the footnote supplementing the product presentation

US 6,999,938 B1

27

28

involves text logic, but client information logic (e.g., personal information about the client), product logic, and pricing logic also appear in this footnote material. The footnotes both front and back are highly individualized throughout.

In the case of individual life insurance, the proposed plans may include various plans which include term insurance products, and permanent insurance plans such as whole life, universal life, variable life, and the like.

Section 3 of the sample communication format of Appendix 1 explains the various products selected by the processor module for presentation to the client in this presentation. This section may include text logic and product logic, for example, in that is may provide alternative descriptions, explanations, even different tone of writing depending on such things as the age of the client.

Section 4 of the sample communication format of Appendix 1 explains each plan utilized and selected by the processor module. This section typically would include text logic and product logic in that the description would change for the various products and classes of the various plans and products. The description of plans will vary with the plan selected. In addition, for a given plan the explanation may change to more particularly addressed a given client or class of clients. For example, the explanation provided to a client in the twenty (20) to forty (40) year old category may differ from the explanation from for the same product provided to a client in the sixty-five (65) to sixty-nine (69) year old range. Similarly, the explanation for a single male may differ for a given product from the explanation provided for the same products to a married couple.

Incidentally, the location of the various sections as described herein would not necessarily appear sequentially, e.g., section 1, 2, 3, . . . . The order may be changed or mixed, and information from one section may be intermingled or interposed with information from another section or sections. Sections and what is contained therein also may be subject to change frequently. The number of sections also may vary.

Section 5 of the sample communication format explains to the client if there are requirements to qualify for a particular plan presented, if any. These requirements will be listed in this section 5 (if the plan requires such based on among other things, amount of insurance, age, etc.) if it is necessary to qualify with more than just the standard application presented to the client. Much of the logic here centers around Plan/Product/Amount of Coverage/Underwriting Logic, etc., text logic, and client information logic.

Section 6 of the sample communication format explains in clear, concise and individualized terms how to obtain the coverage. This section typically will include customer logic in personalizing the presentation, e.g., by inserting the clients name in various places in the text, and product logic in explaining the requirements specific to a particular product(s).

Section 7 of the sample communication format presents, in question and answer format, for example, important information and commonly asked questions regarding the plans and products shown in the presentation. This section typically would include text logic, e.g., to refer to the system user or product marketer. It also may include client information logic, e.g., to refer to specific circumstances which the customer may encounter.

Section 8 of the sample communication format is variable in nature, and may be customized for a given application, product set, system user, etc. It may, for example, provide information on how to obtain additional information, help

with application forms, additional price quotes, etc. Given its customized format it may include any of the logic forms as variables, as may essentially any other section.

Through designation by the system user in interaction with the system, the output module creates the format to be used, the specific information to be included within the format, and the specific locations in the output format where the specific items of information will be used. It also formats all sections to be easy to read and highly organized, no matter what amount of information is contained in the output.

The method according to the invention also may and preferably does include a step of automatically combining the client communication with the host vehicle to create a combined communication, wherein the combined communication comprises a single document, again using the term document in its broad sense. Where a plurality of client communications are to be prepared, this step includes automatically combining the client communication for each of the clients with the host vehicle for the corresponding and respective one of the clients to create a combined communication for the corresponding and respective one of the clients, wherein each of the combined communications comprises a single document.

In accordance with one method, all client communications sent to the client could be accompanied by an application for the financial product, together with an envelope or other means to facilitate return. For example, the client communication would be accompanied by a application for the products presented therein with a return envelope. This also could include electronic communication forms, such as by return e-mail, etc. This effectively results in a one-step sales process for any or all sales programs and products marketed by the system. In many instances, little or no human interaction or involvement is required in the marketing and purchasing process beyond the initiation of the system to provide the appropriate input information.

Turning now to the administrative and support system as illustrated in FIG. 2, the various modules of this system are intended to provide support functions for the Core System modules. In addition, they include management and administrative support modules to aid management in the system, including operation of the core system, scheduling of follow-ups, future communications, etc., with little or no need for human involvement.

The production and scheduling module automates scheduling of marketing sales, preparing budgets, and the like. A flow diagram outlining the logical organization and flow of the production and scheduling module according to the preferred embodiment and method is shown in FIG. 14.

In step A of FIG. 14, the production and scheduling module accepts, stores and allows for future modification instructions for system user(s), and for all sales programs for which the system user will utilize the system. Future add-on sales programs can be easily accepted.

As shown in step B of FIG. 14, the production and scheduling module analyzes and evaluates the jobs which are to be performed by the system. This is done on a daily basis. With this information as an input, the production and scheduling module schedules operation of the core system and instructs the production and scheduling module to operate accordingly, as indicated in step C. In the course of this scheduling and the instruction, the production and scheduling module operates according to a set of predetermined criteria to determine the ordering and scheduling of the system operation and job performance.

As jobs are completed, the production and scheduling module causes that fact and others to be recorded in each of

US 6,999,938 B1

**29**

the client records for which processing has been successfully completed. This is indicated in step E of FIG. 14.

As an administrative support role, the production and scheduling module is capable of generating hard copy, readable, production reports, e.g., on a daily basis, as indicated in step F of FIG. 14. Production reports may be useful for system users and operators, for example, for allocating and providing sufficient supplies, paper, toner, etc. The system also is capable of generating management reports which can aid management in activity planning, resource allocation, budgeting, etc.

The production and scheduling module also is useful for automatically following up on pre-defined activities. A key attribute of the production and scheduling module is it's ability to remember a virtually unlimited number of users and user sales program(s) and implement a virtually unlimited number of instructions for the system to begin work at any point in the future.

The sales & financial report and analysis module ("sales and report module") assembles, calculates and outputs sales, test, financial and projected earnings reports. This can be done on a real-time basis with the preferred embodiment and method.

A flow chart which illustrates the organization and flow of the sales and financial report and analysis module for the preferred embodiment and method is shown in FIG. 15. This particular example pertains to the marketing and sale of life insurance products. As shown in that illustrative diagram, step A involves receiving sales information based on sales of financial products actually made. In step B, these sales results are inputted into the system, manually, by scanning, or by other methods described above with regard to the data input module. In step C of FIG. 15, these results are stored and organized in a sales database resident in the database module.

The sales report module analyzes and evaluates this sales data, e.g., by segregating and compiling it in formats and statistical summaries useful in management.

Once calculated, compiled, etc., the data may be incorporated into and reported as sales reports, as reflected in step E of FIG. 15. These reports may be cumulative in nature or they may be non-cumulative, essentially reflecting snapshots in time. The reports also may be interactive or non-interactive, depending on the format selected, the output mode, etc. The reports may be provided to system users, management, etc. These reports also may be used in digital or automated form to interact automatically with other modules of the system, for example, the processor module.

The sales reports may compile such information as sales demographics, penetration, etc. They may reflect such statistics on several bases, such as sales submitted, the number of sales actually placed, as policies and the number of sales which resulted in falloff (for which no policy was issued or taken).

The sales module also is adapted to generate financial reports. These financial reports also may reflect sales on a submitted, placed, and/or falloff basis. They may be incorporated with other data to reflect actual and/or projected earnings reports, commission reports, and the like.

The system also supports a telemarketing function using the telemarketing module. An illustrative flow chart which outlines the organization and flow of the telemarketing module according to the preferred embodiment and method for the marketing of life insurance products is shown in FIG. 16. In accordance with that flow chart, the operator would log on to the system and thereby gain access to it. Communications between the operator and clients would take place,

**30**

for example, through inbound or outbound calls. For existing clients for whom a client record exists in the client database, that record would be retrieved and edited appropriately. Where no client record exists, a new one would be created as reflected in FIG. 16. In both instances, information would be entered into the system so that the client record reflects the appropriate client information. When this task is complete, the call is disconnected. At this stage, the operator may instruct the system, e.g., to schedule an input the client record for processing in the core system to generate a client communication. To create a record of the communication the operator would complete the compliance note pad to reflect the conversation and the events which occurred during it.

The automated new business ("new business") module supports the processing for new business. The automated portion of this module supports the future policy holder service and insurance need of the client automatically. Flow chart reflecting the organization and logic of this module is shown in FIG. 17.

Referring to FIG. 17, as sales are made the sales information is received by the system user. The sale results are inputted, for example, by scanning, or by other input means, e.g., as disclosed in the discussion of the data input module. As new sales are made a corresponding client record is created in this module. The module automatically creates a "thank you" notification, which is particularized for that particular client. It confirms the products that have been purchased and the corresponding coverage. The automatically-generated communications also lists any information requirements the client needs to execute to obtain product.

In addition to generating a confirming notice to the client, the system also manages the tasks, if any which correspond with sales and new business. As reflected in FIG. 17, such follow-up tasks may include sending submission materials to the product provider, processing the new business, e.g., from an accounting perspective, attending to function relating to issuance of an insurance policy, placement functions, etc. Client records and other system files are updated as appropriate to reflect the sales, the correspondence of the client, etc.

In performing these tasks, it may be necessary in some instances to undertake additional communications, which may implicate the communications and interface module. These communication may be required, for example to order medical examinations, to order attending physicians statements, and to obtain all other information pertaining to the client as required under the circumstances. This module will follow-up on these requirements automatically with no human intervention.

Having disclosed the information presented in our prior applications for patent, the following disclosure presents the present invention.

**The Automatic Reply System Module**

The invention provides a system that includes software that automatically generates a reply to responses received from clients responding to a mass communication. The invention may better be understood with reference to FIG. 18, a flow diagram illustrating a preferred embodiment of the invention. In this particular non-limiting illustrative embodiment, an initial mass communication is mailed to a plurality of clients (up to tens or hundreds of thousands, or even millions) in step 1000. The mass communication elicits client responses 1010, and these are (preferably electronically) read into a logic system 1020 through an appropriate input device. The logic system 1020 reviews the client

US 6,999,938 B1

31

response, analyzes the response 1030 and then determines whether a reply letter must be generated 1040. For example, if the client response relates to a solicitation for life insurance, in which several different options were presented, and the client requests further information on either one of the options, or requests an additional quotation, then the system logic 1020 and 1030 recognizes the client response. If the client requires an additional quotation, for example, an additional letter to the client will be needed. If no communication is needed, for example if the client has made a "purchase response", then the response is routed out of the system to step 1060 where the purchase is further processed and a "thank you" letter or additional follow up is generated, as needed. On the other hand, if it is determined from the response that the client requires additional information, an appropriate letter is generated addressing the specific client's requirements. This letter is then delivered to the client 1050, by any one of a variety of means, which could be specified by the client. It is important to note that the system processes responses and automatically (preferably electronically) generates a plurality (thousands, hundreds of thousands, or millions) of replies, each directed specifically to a response from a particular client.

Once the first reply has been delivered, it might be expected a client would further respond by either making a purchase, or continuing to make further inquiries. The system of the invention provides the advantage of permitting a continuing "conversation" with the client, by providing continuing follow-up replies to each response received from a client, until the client either makes a purchase, or fails to respond. In the latter instance, follow-up communications may be sent to determine why the client has ceased responding, and to encourage further communication until a purchase decision is made.

Referring back to FIG. 18, the system tests whether a client has responded to a prior delivered reply in 1070. If the client has responded, the client response is again input and analyzed as discussed above. If the client has not responded, a determination is made as to whether a follow-up is needed 1080. If a follow-up is not required, the communication with the particular client is terminated. On the other hand, if a follow-up is required, the communication is processed through follow-up logic 1090 which generates a follow-up letter that is delivered 1110 to the client by any one of a variety of appropriate means. Once the follow-up letter is delivered, the system retains information in memory, and tests at a later date whether the client has responded 1070. If there has been no response, the system determines whether a follow-up is needed 1080.

FIG. 19 is a non-limiting illustrative example of a system of the invention for generating replies (in this example delivered by postal letter), using term life insurance as an example. As a preliminary matter, a mass communication will have been made to clients regarding term life insurance, whether through appending a communication regarding insurance to a host communication, or simply by delivery of a customized (or generic) term life insurance program (that may include several options suitable for the individual client) by any one of several appropriate delivery means. The original communication will have provided clients with several (or unlimited) options for response, for example, the range of responses may include "purchase (apply)", "need more information", "need more information on option x", "need additional quotation for (spouse, child, etc.)", and any other of a myriad of possible appropriate responses selected by the party initiating the mass communication (in this case the user, insuror, etc.).

32

The responses to the mass communication to the term life insurance solicitation are then input, preferably automatically, such as by electronic transmission or scanning, into the automated system of the invention. The embodiment illustrated in FIG. 19 shows discrimination between four types of standard responses, and also a handling mechanism for requests for "different information". Clearly, the system can readily be adapted for handling many more or fewer response options. Continuing with the example of FIG. 19, once the responses are sorted in step 1200 those responses relating to option 1 ("purchase option") are further analyzed to determine whether the client's age corresponds to the assumed age in the original communication 1300. If there is correspondence for actuarial purposes, a notification is sent to the client after further checking, as discussed below. If, on the other hand, there is an actuarial discrepancy between the originally assumed age of the client and actual age as disclosed in the response, the system prepares a "price recalculation letter" 1310, which is delivered to the client. Thereafter, at a predetermined interval, a "second notice" is generated 1320 and sent to the client. If a purchase response is not timely received, in order to capitalize on the client's desire for insurance coverage and to avoid loss of client interest. If there is no response to the second notice, then after a predetermined time a "final notice" is generated 1330 and sent to the client.

If, as discussed above, the client's age is an actuarial match to the originally assumed age, the system checks 1340 whether the client has indicated a desire to buy through a "1-800" number. If not, a "thank you letter" is generated 1350, followed-up after a preset time period by a second notice 1360 and thereafter a final notice 1370, as discussed above. On the other hand, if purchase is through the "1-800" number, the system checks whether a physical examination date has been set 1380. If so, a "thank you letter" specifying the exam date 1385 is sent to the client. If the date is not set, the system checks whether a phone number is available 1390. If a phone number is available, the client is telephoned and an examination date is confirmed. A "thank you letter" is then generated and sent to the client with the examination date. On the other hand, if a phone number is not available, a "thank you letter" is generated 1394 that does not specify the examination date and that requests a call back or response to set the examination date (i.e., indicating a need for communication to set an examination date). Thereafter, the system follows-up with a second notice 1396 and, if necessary, a final notice 1398 at predetermined intervals as follow-up to encourage and facilitate the client's desire to continue the application process for term life insurance coverage.

If the system determines in block 1200 that the client response requests "more information", the response may be directed to a first system check for client "test age" 1400, in the case of term life insurance. Thus, if a client is less than 55 years old, the system will generate a basic information letter 1410, and will retain in memory a time to check for response to that basic information letter. If a response is not received within a predetermined time, a second notice 1420 is sent out, which may be followed-up by a final notice, if necessary and appropriate. On the other hand, if the client is over the "test age", a different information letter is generated by the system 1440. That information letter takes into account actuarial factors relating to the client age, as well as other pertinent information supplied or otherwise available. As indicated before, a virtually unlimited number of replies can be sent (based on most demographics) and based on the (almost unlimited) response options. This information letter

US 6,999,938 B1

33

may also be followed-up by a second notice 1450 at a preselected interval, if no response is received for the information letter. A further final notice 1460 may be generated by the system when there is no response to the second notice letter after a predetermined interval.

When the system determines that the client has selected an alternative response, one that, for example, requests an insurance quotation for a spouse, information regarding the spouse is automatically input into the system, and a "spouse quote letter" is generated 1470. As with other letters requiring responses from the client, follow-up letters are generated at predetermined intervals, a "second notice" 1480, followed up by a "final notice" 1490 if necessary and appropriate.

In the event that the client has selected another option, requiring for example further quotations "for insurance on him/herself" or someone else this is determined automatically in the system 1500. In response, a "self requote" letter is sent, appropriately followed-up by a second notice 1520 and final notice 1530, as discussed above. On the other hand, if the quote is not for the client him/herself, the system reviews data supplied for the other person for whom the insurance quote is required, and generates a "other person letter" 1540. This is appropriately followed-up with a second notice and final notice letter, as discussed above.

The system may also include the flexibility to handle the responses that require additional information, other than standard option responses provided in the original communication, or in any subsequent reply communication to the client. This request for "different information" is segregated and an appropriate reply is prepared 1600. For example, the client response may be to call in and a reply would be generated when or shortly after the call is answered, either by a person, or by voice recognition and response technology.

The above example of an embodiment of the invention as applied to term life insurance presumes that responses are received from clients to an initial mass communication to a plurality of clients. As illustrated in FIG. 20, there are numerous ways in which clients might be able to respond. The illustration is non-limiting, and shows some of the most common methods for client response, and client response handling that would be appropriate. In the example delivery is by mail. Other methods of response may become more significant as communications technologies evolve.

In response to, for example, a term life insurance offer, clients may individually call in to a call center 860 number where response information is recorded and periodically, for example daily, downloaded 1810 into the automatic reply system 1900 for generation of reply letters. Otherwise, clients may send their response by fax, "drop off" responses at a branch office, or communicate with platform sales person. These responses may be analyzed, and information retrieved at a plurality of remote branch offices 1830. Appropriate formatted information for each individual client may then be transferred (electronically) en mass, or individually, at preselected intervals (or continuously) 1840 to the reply generation system 1900. In certain instances, it may be preferable to transfer data to the reply generation system 1900 on a daily basis, while in other circumstances more or less frequent transfer may be more appropriate.

As more clients become connected to the internet, client responses using the internet are expected to become increasingly significant. Responses through the internet may also be accumulated with the data transferred at intervals to the reply generation system of the invention. In the illustration of FIG. 20, the internet response 1850 is transferred in real time to the system 1900 which automatically generates an

34

appropriate reply that responds to the client response, preferably also delivered through the internet to the client. Accordingly, the internet related system potentially provides the fastest response, and may be expected to enhance the conversion of solicitations of insurance (or other product) to sales.

A summary and overview of an embodiment of the system of the invention is shown in FIG. 21, this overview and summary is for illustrative purposes only, and clearly does not limit the scope of the invention which may include many additional and different aspects, depending upon the application to which the system is adapted.

As shown, the system software 2500 accesses a database 2000 that contains relevant information regarding clients, that may be maintained by a bank, insurance company, retail institution or any other entity that has a large client database. As a preliminary matter, the system of the invention accesses the database and prepares individualized client communications to each of the multitude of clients (or subset of the multitude of clients) in the database. The system software 2500 generates an output 2550 that may be delivered to each individual client by any one of several methods 2560. In the example shown, communication may be sent to a client on a monthly statement, by direct mail, through platform sales tract format, or through the internet. The communication includes response options 2570, and the client response indicating a selected option, of which several non-limiting examples are shown in FIG. 21. The client response 2575 is input into the system of the invention, and the reply module 2510 of the system software 2500 generates a reply 2580 for each response, out of the multitude of responses. The reply is preferably sent directly to the client through an indicated delivery method, which may include direct mail, facsimile, internet, voice telephony, and the like. The reply may generate further client responses, so that an ongoing "conversation" is set up between the client and the automated reply module 2510 of the system of the invention. This conversation continues, as explained above, until it is terminated by either a client "purchase decision", or lack of client response to a communication from the system.

The system of the invention provides, for the first time, a technology that allows mass communication of product or service information customized to each individual in mass communications. Further, the system also provides for flexibility of responses from the clients, by permitting clients to select from a plurality of options and requests for further information, each of which may be automatically analyzed and replied to through the system of the invention. The automated reply feature potentially enhances the number of purchase decisions that might result from an original mass communication, by responding to individual client queries in an economical, efficient and fast manner to retain the client's purchase interest and facilitate sales.

Additional advantages and modifications will readily occur to those skilled in the art. Therefore, the invention in its broader aspects is not limited to the specific details, representative devices, and illustrative examples shown and described. Accordingly, departures may be made from such details without departing from the spirit or scope of the general inventive concept as defined by the appended claims and their equivalents.

What is claimed is:

1. A method for automatically preparing customized replies to responses from one or more consumer entities, the method comprising:

receiving one or more responses from one or more consumer entities, said responses comprising nonpur-

US 6,999,938 B1

**35**

chase requests and being in response to mass marketing communications relating to offerings for one or more financial products or services being offered as part of a mass marketing campaign;

automatically generating one or more replies, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity, each of said replies specific to one of said responses or a subsequent response; and

delivering said replies to corresponding consumer entities.

2. The method of claim 1, wherein each communication comprises information about a financial product or financial service.

3. The method of claim 1, wherein each response comprises a unique label.

4. The method of claim 3, wherein the unique label of each response comprises a machine readable label.

5. The method of claim 1, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

6. The method of claim 1, further comprising the step of inputting response option information into an automated reply generation system.

7. The method of claim 6, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

8. The method of claim 1, wherein the delivering of the replies comprises delivery by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

9. The method of claim 1, further comprising:

receiving follow up responses each with client identifications from consumer entities to whom a prepared reply was delivered.

10. The method of claim 9, further comprising:

inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

11. The method of claim 10, further comprising:

continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

12. The method of claim 1, wherein the delivering step comprises:

selecting one or more delivery mediums to deliver a given reply to a corresponding consumer entity.

13. The method of claim 12, wherein each delivery medium is at least one of:

electronic; and

non-electronic.

14. The method of claim 12, wherein the selecting step comprises:

selecting said one or more delivery mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

**36**

15. The method of claim 1, further comprising:

continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

16. The method of claim 15, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

17. The method of claim 15, wherein said continuing step comprises:

preparing each follow up reply based on at least one of:

(a) information obtained in the past from a consumer entity;

(b) information purchased from a third party;

(c) information obtained via an existing consumer entity relationship; and

(d) follow up responses and follow up replies related to said particular consumer entity.

18. The method of claim 1, wherein each of said communications and replies includes one or more response options.

19. The method of claim 18, further comprising:

receiving a response containing information or a request not corresponding to any of said response options; and automatically processing said response.

20. The method of claim 18, wherein said one or more response options include at least one of:

(a) a purchase option;

(b) a request for additional information option; and

(c) a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

21. The method of claim 1, further comprising:

(a) automatically preparing and delivering a follow up reply or communication to a consumer entity after a predetermined period.

22. The method of claim 21, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

23. The method of claim 1, wherein said delivering step comprises:

delivering a given reply using at least one of a human operator and voice recognition and response technology.

24. The method of claim 1, wherein said receiving step comprises:

receiving a given response using at least one of electronic means and non-electronic means.

25. The method of claim 1, wherein the receiving step comprises at least one of (a)–(d):

(a) receiving at least some responses individually;

(b) receiving at least some responses en mass;

(c) receiving at least some responses in batches at intervals; and

(d) receiving at least some responses in real-time.

26. The method of claim 1, wherein said receiving step comprises at least one of (a)–(d):

(a) receiving at least some responses via telephone;

(b) receiving at least some responses via fax;

(c) receiving at least some responses via a branch drop off; and

US 6,999,938 B1

<table>
<tr><td>

**37**

(d) receiving at least some responses via consumer interaction with a salesperson.

27. The method of claim 1, wherein said receiving step comprises:

receiving at least some responses via consumer interaction with an Internet web site.

28. The method of claim 1, wherein said receiving step comprises:

receiving at least some responses via email.

29. The method of claim 1, further comprising at least one of (a)–(d):

(a) processing at least some responses individually;

(b) processing at least some responses en mass;

(c) processing at least some responses in batches at intervals; and

(d) processing at least some responses in real-time.

30. The method of claim 1, wherein said delivering step comprises at least one of (a)–(d):

(a) delivering at least some of said replies individually;

(b) delivering at least some of said replies en mass;

(c) delivering at least some of said replies in batches at intervals; and

(d) delivering at least some of said replies in real-time.

31. The method of claim 1, wherein the generating step comprises at least one of (a)–(b):

(a) preparing at least some of said replies in real-time via real-time processing of associated responses; and

(b) preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

32. The method of claim 1, wherein at least some of said replies are delivered via the Internet.

33. The method of claim 1, wherein communications are made available to consumer entities via at least one of (a)–(h):

(a) combining at last some of said communications with hosts;

(b) direct mail;

(c) platform sales track format;

(d) salespersons;

(e) an Internet website;

(f) email;

(g) voice response technology; and

(h) a print medium.

34. The method of claim 1, wherein the generating step comprises:

automatically analyzing said responses; and

preparing said replies in accordance with said analysis.

35. The method of claim 1, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

36. The method of claim 1, further comprising:

preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;

wherein said generating step comprises:

preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

37. The method of claim 1, further comprising:

preparing one or more replies each comprising information requested by a corresponding response.

</td><td>

**38**

38. The method of claim 1, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

39. The method of claim 1, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

40. The method of claim 1, further comprising at least one of (a)–(d):

(a) preparing at least some replies individually;

(b) preparing at least some replies en mass;

(c) preparing at least some replies in batches at intervals; and

(d) preparing at least some replies in real-time.

41. A method for automatically (i) preparing customized communications for a plurality of consumer entities, and (ii) replying to responses from consumer entities with customized replies, the method comprising:

automatically selecting variable information related to an offering for one or more financial products or services, or related to a consumer entity, and automatically inserting the variable information into a mass marketing communication, said communication comprising an offering for one or more financial products or services being offered as part of a mass marketing campaign;

appending each communication to a separate host communication to form a plurality of combined communications;

delivering each combined communication to a respective one of the plurality of consumer entities;

receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to combined communications;

automatically generating one or more replies to at least some of the responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

delivering the replies to associated consumer entities.

42. The method of claim 41, wherein the communications each comprises information about a financial product or a financial service.

43. The method of claim 41, wherein each response comprises a unique label.

44. The method of claim 43, wherein the unique label is machine readable.

45. The method of claim 41, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

46. The method of claim 41, further comprising inputting response option information into an automated reply generation system comprising a programmed computer.

</td></tr>
</table>

US 6,999,938 B1

**39**

47. The method of claim 46, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

48. The method of claim 41, wherein the delivering of the replies comprises delivery by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

49. The method of claim 41, further comprising:
receiving follow up responses each with client identifications from clients to whom a prepared reply was delivered.

50. The method of claim 49, further comprising:
inputting the follow up responses into an automatic reply generation system, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

51. The method of claim 50, further comprising:
continuing a sequence of receiving follow up responses, automatically preparing replies using the automatic reply generation system, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

52. A method for automatically preparing customized communications for a plurality of consumer entities, and replying to responses from consumer entities with customized replies, the method comprising:
automatically preparing a mass marketing customized communication for each consumer entity, said communication comprising information relating to an offering for one or more financial products or services being offered as part of a mass marketing campaign;
delivering each communication to a respective one of the plurality of consumer entities;
receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to communications;
automatically generating one or more replies for at least some of the responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and
delivering said replies to associated consumer entities.

53. The method of claim 52, wherein each response comprises a label.

54. The method of claim 53, wherein the label is machine readable.

55. The method of claim 52, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

56. The method of claim 52, further comprising inputting response option information into an automated reply generation system comprising a programmed computer.

57. The method of claim 56, wherein the generating of a reply comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

**40**

58. The method of claim 52, wherein the delivering of the replies comprises delivery by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

59. The method of claim 52, further comprising:
receiving follow up responses each with client identifications from clients to whom a prepared reply was delivered.

60. The method of claim 59, further comprising:
inputting the follow up responses into an automatic reply generation system, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

61. The method of claim 60, further comprising:
continuing a sequence of receiving follow up responses, automatically preparing replies using the automatic reply generation system, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

62. The method of claim 52, further comprising:
determining variable information related to an offering for one or more financial products or services, or related to a given consumer entity; and
inserting said variable information into a customized communication for said given consumer entity.

63. The method of claim 52, wherein each communication comprises information about a financial product or financial service.

64. The method of claim 52, wherein each response comprises a unique label.

65. The method of claim 64, wherein the unique label of each response comprises a machine readable label.

66. The method of claim 52, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

67. The method of claim 52, further comprising the step of inputting response option information into an automated reply generation system.

68. The method of claim 67, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

69. The method of claim 52, wherein the delivering of the replies comprises delivery by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

70. The method of claim 52, further comprising:
receiving follow up responses each with client identifications from consumer entities to whom a prepared reply was delivered.

71. The method of claim 70, further comprising:
inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

72. The method of claim 70, further comprising:
continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

US 6,999,938 B1

| 41 | 42 |

73. The method of claim 52, wherein the second delivering step comprises:

selecting one or more delivery mediums to deliver a given reply to a corresponding consumer entity.

74. The method of claim 73, wherein each delivery medium is at least one of:

electronic; and

non-electronic.

75. The method of claim 73, wherein the selecting step comprises:

selecting said one or more delivery mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

76. The method of claim 52, further comprising:

continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

77. The method of claim 76, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

78. The method of claim 76, wherein said continuing step comprises:

preparing each follow up reply based on at least one of:

information obtained in the past from a consumer entity;

information purchased from a third party;

information obtained via an existing consumer entity relationship; and

follow up responses and follow up replies related to said particular consumer entity.

79. The method of claim 52, wherein each of said communications and replies includes one or more response options.

80. The method of claim 79, further comprising:

receiving a response containing information or a request not corresponding to any of said response options; and

automatically processing said response.

81. The method of claim 79, wherein said one or more response options include at least one of:

a purchase option;

a request for additional information option; and

a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

82. The method of claim 52, further comprising:

(a) automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

83. The method of claim 82, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

84. The method of claim 52, wherein said second delivering step comprises:

delivering a given reply using at least one of a human operator and voice recognition and response technology.

85. The method of claim 52, wherein said receiving step comprises:

receiving a given response using at least one of electronic means and non-electronic means.

86. The method of claim 52, wherein the receiving step comprises at least one of:

receiving at least some responses individually;

receiving at least some responses en mass;

receiving at least some responses in batches at intervals; and

receiving at least some responses in real-time.

87. The method of claim 52, wherein said receiving step comprises at least one of:

receiving at least some responses via telephone;

receiving at least some responses via fax;

receiving at least some responses via a branch drop off; and

receiving at least some responses via consumer interaction with a salesperson.

88. The method of claim 52, wherein said receiving step comprises:

receiving at least some responses via consumer interaction with an Internet web site.

89. The method of claim 52, wherein said receiving step comprises:

receiving at least some responses via email.

90. The method of claim 52, further comprising at least one of:

processing at least some responses individually;

processing at least some responses en mass;

processing at least some responses in batches at intervals; and

processing at least some responses in real-time.

91. The method of claim 52, wherein said second delivering step comprises at least one of:

delivering at least some of said replies individually;

delivering at least some of said replies en mass;

delivering at least some of said replies in batches at intervals; and

delivering at least some of said replies in real-time.

92. The method of claim 52, wherein the generating step comprises at least one of:

preparing at least some of said replies in real-time via real-time processing of associated responses; and

preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

93. The method of claim 52, wherein at least some of said replies are delivered via the Internet.

94. The method of claim 52, wherein communications are made available to consumer entities via at least one of:

combining at last some of said communications with hosts;

direct mail;

platform sales track format;

salespersons;

an Internet website;

email;

voice response technology; and

a print medium.

95. The method of claim 52, wherein the generating step comprises:

automatically analyzing said responses; and

preparing said replies in accordance with said analysis.

96. The method of claim 52, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

Case 1:07-cv-99999    Document 2619-6    Filed 04/16/2008    Page 56 of 65

US 6,999,938 B1

43

44

**97.** The method of claim 52, further comprising:

preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;

wherein said generating step comprises:

preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

**98.** The method of claim 52, further comprising:

preparing one or more replies each comprising information requested by a corresponding response.

**99.** The method of claim 52, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

**100.** The method of claim 52, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

**101.** A system for automatically preparing a reply to a response, comprising:

means for automatically analyzing information pertinent to consumer entities who responded to marketing communications relating to offerings for one or more financial products or services, said marketing communications being part of a marketing campaign, where responses from said consumer entities comprise non-purchase requests;

means for automatically generating one or more replies for at least some of said consumer entities based on said analysis, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity, each of said replies specific to one of said responses or a subsequent response; and

means for communicating the replies to associated consumer entities.

**102.** The system of claim 101, further comprising labeling the replies to correspond to the responses.

**103.** The system of claim 101, wherein each communication comprises information about a financial product or financial service.

**104.** The system of claim 101, wherein each response comprises a unique label.

**105.** The system of claim 104, wherein the unique label of each response comprises a machine readable label.

**106.** The system of claim 101, further comprising:

means for receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

**107.** The system of claim 101, further comprising:

means for inputting response option information into an automated reply generation system.

**108.** The system of claim 107, further comprising:

means for analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

**109.** The system of claim 101, wherein said communicating means comprises means for delivering replies by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

**110.** The system of claim 101, further comprising:

means for receiving follow up responses each with client identifications from customer entities to whom a prepared reply was delivered.

**111.** The system of claim 110, further comprising:

means for inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

**112.** The system of claim 110, further comprising:

continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

**113.** The system of claim 101, wherein the communicating means comprises:

means for selecting one or more delivery mediums to deliver a given reply to a corresponding consumer entity.

**114.** The system of claim 113, wherein each delivery medium is at least one of:

electronic; and

non-electronic.

**115.** The system of claim 113, wherein the selecting means comprises:

means for selecting said one or more delivery mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

**116.** The system of claim 101, further comprising:

means for continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

**117.** The system of claim 116, wherein said continuing means operates for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

**118.** The system of claim 116, wherein said continuing means comprises:

means for preparing each follow up reply based on at least one of:

information obtained in the past from a consumer entity;

information purchased from a third party;

information obtained via an existing consumer entity relationship; and

follow up responses and follow up replies related to said particular consumer entity.

**119.** The system of claim 101, wherein each of said communications and replies includes one or more response options.

**120.** The system of claim 119, further comprising:

means for receiving a response containing information or a request not corresponding to any of said response options; and

means for automatically processing said response.

US 6,999,938 B1

45

121. The system of claim 119, wherein said one or more response options include at least one of:

a purchase option;

a request for additional information option; and

a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

122. The system of claim 101, further comprising:

means for automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

123. The system of claim 122, wherein said generating and delivering means operates based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

124. The system of claim 101, wherein said communicating means comprises:

means for delivering a given reply using at least one of a human operator and voice recognition and response technology.

125. The system of claim 101, further comprising:

means for receiving a given response using at least one of electronic means and non-electronic means.

126. The system of claim 101, further comprising at least one of:

means for receiving at least some responses individually;

means for receiving at least some responses en mass;

means for receiving at least some responses in batches at intervals; and

means for receiving at least some responses in real-time.

127. The system of claim 101, further comprising at least one of:

means for receiving at least some responses via telephone;

means for receiving at least some responses via fax;

means for receiving at least some responses via a branch drop off; and

means for receiving at least some responses via consumer interaction with a salesperson.

128. The system of claim 101, further comprising:

means for receiving at least some responses via consumer interaction with an Internet web site.

129. The system of claim 101, further comprising:

means for receiving at least some responses via email.

130. The system of claim 101, further comprising at least one of:

means for processing at least some responses individually;

means for processing at least some responses en mass;

means for processing at least some responses in batches at intervals; and

means for processing at least some responses in real-time.

131. The system of claim 101, wherein said communicating means comprises at least one of:

means for delivering at least some of said replies individually;

means for delivering at least some of said replies en mass;

means for delivering at least some of said replies in batches at intervals; and

means for delivering at least some of said replies in real-time.

132. The system of claim 101, wherein the generating means comprises at least one of:

means for preparing at least some of said replies in real-time via real-time processing of associated responses; and

46

means for preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

133. The system of claim 101, wherein at least some of said replies are delivered via the Internet.

134. The system of claim 101, wherein communications are made available to consumer entities via at least one of:

combining at last some of said communications with hosts;

direct mail;

platform sales track format;

salespersons;

an Internet website;

email;

voice response technology; and

a print medium.

135. The system of claim 101, wherein the generating means comprises:

means for automatically analyzing said responses; and

means for preparing said replies in accordance with said analysis.

136. The system of claim 101, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

137. The system of claim 101, further comprising:

means for preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;

wherein said generating means comprises:

means for preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

138. The system of claim 101, further comprising:

means for preparing one or more replies each comprising information requested by a corresponding response.

139. The system of claim 101, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

140. The system of claim 101, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

141. A method for automatically preparing customized replies to responses to communications to one or more consumer entities, comprising:

receiving one or more responses to marketing communications from one or more consumer entities, said communications relating to offerings for one or more financial products or services and being part of a marketing campaign, said responses comprising nonpurchase requests;

automatically generating one or more replies to at least some of said responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said marketing campaign, each reply customized for a consumer entity using other than one or more

US 6,999,938 B1

47

of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity;

communicating said replies to consumer entities who sent the corresponding responses;

receiving one or more follow up responses based on the replies from a plurality of consumer entities; and

automatically generating and communicating one or more follow up replies to at least some of said follow up responses, said follow up replies being customized for consumer entities who sent said follow up responses, until for a given consumer entity follow up replies generate no further follow up responses, or it is determined that no follow up reply is needed.

142. The method of claim 141, wherein each communication, response from each communication, and reply in each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

143. The method of claim 142, wherein the label is machine readable.

144. The method of claim 141, wherein each communication is based on at least one of variable information about a consumer entity to whom each is respectively addressed and variable information about a product or service offering.

145. The method of claim 141, wherein each communication contains at least one of variable information about the consumer entity to whom it is addressed, and variable information about a product or service offering.

146. The method of claim 141, wherein each communication comprises information about a financial product or financial service.

147. The method of claim 141, wherein each response comprises a unique label.

148. The method of claim 147, wherein the unique label of each response comprises a machine readable label.

149. The method of claim 141, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

150. The method of claim 141, further comprising the step of inputting response option information into an automated reply generation system.

151. The method of claim 150, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

152. The method of claim 141, wherein the communication of the replies comprises communicating by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

153. The method of claim 141, further comprising:

receiving follow up responses each with client identifications from consumer entities to whom a prepared reply was delivered.

154. The method of claim 153, further comprising:

inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

155. The method of claim 153, further comprising:

continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

48

ing step comprises:

selecting one or more mediums to communicate a given reply to a corresponding consumer entity.

157. The method of claim 156, wherein the selecting step comprises:

selecting said one or more communication mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

158. The method of claim 156, wherein each medium is at least one of:

electronic; and

non-electronic.

159. The method of claim 141, further comprising:

continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

160. The method of claim 159, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

161. The method of claim 159, wherein said continuing step comprises:

preparing each follow up reply based on at least one of:

information obtained in the past from a consumer entity;

information purchased from a third party;

information obtained via an existing consumer entity relationship; and

follow up responses and follow up replies related to said particular consumer entity.

162. The method of claim 141, wherein each of said communications and replies includes one or more response options.

163. The method of claim 162, further comprising:

receiving a response containing information or a request not corresponding to any of said response options; and

automatically processing said response.

164. The method of claim 162, wherein said one or more response options include at least one of:

a purchase option;

a request for additional information option; and

a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

165. The method of claim 141, further comprising:

(a) automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

166. The method of claim 165, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

167. The method of claim 166, wherein said communicating step comprises:

communicating a given reply using at least one of a human operator and voice recognition and response technology.

168. The method of claim 166, wherein said receiving step comprises:

receiving a given response using at least one of electronic means and non-electronic means.

156. The method of claim 141, wherein the communicat-

Case 1:07-cv-99999   Document 2619-6   Filed 04/16/2008   Page 50 of 65

US 6,999,938 B1

49

169. The method of claim 166, wherein the receiving step comprises at least one of:
receiving at least some responses individually;
receiving at least some responses en mass;
receiving at least some responses in batches at intervals; and
receiving at least some responses in real-time.

170. The method of claim 166, wherein said receiving step comprises at least one of:
receiving at least some responses via telephone;
receiving at least some responses via fax;
receiving at least some responses via a branch drop off; and
receiving at least some responses via consumer interaction with a salesperson.

171. The method of claim 141, wherein said receiving step comprises:
receiving at least some responses via consumer interaction with an Internet web site.

172. The method of claim 141, wherein said receiving step comprises:
receiving at least some responses via email.

173. The method of claim 141, further comprising at least one of:
processing at least some responses individually;
processing at least some responses en mass;
processing at least some responses in batches at intervals; and
processing at least some responses in real-time.

174. The method of claim 141, wherein said communicating step comprises at least one of:
communicating at least some of said replies individually;
communicating at least some of said replies en mass;
communicating at least some of said replies in batches at intervals; and
communicating at least some of said replies in real-time.

175. The method of claim 141, wherein the generating step comprises at least one of:
preparing at least some of said replies in real-time via real-time processing of associated responses; and
preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

176. The method of claim 141, wherein at least some of said replies are delivered via the Internet.

177. The method of claim 141, wherein communications are made available to consumer entities via at least one of:
combining at last some of said communications with hosts;
direct mail;
platform sales track format;
salespersons;
an Internet website;
email;
voice response technology; and
a print medium.

178. The method of claim 141, wherein the generating step comprises:
automatically analyzing said responses; and
preparing said replies in accordance with said analysis.

179. The method of claim 141, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

50

180. The method of claim 141, further comprising:
preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;
wherein said generating step comprises:
preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

181. The method of claim 141, further comprising:
preparing one or more replies each comprising information requested by a corresponding response.

182. The method of claim 141, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

183. The method of claim 141, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

184. A method for marketing of financial products and services, comprising:
selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering;
automatically preparing marketing communications comprising offerings for said particular type of financial product or service or variant thereof to said selected consumer entities, said communications being part of a marketing campaign;
communicating said communications to said selected consumer entities;
receiving responses to said communications from at least some of said selected consumer entities, said responses comprising nonpurchase requests;
automatically generating replies to at least some of the responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said particular type of financial product or service or variant thereof, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and
communicating said replies to associated consumer entities.

185. The method of claim 184, further comprising:
receiving follow up responses to prepared replies from respective consumer entities;
automatically preparing follow up replies to follow up responses using a programmed computer; and
communicating the follow up replies to respective consumer entities.

186. The method of claim 185, further comprising:
continuing a cycle of receiving follow up response, preparing follow up replies and communicating follow up replies, until no further follow up reply is required, or no follow up response is received.

187. The method of claim 186, wherein each communication, and reply to a particular client, and response from the particular consumer entity comprises a machine-readable label.

US 6,999,938 B1

51

188. The method of claim 184, wherein each communication comprises information about a financial product or financial service.

189. The method of claim 184, wherein each response comprises a unique label.

190. The method of claim 189, wherein the unique label of each response comprises a machine readable label.

191. The method of claim 184, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

192. The method of claim 184, further comprising the step of inputting response option information into an automated reply generation system.

193. The method of claim 192, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

194. The method of claim 184, wherein the communication of the replies comprises communication by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

195. The method of claim 184, further comprising: receiving follow up responses each with client identifications from consumer entities to whom a prepared reply was delivered.

196. The method of claim 195, further comprising: inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

197. The method of claim 195, further comprising: continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

198. The method of claim 184, wherein the communicating step comprises: selecting one or more delivery mediums to communicate a given reply to a corresponding consumer entity.

199. The method of claim 198, wherein each communication medium is at least one of: electronic; and non-electronic.

200. The method of claim 198, wherein the selecting step comprises: selecting said one or more mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

201. The method of claim 184, further comprising: continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

202. The method of claim 201, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

203. The method of claim 201, wherein said continuing step comprises: preparing each follow up reply based on at least one of: information obtained in the past from a consumer entity; information purchased from a third party;

52

information obtained via an existing consumer entity relationship; and follow up responses and follow up replies related to said particular consumer entity.

204. The method of claim 184, wherein each of said communications and replies includes one or more response options.

205. The method of claim 204, further comprising: receiving a response containing information or a request not corresponding to any of said response options; and automatically processing said response.

206. The method of claim 204, wherein said one or more response options include at least one of: a purchase option; a request for additional information option; and a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

207. The method of claim 184, further comprising: (a) automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

208. The method of claim 207, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

209. The method of claim 184, wherein said communicating step comprises: communicating a given reply using at least one of a human operator and voice recognition and response technology.

210. The method of claim 184, wherein said receiving step comprises: receiving a given response using at least one of electronic means and non-electronic means.

211. The method of claim 184, wherein the receiving step comprises at least one of: receiving at least some responses individually; receiving at least some responses en mass; receiving at least some responses in batches at intervals; and receiving at least some responses in real-time.

212. The method of claim 184, wherein said receiving step comprises at least one of: receiving at least some responses via telephone; receiving at least some responses via fax; receiving at least some responses via a branch drop off; and receiving at least some responses via consumer interaction with a salesperson.

213. The method of claim 184, wherein said receiving step comprises: receiving at least some responses via consumer interaction with an Internet web site.

214. The method of claim 184, wherein said receiving step comprises: receiving at least some responses via email.

215. The method of claim 184, further comprising at least one of: processing at least some responses individually; processing at least some responses en mass; processing at least some responses in batches at intervals; and processing at least some responses in real-time.

US 6,999,938 B1

**53**

216. The method of claim 184, wherein said communicating step comprises at least one of:
communicating at least some of said replies individually;
communicating at least some of said replies en masse;
communicating at least some of said replies in batches at intervals; and
communicating at least some of said replies in real-time.

217. The method of claim 184, wherein the generating step comprises at least one of:
preparing at least some of said replies in real-time via real-time processing of associated responses; and
preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

218. The method of claim 184, wherein at least some of said replies are communicated via the Internet.

219. The method of claim 184, wherein communications are made available to consumer entities via at least one of:
combining at last some of said communications with hosts;
direct mail;
platform sales track format;
salespersons;
an Internet website;
email;
voice response technology; and
a print medium.

220. The method of claim 184, wherein the generating step comprises:
automatically analyzing said responses; and
preparing said replies in accordance with said analysis.

221. The method of claim 184, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

222. The method of claim 184, further comprising:
preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;
wherein said generating step comprises:
preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

223. The method of claim 184, further comprising:
preparing one or more replies each comprising information requested by a corresponding response.

224. The method of claim 184, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

225. The method of claim 184, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

226. A method for automatically preparing customized replies, comprising:
receiving responses to mass marketing communications from a plurality of consumer entities, said communications relating to offerings for one or more financial products or services, wherein at least some of said

**54**

communications are accessible via the Internet, said responses comprising nonpurchase requests;
automatically generating replies to at least some of said responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and
communicating said replies to consumer entities who sent the associated responses.

227. The method of claim 226, wherein each reply is incorporated into a host communication.

228. The method of claim 226, wherein said communication comprises information about a financial product or financial service.

229. The method of claim 226, wherein each response comprises a unique label.

230. The method of claim 229, wherein the unique label of each response comprises a machine readable label.

231. The method of claim 226, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

232. The method of claim 226, further comprising the step of inputting response option information into an automated reply generation system.

233. The method of claim 232, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

234. The method of claim 226, wherein the communication of the replies comprises communication by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

235. The method of claim 226, further comprising:
receiving follow up responses each with client identifications from consumer entities to whom a prepared reply was delivered.

236. The method of claim 235, further comprising:
inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

237. The method of claim 201, further comprising:
continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

238. The method of claim 226, wherein the communicating step comprises:
selecting one or more mediums to communicate a given reply to a corresponding consumer entity.

239. The method of claim 238, wherein each medium is at least one of:
electronic; and
non-electronic.

240. The method of claim 238, wherein the selecting step comprises:
selecting said one or more mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

US 6,999,938 B1

**55**

241. The method of claim 226, further comprising:
continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

242. The method of claim 241, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

243. The method of claim 241, wherein said continuing step comprises:
preparing each follow up reply based on at least one of:
information obtained in the past from a consumer entity;
information purchased from a third party;
information obtained via an existing consumer entity relationship; and
follow up responses and follow up replies related to said particular consumer entity.

244. The method of claim 226, wherein each of said communications and replies includes one or more response options.

245. The method of claim 244, further comprising:
receiving a response containing information or a request not corresponding to any of said response options; and
automatically processing said response.

246. The method of claim 244, wherein said one or more response options include at least one of:
a purchase option;
a request for additional information option; and
a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

247. The method of claim 226, further comprising:
(a) automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

248. The method of claim 247, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

249. The method of claim 226, wherein said communicating step comprises:
communicating a given reply using at least one of a human operator and voice recognition and response technology.

250. The method of claim 226, wherein said receiving step comprises:
receiving a given response using at least one of electronic means and non-electronic means.

251. The method of claim 226, wherein the receiving step comprises at least one of:
receiving at least some responses individually;
receiving at least some responses en mass;
receiving at least some responses in batches at intervals; and
receiving at least some responses in real-time.

252. The method of claim 226, wherein said receiving step comprises at least one of:
receiving at least some responses via telephone;
receiving at least some responses via fax;
receiving at least some responses via a branch drop off; and

**56**

receiving at least some responses via consumer interaction with a salesperson.

253. The method of claim 226, wherein said receiving step comprises:
receiving at least some responses via consumer interaction with an Internet web site.

254. The method of claim 226, wherein said receiving step comprises:
receiving at least some responses via email.

255. The method of claim 226, further comprising at least one of:
processing at least some responses individually;
processing at least some responses en mass;
processing at least some responses in batches at intervals; and
processing at least some responses in real-time.

256. The method of claim 226, wherein said communicating step comprises at least one of:
communicating at least some of said replies individually;
communicating at least some of said replies en mass;
communicating at least some of said replies in batches at intervals; and
communicating at least some of said replies in real-time.

257. The method of claim 226, wherein the generating step comprises at least one of:
preparing at least some of said replies in real-time via real-time processing of associated responses; and
preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

258. The method of claim 226, wherein at least some of said replies are delivered via the Internet.

259. The method of claim 226, wherein communications are made available to consumer entities via at least one of:
combining at last some of said communications with hosts;
direct mail;
platform sales track format;
salespersons;
an Internet website;
email;
voice response technology; and
a print medium.

260. The method of claim 226, wherein the generating step comprises:
automatically analyzing said responses; and
preparing said replies in accordance with said analysis.

261. The method of claim 226, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

262. The method of claim 226, further comprising:
preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;
wherein said generating step comprises:
preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

263. The method of claim 226, further comprising:
preparing one or more replies each comprising information requested by a corresponding response.

264. The method of claim 226, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer

US 6,999,938 B1

57

entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

265. The method of claim 226, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

266. A system for automatically preparing customized replies, the system comprising:

means for receiving one or more responses to mass marketing communications from one or more consumer entities, said communications relating to offerings for one or more financial products or services, wherein at least some of said communications are accessible via the Internet, said responses comprising nonpurchase requests;

means for automatically generating one or more replies to at least some of said responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

means for communicating said replies to associated consumer entities.

267. The system of claim 266, wherein each reply is incorporated into a host vehicle to form a combined communication.

268. A method for automatically preparing customized communications for consumer entities, and replying to responses from consumer entities with customized replies, the method comprising:

automatically preparing a plurality of customized mass marketing communications as part of a mass marketing campaign, each communication comprising information relating to an offering for one or more financial products or services;

appending each communication to a host communication to form a plurality of combined communications;

delivering each combined communication to a consumer entity;

receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to combined communications;

automatically generating one or more replies to at least some of the responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

delivering the replies to associated consumer entities.

269. The method of claim 268, wherein each communication comprises information about a financial product or financial service.

270. The method of claim 268, wherein each response comprises a unique label.

271. The method of claim 270, wherein the unique label of each response comprises a machine readable label.

58

272. The method of claim 268, wherein the receiving of responses comprises receiving responses by at least one of mail, telephone, facsimile, hand, the internet, electronically, and non-electronically.

273. The method of claim 268, further comprising the step of inputting response option information into an automated reply generation system.

274. The method of claim 273, wherein the generating of replies comprises analyzing the response option information and selecting or formulating a reply appropriate to said response option information.

275. The method of claim 268, wherein the delivering of the replies comprises delivery by at least one of mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically.

276. The method of claim 268, further comprising:

receiving follow up responses each with client identification from consumer entities to whom a prepared reply was delivered.

277. The method of claim 276, further comprising:

inputting the follow up responses, and preparing follow up replies automatically to the follow up responses, each follow up reply comprising an identifying label corresponding with the response to which it replies.

278. The method of claim 276, further comprising:

continuing a sequence of receiving follow up responses, automatically preparing replies, and delivering of follow up replies until at least one of (1) no further follow up replies are required, and (2) until no further response is received responsive to a follow up reply.

279. The method of claim 268, wherein the second delivering step comprises:

selecting one or more delivery mediums to deliver a given reply to a corresponding consumer entity.

280. The method of claim 279, wherein each delivery medium is at least one of:

electronic; and

non-electronic.

281. The method of claim 279, wherein the selecting step comprises:

selecting said one or more delivery mediums based on at least one of information related to said corresponding consumer entity and consumer entity preferences.

282. The method of claim 268, further comprising:

continuing, for a particular consumer entity, a sequence of receiving one or more follow up responses, followed by preparing and delivering one or more follow up replies corresponding to said one or more follow up responses.

283. The method of claim 282, wherein said continuing step is performed for said particular consumer entity until no further follow up responses are received from said particular consumer entity, or until it is determined that no further follow up replies are required for said particular consumer entity.

284. The method of claim 282, wherein said continuing step comprises:

preparing each follow up reply based on at least one of:

information obtained in the past from a consumer entity;

information purchased from a third party;

information obtained via an existing consumer entity relationship; and

follow up responses and follow up replies related to said particular consumer entity.

285. The method of claim 268, wherein each of said communications and replies includes one or more response options.

US 6,999,938 B1

59

286. The method of claim 285, further comprising:
receiving a response containing information or a request not corresponding to any of said response options; and automatically processing said response.

287. The method of claim 268, wherein said one or more response options include at least one of:
a purchase option;
a request for additional information option; and
a request for one or more additional quotations option, said quotations comprising at least one of a pricing quotation, a product or service design quotation, and an additional product or service quotation.

288. The method of claim 268, further comprising:
(a) automatically generating and delivering a follow up reply or communication to a consumer entity after a predetermined period.

289. The method of claim 288, wherein step (a) is performed based on at least one of a prior communication, a prior response, a prior reply, prior conversation information, and information from a database.

290. The method of claim 268, wherein said second delivering step comprise:
delivering a given reply using at least one of a human operator and voice recognition and response technology.

291. The method of claim 268, wherein said receiving step comprises:
receiving a given response using at least one of electronic means and non-electronic means.

292. The method of claim 268, wherein the receiving step comprises at least one of:
receiving at least some responses individually;
receiving at least some responses en mass;
receiving at least some responses in batches at intervals; and
receiving at least some responses in real-time.

293. The method of claim 268, wherein said receiving step comprises at least one of:
receiving at least some responses via telephone;
receiving at least some responses via fax;
receiving at least some responses via a branch drop off; and
receiving at least some responses via consumer interaction with a salesperson.

294. The method of claim 268, wherein said receiving step comprises:
receiving at least some responses via consumer interaction with an Internet web site.

295. The method of claim 268, wherein said receiving step comprises:
receiving at least some responses via email.

296. The method of claim 268, further comprising at least one of:
processing at least some responses individually;
processing at least some responses en mass;
processing at least some responses in batches at intervals; and
processing at least some responses in real-time.

297. The method of claim 268, wherein said second delivering step comprises at least one of:
delivering at least some of said replies individually;
delivering at least some of said replies en mass;
delivering at least some of said replies in batches at intervals; and
delivering at least some of said replies in real-time.

60

298. The method of claim 268, wherein the generating step comprises at least one of:
preparing at least some of said replies in real-time via real-time processing of associated responses; and
preparing at least some of said replies in a non-real-time mode after accumulation of a plurality of responses.

299. The method of claim 268, wherein at least some of said replies are delivered via the Internet.

300. The method of claim 268, wherein communications are made available to consumer entities via at least one of:
combining at last some of said communications with hosts;
direct mail;
platform sales track format;
salespersons;
an Internet website;
email;
voice response technology; and
a print medium.

301. The method of claim 268, wherein the generating step comprises:
automatically analyzing said responses; and
preparing said replies in accordance with said analysis.

302. The method of claim 268, wherein each reply for a given consumer entity includes one or more response options, wherein said response options are based on at least one of previous responses, replies related to said given consumer entity, and information related to said given consumer entity from a database.

303. The method of claim 268, further comprising:
preparing a financial product or financial service specific for a given consumer entity based on information related to said given consumer entity;
wherein said generating step comprises:
preparing a reply for said given consumer entity, said reply customized for said given consumer entity and comprising an offering for said specific financial product or financial service.

304. The method of claim 268, further comprising:
preparing one or more replies each comprising information requested by a corresponding response.

305. The method of claim 268, wherein each reply comprises consumer entity-customized content that comprises at least one of customized content related to said consumer entity, customized content related to a financial product or service being offered to said consumer entity, and customized content related to an offering of a financial product or service to said consumer entity.

306. The method of claim 268, wherein each communication, response from each communication, and reply to each response is at least one of labeled and identified with consumer entity information to link each communication to its response, and each reply to its response.

307. The method of claim 268, further comprising:
determining variable information related to an offering for one or more financial products or services, or related to a given consumer entity; and
inserting said variable information into a customized communication for said given consumer entity.

308. A system for automatically preparing a reply to a response, comprising:
automatically analyzing information pertinent to consumer entities who responded to mass marketing communications relating to offerings for one or more financial products or services being offered as part of a mass marketing campaign, wherein responses from consumer entities comprise nonpurchase requests;

US 6,999,938 B1

**61**

automatically generating one or more replies for at least some of said consumer entities based on said analysis, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity, each of said replies specific to one of said responses or a subsequent response; and

communicating the replies to associated consumer entities.

309. A system for automatically preparing customized communications for consumer entities, and replying to responses from consumer entities with customized replies, comprising:

means for automatically preparing a plurality of customized mass marketing communications, each communication comprising information relating to an offering for one or more financial products or services being offered as part of a mass marketing campaign;

means for appending each communication to a host communication to form a plurality of combined communications;

means for delivering each combined communication to a consumer entity;

means for receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to combined communications;

means for automatically generating one or more replies to at least some of the responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

means for delivering the replies to associated consumer entities.

310. A system for automatically preparing customized communications for a plurality of consumer entities, and replying to responses from consumer entities with customized replies, comprising:

means for automatically preparing a customized mass marketing communication for each consumer entity, said communication comprising information relating to an offering for one or more financial products or services being offered as part of a mass marketing campaign;

means for delivering each communication to a respective one of the plurality of consumer entities;

means for receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to mass marketing communications;

means for automatically generating one or more replies for at least some of the responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign,

**62**

each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

means for delivering said replies to associated consumer entities.

311. A system for automatically preparing customized replies to responses to communications to one or more consumer entities, comprising:

means for receiving one or more responses to mass marketing communications from one or more consumer entities, said communications relating to offerings for one or more financial products or services being part of a mass marketing campaign, said responses comprising nonpurchase requests;

means for automatically generating one or more replies to at least some of said responses or subsequent responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more financial products or services being offered as part of said mass marketing campaign, each reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity;

means for communicating said replies to consumer entities who sent the responses;

means for receiving one or more follow up responses based on the replies from a plurality of consumer entities; and

means for automatically generating and communicating one or more follow up replies to at least some of said follow up responses, said follow up replies being customized for consumer entities who sent said follow up responses, until for a given consumer entity follow up replies generate no further follow up responses, or it is determined that no follow up reply is needed.

312. A system for marketing of financial products and services, comprising:

means for selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign;

means for automatically preparing mass marketing communications comprising offerings for said particular type of financial product or service or variant thereof to said selected consumer entities;

means for communicating said communications to said selected consumer entities;

means for receiving responses to said communications from at least some of said selected consumer entities, said responses comprising nonpurchase requests;

means for automatically generating replies to at least some of the responses, each of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said particular type of financial product or service or variant thereof using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and

means for communicating said replies to associated consumer entities.

* * * * *

# TAB B

## DECLARATION OF ANDREW B. WEISMAN

State of New York      )
          ss       )
Borough of Manhattan   )

I, Andrew B. Weisman, being first duly sworn on oath, hereby deposes and states as follows:

1.       I am employed by Morgan Stanley as the Executive Director of Risk & Insurance Management. I have personal knowledge of the facts stated herein and I am otherwise competent to testify.

2.       Discover Financial Services, Discover Bank, DFS Services LLC, and Discover Products Inc. (collectively "Discover") were subsidiaries of Morgan Stanley f/k/a Morgan Stanley Dean Witter & Co. In late 2001, the Dean Witter name was dropped and the company became Morgan Stanley.

3.       Morgan Stanley owned more than 50% of Discover ever since the two companies merged on February 5, 1997.

4.       As such, Discover is an insured under National Union policy No. BE 357-88-80, a renewal of policy No. BE 357-12-60, effective October 1, 1998, through October 1, 2001, and extended by endorsement through October 1, 2002. This Policy was issued by National Union to Morgan Stanley Dean Witter & Co. and all subsidiaries in which it owned more than 50%.

5.       Prior to being named as defendants in the lawsuit titled *Phoenix Licensing, LLC, et al. v. Chase Manhattan Mortgage Corp., et al.*, currently pending in the United States District Court for the Eastern District of Texas, Case No. 2:07-cv-387 (TJW/CE), Discover had no knowledge of a known loss that required reporting to National Union.

FURTHER AFFIANT SAYETH NOT.

_Andrew B. Weisman_
Andrew B. Weisman

SUBSCRIBED AND SWORN to
before me this 28th day
of June 2008.

By: _____
    Notary Public

Wendi L. Herman
Notary Public, State of New York
No. 02HE5070124
Qualifed in Suffolk County
Term Expires Dec. 9, 2011

2

# TAB C

 **Liberty Mutual™**

Marcia E. Rowell
Chief Examiner
100 Liberty Way
PO Box 1525
Dover NH 03820-1525
Telephone: (603) 749-2600 ext. 32150
Fax: (603) 742-0706

November 20, 2007

John C. Kline
Risk Manager
Discover Financial
2500 Lake Cook Rd.
Riverwoods, IL 60015-3851

RE: Phoenix Licensing, LLC, et al vs Discover Financial
      Claim: P001-061920-01

Dear Mr. Kline:

Liberty Mutual has reviewed the complaint filed in the United States District Court for the Eastern District of Texas by Phoenix Licensing, LLC ("Phoenix") and LPL Licensing, LLC ("LPL")(collectively "plaintiffs") against Discover Financial Services, LLC ("Discover,") and other defendants alleging patent infringement. Liberty Mutual has determined that the allegations of the complaint do not fall within the scope of the insurance afforded by Liberty Mutual commercial general liability policies issued to Morgan Stanley for the period of 10/01/01 to 10/04/07 under which Discover is a named insured, or policy number TB2-093186-047 issued by Liberty Mutual to Discover Financial Services, Inc. with effective dates of 06/30/07 to 6/30/08. Accordingly, as explained hereafter, Liberty Mutual declines to provide Discover with a defense or indemnification to the lawsuit filed by Phoenix and LPL.

The policies issued through 10/01/06 afford insurance pursuant to form NRD 207 RG R6 10 99 as amended by various endorsements. Policy number TB2-621-004305-186 issued to Morgan Stanley and policy number TB2-093186-047 issued to Discover afford insurance pursuant to coverage form CG 00 01 12 04. Due to the differences between the two types of coverage forms the policies will be addressed in two groups. The earlier policies that utilize form NRD 207 RG R6 10 99 will be addressed first.

Coverage A affords insurance for "bodily injury" and "property damage" caused by an "occurrence," defined as an accident. The term "bodily injury" is replaced in most of the policy by the term "personal injury." Phoenix and LPL are corporations and are not capable of sustaining "bodily injury." As will be discussed below, the complaint does not allege "personal injury." "Property damage" is defined in the policies as physical injury to tangible property, or loss of use of tangible property that has not been physically injured. The damages sought are economic in nature and therefore do not constitute "property damage."

The "bodily injury" or "property damage" must result from an "occurrence." Phoenix and LPL have alleged that Discover's patent infringement was willful. Such conduct does not qualify as an "occurrence." Liberty Mutual has no duty to defend or indemnify Discover under Coverage A as Phoenix and LPL do not seek to recover for "bodily injury" or "property damage" resulting from an "occurrence."

The insurance typically afforded for "personal and advertising injury" by Coverage B is deleted by the General Amendatory Endorsement (Occurrence Form). The endorsement replaces the term "bodily injury" with the term "personal injury" in most parts of the policy, and adds a new definition of "personal injury" which reads as follows:

"Personal injury" means:

    a. "Bodily injury", except for "bodily injury" arising out of injury within subdivision b. or c. of this definition;

    b. Injury, including consequential "bodily injury," to the feelings or reputation of a natural person; and

    c. Injury, including consequential "bodily injury," arising out of one or more of the following offenses:

        (1) False arrest, detention or imprisonment;

        (2) Malicious prosecution;

        (3) Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

        (4) Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

        (5) Oral or written publication, in any manner, of material that violates a person's right of privacy.

        (6) Emotional distress and humiliation.

Plaintiffs have not alleged "bodily injury" as included in subparagraph a. of the definition. As Phoenix and LPL are corporations, not natural persons, they cannot allege "personal injury" as defined in subparagraph b. Plaintiffs have not alleged any of the torts that are included in subparagraph c. of the definition of "personal injury." Phoenix and LPL have alleged that Discover has infringed upon their patents. They have not alleged "personal injury" as defined in the endorsement.

The policy contains an endorsement titled Coverage – Advertising Offense which adds insurance for "advertising injury." "Advertising injury" is defined in the endorsement as follows:

> "Advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> (1) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> (2) Oral or written publication of material that violates a person's right of privacy;
>
> (3) The use of another's advertising idea in your "advertisement"; or
>
> (4) Infringement upon another's copyright, trade dress or slogan in your "advertisement".

"Advertisement" means "a notice that is broadcast or published (in the print, broadcast or electronic media) to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."

Phoenix and LPL have alleged patent infringement, which is not among those offenses specifically named in the definition of "advertising injury." Additionally, exclusion a.(8) provides that the insurance afforded does not apply to "advertising injury" arising out of patent infringement or securities fraud that arises out of your "advertisement." Liberty Mutual has no duty to defend or indemnify Discover under the insurance afforded for "advertising injury."

The policies also contain a Customer Injury Endorsement. Phoenix and LPL are not customers of Discover, and so the insurance afforded by this endorsement has not been triggered.

In summary, Liberty Mutual has no duty to defend or indemnify Discover under the policies in effect through 10/01/06 as plaintiffs do not allege "bodily injury" or "property damage" caused by an "occurrence," "personal injury," "advertising injury" or "customer injury." The policies issued after 10/01/06 will now be addressed.

Coverage A affords insurance for "bodily injury" or "property damage" caused by an "occurrence." "Bodily injury" has been redefined by endorsement to mean bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time, and mental anguish, shock or humiliation arising out of such injury. There are no allegations of "bodily injury." "Property damage" is defined in the policies as physical injury to tangible property, or loss of use of tangible property that has not been physically injured. Phoenix and LPL have alleged economic loss that does not qualify as "property damage." "Occurrence" is defined as an accident, including continuous or repeated exposure to substantially the same harmful conditions. As was discussed above with regard to the other

policies, plaintiffs have not alleged an "occurrence." Liberty Mutual declines to provide Discover with a defense or indemnification under Coverage A.

Coverage B. affords insurance for "personal and advertising injury." This insurance is modified by endorsement LN 29 04 06 05. The revised definition of "personal and advertising injury" reads as follows:

"Personal and advertising injury" means:

1. injury, including consequential "bodily injury," to the feelings or reputation of a natural person, except injury arising out of:

   a. your "advertisement"; or

   b. publishing, broadcasting or telecasting done by or for you; or

2. injury, including consequential "bodily injury," arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy.

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

"Advertisement" is redefined in form LN 29 06 06 05 as follows:

"Advertisement" means a paid announcement that is broadcast or published in the print, broadcast or electronic media to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a.   Announcements that are published include material placed on the Internet or on similar electronic means of communications: and

b.   Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

As Phoenix and LPL are not natural persons they cannot sustain "personal and advertising injury" as defined in subparagraph 1. Additionally, plaintiffs have not alleged any of the offenses contained in subparagraph 2.

The intent not to provide insurance for claims of patent infringement is highlighted by exclusion i., which reads as follows:

This insurance does not apply to:

i.   Infringement of Copyright, Patent, Trademark or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in "your advertisement," of copyright, trade dress or slogan.

Liberty Mutual declines to provide Discover with a defense or indemnification under Coverage B. as Phoenix and LPL have not alleged "personal and advertising injury," and as any such claim would be excluded by exclusion i.

While we have attempted to address all of the coverage considerations related to this claim, Liberty Mutual reserves all rights under applicable law and the policy. This letter should in no way be construed as a waiver or estoppel of any of the possible coverage defenses afforded by the policy or applicable law. Please feel free to contact me if you have any questions.

Sincerely,

Marcia E. Rowell
Chief Examiner

CC:  Mr. Andrew B. Wesiman, ARM, CPCU
      Executive Director
      Morgan Stanley
      750 Seventh Ave, 33rd Fl
      New York, NY 10019

5

Mr. Anthony Pisciotta
Area Vice President – Claims
Arthur J. Gallagher
444 Madison Ave, 21ᵗ Floor
New York, NY 10022-6947

Val West – Liberty Mutual, via email

6

# TAB D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | |
|---|---|
| Case No. | SACV 08-00020-JVS (RNBx) |

Date   August 19, 2008

| | |
|---|---|
| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. |

| | | |
|---|---|---|
| Present: The Honorable | James V. Selna | |
| Karla J. Tunis | | Not Present |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:**   (IN CHAMBERS)
Order Denying Plaintiff's Motion for Summary Judgment (fld 6-23-08)

Order Granting Defendants' Motion for Summary Judgment (fld 6-23-08)

Plaintiff Hyundai Motor America ("Hyundai") filed a complaint against Defendants National Union Fire Insurance Company of Pittsburgh et al. (collectively "the Insurers") requesting declaratory relief on claims regarding the Insurers' duty to defend, right to control Hyundai's defense and duty to pay reasonable defense costs, and further, claiming that the Insurers breached the parties' insurance contract. Both parties now move for summary judgment on Hyundai's claims.

I.   BACKGROUND

Hyundai markets and distributes Hyundai-brand automobile and automotive parts in the United States. (Insurers' Statement of Genuine Issues ("Insurers' SGI") ¶ 1.) It maintains a website that offers a feature Hyundai refers to as the "build your own vehicle" ("BYO") feature. (See, Hyundai Mot. at 7.) The BYO feature allows visitors to navigate through a series of menu questions, select a personalized list of options on any given Hyundai automobile, and "ultimately configure a customized product proposal" for a vehicle meeting their criteria. (See id.) In similar fashion, the website also links to an electronic "parts catalog" that allows users to navigate through a series of menus and generate a customized proposal for any combination of automotive parts available on the site. (See, e.g. Declaration of James Erb ("Erb Decl.") ¶ 7.)

Hyundai purchased a series of "Personal Injury and Advertising Injury" policies ("the Policies") issued by the Insurers. The Policies state in relevant part:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | Date | August 19, 2008 |
|---|---|---|---|

| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. |
|---|---|

1.a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

1.b. The insurance applies to . . . "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services . . .

(Insurers' SGI ¶ 15.)

The policies further define an "Advertising injury" as an injury arising out of one or more of the following offenses:

. . .

c. Misappropriation of advertising ideas or style of doing business; or
d. Infringement of copyright, title or slogan

(Id. ¶ 16.)[1]

In August, 2005, Hyundai was named as a defendant in a patent infringement action, Orion IP, LLC vs. Mercedes-Benz USA, et al., (the "Orion action"). (Insurers' SGI ¶ 2.) In that case, Plaintiff Orion IP, LLC ("Orion") alleged that Hyundai infringed directly and indirectly on U.S. patents Nos. 6,615342 ("the '342 patent") and 5,367,626 ("the '627 patent") (collectively "Orion's patents"). (Id. ¶¶ 2-4.)

Orion's '342 patent is for an invention titled "Electronic Proposal Preparation System," and describes a "method embodied by a computerized system where a potential customer can build, through his or her answer to menu-driven questions, a customized product with a quoted purchase price." (Id. ¶¶ 3, 5, internal quotations omitted.) Orion's '627 patent claims an invention titled "Computer-Assisted Parts Sales Method," and describes a "method embodied by a computer system in which a user can obtain a customized parts proposal after navigating a series of questions tied to parts illustrations

---

[1] The parties concede that none of the other definitions for an "advertising injury" listed in the policy are relevant to this dispute.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | Date | August 19, 2008 |
|---|---|---|---|

| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. |
|---|---|

and parts-related information." (Id. ¶¶ 3, 9.) In the complaint filed in the Orion action, Orion alleges that Hyundai infringed on its patents by "methods practiced on its various websites . . . making and using supply chain methods, sales methods, sales systems, marketing methods, marketing systems and inventory systems covered by" Orion's patents. (Erb Decl., Ex.1, ¶¶ 34, 59.)

After being served with the Orion complaint, Hyundai tendered the summons and complaint to the Insurers, presumably requesting coverage under the "Advertising injury" portion of its policies. The Insurers claimed they had no duty to defend, however, because the Orion complaint did not allege any conduct described in the Policies' "enumerated offenses" and was therefore not a complaint for an advertising injury covered by the Policies.

Hyundai went on to defend the Orion action on its own, and the parties now dispute whether the Insurers had a duty to defend Hyundai in that action under the advertising injury portion of the Policies.

II.    LEGAL STANDARD

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If, and only if, the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. See id. at 322-23. If the non-moving party meets this burden, then the motion will be denied. Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits. Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | | Date | August 19, 2008 |
|---|---|---|---|---|
| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. | | | |

The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under.  See id. at 1137.

III.   DISCUSSION

A.   Claim One: Duty to Defend

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." Waller v. Truck Insurance Exchange, Inc., 11 Cal. 4th 1, 19 (1995); Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 276-77 (1966).  The insurer's duty to defend persists "until the insurer can demonstrate, by reference to undisputed facts, that *the claim cannot be covered.*" Ringler Associates Inc. v. Maryland Casualty Co., 80 Cal. App. 4th 1165, 1186 (Ct. App. 2000) (emphasis original).  Similarly, "where there is no possibility of coverage, there is no duty to defend." Waller, 11 Cal. 4th at 19.  Thus, "[i]n order to establish a duty to defend, an insured need only establish the existence of a potential for coverage; while to avoid the duty, the insurer must establish the *absence* of any such potential." Ringler Associates Inc., 80 Cal. App. 4th at 1186 (emphasis original).

The determination of "whether a particular policy provides a potential for coverage and a duty to defend" depends on "the principle that interpretation of an insurance policy is a question of law." Waller, 11 Cal. 4th at 18.  The general rules of contract interpretation apply to determinations of coverage under an insurance policy. Id.  "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." Medill v. Westport Ins. Corp., 143 Cal. App. 4th 819, 828 (Ct. App. 2006).

Courts determine "whether the insurer owes a duty to defend . . . in the first instance by comparing the allegations of the complaint with the terms of the policy." Waller, 11 Cal. 4th at 19.  However, courts are advised not to "designate the third party as the arbiter of the policy's coverage" by relying exclusively on "the pleaded word," but rather are instructed to "examine . . .the potential liability created by the suit." Gray, 65 Cal. 2d at 276.

Thus, for Hyundai to establish that the Insurers had a duty to defend it in the Orion action, it must show that it had a reasonable expectation of coverage under the Policies' "advertising injury" provisions.  This requires Hyundai to demonstrate that (1) it was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | | Date | August 19, 2008 |
|---|---|---|---|---|
| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. | | | |

"advertising" during the policy period when the alleged "advertising injury" occurred; (2) Orion's allegations created a potential for liability under of the Policies' covered offenses; and (3) a causal connection existed between the alleged injury and the "advertising." Hameid v. National Fire Insurance of Hartford, 31 Cal.4th 16, 22 (Cal. 2003).

      1.    Enumerated Offenses

Hyundai argues that the Orion suit created a potential for liability under the Policies' enumerated offense for "misappropriation of advertising ideas or style of doing business." In support of this argument, it claims that what the Orion complaint really alleges is not merely patent infringement, but rather, that "Hyundai misappropriated Orion's advertising ideas and style of doing business by using an interactive system to which Orion holds exclusive rights . . . [and which] was allegedly Orion's advertising idea." (Hyundai Mot. at 15.)

This claim is not tethered to any actual statement in the Orion complaint, and further, simply misstates the basis of the Orion action. Orion alleged only two claims against Hyundai, both of which were for patent infringement. (Erb Decl., Ex.1.) Accordingly, even if the Court accepts Hyundai's assertion that the inventions claimed in the Orion patents are actually inventions regarding "advertising ideas," the potential liability created by the suit is the same: regardless of the nature of the patent allegedly infringed, the only liability arising from the Orion suit is liability for patent infringement.[2]

---

[2] In its reply brief, Hyundai argues that even if the patents are not 'advertising ideas," they constitute a "style of doing business" and are therefore included in the Policies' definition of "advertising injuries." (Hyundai Reply at 8.) This argument has no merit. As the California Supreme Court stated in Hamedi, the term "style of doing business" in an "advertising injury" policy refers "to a company's comprehensive manner of operating." 31 Cal.4th at 22, Fn2. Hyundai has not alleged that the patents have anything to do with Orion's comprehensive manner of operating and therefore can not argue that the Orion complaint alleges an injury based on a misappropriation of Orion's style of doing business.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | Date | August 19, 2008 |
|---|---|---|---|

| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. |
|---|---|

For this reason, the Court does not agree that an "advertising injury" includes an injury caused by patent infringement, even if that injury occurs during the course of an advertising activity. This conclusion is buttressed by one of the Policies' additional definitions of an "advertising injury," which specifically includes the "infringement of copyright, title or slogan," but does not mention patent infringement. (Insurers' SGI ¶ 16.)

Further, had the Insurers meant to include patents as within the scope of potential intellectual property infringements encompassed as an "advertising injury", they could certainly have listed them in that definition. The fact that they chose not to do so implies that patent infringement, unlike copyrights, slogans or titles, is not an advertising injury regardless of the type of invention claimed in the patents at issue.[3]

Because patent infringement is not an "advertising injury" as defined by the Policies, Hyundai cannot demonstrate the Insurers had a duty to defend it in the Orion action.

2.    Causal Connection

As noted above, the Court's holding in Section III.A.1 compels a finding that the Insurers did not have a duty to defend Hyundai in the Orion action. As a separate and distinct basis for this ruling, however, the Court also finds that Hyundai is unable to demonstrate a causal connection between its advertising, and Orion's alleged injury.

As plainly stated in <u>Simply Fresh Fruit, Inc. v. the Continental Insurance Company</u>, 94 F.3d 1219, 1222 (9th Cir. 1996), the Ninth Circuit has previously held that, "as a matter of law, patent infringement cannot occur in the course of an insured's advertising activities." This is because the injury caused by patent infringement "has no causal connection to any advertising activities . . . because it [can occur] independent and

---

[3] Contrary to Hyundai's assertion, the fact that the Insurers later amended their policies to specifically <u>exclude</u> patent infringement from the definition of "advertising injury" does not demonstrate that they intended patent infringement to be included in that definition in their earlier policies. (Mot. at 15.)  Rather, it may just as easily supports the proposition that the Insurers never intended patent infringement to be included as an "advertising injury" in the first place.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | SACV 08-00020-JVS (RNBx) | Date | August 19, 2008 |
|---|---|---|---|

| Title | Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al. |
|---|---|

irrespective of any advertising" by the alleged infringer. Id.[4]

Here, it is clear that Hyundai could have infringed Orion's patents without ever advertising its product to consumers. For example, Hyundai could have used the same computer assisted, menu-driven system to generate proposals for its salespeople to use while selling cars at dealerships. (See, e.g. Erb Decl., Ex. 1, p. 91, '342 patent, 39:51 (claim 1 describes a "computer assisted method of generating a customized proposal for selling products to particular customers . . .").) This activity could still amount to infringement under claim 1 of the '342 patent, but would not amount to advertising activity. Accordingly, as in Simply Fresh, the Court must find that Orion's injury was caused by Hyundai's infringement of the Orion patents, rather than by Hyundai's advertising. The fact that such injury may have occurred while Hyundai was advertising its products is irrelevant.[5]

To the extent the Washington Court of Appeals reached a different result in Amazon.com International Inc. v. American Dynasty Surplus Lines Insurance Co., 120 Wash.App.610 (Wa. Ct. App. 2004), its decision is not binding on this Court, and further, contradicts the Ninth Circuit's holding in Simply Fresh.

Because Hyundai cannot demonstrate that patent infringement is an enumerated offense under the Policies' definition of "advertising injury" or that there is a causal connection between Orion's alleged injury and Hyundai's advertising, the Court finds

---

[4] Hyundai claims that the holding in Simply Fresh actually supports its position that Orion's injury was actually caused by Hyundai's advertising. (Hyundai's Opp'n at 25-25.) The Court disagrees that the broad language in Simply Fresh does anything other than preclude Hyundai's claim, regardless of the fact that the plaintiff in Simply Fresh was alleged to have infringed a patent that did not involve an advertising process.

[5] Because the holding in Simply Fresh is squarely on point, the dicta Hyundai cites from Iolab Corp. v. Seaboard Sur. Co, 15 F.3d 1500, 1507 n.5 (9th 1994), is simply not relevant to this Court's holding. (See Hyundai Mot. at 4 (acknowledging that the Ninth Circuit explicitly stated in Iolab that the issue of whether an advertising technique that is itself patented can be considered infringement arising out of or committed in advertising was not before the court).)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.  SACV 08-00020-JVS (RNBx)              Date  August 19, 2008

Title     Hyundai Motor America v. National Union Fire Insurance Co. of Pittsburgh, PA, et al.

that the Insurers did not have a duty to defend Hyundai in the Orion action.[6]

Accordingly, the Court grants summary judgment in favor of the Insurers and against Hyundai on Hyundai's first claim for relief.

B.      Remaining Claims

Because the Court finds that the Insurers did not have a duty to defend Hyundai in the Orion action, Hyundai cannot prevail on its remaining claims for declaratory relief regarding the right to control or duty to pay reasonable defense costs, or further, for the breach of contract claim premised on the duty to defend. Accordingly, summary judgment is appropriately awarded in favor of the Insurers and against Hyundai on all of Hyundai's remaining claims.

IV.    <u>CONCLUSION</u>

For the reasons noted above, the Court awards summary judgment in favor of the Insurers and denies Hyundai's motion for summary judgment.

|                       |  0  |  :  | 00 |
|-----------------------|-----|-----|-----|
| Initials of Preparer  | kjt |     |    |

---

[6] Accordingly, the Court need not decide whether the conduct engaged in (namely, the BYO feature and electronic parts catalogue featured on Hyundai's website) constitute "advertising" as defined by the relevant California authority.